## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION

                            Plaintiff,

      v.

                               Civil Action No. 1:08-cv-00244 (JDB)

CEPHALON, INC.

                            Defendant.

### FEDERAL TRADE COMMISSION'S OPPOSITION
### TO CEPHALON'S MOTION TO TRANSFER

Transfer and consolidation or coordination of the FTC's enforcement action with related private actions in Pennsylvania is contrary to public policy. That policy, embodied in the statute governing multidistrict litigation, 28 U.S.C. § 1407 (2000), rests on the public interest in expedited resolution of government antitrust actions that seek to stop ongoing anticompetitive conduct harming consumers. To further this public interest, Congress provided that government antitrust suits be afforded special status, to avoid the risk that coordinating or consolidating them with private antitrust actions might delay relief for the public. Cephalon dismisses the policy reflected in Section 1407 as being of "no relevance" here on the ground that its current motion seeks only transfer and the transferee court will decide whether to consolidate the cases. But the public interest that Congress sought to protect by exempting government antitrust actions from the multidistrict litigation rules is plainly implicated when a defendant tries to use a two-step process to circumvent that exemption.

Cephalon's motion is further undercut by the simple fact that the pending private antitrust damage actions to which it would tether the FTC's injunction case have been at a standstill for over a year, without any substantial proceedings having taken place. The prospect that transfer would delay the FTC's case is beyond dispute. Finally, even aside from the public interest in avoiding potential delay, Cephalon's attempt to demonstrate that private interests make transfer appropriate here falls far short of what the law requires.

## BACKGROUND

### A.    The FTC's case

The escalating cost of health care in the United States – and in particular, of prescription drugs – is a significant, national issue. The FTC's complaint seeks to enjoin an ongoing violation of the FTC Act that is contributing to the escalating prescription drug costs, and costing consumers hundreds of millions of dollars every year that it continues. The complaint charges that Cephalon engaged in a course of anticompetitive conduct to prevent the entry of low-cost generic products that would have competed with its flagship product, Provigil, a branded drug that had over $800 million in sales in the United States last year. Facing the threat of imminent entry by at least one of four generic drug makers that had challenged the only remaining patent on Provigil (a narrow patent relating to the size and distribution of particles of the active ingredient), Cephalon paid each of the companies to abandon its patent challenge and agree not to compete with Provigil until April 2012. This date – three years prior to expiration of the challenged patent – is some six years later than was likely to occur absent Cephalon's unlawful conduct.

There is a strong public interest in expediting the resolution of this case. The FTC is seeking a permanent injunction that, among other things, would bar Cephalon from maintaining

the provisions in its agreements with the generic challengers that prevent the sale of a generic version of Provigil.  If the entry restriction in those agreements is eliminated, generic versions of Provigil will be able to enter and compete.  Cephalon and the generic firms have predicted that generic versions of Provigil would be priced at 75 to 90 percent below the price of branded Provigil and would quickly capture the vast majority of Cephalon's sales.  Unnecessary delay in the prosecution of the FTC's case would be extremely costly for patients and those who purchase Provigil on their behalf.  Delay, however, is exactly what Cephalon expects – and is counting on – in order to preserve its Provigil monopoly.[1]

### B.    The private suits pending in the Eastern District of Pennsylvania

Although various private antitrust suits challenging Cephalon's agreements with the four generic companies were filed in 2006, after more than a year and a half, there has been no significant progress in these cases.  Declaration of Barry S. Taus ("Taus Decl.") ¶¶ 3, 8-10. Discovery has not even begun.  Taus Decl. ¶ 10.

The private cases are damage actions – most are class action suits – alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2 (2000).  Taus Decl. ¶ 7.  Rather than a single defendant (as in the FTC's case), there are five:  Cephalon and the four generic companies that were paid not to compete.  Taus Decl. ¶ 6.  The defendants all filed motions to dismiss the

---

[1]    Cephalon 8-K at 3 (filed March 23, 2007) (stating that a possible FTC challenge to Cephalon's patent litigation settlements "would take many years to resolve, and therefore [] the final resolution of this matter will not have a material adverse impact on [Cephalon's] business."), *available at* http://www.sec.gov/Archives/edgar/data/873364/000110465907021799/a07-8836_18k.htm (last visited March 6, 2008); *see also* Cephalon Q2 2006 earning call transcript at 21-22 (August 3, 2006) (statements to the same effect by Cephalon's CEO and General Counsel), *available at* http://seekingalpha.com/article/14976-cephalon-q2-2006-earnings-conference-call-transcript-cep h?page=-1 (last visited March 6, 2008).

complaints for failure to state a claim, and have refused to comply with plaintiffs' discovery requests while the dismissal motions are pending. Taus Decl. ¶¶ 8, 10. The dismissal motions contend that the private plaintiffs lack antitrust standing to maintain the suits. Taus Decl. ¶ 9. In addition, the defendants claim that mere possession of a patent, even though untested in the courts, provides a broad antitrust immunity that allows a patent holder with monopoly power to grant would-be competitors a share of the monopoly profits in exchange for a promise to stay off the market for the life of the patent.

Although briefing on the motions to dismiss was completed more than a year ago (in January 2007), oral argument has yet to be scheduled. Taus Decl. ¶ 8. Likewise, briefing on plaintiffs' motion to compel responses to discovery has been completed for over a year, but the motion remains unresolved. Taus Decl. ¶ 10. Cephalon suggests that the court in the Eastern District of Pennsylvania is already familiar with the issues raised by the FTC's case, but nothing in the proceedings in the private cases indicates that is so.

Thus, although the private damage suits were filed before the FTC's suit, these actions are far behind the FTC in trial preparation. The private damage actions were filed based on publicly available information after learning of Cephalon's agreements with the generic firms in early 2006. Taus Decl. ¶ 2. The FTC filed its case after an investigation that spanned a year and a half and included internal business documents from Cephalon and generic firms, as well as 24 investigational depositions. Declaration of Saralisa C. Brau ("Brau Decl.") ¶¶ 2, 5-6. The private plaintiffs have had no discovery. Indeed, they do not even have copies of the challenged agreements. Taus Decl. ¶ 10.

The private actions raise numerous complex issues that are irrelevant to the FTC's case but will require substantial time to resolve, for example: whether the various classes of plaintiffs

can establish antitrust standing; the correct calculation of damages; and the propriety of the

private plaintiffs' requests for certification of the various classes.[2]  Indeed, private antitrust suits

generally take far longer than government antitrust enforcement actions to resolve.[3]

## ARGUMENT

### I.    Congress has expressed a strong public policy against combining government antitrust enforcement actions with private antitrust suits

To protect the nation's consumers from ongoing injury caused by anticompetitive

conduct, Congress has determined that federal government antitrust law enforcement initiatives,

such as this current action, must be allowed to proceed expeditiously and separately from related

private actions.  Under the multidistrict litigation program, most civil actions involving one or

more common questions of fact pending in different districts may be consolidated or coordinated

for pretrial proceedings.  28 U.S.C. § 1407(a) (2000).  However, even where the actions involve

common questions of fact, the multidistrict litigation statute specifically exempts "any action in

which the United States is a complainant arising under the antitrust laws."  28 U.S.C. § 1407(g)

(2000).[4]

---

[2]    *See, e.g., In re Nifedipine Antitrust Litigation*, MDL No. 1515, 2007 U.S. Dist. LEXIS 85726 (D.D.C. Nov. 21, 2007) (case pending five years before class certified).  *See also* Taus Decl. ¶ 9.

[3]    In the *Lorazepam* antitrust litigation, for example, it took three years from the filing of the complaint for the government to obtain injunctive and equitable relief; in contrast, in the private actions it took almost eight years from the filing of the complaint for the court to enter judgment for compensatory and punitive damages in favor of plaintiffs.  *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 372-74 (D.D.C. 2002); *In re Lorazepam & Clorazepate Antitrust Litig.*, MDL 1290, No. 99-mc-0276 (D.D.C. February 6, 2008) (judgment entered for private plaintiffs).

[4]    The FTC's action is an antitrust case brought by the "United States."  *Cf. Minnesota Mining & Mfg. Co. v. New Jersey Woodfinishing Co.*, 381 U.S. 311, 321-22 (1965) (finding that an FTC enforcement action was "instituted by the United States" for purposes of

(continued...)

The legislative history of Section 1407 demonstrates Congress's concern with delaying government enforcement suits:

> To treat the Government differently is not arbitrary, for the purpose of the governmental suit normally differs from that of a private suit; the Government seeks to protect the public from competitive injury, while private parties are primarily interested in recovering damages for injuries already suffered.

H.R. Rep. No. 90-1130, at 8 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1898, 1905 (letter of Deputy Attorney General Ramsey Clark, incorporated into Report).  Significantly, Congress was well aware that forbidding consolidation and coordination would occasionally impose a burden on defendants:

> [E]xempting the Government from this legislation may occasionally burden defendants because they may have to answer similar questions posed both by the Government and by private part[ies].

*Id.*  Nonetheless, Congress concluded that the potential burden on private defendants from duplicative discovery was "justified by the importance to the public of securing relief in antitrust cases as quickly as possible."  *Id.*

## II.     The public policy against combining government antitrust actions with private damage actions is both relevant and compelling here

Cephalon cannot seek to transfer this case under the provisions that Congress specifically adopted to deal with the pendency of related cases in multiple districts.  As discussed above, 28 U.S.C. § 1407(g) expressly exempts government antitrust enforcement suits from these rules, in order to eliminate the risk that such transfer would threaten the public's interest in expedited relief for ongoing antitrust violations.  Cephalon instead is attempting to use a two-step process: it asks this Court to transfer this case to the Eastern District of Pennsylvania in order to permit

---

[4](...continued)
tolling the statute of limitations for private plaintiff antitrust damages action under the Clayton Act).

6

that court to then consider consolidation or coordination of the FTC case with the pending

private actions.[5]

Although Cephalon claims that its use of this two-step process renders the public policy

embodied in the multidistrict litigation statute of "no relevance, even by analogy" here,[6] it offers

no support for this assertion.  It cites no case – in this District or elsewhere – in which a

government antitrust case has been transferred and consolidated or coordinated with one or more

private damages suits.[7]  In fact, in *United States v. Dentsply International, Inc*., 190 F.R.D. 140

(D. Del. 1999), the court anticipated and rejected the two-step strategy Cephalon seeks to

employ here, finding it inconsistent with congressional policy.  The *Dentsply* court denied the

defendant's request for consolidation of the government's antitrust case with pending private

damages suits under Fed. R. Civ. P. 42(a), based on "the public policy position articulated by the

United States Congress" in exempting government actions from the rules governing multidistrict

litigation.  In so doing, the court pointed out that to countenance the sort of two-step strategy that

Cephalon seeks would effectively allow defendants to evade the exemption for government

antitrust suits in the multidistrict litigation statute:

> [A]llowing defendants to consolidate private antitrust cases filed in the same
> district with Government antitrust cases would allow them to circumvent
> § 1407(g) by seeking transfer of individual cases to the same forum and then
> moving for consolidation under Rule 42(a).

---

[5]    *See* Def. Mot. at 11, n. 9 (issue of consolidation or coordination among the
actions "can (and should) be addressed by the Eastern District of Pennsylvania court after
transfer").

[6]    *Id.*

[7]    Cephalon erroneously characterizes *Comptroller of the Currency v. Calhoun First
Nat'l Bank*, 626 F. Supp. 137 (D.D.C. 1985), as a civil antitrust action that was transferred to
another district where related cases were pending (Def. Mot. at 8); it was a securities case.

*Dentsply*, 190 F.R.D. at 144.

Absent consolidation or coordination with the various private cases, the judicial efficiencies that Cephalon claims justify transfer are unlikely to be significant.[8]  And, given the circumstances here, the potential for slowing down the FTC case is substantial.  As was noted at the outset, the private cases were filed on the basis of publicly available information and plaintiffs have had no discovery.  The FTC, in contrast, already has the fruits of its year and a half investigation, including internal business documents from Cephalon and generic firms, as well as over twenty witness transcripts.  Furthermore, the presence of numerous issues unique to the private damage actions (including class certification and calculation of damages), as well as the numerous parties on both sides, will inevitably make the proceedings in the private cases far more complex and time consuming than what is required by the FTC's relatively streamlined suit.

Whatever modest litigation efficiencies might be achieved from transfer here do not justify the substantial likelihood of delay in the government case.  Indeed, the *Dentsply* court, after finding that "the standard factors . . . would counsel consolidation in this case," nonetheless declined to consolidate in light of the overriding public policy interest.  *Dentsply*, 190 F.R.D. at 143.  As the *Dentsply* court explained, Congress wisely precluded an individual case-by-case balancing of litigation efficiencies against delay:

---

[8]      *See SEC v. Hart*, No. 78-65, 1978 U.S. Dist. LEXIS 17506 at *4-5 (D.D.C. May 26, 1978) (denying transfer of case where judicial economy would not be served because government action would not likely be consolidated with related cases in transferee forum); *Polychrome Corp. v. Minnesota Mining and Mfg. Co.*, 259 F. Supp. 330, 333-334 (D.C.N.Y. 1966) (denying transfer of antitrust case to forum where government antitrust suit pending, in part because cases were different and it was unlikely that cases would be consolidated for trial if transferred).

> Congress, in carving out an exclusion of Government antitrust claims from the
> multidistrict litigation statute, explicitly excluded these cases from a case-by-case
> weighing of possible delays versus efficiencies to be gained from coordinating
> pretrial proceedings.

*Id.* at 146. Even if there may be some instances in which coordination might not prove to cause

delay, "there is no way to ensure ahead of time that delay will not occur." *Id.*

Likewise, the risk of inconsistent judgments does not warrant setting aside the strong

public policy against requiring government antitrust cases to be coordinated with related private

actions.[9] Indeed, courts routinely deny such transfer requests when related cases are pending in

different districts, even though inconsistent results are always possible.[10] Moreover, the risk of

inconsistent results is inherent in the multidistrict litigation scheme that Congress devised,

because cases are coordinated only for pretrial proceedings, with cases returning to the transferor

court for trial. 28 U.S.C. § 1407(a).

---

[9]    Cephalon cites three cases in which the court identified the risk of inconsistent judgments as a factor in granting transfer. Def. Mot. at 12. None involve government antitrust enforcement, and all involve circumstances not present here. *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 53 (D.D.C. 2000), granted a transfer to a district in which the same plaintiff had already litigated and lost identical claims against the same defendant. *Barham v. UBS Financial Services*, 496 F. Supp. 2d 174, 180 (D.D.C. 2007), granted transfer where the same attorneys were already litigating, on behalf of the plaintiffs' co-workers, identical employment discrimination claims against the same employer in the neighboring district. *California Farm Bureau Federation v. Badgley*, No. 02-2328, 2005 U.S. Dist LEXIS 12861, at *5-7 (D.D.C. June 29, 2005), granted the government defendants' motion to transfer the case to a district where a suit involving "apparently identical issues of law and fact" (at *5) was pending, observing that "[a]llowing these two suits to proceed unconsolidated" would be inappropriate (at *7).

[10]    *AT&T Corp. v. PAB Inc.*, 935 F. Supp. 584 (E.D. Pa. 1996) (denying transfer of case to district where related actions pending, when transfer likely to lead to delay); *Combs v. Adkins & Adkins Coal Co., Inc.*, 597 F. Supp. 122 (D.D.C. 1984) (denying transfer notwithstanding related litigation pending in transferee district); *Star Lines, Ltd. v. Puerto Rico Mar. Shipping Auth.*, 442 F. Supp. 1201 (S.D.N.Y. 1978) (same); *Hart*, 1978 U.S. Dist. LEXIS 17506 (same); *Polychrome Corp.*, 259 F. Supp. 330 (same).

The "clear public policy of prioritizing prompt judicial resolution of Government antitrust claims to provide expeditious relief to the public" is particularly compelling under the circumstances presented here. *Dentsply,* 190 F.R.D. at 145. As noted above, the ongoing harm from denying consumers access to generic versions of Provigil is clear, direct, and predictable, and amounts to hundreds of millions of dollars in increased drug costs each year. These higher costs fall on patients, public and private health plans, and taxpayers, who ultimately foot the bill for government drug benefit programs. These facts reinforce the wisdom of the congressional policy granting special status to government antitrust enforcement actions.

## III. Cephalon has failed to show that the private interest factors of section 1404(a) justify transfer of the FTC's enforcement action

Even aside from the strong public policy reasons against transfer and consolidation or coordination of this federal enforcement antitrust case, Cephalon does not meet its burden to show that private interests make transfer of the FTC's action appropriate.

### A. The FTC's choice of forum is entitled to substantial deference

The plaintiff's choice of forum is a "'paramount consideration' in any determination of a transfer request," and is ordinarily entitled to "great deference." *Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc.*, 196 F. Supp. 2d 21, 31 (D.D.C. 2002) (Bates, J.).[11] Moreover, the presumption in favor of the plaintiff's forum choice has been given "heightened respect" in cases arising under the antitrust laws because of the affirmative congressional policy embodied in the Clayton Act's liberal venue provisions which allows plaintiffs the widest possible choice of

---

[11] *See also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981) ("there is ordinarily a strong presumption in favor of the plaintiff's choice of forum"); *FC Inv. Group LC v. Lichtenstein*, 441 F. Supp. 2d 3, 12-13 (D.D.C. 2006) (same).

forums in which to sue.[12]  The FTC's venue provision, 15 U.S.C. § 53(b)(2) (2000), is at least as

broad as the Clayton Act's.[13]

Notwithstanding these well-established principles, Cephalon urges this Court to nullify

the FTC's forum choice here, charging that the FTC filed its complaint in this District, rather

than in the Eastern District of Pennsylvania where several private actions are pending, as part of

some Machiavellian ploy to maximize its "bites at the judicial apple."  Def. Mot. at 12-13.  But

the FTC should hardly be expected or required to abandon its prosecutorial judgment simply

because some private plaintiffs happened to reach the courthouse steps first.  Moreover, the

FTC's decision to sue in the District of Columbia is neither remarkable nor unusual.  The

Commission routinely files antitrust enforcement actions in the District of Columbia, particularly

when the impact of the challenged conduct, such as here, is felt by consumers on a nationwide

scale.[14]

---

[12]    *See, e.g., United States v. Brown Univ.*, 772 F. Supp. 241, 242 (E.D. Pa. 1991)
(denying transfer motion because a government's choice of forum in an antitrust suit is entitled
to "heightened respect"); *Expoconsul Int'l, Inc. v. A/E Sys., Inc.*, 711 F. Supp. 730, 735
(S.D.N.Y. 1989) (denying transfer motion, in part, because defendant's burden to overcome
plaintiff's choice of forum is "especially heavy in antitrust suits") (quoting *Star Lines, Ltd.* 442
F. Supp. at 1207).

[13]    *Compare* FTC Act, 15 U.S.C. § 53(b)(2) ("Any suit may be brought where . . .
[the] corporation resides or transacts business, or wherever venue is proper under section 1391 of
title 28.") *with* Clayton Act, 15 U.S.C. § 22 (2000) ("Any suit . . . under the antitrust laws against
a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also
in any district wherein it may be found or transacts business . . .").

[14]    *See, e.g., FTC v. Mylan Labs., Inc.,* 62 F. Supp. 2d 25 (D.D.C. 1999); *FTC v.
Warner Chilcott Holdings Co.*, Civ. Action No. 1:05-CV-2179-CKK (D.D.C. 2005); *FTC v.
Perrigo Co.,* Civ. Action No. 1:04-CV-1397 (D.D.C. 2004) (stipulated judgment).

### B.    Convenience of the parties and witnesses does not support transfer

To overcome the strong presumption in favor of the FTC's forum choice, Cephalon "bear[s] a heavy burden of establishing that [this choice] is inappropriate" and that transfer is necessary. *Thayer/Patricof*, 196 F. Supp. 2d at 31 (quoting *Pain v. United Techs. Corp.*, 637 F.2d 775, 784 (D.C. Cir. 1980)). To satisfy this burden, Cephalon must do more than merely suggest that another forum "may be superior to that chosen by the plaintiff." *Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard, Jr.*, 24 F. Supp. 2d 66, 71 (D.D.C. 1998). Cephalon must show that "the private and public interest factors clearly point towards trial in the alternative forum." *FC Inv. Group LC,* 441 F. Supp. 2d at 13-14. This Court has routinely denied requests to transfer based on a defendant's failure to meet this heavy burden.[15]

On the last page of its motion – almost as an afterthought – Cephalon finally tries to satisfy this burden, arguing that the convenience of the parties and witnesses "clearly favors transfer." Def. Mot. at 14. As support for this claim, Cephalon states that the Eastern District of Pennsylvania would be more convenient because seven of its current employees who may be witnesses at trial reside in that forum. Zakreski Aff. ¶ 12-13. Of course, transfer to the defendant's home district would always be more convenient for the defendant. But, as this Court has noted before, the critical factor for a Section 1404(a) transfer request is not whether certain

---

[15]    *Toledano v. O'Conner*, 501 F. Supp. 2d 127, 156 (D.D.C. 2007) (Bates, J.) (denying transfer because defendant failed to show that considerations of convenience and interests of justice warranted it); *Thayer/Patricof*, 196 F. Supp. at 37 (denying transfer because defendants did not meet "heavy burden of establishing that [plaintiff's] choice of forum should be disturbed"); *FC Inv. Group LC*, 441 F. Supp. at 14 (denying transfer because defendant did not meet their "burden of showing that the balance of convenience of the parties and witnesses and the interest of justice are in their favor"); *Green v. Footlocker Retail, Inc.*, No. 04-1875, 2005 U.S. Dist. LEXIS 11190, at *8 (D.D.C. June 3, 2005) (denying transfer); *Shapiro, Lifschitz & Schram, P.C.*, 24 F. Supp. at 73 (denying transfer because "defendants have failed to meet the heavy burden of demonstrating that transfer is warranted"); *Air Line Pilots Ass'n v. Eastern Air Lines*, 672 F. Supp. 525 (D.D.C. 1987) (denying transfer).

witnesses may be located outside the chosen forum, but instead whether those "witnesses would

be unwilling to testify in the District of Columbia." *FC Inv. Group LC,* 441 F. Supp. 2d at 14.

Because a party can compel testimony from its own employees, this Court has assumed that

employee witnesses will appear voluntarily, an assumption that Cephalon does not appear to

dispute.[16]  In addition, while inconvenience and burden on individual defendants (who are

required to remain in a forum for the duration of a trial) may, in certain cases warrant transfer,

such concerns are far less significant in matters involving a large corporate defendant (like

Cephalon), where any potential inconvenience to employee witnesses is limited to the day of

testimony.[17]  Accordingly, the fact that Cephalon's likely employee witnesses may reside in the

Eastern District of Pennsylvania does not warrant transfer.[18]

    Moreover, in addition to witnesses from Cephalon, this case will likely involve testimony

from various non-parties.  These non-parties include the generic companies that Cephalon paid

to abandon their patent challenges and agree not to compete with Provigil until April 2012, as

---

[16]    *See Thayer/Patricof*, 196 F. Supp. 2d at 32.  Indeed, all nine Cephalon employees appeared voluntarily at investigational depositions held at the Commission's office in Washington, D.C.  Brau Decl. ¶ 7.

[17]    A number of the cases Cephalon cites in which the court granted transfer involve individual defendants where matters of convenience and burden appropriately carry more weight than here.  *See, e.g., SEC v. Roberts*, No. 07-407, 2007 U.S. Dist. LEXIS 49301, at *2-3 (D.D.C. July 10, 2007) (individual defendant facing
criminal charges in another district arising from the same conduct); *SEC v. Page Airways, Inc.*, 464 F. Supp. 461, 463 (D.D.C. 1978) (defendants included individuals comprising "a large part of Page's senior management"); *Calhoun First Nat'l Bank*, 626 F. Supp. at 138 (individual as well as corporate defendants).

[18]    *Thayer/Patricof*, 196 F. Supp. 2d at 32.  *See also Gruber Hurst Johansen & Hail, LLP v. Hackard & Holt*, No. 3:07-cv-1410-G, 2008 U.S. Dist. LEXIS 2961 at *17 (N.D. Tex. Jan. 15, 2008) (convenience to party employee witnesses is entitled to little weight because their presence may be compelled by the party); *Brown Univ.*, 772 F. Supp. at 243 (location of party employee witnesses is not a factor warranting transfer because their presence can be compelled by the party).

well as other generic companies blocked from competing with a generic version of Provigil as a result of Cephalon's anticompetitive conduct.  Brau Decl. ¶¶ 8-18.  Some of these potential non-party witnesses are located within the subpoena power of the District of Columbia.  Brau Decl. ¶ 12.  Most of these potential non-party witnesses, however, are scattered around the country, far from either the District of Columbia or the Eastern District of Pennsylvania.  Brau Decl. ¶¶ 8-18 (identifying potential witnesses in locations including California, Michigan, Vermont, Illinois, and Ontario, Canada).

Cephalon does not show – as it must to justify transfer – that these potential non-party witnesses would be unwilling to testify in the District of Columbia.[19]  Nor does Cephalon suggest that those potential witnesses residing outside either jurisdiction would, for some reason, be more willing to travel and appear to testify in the Eastern District of Pennsylvania than in the District of Columbia.  Finally, even if certain witnesses were unwilling to appear, that alone does not warrant transfer because parties can use videotaped depositions to capture their testimony.[20]  For all these reasons, Cephalon has failed to show that the convenience to the parties and witnesses and the interests of justice clearly point towards the Eastern District of Pennsylvania.

## CONCLUSION

Transfer and consolidation or coordination of the FTC's action is contrary to public policy.  "Congress has made the decision that inefficiencies and inconvenience to antitrust

---

[19]     *Thayer/Patricof*, 196 F. Supp. 2d at 33 (the moving party "must demonstrate . . . whether [a] witness is willing to travel to a foreign jurisdiction"); *FC Inv. Group LC*, 441 F. Supp. 2d at 14 (moving party must demonstrate that witnesses are unwilling to testify in the transferor forum); *Shapiro, Lifschitz & Schram, P.C.*, 24 F. Supp. 2d at 72 (D.D.C. 1998) (denying transfer request, in part, because defendant failed to show that non-resident witnesses would not appear).

[20]     *See Thayer/Patricof*, 196 F. Supp. 2d at 34.

14

defendants are trumped by an unwillingness to countenance delay in the prosecution of

Government antitrust litigation." *Dentsply*, 190 F.R.D. at 146.  Accordingly, Cephalon's motion

to transfer should be denied.


Dated: March 6, 2008                              Respectfully Submitted,


                                           ___/s/  Markus H. Meier___
                                           MARKUS H. MEIER (DC Bar # 459715)
                                           BRADLEY S. ALBERT
                                           SARALISA C. BRAU
                                           JEFFREY C. BANK
                                           ALPA D. GANDHI (DC Bar # 498746)
                                           Attorneys for Plaintiff
                                           Federal Trade Commission
                                           600 Pennsylvania Avenue, N.W.
                                           Washington, D.C. 20580
                                           Telephone:  (202) 326-3759
                                           Facsimile:  (202) 326-3384
                                           mmeier@ftc.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION | |
| Plaintiff, | Civil Action No. |
| v. | 08-cv-00244 (JDB) |
| CEPHALON, INC. | |
| Defendant. | |

### [PROPOSED] ORDER

Having considered Defendant's Motion to Transfer this action to the United States District Court for the Eastern District of Pennsylvania, its Memorandum of Points and Authorities in Support thereof, and Plaintiff's Opposition to such Motion, the Court hereby ORDERS that:

1.    Defendant's Motion to Transfer this action to the United States District Court for the Eastern District of Pennsylvania is DENIED.

SO ORDERED this _____ day of _____, 2008.

_____
John D. Bates
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION | |
| Plaintiff, | Civil Action No. |
| v. | 08-cv-00244 (JDB) |
| CEPHALON, INC. | |
| Defendant. | |

## DECLARATION OF SARALISA C. BRAU, ESQ.

I, Saralisa C. Brau, Esq., submit this declaration upon personal knowledge or information and belief:

1.      I am an attorney, a member of the bar of the State of New York, and have been an attorney with the Federal Trade Commission since December 2005.

2.      In April 2006 the Federal Trade Commission (the "Commission") began investigating a series of patent litigation settlement agreements between Cephalon, Inc. and potential competitors regarding the drug Provigil. As a result of the investigation, the Commission filed a complaint against Cephalon on February 13, 2008 in the U.S. District Court for the District of Columbia alleging antitrust violations under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) (2000). I have been involved with the investigation and pending litigation since the matter commenced in April 2006.

3.      When investigating possible antitrust violations, the Commission may, by statute, obtain documents and testimony through voluntary access letters and by compulsory process. The documents and testimony obtained in the course of an investigation provide a partial list of potential trial witnesses.  This declaration identifies, without limitation, those potential trial witnesses and their location.

### Documents Produced to the Commission in the Course of the Investigation

4.      In June 2006 the Commission issued voluntary access letters to Cephalon and the four first-filer generic drug companies – Teva Pharmaceuticals USA, Inc., Ranbaxy Pharmaceuticals, Inc., Mylan Laboratories, Inc., and Barr Laboratories, Inc., – that had signed agreements with Cephalon settling the Provigil patent litigation.  Between November 2006 and July 2007 the Commission issued *subpoenas duces tecum* and civil investigative demands to Cephalon and seven non-parties – Teva, Ranbaxy, Mylan, Barr, Watson Pharmaceuticals, Inc., Perrigo Company (and its subsidiary, Chemagis), and Takeda Pharmaceuticals North America.

5.      As a result of these requests, the Commission has received internal business documents from Cephalon and generic companies related to the settlement of the Provigil patent litigation.

### Testimony Taken by the Commission in the Course of the Investigation

6.      The Commission has taken 24 investigational depositions in the course of its investigation.  Nine investigational depositions were taken of Cephalon employee witnesses, and fifteen of non-party witnesses.

7.      All nine Cephalon employees appeared voluntarily at investigational depositions held at the Commission's office in Washington, D.C.

8.     All 15 non-party witnesses who gave testimony appeared voluntarily as well.  As described below, nine of the non-party witnesses are located outside the subpoena power of the U.S. District Courts for both the District of Columbia and the Eastern District of Pennsylvania. Two of the non-party witnesses are located within the subpoena power of the District of Columbia.  Four of the non-party witnesses are located within the subpoena power of the Eastern District of Pennsylvania.

9.     Teva is based in North Wales, Pennsylvania.  Four Teva employees testified in investigational depositions – the President and CEO of Teva USA, the General Counsel, the Deputy General Counsel, and the Chief Financial Officer of the North American business unit of Teva's API division.  The four Teva employees work at Teva's office in North Wales.  The Chief Financial Officer's investigational deposition took place at the Willkie Farr & Gallagher LLP office in New York, New York; the other three investigational depositions took place at the Commission's office in Washington, D.C.  A partner at Kenyon & Kenyon LLP in New York, New York also testified regarding Teva's involvement in the Provigil settlement agreement.  He testified at the Washington, D.C. offices of Willkie Farr & Gallagher LLP.

10.     Ranbaxy is based in Princeton, New Jersey.  Two Ranbaxy employees testified in investigational depositions held at the Commission's office in Washington, D.C. – the Vice President of Business Development and Licensing in North America and the Regional Director of North America.  Both employees work at Ranbaxy's office in Princeton.

11.     Mylan is based in Canonsburg, Pennsylvania, which is located in the Western District of Pennsylvania.  Three Mylan employees testified in investigational depositions held at the Commission's office in Washington, D.C. – the President of Mylan Technologies, Inc., the Associate General Counsel of Operations, and the Chief Legal Officer.  Mylan Technologies,

Inc. is located in St. Albans, Vermont, and its President works there. The Associate General Counsel and Chief Legal Officer both work at Mylan's office in Canonsburg.

12.     Barr is based in Montvale, New Jersey. Three Barr employees testified in investigational depositions – the then-President and Chief Operating Officer, the Chairman and Chief Executive Officer, and the Executive Vice President and General Counsel. The President and Chief Operating Officer testified at the Kirkland & Ellis LLP office in New York, New York. He now works in Corona, California as President of Watson Pharmaceuticals, Inc. The Chairman and CEO and the Executive Vice President and General Counsel both testified at the Commission's office in Washington, D.C. The Chairman and CEO resides in Potomac, Maryland. The Executive Vice President and General Counsel resides in Bethesda, Maryland.

13.     Watson is a drug company based in Corona, California. One Watson employee testified in an investigational deposition held at the Commission's office in Washington, D.C. – the Senior Vice President and General Counsel. He works at Watson's office in Corona.

14.     Perrigo is a drug company based in Allegan, Michigan. One Perrigo employee testified in an investigational deposition held at the Commission's office in Washington, D.C. – the Executive Vice President, U.S. Pharmaceuticals. He works at Perrigo's office in Allegan.

### Other Potential Non-Party Trial Witnesses

15.     In addition to the partial list of potential trial witnesses identified above, the FTC has also identified, without limitation, the following companies whose as-yet-unidentified employees are potential trial witnesses as well.

16.     Takeda is the Deerfield, Illinois-based U.S. subsidiary of a global drug company. Takeda entered into a co-promote agreement with Cephalon regarding Provigil.

4

17.    Caraco Pharmaceutical Laboratories Ltd. is a generic drug company based in Detroit, Michigan.  Caraco filed a Paragraph IV Abbreviated New Drug Application ("ANDA") for Provigil, but was not a first-filer.  Cephalon did not sue Caraco for patent infringement, but Caraco cannot enter the market with a generic form of Provigil until one of the four first-filers has exhausted its 180-day marketing exclusivity.

18.    Apotex, Inc. is a drug company based in Weston, Ontario in Canada.  Its U.S. subsidiary, Apotex Corp., is located in Weston, Florida.  Apotex filed a Paragraph IV ANDA for Provigil, but was not a first-filer.  Cephalon did not sue Apotex for patent infringement, but Apotex cannot enter the market with a generic form of Provigil until one of the four first-filers has exhausted its 180-day marketing exclusivity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 6, 2008        _/s/ Saralisa C. Brau_
                                  Saralisa C. Brau, Esq.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION <br><br><br> Plaintiff, <br> v. <br><br> CEPHALON, INC. <br><br><br><br> Defendant. | Civil Action No. <br> 08-cv-00244 (JDB) |

## DECLARATION OF BARRY S. TAUS, ESQ.

I, Barry S. Taus, Esq., submit this declaration upon personal knowledge or information and belief:

1.      I am an attorney, a member of the bar of New York, and a partner with the law firm of Garwin Gerstein & Fisher LLP.

2.      King Drug Company of Florence, Inc. ("King Drug"), a direct purchaser of the brand name drug Provigil, filed a complaint against Cephalon, Inc., Teva Pharmaceuticals USA, Inc. (and Teva Pharmaceutical Industries, Ltd.), Ranbaxy Pharmaceuticals, Inc. (and Ranbaxy Laboratories, Inc.), Mylan Laboratories, Inc., and Barr Laboratories, Inc. (collectively, the "Defendants") in the United States District Court for the Eastern District of Pennsylvania on April 27, 2006, after learning of the settlement of the Provigil patent infringement litigation.

3.      Numerous additional plaintiffs subsequently filed complaints as putative class actions against the Defendants in the Eastern District of Pennsylvania between April 27, 2006

and August 4, 2006. On August 8, 2006, Judge R. Barclay Surrick consolidated these private actions into two classes – Direct Purchaser Class Actions ("Direct Purchaser Class") and End-Payor Class Actions ("End-Payor Class") (collectively, the "Plaintiffs") – and ordered that the classes be coordinated for pre-trial purposes only.

4.      Two non-class private actions have also been filed against Defendants in the Eastern District of Pennyslvania: an excluded competitor, Apotex, Inc., filed a complaint against Defendants on June 26, 2006; and an individual end-payor, Avmed, Inc., filed a complaint against Defendants on September 12, 2007.

5.      Garwin Gerstein & Fisher LLP represents King Drug in the above-referenced case and has been appointed lead counsel for the Direct Purchaser Class by the Court.

6.      All private complaints filed in the Eastern District of Pennsylvania – the Direct Purchaser Class complaint (i.e., the King Drug Complaint), the End-Payor Class Complaint, and the two non-class private complaints – name as Defendants Cephalon as well as each of the four generic companies that had entered into patent litigation settlements with Cephalon.

7.      The Direct Purchaser Class Complaint (as well as the End-Payor Class Complaint) alleges antitrust violations under both Section 1 and Section 2 of the Sherman Antitrust Act, and seeks class certification, and monetary damages.  The Apotex Complaint alleges antitrust violations under both Section 1 and Section 2 of the Sherman Antitrust Act, and seeks monetary damages.  The Avmed Complaint alleges antitrust violations under both Section 1 and Section 2 of the Sherman Antitrust Act, and seeks equitable, injunctive, and declaratory relief, and damages.

8.      The Defendants filed motions to dismiss the King Drug Complaint (as well as the End-Payor Complaint) on November 3, 2006.  On December 14, 2006, the Plaintiffs filed their

oppositions to the Defendants' motions to dismiss, and requested oral hearings on the matter. The Defendants filed replies to the Plaintiffs' opposition briefs on January 11, 2007.   In addition, Defendants filed motions to dismiss Apotex's Complaint on September 29, 2006.  The parties in the Avmed case stipulated that Defendants need not respond to Avmed's Complaint until after the Court resolves the pending motions to dismiss against the Direct Purchaser Class, the End-Payor Class, and Apotex, Inc.  The Court has not yet ruled on the motions to dismiss, nor has an oral hearing been scheduled.

9.     Defendants have raised numerous defenses that, in the view of counsel for the Direct Purchaser Class, will take substantial discovery to resolve, including defenses that I understand are not issues in the Federal Trade Commission case, such as issues relating to antitrust injury and damages.  I also expect Defendants to vigorously oppose class certification. Though it is not possible to specify how long the Direct Purchaser Class case will take to resolve, historically, private antitrust actions have taken a number of years to reach their conclusions.

10.     Discovery has not yet begun in any of the private class actions.  The Plaintiffs moved to compel discovery on January 24, 2007, but this motion has not been resolved yet.  The Defendants have refused to turn over any documents – including the Provigil patent litigation settlement agreements giving rise to these lawsuits – until the motions to dismiss have been resolved.  The Court has yet to enter a protective order or a scheduling order regarding discovery.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 5, 2008     _____
                                Barry S. Taus, Esq.