# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ——————————————————— ) | |
| FEDERAL TRADE COMMISSION,    ) | |
| ) | |
| Plaintiff,   ) | |
| v.    ) | **Civil Action No. 08-cv-00244 (JDB)** |
| ) | |
| CEPHALON, INC.,   ) | |
| ) | |
| Defendant.   ) | |
| ——————————————————— ) | |

## DEFENDANT CEPHALON, INC.'S MOTION TO DISMISS

Defendant Cephalon, Inc., by undersigned counsel, respectfully moves the Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an Order dismissing this action. In support of this Motion, the Court is referred to the accompanying Memorandum of Points and Authorities as well as the Declaration of Eric Mahr and accompanying Exhibits. A proposed Order also is attached.

*Of Counsel:*

James C. Burling
Peter A. Spaeth (DC Bar # 392239)
Mark A. Ford
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
(617) 526-5000 fax

David J. Creagan
Michael N. Onufrak
David E. Edwards
WHITE AND WILLIAMS LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
(215) 864-7000
(215) 864-7123 fax

Respectfully submitted,

 /s/ Eric Mahr

———————————————————
Eric Mahr (DC Bar # 459350)
Daniel J. Matheson (DC Bar # 502490)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000
(202) 663-6363 fax

Attorneys for CEPHALON, INC.

Dated:  May 2, 2008

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 08-cv-00244 (JDB)** |
| | ) | |
| CEPHALON, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT CEPHALON, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND .................................................................................3

      A.    The Hatch-Waxman Act And Provigil®'s FDA Status ...............................3

      B.    The '516 Patent And FDA Approval Of Provigil® ....................................6

      C.    The Underlying Infringement Litigation And The Settlements...................6

III.  ARGUMENT ..........................................................................................................8

      A.    Settlements Within The Exclusionary Scope Of A Patent Are Lawful Under
            The Prevailing Standard Articulated By The Second And Eleventh Circuits
            And District Courts .....................................................................................9

      B.    "Reverse Payments" Do Not Invalidate Settlements Within A Patent's
            Exclusionary Scope, And Arise Naturally From The Risk-Shifting Aspects
            Of The Hatch-Waxman Scheme ...............................................................14

      C.    The Settlements Are Not Outside The Exclusionary Scope Of The '516 Patent
            Merely Because The Parties Theoretically Could Have Agreed On An Earlier
            Generic Entry Date .................................................................................17

      D.    The FTC Alleges No Facts Showing That The Settlements Here Are Outside
            The '516 Patent's Exclusionary Scope ...................................................21

            1.    The FTC's *Post Hoc* Attacks On The Strength Of The '516 Patent
                  Do Not Establish That The Settlements Are Outside Its
                  Exclusionary Scope.......................................................................21

            2.    The Provigil® Settlements Do Not Include Products Outside
                  The '516 Patent's Exclusionary Scope ........................................23

            3.    The "Delay" In Subsequent Filer Entry Is Not Beyond The Patent's
                  Scope And, In Any Event, Results From Hatch-Waxman...................26

IV.   CONCLUSION.....................................................................................................28

# TABLE OF AUTHORITIES

## Federal Cases

*Am. Motor Inns, Inc., v. Holiday Inns, Inc.*,
    521 F.2d 1230 (3d Cir. 1975)............................................................................... 20

*Andrx Pharm., Inc. v. Biovail Corp., Intl.*,
    256 F.3d 799 (D.C. Cir. 2001) ............................................................................ 13

*Asahi Glass Co. v. Pentech Pharm., Inc.*,
    289 F. Supp. 2d 986 (N.D. Ill. 2003) ........................................................... *passim*

*Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n.*,
    434 U.S. 412 (1978)............................................................................................. 22

*City of Pittsburgh v. West Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998)................................................................................ 27

*Del Mar Avionics, Inc. v. Quinton Instrument Co.*,
    836 F.2d 1320 (Fed. Cir. 1987)........................................................................... 25

*Federal Trade Comm'n v. Schering-Plough Corp.*,
    402 F.3d 1056 (11th  Cir. 2005) ................................................................... *passim*

*Ieradi v. Mylan Labs., Inc.*,
    230 F.3d 594 (3d Cir.2000)................................................................................. 25

*In re Cardizem CD Antitrust Litigation*,
    332 F.3d 896 (6th Cir. 2003) .............................................................................. 13

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
    363 F. Supp. 2d 514 (E.D.N.Y. 2005) .......................................................... *passim*

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
    261 F. Supp. 2d 188 (E.D.N.Y. 2003) .................................................... 12, 15, 16

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ..................................................................... 14

*In re Tamoxifen Citrate Antitrust Litig.*,
    466 F.3d 187 (2d Cir. 2006)......................................................................... *passim*

*In re Wellbutrin SR/Zyban Antitrust Litig.*,
    281 F. Supp. 2d 751 (E.D. Pa. 2003) .................................................................... 6

*Mead Johnson Pharm. Group v. Bowen*,
    838 F.2d 1332 (D.C. Cir. 1988) ............................................................................ 3

*Messer v. HO Sports Co., Inc.*,
  Civ. A. No. 06-826, 2007 WL 3113334 (D. Or. Oct. 22, 2007)............................................. 25

*Pfaff v. Wells Elecs.*,
  5 F.3d 514 (Fed. Cir. 1993) .......................................................................................... 25

*Ranbaxy Labs. Ltd. v. Leavitt*,
  469 F.3d 120 (D.C. Cir. 2006) ..................................................................................... 26

*Roche Palo Alto LLC v. Apotex, Inc.*,
  526 F. Supp. 2d 985 (N.D. Cal. 2007) .......................................................................... 25

*Standard Oil Co. v. United States*,
  283 U.S. 163 (1931) .................................................................................................... 11

*Travis v. Miller*,
  226 F. Supp. 2d 663 (E.D. Pa. 2002) .............................................................................. 7

*United States v. Line Material Co.*,
  333 U.S. 287 (1948) .................................................................................................... 12

*United States v. Masonite Corp.*,
  316 U.S. 265 (1942) .................................................................................................... 12

*United States v. Singer Mfg. Co.*,
  374 U.S. 174 (1963) .................................................................................................... 12

*United States v. United Shoe Mach. Co.*,
  247 U.S. 32 (1918) ...................................................................................................... 11

*USM Corp. v. SPS Technologies, Inc.*,
  694 F.2d 505 (7th Cir. 1982) ....................................................................................... 19

*Valley Drug Co. v. Geneva Pharm., Inc.*,
  344 F.3d 1294 (11th Cir. 2003) ............................................................................. *passim*

*Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) .................................................................................................... 19

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965) .................................................................................................... 23

## Federal Statutes

15 U.S.C. § 1 (2000) ........................................................................................... *passim*

15 U.S.C. § 2 (2000) ........................................................................................... *passim*

15 U.S.C. § 45 (2000) ................................................................................................... 8

21 U.S.C. § 331 (2000 & Supp. V) ................................................................................. 3

21 U.S.C. § 355 (2000 & Supp. V) .......................................................................... *passim*

21 U.S.C. § 355a (2000 & Supp. V) .............................................................................. 5

35 U.S.C. § 271 (2000) ............................................................................................ 4, 15

**Federal Regulations**

21 C.F.R. § 314.53(e) (2006) ........................................................................................ 3

**Federal Administrative Materials**

Food & Drug Admin., "Guidance for Industry: 180-Day Exclusivity When Multiple
    ANDAs Are Submitted on the Same Day," 68 Fed. Reg. 45,252 (Aug. 1, 2003) ..................... 5

**Other Authorities**

Bernard, Kent S. & Willard K. Tom, "Antitrust Treatment of Pharmaceutical Patent
    Settlements: The Need for Context and Fidelity to First Principles,"
    15 FED. CIR. B.J. 617 (2006) ............................................................................... 17, 18

Schildkraut, Marc G., "Patent-Splitting Settlements And The Reverse Payment Fallacy,"
    71 ANTITRUST L.J. 1033 (2004) ................................................................................. 18

Willig, Robert D. & John Bigelow, "Antitrust Policy Toward Agreements That Settle Patent
    Litigation," 49 ANTITRUST BULL. 655, 660 (2004) ...................................................... 18

## I.    INTRODUCTION

In late 2005 and early 2006, Cephalon, Inc. ("Cephalon") and each of four generic drug manufacturers (the "Generics")[1] separately settled vigorously disputed Hatch-Waxman Act ("Hatch-Waxman" or the "Act") patent litigation in which Cephalon sought to enforce its patent on Provigil® (the '516 patent), a drug approved by the Food and Drug Administration ("FDA") for the treatment of narcolepsy (the "Provigil® Settlements" or "Settlements").  The Settlements permitted the Generics to enter the market three years prior to expiration of the '516 patent. Despite the obvious benefits and efficiencies achieved by securing early generic entry and resolving complex and costly litigation, the Federal Trade Commission (the "FTC" or "Commission") seeks in this action to second-guess the Settlements under the antitrust laws, claiming that Cephalon paid its generic competitors to *delay* entry.  In particular, the Commission claims that payments by Cephalon to each Generic in connection with business transactions such as supply and intellectual property agreements were really payments not to compete.

The FTC challenges the Settlements on largely the same theories advanced by the putative classes of direct purchasers and "end payors" and by another generic company, Apotex, Inc., in actions previously filed in this District[2] and subject to pending motions to dismiss. However, as previously explained by Cephalon in its papers supporting those pending motions, each of the asserted bases for liability set forth in the Complaint has been decisively rejected by the only two courts of appeals to have analyzed the legality of Hatch-Waxman settlements

---

[1]      The four "Generics" in this case are (1) Barr Laboratories, Inc.; (2) Mylan Laboratories, Inc.; (3) Teva Pharmaceutical Industries, Ltd. together with its subsidiary Teva Pharmaceuticals USA, Inc.; and (4) Ranbaxy Laboratories, Ltd., together with its subsidiary Ranbaxy Pharmaceuticals, Inc.

[2]      On April 28, 2008, the U.S. District Court for the District of Columbia granted Cephalon's motion to transfer this case to the Eastern District of Pennsylvania.  Because the transfer had not yet been implemented on the date of filing, Cephalon nominally files in the District of Columbia.  Accordingly, references to "this Court" or "this District" refer to the Eastern District of Pennsylvania.

(including one overturning an order of the FTC itself), as well as district courts.  Those courts have recognized that appropriate analysis of such settlements – even ones that include payments from innovator companies to generics – must take into account not only antitrust principles but also the need to protect patent rights in order to promote innovation, and the duty of courts to promote resolution of litigation.  Accordingly, these courts have upheld Hatch-Waxman settlements so long as the underlying litigation was not a sham and so long as any effect on competition does not exceed the exclusionary potential of the patent, meaning that the parties do not restrict the sale of indisputably non-infringing products or restrict generic entry beyond the life of the patent.

Measured against this standard, the FTC's Complaint fails to state a claim.  Courts have conclusively, and persuasively, reasoned that the inclusion of payments from innovator companies to generics does not render Hatch-Waxman settlements unlawful, but instead reflects incentives created by the Act itself.  The FTC's theory that a hypothetical cashless settlement would have led to even earlier generic entry has not been adopted by any court.  The FTC's allegations about the supposed weakness of the Provigil® patent and the litigants' thoughts about the underlying suit are irrelevant, and its attempt to suggest that the Settlements are unlawful because they covered products other than the specific generic formulations at issue in the patent litigation is unavailing.  Finally, any effect on subsequent generic applicants is a direct result of the Hatch-Waxman scheme rewarding first-filers for challenging pharmaceutical patents, not a result of Cephalon's conduct.

This Court should not be the first to adopt the FTC's position, which would weaken the prevailing standard, severely undermine patent rights, and contravene public policy by deterring litigation settlements.  It should not be the province of the FTC, or the burden of the courts, to

intervene in the appropriate and protected process of litigation risk assessment undertaken by drug manufacturers. The Complaint should be dismissed.

## II.     FACTUAL BACKGROUND

### A.     The Hatch-Waxman Act And Provigil®'s FDA Status

Hatch-Waxman provides incentives both for innovator companies to develop and market new and innovative drug treatments as well as, where consistent with innovator patent rights, for generic companies to introduce low cost versions of those branded drugs. *See Mead Johnson Pharm. Group v. Bowen*, 838 F.2d 1332, 1333 (D.C. Cir. 1988). Through Hatch-Waxman, Congress has attempted to balance these potentially conflicting goals. Among other things, the Act establishes different types of market exclusivities – *i.e.*, periods of time in which either innovators are free from generic competition or in which the initial generic challenger(s) ("first-filer(s)") is free from competition from other generics ("FDA exclusivities"). The Act also sets forth procedures for securing early determination of whether generics infringe innovators' patent rights.

*NDAs.* FDA approval is required before any drug can be introduced, or delivered for introduction, in interstate commerce. 21 U.S.C. §§ 331(d), 355(a) (2000 & Supp. V). Under the Food, Drug, and Cosmetic Act ("FDCA"), the FDA will not approve a New Drug Application ("NDA") until the applicant demonstrates that the drug is safe and effective for its intended use(s). *Id.* at § 355(b)(1). Upon approval of an NDA, holders of patents covering approved drugs *must* identify those patents to the FDA, which in turn lists them in a publication called *Approved Drug Products with Therapeutic Equivalence Evaluations*, commonly referred to as the "Orange Book." *Id.* at § 355(b)(1); 21 C.F.R. § 314.53(e) (2006).

*ANDAs and Paragraph IV Certifications.* In contrast to innovator manufacturers, generic manufacturers submit Abbreviated New Drug Applications ("ANDAs"). ANDAs need not

- 3 -

independently demonstrate safety and efficacy, but rather must show that the proposed generic is "bioequivalent" to an approved branded drug. *See* 21 U.S.C. § 355(j)(2)(A)(iv). If the Orange Book lists patents covering the relevant branded drug, Hatch-Waxman establishes a mechanism for generics to challenge listed patents, and for patentees to enforce their patent rights, before any generic product launch. *See* 35 U.S.C. § 271(e)(2) (2000). In particular, as part of the ANDA, the generic manufacturer must, for each unexpired patent included in the branded drug's Orange Book listing, either: (a) identify the patent and its expiration date (a "Paragraph III certification"); or (b) certify that each patent listed is either invalid or will not be infringed by the proposed generic (a "Paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii)(III)-(IV).

A Paragraph III certification indicates that the generic does not seek FDA approval until the expiration of the patent. A Paragraph IV certification (such as those the Generics filed), on the other hand, contests the validity or applicability of the patent. The ANDA applicant must provide a copy of the Paragraph IV certification to the holder of each applicable patent, stating that an ANDA has been filed and setting forth a detailed statement of the basis for its claims of invalidity and/or noninfringement. *Id.* at § 355(j)(2)(B)(i), (iii) & (iv). A Paragraph IV certification is itself an act of infringement, 35 U.S.C. § 271(e)(2), triggering the patent holder's right to enforce its patent immediately and enabling the generic applicant to challenge the patent without making potentially infringing sales that would expose it to damages.

*Litigation Stay*. If the patent holder does not file an infringement suit within 45 days of receiving a Paragraph IV notification, the FDA may approve the ANDA once all FDA exclusivities (*see infra* at n. 3) have expired and the FDA determines that the proposed generic is bioequivalent to the approved branded drug and is otherwise approvable. 21 U.S.C. § 355(j)(5)(B)(iii). If, however, the patent holder files suit to enforce the patent within 45 days of

- 4 -

receiving a Paragraph IV notification, FDA approval for that ANDA is automatically stayed for a period of time (typically 30 months, although possibly longer where, as here, the NDA meets certain criteria[3]) or until the court hearing the infringement case determines that the patent is invalid, not infringed, or unenforceable, whichever is earlier (a "Paragraph IV litigation stay"). *Id.* During this time, the FDA may grant "tentative approval" for the ANDA, meaning the application is otherwise acceptable, but may not grant "final approval" until the stay and all other applicable FDA exclusivities have expired. *Id.* at § 355(j)(5)(B)(iv)(II)(dd).

*180-day Generic First-Filer Exclusivity.* As an incentive for generic companies to mount patent challenges, the first ANDA holder to file a Paragraph IV certification is entitled to a 180-day generic exclusivity period, during which time the FDA will not approve any other ANDAs containing Paragraph IV certifications that list the same branded drug. *Id.* at § 355(j)(5)(B)(iv)(I). If multiple filers submit ANDAs with Paragraph IV certifications on the same day and no filer has submitted an ANDA with a Paragraph IV certification before that day, each is considered a "first-filer" and is entitled to share in the 180-day exclusivity period. The 180-day exclusivity begins to run once the first among them markets the drug or obtains a favorable ruling in the patent litigation, whichever is earlier. *Id.* at § 355(j)(5)(B)(iv)(I), 355(j)(5)(D); *see* FDA, "Guidance for Industry: 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day," 68 Fed. Reg. 45,252, 45,255 (Aug. 1, 2003). A first-filer

---

[3]    In the case of a branded drug (such as Provigil®) with an active ingredient deemed to be a "New Chemical Entity" ("NCE"), no ANDAs referencing that drug may be submitted to the FDA before the expiration of five years from the branded drug's approval date, or before the expiration of four years if the ANDA includes a Paragraph IV certification ("NCE exclusivity"). 21 U.S.C. § 355(j)(5)(F)(ii). If the owner of an NCE drug files a Paragraph IV patent infringement suit before the expiration of the fifth year after approval, instead of the typical 30-month litigation stay, the stay lasts until seven-and-a-half years after the product was approved by the FDA, or until the court hearing the infringement case determines that the patent is invalid or not infringed, whichever is sooner. *Id.* When an innovator company is formally requested by the FDA to conduct studies of its drugs on a pediatric population, if the company submits the studies in a timely manner, and the FDA accepts the studies, certain exclusivities are thereby extended by six months including any Paragraph IV litigation stay. 21 U.S.C. § 355a(c)(1)(A)(i)(I). Based on these provisions, Provigil®'s Paragraph IV litigation stay would not have expired until December 24, 2006.

retains its 180-day exclusivity if it is sued by a patentee and the parties subsequently settle and agree that the generic can begin marketing on a date certain.[4]

### B.     The '516 Patent And FDA Approval Of Provigil®

In 1997, Cephalon obtained a patent on a particle size composition of modafinil, the active ingredient in Provigil®.  Compl. at ¶ 24, 33.  Provigil® received FDA approval in December of the following year, indicated at the time for the treatment for excessive daytime sleepiness associated with narcolepsy.  *Id*. at ¶ 26.  Several years later, in 2002, Cephalon's particle size patent reissued as U.S. Patent No. RE37,516 (the "'516 patent").  *Id.* at ¶ 33.  Cephalon then identified the '516 patent to the FDA for listing in the Orange Book for Provigil®.  The '516 patent expires in October 2014 (with pediatric exclusivity effectively extending the patent life to April 2015).  *Id.* at ¶ 34.[5]

### C.     The Underlying Infringement Litigation And The Settlements

Because the FDA recognized Provigil® as a "New Chemical Entity"[6] ("NCE"), generic companies were not allowed to file ANDAs for Provigil® until December 24, 2002.  *See id.* at ¶ 36.  On that day, each of the four Generics filed its ANDA for generic modafinil with a Paragraph IV certification.  *See id*.  On March 28, 2003, Cephalon timely filed patent infringement claims in the U.S. District Court for the District of New Jersey against each

---

[4]     In 2003, Congress identified a number of circumstances in which a first-filer would forfeit its 180-day exclusivity.  The only event of forfeiture applicable to this case is 21 U.S.C. § 355(j)(5)(D)(i)(V), which occurs if the FTC or DOJ challenges a brand-generic agreement and there is "a final decision … from which no appeal (other than a petition to the Supreme Court for writ of *certiorari*) has been or can be taken that the agreement has violated the antitrust laws."

[5]     *See* Provigil® Orange Book listing, available at http://www.accessdata.fda.gov/scripts/cder/ob/docs/patexclnew.cfm?Appl_No=020717&Product_No=001&table1=OB_Rx (last accessed Apr. 29, 2008); *In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 754 n. 1 (E.D. Pa. 2003) (taking judicial notice on motion to dismiss of official FDA internet publications).

[6]     *See* FDA Orange Book, Prescription and OTC Drug Product: Patent and Exclusivity Data, at 59, available at http://www.fda.gov/cder/orange/24bookpub.pdf  (last accessed Apr. 29, 2008).

Generic, thereby triggering the statutory litigation stay. *See id.* at ¶ 41.[7] The cases were consolidated. None of the Generics ever asserted that Cephalon's patent suit was not brought in good faith.[8]

By February 1, 2006, after two-and-a-half years of vigorous litigation with the Generics, Cephalon separately settled its patent infringement claims against each of the Generics. *See id.* at ¶¶ 60, 64, 69, 72. Under each of the Provigil® Settlements, Cephalon agreed to license the Generic to begin marketing a generic version of Provigil® in 2012, three years prior to the earliest date the Generics could have entered had Cephalon prevailed on its patent claims. *Id.* In addition, each settlement included an early entry provision – permitting each Generic to launch even earlier if and when another generic manufacturer successfully entered the market. *Id.* at ¶ 58.

Cephalon and each of the Generics also entered into separate business transactions. For example, Cephalon obtained a non-exclusive, worldwide license to all of Teva's modafinil-related intellectual property rights. *See id.* at ¶ 61. Cephalon also entered into a supply contract with a Teva subsidiary to purchase modafinil active pharmaceutical ingredient ("modafinil API"). *Id.* at ¶ 66. In addition, Cephalon agreed to purchase modafinil API from Ranbaxy (*id.* at ¶ 66) as well as from Chemagis, Ltd., a business partner of Barr's (*id.* at ¶ 73). Cephalon further

---

[7]    *See* Complaint, *Cephalon, Inc. v. Mylan Pharm., Inc., et al.*, Civ. A. No. 03-1394, Doc. No. 1 (D.N.J. Mar. 28, 2003) (Declaration of Eric Mahr in Support of Cephalon, Inc.'s Mem. of Points and Authorities in Support of its Motion to Dismiss ("Mahr Decl."), Ex. 1); *see also Travis v. Miller*, 226 F. Supp. 2d 663, 664-65 n. 2 (E.D. Pa. 2002) (stating that, on motions to dismiss, courts may take judicial notice of public records such as court proceedings).

[8]    Barr Laboratories' Answer, Affirmative Defenses, and Counterclaims, *Cephalon, Inc. v. Mylan Pharm., Inc., et al.*, Civ. A. No. 03-1394, Doc. No. 3 (Apr. 30, 2003) (Mahr Decl. Ex. 2); Ranbaxy Laboratories, Ltd.'s First Amended Answer to Complaint and Counterclaims, *Cephalon, Inc. v. Mylan Pharm., Inc., et al.*, Civ. A. No. 03-1394, Doc. No. 95 (Feb. 22, 2005) (Mahr Decl. Ex. 3); Teva Pharmaceuticals USA, Inc.'s First Answer to Complaint, *Cephalon, Inc. v. Mylan Pharm., Inc., et al.*, Civ. A. No. 03-1394, Doc. No. 97 (Feb. 23, 2005) (Mahr Decl. Ex. 4); and Mylan Pharmaceuticals' Second Amended Answer To Complaint and Counterclaims For Patent Infringement, *Cephalon, Inc. v. Mylan Pharm., Inc., et al.*, Civ. A. No. 03-1394, Doc. No. 99-1 (Feb. 25, 2005) (Mahr Decl. Ex. 5).

acquired licenses to or purchased patent rights relating to modafinil manufacturing processes and formulations from Ranbaxy, Barr, and Chemagis. *Id.* at ¶¶ 67, 73, 75. Finally, Cephalon entered into business development collaboration agreements with both Mylan and an affiliate of Chemagis for the development of new pharmaceutical products. *Id.* at ¶¶ 70, 75.

Contrary to the FTC's allegations that these transactions were merely "side-term inducements" intended to compensate the Generics for their "agreements not to compete" (*id.* at ¶¶ 54, 56-57), the record will support that these were in fact legitimate business arrangements for which fair consideration was paid. While the Court must accept the FTC's allegations for the limited purpose of this motion, the FTC's characterization of the arrangements as "side-term inducements" cannot cure the legal insufficiency of its claims.

## III.    ARGUMENT

The FTC alleges that the Provigil® Settlements constitute unlawful exclusionary conduct that allowed Cephalon to maintain a monopoly in a product market narrowly defined to include only Provigil®. Compl. at ¶¶ 94, 98, 99. According to the FTC, this alleged violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, constitutes an unfair method of competition under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). *See id.* at ¶ 100.[9] The FTC's Complaint can fairly be reduced to these principal allegations: (1) the Settlements included payments to the Generics in return for the Generics' agreement to "forego [generic] entry" until 2012, *e.g.*, Compl. at ¶ 3; (2) a cashless settlement would have resulted in an even earlier generic entry date, *id.* at ¶¶ 81, 83; (3) the litigants (and other parties) believed Cephalon's patent protection was weak, *id.* at ¶¶ 35,

---

[9]    Hatch-Waxman settlements have been challenged under Sections 1 and 2 of the Sherman Act, both directly and by the FTC through Section 5 of the FTC Act. *See, e.g., Valley Drug Co. v. Geneva Pharm., Inc.*, 344 F.3d 1294 (11th Cir. 2003) (Section 1 claim); *Federal Trade Comm'n. v. Schering-Plough Corp.*, 402 F.3d 1056 (11th Cir. 2005) (Section 1 allegations advanced under Section 5 of the FTC Act); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187 (2d Cir. 2006) (Section 1 and Section 2 claims). The courts have applied the same analysis under each of these provisions. *See Tamoxifen*, 466 F.3d at 196-97, 201, 212 (applying same analysis to claims under both Sherman Act sections); *see infra* § III(A).

48-52; (4) Cephalon likely would have lost the patent case and/or a preliminary injunction motion, *id.* at ¶¶ 81, 83; (5) the Settlements restricted the sale of generic products other than the specific formulations at issue in the underlying litigation, *id.* at ¶¶ 35, 77-79; and (6) the Settlements constrained the ability of other generics to enter the market, *id.* at ¶¶ 85-88.

Similar challenges to Hatch-Waxman settlements by the FTC itself and by private plaintiffs advancing the same theories have been made and rejected many times, including by the only two courts of appeals to analyze the application of the antitrust laws to such settlements: the Eleventh Circuit in *Federal Trade Comm'n v. Schering-Plough Corp.* ("*Schering-Plough*"), 402 F.3d 1056, 1076 (11th Cir. 2005) (vacating an FTC order) and the Second Circuit in *In re Tamoxifen Citrate Antitrust Litig.* ("*Tamoxifen*"), 466 F.3d 187, 212-23 (2d Cir. 2006) (where the FTC filed an *amicus* brief in support of the plaintiff/appellants' motion for rehearing and rehearing *en banc,* which the court thereafter denied), *amending* 429 F.3d 396 (2d Cir. 2005).[10] These appellate decisions – rejecting the same position the FTC again asserts here – provide the strongest judicial precedent for dismissing this action.

### A. Settlements Within The Exclusionary Scope Of A Patent Are Lawful Under The Prevailing Standard Articulated By The Second And Eleventh Circuits And District Courts

The Second and Eleventh Circuits as well as district courts have held that so long as Hatch-Waxman settlements do not restrain competition to any greater extent than the underlying patents, they do not violate the antitrust laws, even if the settlements include so-called "reverse

---

[10]    The Supreme Court denied the FTC's petition for writ of *certiorari* in *Schering-Plough*, 126 S.Ct. 2929 (2006), and the plaintiffs' petition in *Tamoxifen*, 127 S.Ct. 3001 (2007). In both cases, the Solicitor General, on behalf of the United States, opposed review. *See* Br. for United States as *Amicus Curiae* at 16-20, *Schering-Plough*, No. 05-273 (May 1, 2006), *available at* 2006 WL 1647529; Br. for United States as *Amicus Curiae* at 16-20, *Tamoxifen*, No. 06-830 (May 2007), *available at* 2007 WL 1511527.

payments" (that is, payments from the innovator company to the generic).[11]  *See Tamoxifen*, 466

F.3d at 212 (upholding dismissal of private challenges to Hatch-Waxman settlement, and stating

that "[w]e generally agree … that 'simply because a brand-name pharmaceutical company

holding a patent paid its generic competitor money cannot be the sole basis for a violation of

antitrust law,' unless the 'exclusionary effects of the agreement' exceed the 'scope of the

patent's protection'"); *Schering-Plough*, 402 F.3d at 1064, 1076 (reversing FTC decision that

had invalidated Hatch-Waxman settlements including "reverse payments" because restrictions

were "no more broad than the patent's own exclusionary power"); *Valley Drug Co. v. Geneva*

*Pharm., Inc.* ("*Valley Drug*"), 344 F.3d 1294, 1312 (11th Cir. 2003) ("reverse payment"

settlement subject to antitrust scrutiny only if "found to have effects beyond the exclusionary

effects of [defendant's] patent"); *In re Ciprofloxacin Hydrochloride Antitrust Litig.* ("*Cipro III*"),

363 F. Supp. 2d 514, 535 (E.D.N.Y. 2005)[12] (granting defendants' motions for summary

judgment where Hatch-Waxman settlement restrained "competition  . . . only within the scope of

the patent").

　　　　Under the prevailing "scope of the patent" test, Hatch-Waxman settlements (whether or

not they contain "reverse payments") do not violate the antitrust laws so long as they do not: (1)

delay entry of generic products beyond the patent's expiration date; or (2) restrict the sale of

indisputably "unrelated or non-infringing" products for any period of time.  *See, e.g., Valley*

*Drug*, 344 F.3d at 1305, 1310 (so long as there is a "genuine dispute" over the patent claims, a

---

[11]　　　　Though not specifically using the phrase "reverse payments" in the Complaint, the FTC has used this
phrase in previous filings asserting the same theories as it advances here.  *See* Brief of Respondent FTC at 45, 47,
54-56 *Schering-Plough*, 402 F.3d 1056 (No. 04-10688) (Mahr Decl. Ex. 6) (discussing propriety of reverse
payments).

[12]　　　　The district court's judgment in *Cipro III* is pending appeal in two courts of appeals.  The direct
purchasers' appeal is pending in the Second Circuit, *see In re Ciprofloxacin Hydrochloride Antitrust Litig.*, Nos. 05-
2851, 05-2852 (2d Cir.), while the indirect purchasers' appeal is pending in the Federal Circuit, *In re Ciprofloxacin*
*Hydrochloride Antitrust Litig.*, No. 2008-1097 (Fed. Cir.).

settlement is lawful if within the exclusionary "potential" of the patent); *Schering-Plough*, 402 F.3d at 1076 (applying *Valley Drug* in case involving disputed infringement); *Tamoxifen*, 466 F.3d at 213 (holding that agreement "did not extend the patent monopoly by restraining the introduction or marketing of unrelated or non-infringing products"). As the Supreme Court has stated, where there are "legitimately conflicting [patent] claims, … a settlement by agreement, rather than litigation, is not precluded by the [Sherman] Act." *See Standard Oil Co. v. United States*, 283 U.S. 163, 171 (1931).[13]

The prevailing standard recognizes that Hatch-Waxman settlements cannot be analyzed as simple horizontal restraints of trade. Rather, courts also must recognize the exclusionary rights conferred by patents, and protect them in order to promote innovation. *See Tamoxifen*, 466 F.3d at 202 ("It is the tension between restraints on anti-competitive behavior imposed by the Sherman Act and grants of patent monopolies under the patent laws, as complicated by the Hatch-Waxman Act, that underlies this appeal."); *Valley Drug*, 344 F.3d at 1307 ("A suitable accommodation between antitrust law's free competition requirement and the patent regime's incentive system is required…."); *Cipro III*, 363 F. Supp. 2d at 540 ("[A]n exclusion of competitors and charging of supracompetitive prices are at the core of the patentee's rights, and are legitimate rewards of the patent monopoly.") (internal quotation and citation omitted).[14]

---

[13]     Although no court has so held, the Second and Eleventh Circuits have suggested in *dicta* that a settlement would not be within the scope of a patent if the underlying suit was a "sham" or the patent at issue was procured by fraud. *Tamoxifen*, 466 F.3d at 213 ("[A]bsent an extension of the monopoly beyond the patent's scope … and absent fraud … the question is whether the underlying infringement lawsuit was 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.'"); *Cipro III*, 363 F. Supp. 2d at 535 ("Unless and until the patent is shown to have been procured by fraud, or a suit for its enforcement is shown to be objectively baseless, there is no injury to the market cognizable under existing antitrust law…."). Neither circumstance is alleged here.

[14]     Patent law, of course, confers on the patentee "the right to exclude others from the use of the invention, absolutely or on the terms the patentee chooses to impose." *United States v. United Shoe Mach. Co.*, 247 U.S. 32, 57 (1918).

The "scope of the patent" standard described by the Second and Eleventh Circuits and district courts derives directly from Supreme Court precedent holding that a patentee is subject to antitrust liability *only* when it restrains competition *beyond* the confines of its lawful patent monopoly. *See United States v. Line Material Co.*, 333 U.S. 287, 305 (1948) ("Within the limits of the patentee's rights under his patent, monopoly of the process or product by him is authorized by the patent statutes."); *see also United States v. Singer Mfg. Co.*, 374 U.S. 174, 196-97 (1963) ("[T]he possession of a valid patent … does not give the patentee any exemption from the provisions of the Sherman Act *beyond the limits of the patent monopoly.*") (emphasis added; internal quotations omitted); *United States v. Masonite Corp.*, 316 U.S. 265 (1942) ("The owner of a patent cannot *extend* his statutory grant by contract or agreement.") (emphasis added); *Tamoxifen*, 466 F.3d at 302 (citing *Singer*); *Schering-Plough*, 402 F.3d at 1067 (same); *Valley Drug*, 344 F.3d at 1312 (citing *Masonite*); *In re Ciprofloxacin Hydrochloride Antitrust Litig.* ("*Cipro II*"), 261 F. Supp. 2d 188, 248 (E.D.N.Y. 2003) (citing *Singer*).

The "scope of the patent" test also reflects the need to balance competitive concerns with the long-standing judicial policy of encouraging settlements, which provide important public and private efficiencies. *See Tamoxifen*, 466 F.3d at 202 (stating that courts "are bound to encourage" the settlement of litigation); *Schering-Plough*, 402 F.3d at 1072 (noting policy favoring settlement and noting that "[p]atent owners should not be in a worse position, by virtue of the patent right, to negotiate and settle surrounding lawsuits"); *Asahi Glass Co. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 992 (N.D. Ill. 2003) (Posner, J., sitting by designation) ("If …there is nothing suspicious about the circumstances of a patent settlement, then to prevent a

cloud from being cast over the settlement process a third party should not be permitted to haul the parties to the settlement over the hot coals of antitrust litigation.").[15]

In addition to the avoidance of "a litany of direct and indirect costs" of litigation, settlements play a particularly important role in the patent context because they foster innovation by enabling patentees to achieve certainty in their patent rights. As the Eleventh Circuit explained: "[T]he caustic environment of patent litigation may actually decrease product innovation by amplifying the period of uncertainty around the drug manufacturer's ability to research, develop, and market the patented product or allegedly infringing product." *Schering-Plough*, 402 F.3d at 1075; *see also Valley Drug*, 344 F.3d at 1308 ("By restricting settlement options, which would effectively increase the cost of patent enforcement, the proposed rule would impair the incentives for disclosure and innovation.").

As set out below, measured against this prevailing standard, none of the FTC's allegations state a claim as they do not allege that the underlying litigation was a sham or that the Settlements excluded competition beyond the exclusionary scope of the patent. Nor can the FTC make any persuasive argument why the standard should be modified to redefine (and weaken)

---

[15]     Two cases sometimes cited by parties challenging "reverse payments," *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003) ("*Cardizem*") and *Andrx Pharm., Inc. v. Biovail Corp., Int'l.*, 256 F.3d 799 (D.C. Cir. 2001), are inapposite because the agreement at issue in those cases did not resolve patent litigation. Both cases involved the same *interim* agreement that included payment from the innovator company to the generic in return for the generic's agreement not to sell its product during the pendency of the litigation. Thus, the holding in *Cardizem* and the dicta in *Andrx* that such agreements are *per se* violations of Section 1 of the Sherman Act (the holding in *Andrx* focused on standing issues) are easily distinguished. In fact, in *Cardizem*, in an *amicus* brief joined by the FTC, the United States emphasized the distinction between *interim* and *settlement* agreements:

> The distinction is important because the calculus of competitive costs and benefits is substantially different …. While final settlements of infringement claims may have anticompetitive effects, they may "facilitate innovation and investment in the patented technology by eliminating litigation risks and providing certainty over patent rights." The type of interim agreement at issue in [*Cardizem*], on the other hand, may have none of those effects, because it leaves questions of patent validity and infringement to be litigated.

Brief for the U.S. as *Amicus Curiae* at 16-17, *Andrx Pharm., Inc. v. Kroger Co.*, 543 U.S. 939 (2004) (No. 03-779) (internal citation omitted) (Mahr Decl. Ex. 7); *see also* Opinion of the Comm'n at 13 n. 26, *In re Schering-Plough Corp.*, Docket No. 9297, available at http://www.ftc.gov/os/adjpro/d9297/031218commissionopinion.pdf (distinguishing *Cardizem* on the basis that it involved an interim agreement).

the "scope of the patent" test by a *post hoc* assessment of the strength of the patent claims, or consideration of the litigants' private thoughts. To the contrary, "reverse payments" are a normal consequence of the incentives created by Hatch-Waxman itself.

> **B.    "Reverse Payments" Do Not Invalidate Settlements Within A Patent's Exclusionary Scope, And Arise Naturally From The Risk-Shifting Aspects Of The Hatch-Waxman Scheme**

Many of the allegations in the Complaint focus on payments from Cephalon to each of the Generics. *See* Compl. at ¶¶ 3, 54, 56-57, 60-76. As noted above, Cephalon vigorously maintains that these payments were fair consideration for business transactions involving supply, intellectual property, and collaboration agreements. The FTC characterizes the payments as "side-term inducements" through which Cephalon "bought off" competitors. *Id.* at ¶¶ 3, 57. Even accepting for the sake of argument the FTC's characterization of the payments as "reverse payments," the Complaint fails to state a claim.

The courts that have considered so-called "reverse payments" in the context of Hatch-Waxman settlements have observed that any "suspicion" about payments to generics "abates upon reflection" because those payments are merely a by-product of the incentives and risks created by Hatch-Waxman. *Tamoxifen*, 466 F.3d at 208.[16] Therefore, even assuming the

---

[16]        In *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 532 (D.N.J. 2004) ("*K-Dur*"), the district court declined to dismiss a complaint by private plaintiffs that alleged not only the inclusion of a so-called "reverse payment" but also other allegedly anticompetitive restraints. Any reliance on *K-Dur* would be misplaced because *K-Dur* relied on *Cardizem*, a case that did not involve a patent settlement agreement but rather an agreement effective during the pendency of litigation. *Id.* at 533. The court in *K-Dur* also did not properly balance the interests of patent law and the judicial policy in favor of litigation settlement. Moreover, the Eleventh Circuit's decision in *Schering-Plough* subsequently rejected the FTC's challenge to the same settlements at issue in *K-Dur*, holding that they were lawful under the "scope of the patent" test. *See Schering-Plough*, 402 F.3d at 1064, 1076.

payments at issue were "reverse payments" and not fair consideration for side deals, they do not give rise to antitrust liability.[17]

In particular, patent litigation usually involves circumstances where the potentially infringing product already has been sold, and the potential infringer therefore risks both substantial damages (indeed, treble damages) as well as significant lost investment if found liable. *See Cipro II*, 261 F. Supp. at 251. The potential infringer may mitigate that risk either by paying the patentee some amount of the profits earned or by agreeing to pay for a patent license. Conversely, the patentee may mitigate its risk of losing patent protection by accepting damages that are less than its actual lost profits, or granting a license for a fee less than it would have accepted had its patent protection not been in jeopardy. Thus, in non-Hatch-Waxman patent settlements, payments generally flow from the defendant to the plaintiff (although, as explained above, consideration also flows to the settling infringer).

When innovator companies sue generics under Hatch-Waxman, everything is different. The mere filing of a Paragraph IV certification is itself an act of infringement, 35 U.S.C. § 271(e)(2), and generic companies thus are able to challenge patents without marketing a product and subjecting themselves to the risk of having to pay damages. *See Cipro II*, 261 F. Supp. 2d at 252 ("[B]ecause of the generic manufacturer's entitlement under the Hatch-Waxman

---

[17]    Characterizing cash flowing from an innovator company to a generic as a "reverse payments" is a misnomer in the first instance because *any* patent settlement involves compensation to the alleged infringer (for example, in the form of reduced damages or lower royalty payments). *See Asahi Glass*, 289 F. Supp. 2d at 994 ("*[A]ny* settlement agreement can be characterized as involving 'compensation' to the defendant") (emphasis in original); *see also Tamoxifen*, 466 F.3d at 207 n. 20 ("It has been observed that even the typical settlement of the ordinary patent infringement suit appears to involve what may be characterized as a reverse payment …."); *Schering-Plough*, 402 F.3d at 1074 (stating that FTC's objection to reverse payments "ignores that patents, payments, and settlements are, in a sense, all symbiotic components that must work together in order for the larger abstract to succeed."). Thus, while the FTC to date has not yet prosecuted patent settlements in other contexts, "[a] blanket rule that all settlements involving reverse payments are unlawful could thus conceivably endanger many ordinary settlements of patent litigation." *Tamoxifen*, 466 F.3d at 207 n. 20; *see also Asahi Glass*, 289 F. Supp. 2d at 994 ("If any settlement agreement is thus to be classified as involving a forbidden 'reverse payment,' we shall have no more patent settlements.").

Amendments to institute patent litigation merely by filing [a Paragraph IV certification], the

statutory scheme has the unintended consequence of altering the litigation risks of patent

lawsuits.").  Moreover, because a generic needs only to demonstrate that its product is

bioequivalent to the patented product to obtain FDA approval, 21 U.S.C. § 355(j)(2)(A)(iv), it

may have a relatively insubstantial investment at risk.  On the other hand, the patentee faces the

same risk it would face in the non-Hatch-Waxman context – potential loss of patent protection

and loss of future profits, as well as substantial investment to obtain approval of an NDA – but

does not have the upside of a potential damages award to use as negotiation leverage.  Thus, the

Eleventh Circuit in *Valley Drug* observed:

> Appellees have not explained why a monetary payment as part of a patent
> litigation settlement should be flatly prohibited as a *per se* violation, particularly
> where the alleged infringer has not yet caused the patentee any harm and the
> patentee does not have a damages claim to bargain with.

344 F.3d at 1309.

There is, therefore, nothing nefarious about settlement payments to generics.  Rather,

they simply reflect the dramatically increased leverage generics have in settlement negotiations,

and are "particularly to be expected in the drug-patent context because the Hatch-Waxman Act

created an environment that encourages them."  *Tamoxifen*, 466 F.3d at 206; *Schering-Plough*,

402 F.3d at 1074 ("Hatch-Waxman essentially redistributes the relative risk assessments and

explains the flow of settlement funds and their magnitude."); *Cipro II*, 261 F. Supp. 2d at 252

("Accordingly, so-called reverse payments are a natural by-product of the Hatch-Waxman

process.").  As a result, there is "no sound basis for categorically condemning reverse payments

employed to lift the uncertainty surrounding the validity and scope of the holder's patent."

*Tamoxifen*, 466 F.3d at 207.

**C.      The Settlements Are Not Outside The Exclusionary Scope Of The '516 Patent Merely Because The Parties Theoretically Could Have Agreed On An Earlier Generic Entry Date**

The Complaint alleges that the Provigil® Settlements "harm competition and consumer welfare" because, without the alleged settlement payments, the parties "would have agreed to settle [their] patent litigation on terms that … provided for generic entry earlier than April 2012." Compl. at p. 21, ¶¶ 81, 83.  These allegations reflect the FTC's hypothetical "entry-date-only" settlement theory of liability, which it has repeatedly advocated unsuccessfully, and asserts again here.  Essentially, the theory contends that patents are only "probabilistic" (that is, they only confer on the patentee a right that may or may not be enforced in court depending on the strength of the patent).  According to the FTC, a settlement where no cash flows to the generic, and where the parties can bargain only about generic entry date, reflects the true "probability" that the patentee would have prevailed in the lawsuit.  Thus, the argument goes, a hypothetical cashless settlement reflects the true "exclusionary scope" of a patent; and a settlement with a cash payment to the generic is anticompetitive because it extends the entry date beyond that to which the parties would have agreed in a cashless settlement.  The court of appeals in *Schering-Plough* specifically addressed and rejected this theory of liability.  402 F.3d at 1074.  In fact, *no court* has imposed liability based on the FTC's theory, and because that theory is fundamentally flawed, this Court should not be the first.

The  FTC's "entry-date-only" theory proceeds from the faulty assumption that parties can always settle Hatch-Waxman cases using adjusted entry dates as the only consideration. However, in the real world, such settlements are often impossible because of the parties' dissimilar risks, rewards, and perceptions.  Indeed, in many cases, the asymmetry of risk caused by Hatch-Waxman, *see supra* § III(B), may mean that many cases cannot be settled "within the cashless, patent-term-splitting paradigm" the FTC suggests.  *See* Kent S. Bernard & Willard K.

Tom, "Antitrust Treatment of Pharmaceutical Patent Settlements: The Need for Context and Fidelity to First Principles," 15 FED. CIR. B.J. 617, 630 (2006).

> Over optimism, either by both parties or by the entrant alone, can produce a gap between the latest date at which the generic is willing to accept entry in order to settle litigation and the earliest date at which the innovator is willing to permit entry. A cash payment can bridge the gap.

*Id.*; *see also* Marc G. Schildkraut, "Patent-Splitting Settlements And The Reverse Payment Fallacy," 71 ANTITRUST L.J. 1033, 1034 (2004) ("The payment may be necessary, for instance, because the alleged infringer is unduly optimistic about its chances of prevailing in the litigation."); Robert D. Willig & John Bigelow, "Antitrust Policy Toward Agreements That Settle Patent Litigation," 49 ANTITRUST BULL. 655, 660 (2004) (Mahr Decl. Ex. 8) ("Among the circumstances that might make financial payments essential are differences between the firms … in their expectations regarding their likelihood of success in the litigation.").

By deterring settlements, the FTC's theory would, if adopted, run directly contrary to the duty of courts to promote settlements. *See*, *e.g.*, *Tamoxifen*, 466 F.3d at 202 ("[C]ourts are bound to encourage the settlement of litigation.") (internal quotation and citation omitted). Equally importantly, tying litigants' hands would result in some cases proceeding to judgment in favor of the patentee which could have settled on terms allowing early generic entry. Viewed against that benchmark, the FTC's theory leads to anticompetitive consequences. *See Schering-Plough*, 402 F.3d at 1074 ("If settlement negotiations fail and the patentee prevails in its suit, competition would be prevented to the same or an even greater extent because the generic could not enter the market prior to the expiration of the patent."); *Asahi Glass*, 289 F. Supp. 2d at 994 (expressing "doubt" that even agreement under which patentee pays generic to stay off market for remaining term of patent is anticompetitive, "since if settlement negotiations fell through and the patentee went on to win his suit, competition would be prevented to the same extent").

Moreover, even when "entry-date-only" settlements are possible, they do not necessarily better reflect the parties' collective assessment of the "strength" of the patent case. The same asymmetries of risk that may make some settlements impossible may in other cases put the generic in a position to *demand* more than the merits dictate and the innovator company in a position to *concede* more. The Second and Eleventh Circuits observed that innovator companies may make settlement payments even when they are quite confident in their claims:

> [A] rule [prohibiting reverse payments would] fail to give sufficient consideration to the patent holder's incentive to settle the lawsuit without reference to the amount the generic manufacturer might earn in a competitive market, even when it is relatively confident of the validity of its patent – to insure against the possibility that its confidence is misplaced, or, put another way, that a reviewing court might (in its view) render an erroneous decision…. Whatever the degree of the patent holder's certainty, there is always some risk of loss that the patent holder might wish to insure against by settling.

*Tamoxifen*, 466 F.3d at 210 (upholding settlement in case where innovator made settlement payment to one generic and went on to prevail in patent challenges against others); *Valley Drug,* 344 F.3d at 1310 ("Given the asymmetries of risk and large profits at stake, even a patentee confident in the validity of its patent might pay a potential infringer a substantial sum in settlement.").

Finally, the FTC's hypothetical "entry-date-only" settlement theory runs afoul of the basic antitrust principle that private parties have no affirmative obligation to enter into agreements that maximize consumer welfare. *See Verizon Commc'n. Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415-16 (2004) ("The Sherman Act … does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition."); *USM Corp. v. SPS Techn., Inc.*, 694 F.2d 505, 512-13 (7th Cir. 1982) (Posner, J.) (stating that antitrust laws do not create positive duty to enhance competition); *Cipro III*, 363 F. Supp. 2d at 532 ("[T]here is no duty to use patent-derived market

power in a way that imposes the lowest monopoly rents on the consumer.").  Nor do private parties have an obligation to enter into settlements according to terms dictated by the FTC's policy preferences, unrestrained by the realities of business, litigation, and the real-world risks attendant to both.

In other contexts, agreements are not compared to hypothetical "benchmarks" representing the most procompetitive solution that the FTC might be able to conceive; nor are they condemned because they might fall short of the FTC's preferred hypothetical benchmarks. *See Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3d Cir. 1975) (stating that requiring businesses to enter into most procompetitive agreements possible would improperly make businesspeople "guarantors that the imaginations of lawyers could not conjure up some method of achieving the business purpose in question that would result in a somewhat lesser restriction of trade").  Rather, the antitrust laws condemn agreements only because they are "naked" restraints of trade or because their anticompetitive effects outweigh their procompetitive benefits.  The FTC's approach, then, turns traditional antitrust analysis on its head.  *See Cipro III*, 363 F. Supp. 2d at 536 ("Bayer and Barr cannot be penalized just because plaintiffs can imagine a more pro-competitive settlement, if the agreement they did reach does not adversely affect competition beyond the scope of the '444 Patent.").

For all these reasons, abstract allegations that the parties might have been able to come up with a theoretically more procompetitive "entry-date-only" settlement – even if taken as true – neither state a claim under prevailing law nor furnish a sound basis to depart from that law.

**D.    The FTC Alleges No Facts Showing That The Settlements Here Are Outside The '516 Patent's Exclusionary Scope**

> **1.    *The FTC's* Post Hoc *Attacks On The Strength Of The '516 Patent Do Not Establish That The Settlements Are Outside Its Exclusionary Scope***

The FTC alleges repeatedly that Cephalon and the Generics were preparing for, even anticipating, imminent generic entry upon expiration of the litigation stay, and that Cephalon knew generics could design around the '516 patent and still produce a bioequivalent version of Provigil®.  *See* Compl. at ¶ 35 ("a consultant advised Cephalon … that 'all generic drug companies know … the [Particle Size Patent] may be easily circumvented'"), ¶ 48 (Cephalon's earnings guidance "explicitly assumed that Provigil was 'going away'"), ¶ 49 ("Cephalon had begun to prepare for life without Provigil.").  The FTC also advances its own theory about what would have happened had the case proceeded, alleging that Cephalon would not have been able to block "at risk" generic entry through a preliminary injunction, and that "one or more" of the Generics would have prevailed at trial.  S*ee*, *e.g.*, *id.* at ¶ 81, 83.  These allegations presumably are intended to suggest that the '516 patent lacked the "exclusionary power" to keep the Generics off the market through 2012.

However, because patent litigation is inherently uncertain, courts articulating the prevailing standard have refused to measure the "exclusionary scope" of a patent through *post hoc* analysis of the strengths of the patent case or its likely outcome.  *See*, *e.g.*, *Tamoxifen*, 466 F.3d at 203 ("We cannot judge this … settlement on the basis of the likelihood *vel non* of success had [the matter] not settled….."); *Valley Drug*, 344 F.3d at 1308 (holding that even a subsequent judicial determination of invalidity of the patent at issue did not render a Hatch-Waxman settlement unlawful); *Cipro III*, 363 F. Supp. 2d at 529-30 (refusing to engage in *post hoc* analysis of patent validity because it would discourage settlements).  In the same vein, courts have refused to consider the litigants' own perceptions or predictions about the case.  *See*

*Tamoxifen*, 466 F.3d at 210 ("[W]e doubt the wisdom of deeming a patent effectively invalid on the basis of a patent holder's fear of losing it."); *Valley Drug*, 344 F.3d at 1308 ("Patent litigation is too complex and the results too uncertain for parties to accurately forecast" the outcome). As Judge Posner held:

> It is not "bad faith" … to assert patent rights that one is not certain will be upheld in a suit for infringement pressed to judgment and to settle the suit to avoid risking the loss of the rights. No one can *certain* that he will prevail in a patent suit.

*Asahi Glass*, 289 F. Supp. 2d at 993 (emphasis in original); *see also Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n.*, 434 U.S. 412, 422 (1978) ("[N]o matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable.").

The considered judgment of these courts is sound. Requiring judges or juries to evaluate the lawfulness of settlements based on *post hoc* assessments of the strength of the patent claims and defenses (or, even worse, private doubts of litigants) would pose enormous practical problems. One can imagine the difficulties, for example, posed by a jury instruction that, "You should find the settlement violates the antitrust laws if you find by a preponderance of the evidence that the consideration paid by the patentee to the generic company was excessive relative to the likelihood the patentee would have prevailed in the underlying suit." Moreover, in order to make even that subjective determination, it would be necessary essentially to retry the underlying patent case.[18] Not only would this consume scarce judicial resources without justification, but it also would deter even reasonable settlements because litigants would fear swapping patent litigation for future complex, expensive, treble-damage antitrust litigation. *See Cipro III*, 363 F. Supp. 2d at 529-30 ("[M]aking the legality of a patent settlement agreement, on

---

[18] While it has been suggested that this inquiry could be truncated, and that the full patent case need not be retried, the FTC has not suggested in practical terms any alternative means of evaluating the strength of the underlying patent claims and defenses, which are often tremendously complex.

pain of treble damages, contingent on a later court's assessment of the patent's validity might chill patent settlements altogether.").[19]  Accordingly, allegations about the strength of the patent claims are not considered at all under the prevailing standard, and the sound rationale underlying that standard counsel against adopting a weaker one.[20]

### 2. The Provigil® Settlements Do Not Include Products Outside The '516 Patent's Exclusionary Scope

The Commission also alleges that while the Generics agreed not to sell any generic version of Provigil® prior to the agreed-upon entry date, the "patent lawsuit, in contrast, had the potential to restrict only sales of these companies' *current* [*i.e.*, proposed] versions of generic Provigil, the products at issue in the litigation."  *See* Compl. at ¶ 79 (emphasis added).[21]  To the extent this is an attempt to suggest that the Settlements went beyond the "scope of the patent" within the meaning of the Second and Eleventh Circuit decisions, it fails.

As a matter of law and logic, the "exclusionary scope" of a patent cannot be confined to the *particular* infringing product at issue in the patent litigation (here, the generic versions of

---

[19]     In his oft-cited concurring opinion in *Walker Process,* Justice Harlan explained that if antitrust suits could reach "monopolies practiced under patents that for one reason or another may turn out to be voidable," that would "chill the disclosure of inventions through the obtaining of a patent because of fear of the vexations or punitive consequences of treble-damages suits." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 180 (1965) (Harlan, J., concurring).  Justice Harlan echoed the opinion of the Court that so long as the patent was not void *ab initio* because it had been procured by fraud on the Patent Office and therefore would not have issued but for the fraud, defects in the patent that might lead to a finding of invalidity in an enforcement suit could not form the basis for antitrust liability. *Id.* at 179-180.  *See Cipro III*, 363 F. Supp. 2d at 530 (holding that subjecting patent settlements to antitrust liability "simply because the patent is later found to be invalid would overstep the bright-line rule adopted by the Supreme Court in *Walker Process*, first elaborated upon by Justice Harlan in his concurrence and relied upon by the patent bar for the past forty years").

[20]     Indeed, the Commission itself has in the past agreed with the Second and Eleventh Circuits that antitrust liability should not hinge on a *post hoc* assessment of the patent merits.  For example, in its Reply Brief in support of its Petition for Writ of *Certiorari* in *Schering-Plough*, the FTC noted that it believed an "*ex post* inquiry into the patent merits was neither necessary nor helpful."  Reply Brief for the Petitioner Federal Trade Comm'n in Support of its Petition for Writ of *Certiorari* at 5 n. 4, *Federal Trade Comm'n v. Schering-Plough Corp.*, 126 S.Ct. 2929 (2006) (No. 05-273) (Mahr Decl. Ex. 9).  It argued that such inquiries were "inherent[ly] unreliab[le]" and "ultimately [would] have a chilling effect on the efficient settlement of patent litigation." *Id.* (internal citations omitted).  Moreover, the FTC conceded that the Eleventh Circuit's decisions (including *Valley Drug* and *Schering-Plough*) "preclude[] a conclusion of liability on that basis." *Id.* at 2.

[21]     The FTC further alleges that two of the Settlements also preclude the sale of "generic equivalents of successor products" of Provigil® (Nuvigil® and Sparlon®).  Compl. at ¶ 78.

Provigil® that were the subject of the ANDAs).  Rather, by definition, a patentee has the power

to exclude *all* products that infringe the patent.  When there is a *dispute* about how to define the

universe of products that infringe, such as that raised by the FTC here, the policies and rationale

underlying the prevailing standard dictate that settlements be permitted to cover products to the

full extent of a good faith construction of the patent claims.  To allow anything less would

require a *post hoc* construction of the patent's claims and an analysis (in the case of formulation

patents such as the particle size patent at issue) of the composition of the generic products that

allegedly are beyond the exclusionary scope of the patent.  After all, there is no conceptual

difference between analyzing *post hoc* whether the generic product *at issue* infringes, and

whether additional generic products covered by the settlement infringe.

     A plaintiff, however, cannot challenge a Hatch-Waxman settlement merely by alleging

that the generic drug *at issue* did not, in fact, infringe.  To the contrary, the courts have made

clear that so long as there was a *good faith dispute* about whether a generic product infringed, a

settlement covering that product is within the exclusionary scope of the patent.  *See Valley Drug*,

344 F.3d at 1305, 1310 (declining to engage in *post hoc* analysis of patent case so long as there

was "genuine dispute"); *Schering-Plough*, 402 F.3d at 1072 (clarifying that scope of patent test

applied to settlement of case where infringement was at issue in the underlying patent litigation);

*Cipro III*, 363 F. Supp. 2d at 529-30 (rejecting *post hoc* analysis).  By logic, the same principle

must apply here: so long as there is a "genuine dispute" whether the other actual or potential

generic modafinil formulations covered by the Settlements infringe the '516 patent,[22] the

Settlements are within the exclusionary "scope of the patent."[23]

Permitting settlements to the full extent of good faith claim construction is also practical,

and consistent with the duty to promote settlements relied on by courts articulating the "scope of

the patent" test. Like many "composition" patents, the '516 patent covers a range of possible

formulations of the drug.[24] In such circumstances, a generic that agrees not to market the

specific formulation of a drug that is the subject of its ANDA potentially could modify its

product and submit a new ANDA. As a result, under the regime suggested by the FTC where a

Hatch-Waxman settlement cannot be broader than the ANDA at issue, a holder of a formulation

patent wishing to settle would face the Hobson's choice of (1) entering into a settlement covering

only the specific formulation that is the subject of the ANDA at issue, leaving open the

possibility of future infringement litigation over other ANDA's for the same drug, or (2) not

settling at all. It would be particularly inappropriate to adopt such a standard here, where the

---

[22]      Notably, while the FTC vaguely alleges that the '516 patent does not block all generic modafinil products, Compl. at ¶ 35, it nowhere alleges that Cephlon's claim construction was not advanced in good faith.

[23]      This is consistent with principles of issue preclusion. Contrary to the FTC's allegation, the patent litigation had the potential to restrict the Generics from selling not only the particular modafinil formulations at issue, but also any generic product covered by Cephalon's construction of the patent claims. *See Pfaff v. Wells Elecs.*, 5 F.3d 514, 518 (Fed. Cir. 1993) (prior court's interpretation of patent claims, if necessary to infringement finding, has preclusive effect in subsequent litigation between same parties); *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1323 (Fed. Cir. 1987) (holding that claim construction from prior litigation against accused infringer had preclusive effect when applying same patent claim to remodeled product); *Roche Palo Alto LLC v. Apotex, Inc.*, 526 F. Supp. 2d 985, 991 (N.D. Cal. 2007) (stating, where generic company filed new ANDA after losing prior ANDA litigation, "issue preclusion would prevent [generic] from relitigating these claim construction issues").

[24]      Among other things, the '516 patent claims: "[a] pharmaceutical composition comprising a substantially homogeneous mixture of modafinil particles, wherein at least about 95% of the cumulative total of modafinil particles in said composition have a diameter of less than about 200 microns"; and also "[a] pharmaceutical composition in an oral dose form comprising: an amount of modafinil effective to alter a somnolent state of a mammal upon oral administration, said amount of modafinil being in the form of solid modafinil particles, said particles have a size distribution wherein at least about 95% of the cumulative total of said particles have a diameter of less than about 200 microns." *See* U.S. Patent RE37,516 (claims 1 & 7) (Mahr Decl. Ex. 10). *See Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n. 3 (3d Cir. 2000) (stating that courts may take judicial notice of facts are "not subject to reasonable dispute [and are] capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned"); *see also Messer v. HO Sports Co., Inc.*, Civ. A. No. 06-826, 2007 WL 3113334, at *6 (D. Or. Oct. 22, 2007) (taking judicial notice of substance of patent claims).

Settlements resulted in generic entry *years earlier* than patent expiration. Accordingly, adopting the FTC's position would undermine the efficiencies that settlements provide, and chill settlements in contravention of the duty of courts to promote them. *See Tamoxifen*, 466 F.3d at 202. The settlements here included only products within the exclusionary power of the patent and the FTC's Complaint therefore should be dismissed.

>    **3.    *The "Delay" In Subsequent Filer Entry Is Not Beyond The Patent's Scope And, In Any Event, Results From Hatch-Waxman***

Finally, the FTC alleges that the Settlements have the further effect of delaying the market entry of additional generic filers until 180 days after the Generics first market in 2012. *See* Compl. at ¶ 85-88. These allegations fail to demonstrate an exclusionary effect beyond the scope of the '516 patent, which does not expire until 2015 (as extended by pediatric exclusivity). Moreover, any such "delay" results from operation of Hatch-Waxman, and occurs whenever the settlement involves a first-filer, whether there is a "reverse payment" or not.

In particular, under Hatch-Waxman, subsequent generic applicants cannot obtain final FDA approval for their ANDAs until 180 days after the Generics first market in 2012 (three years before patent expiration). 21 U.S.C. § 355(j)(5)(B)(iv)(I); *see Tamoxifen*, 466 F.3d at 192 (describing 180-day generic marketing exclusivity as "an incentive for generic manufacturers to choose the paragraph IV certification route").[25]  Moreover, under the statutory framework in place at the time, the Settlements did not forfeit, trigger, or otherwise affect the Generics'

---

[25]    That reward is entirely appropriate here, as the Generics accomplished precisely what the statute was designed to encourage – filing the first paragraph IV ANDAs and ultimately achieving entry years prior to the relevant patent's expiration. *See Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 122, 126 (D.C. Cir. 2006) (stating that Hatch-Waxman "rewards the first manufacturer to file an approved ANDA containing" a paragraph IV certification as an "incentive … to challenge a patent listed in the Orange Book").

exclusivity period, and subsequent ANDA filers for Provigil® therefore cannot obtain final FDA approval of their ANDAs until after the first-filers commence marketing.[26]

The FTC, then, is seeking to blame Cephalon for consequences that flow directly from the statute itself. *See City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998) ("[A]ny injury suffered by the City did not flow from the defendants' conduct, but, rather, from the realities of the regulated environment in which all three were actors."). To be sure, courts have imposed liability on innovator companies for securing a generic's a*greement* not to relinquish its 180 days of marketing exclusivity. *See Cardizem*, 332 F.3d at 902 (invalidating agreement under which generic expressly promised "to not 'relinquish or otherwise compromise any right accruing [under] … or pertaining [to its ANDA]' including its 180-day period of exclusivity"); *see also Andrx*, 256 F.3d at 809 (stating in case involving same agreement at issue in *Cardizem*, "[Hatch-Waxman] does not envision the first applicant's *agreeing* with the patent holder of the pioneer drug to delay the start of the 180-day exclusivity period") (emphasis added). In those cases, the patent holder has secured by agreement a potential additional exclusion going beyond that flowing from the patent or the operation of Hatch-Waxman. However, the FTC alleges no such agreement here. Nor does it point to any other facts suggesting that Cephalon, as opposed to the '516 patent or Hatch-Waxman, caused the alleged delay in subsequent generic entry. Accordingly, the FTC should address this aspect of the Complaint to Congress.

Moreover, any claim that a settlement with a first-filer is beyond the exclusionary power of the patent because it delays entry by subsequent filers prove too much. As a result of the operation of the statute, a cashless, "entry-date-only" settlement with a first-filer also would

---

[26]     Settlements lead to forfeiture of generic marketing exclusivity only if they are held unlawful by a final court decision in an antitrust case brought by the FTC or Department of Justice. 21 U.S.C. § 355(j)(5)(D)(i)(V).

leave subsequent generic applicants waiting for expiration of the first-filer's exclusivity. But the FTC has expressly endorsed such settlements, *see supra* at § III(C), proving that the allegations here about delayed subsequent generic entry are not a separate ground for liability at all. Rather, the question comes back to whether a "reverse payment" renders a Hatch-Waxman settlement outside the exclusionary scope of the patent, and the courts have decisively held that it does not.[27]

## IV.    CONCLUSION

Under the prevailing standard, adopted by the Second and Eleventh Circuits as well as by district courts, a complaint challenging the legality of a Hatch-Waxman patent settlement should be dismissed unless it alleges that the settlement either: (1) delays the entry of generic products beyond the patent's expiration date; or (2) restricts the sale of indisputably "unrelated or non-infringing" products for any period of time. This standard is derived from Supreme Court precedent protecting the rights of patentees to restrict competition within the scope of the patent grant, and from the well-established judicial policy of encouraging settlements, particularly in the patent context. This Court should follow that standard rather than the FTC's unsound views that have been repeatedly rejected by the courts. The standard the FTC proposes would turn precedent, public policy, and common sense squarely on their heads by asking courts to second-guess how generic and branded drug manufacturers, based on good faith assessments of the relative risks and rewards, decide to resolve commercial disputes. Because the Provigil®

---

[27]    The Commission obliquely alleges that Cephalon took "further steps" to delay subsequent generic entry, "including settling or refusing to litigate with other generic companies that could trigger the exclusivity period." Compl. at ¶ 88. But the Complaint identifies no basis on which any other settlement was even purportedly unlawful. And surely the FTC does not (and could not) seriously contend that antitrust liability can be premised on a decision by a patentee not to enforce a patent against a particular infringer. Again, any issue the FTC has in this regard is with the Hatch-Waxman scheme, and not with Cephalon.

Settlements are well within Cephalon's patent rights, the Complaint fails to state a claim and should be dismissed.

Respectfully submitted,

/s/ Eric Mahr

*Of Counsel:*

James C. Burling
Peter A. Spaeth (DC Bar # 392239)
Mark A. Ford
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
(617) 526-5000 fax

David J. Creagan
Michael N. Onufrak
David E. Edwards
WHITE AND WILLIAMS LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
(215) 864-7000
(215) 864-7123 fax

Dated:  May 2, 2008

Eric Mahr (DC Bar # 459350)
Daniel J. Matheson (DC Bar # 502490)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000
(202) 663-6363 fax

Attorneys for CEPHALON, INC.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

FEDERAL TRADE COMMISSION,      )

)

                Plaintiff,     )

)

         v.                )      **Civil Action No. 08-cv-00244 (JDB)**

)

CEPHALON, INC.,             )

)

            Defendant.     )

_____)


## DECLARATION OF ERIC MAHR IN SUPPORT OF
## CEPHALON, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN
## SUPPORT OF ITS MOTION TO DISMISS


*Of Counsel:*

James C. Burling

Peter A. Spaeth (DC Bar # 392239)

Mark A. Ford

WILMER CUTLER PICKERING

    HALE AND DORR LLP

60 State Street

Boston, MA 02109

(617) 526-6000

(617) 526-5000 fax


David J. Creagan

Michael N. Onufrak

David E. Edwards

WHITE AND WILLIAMS LLP

1800 One Liberty Place

Philadelphia, PA 19103-7395

(215) 864-7000

(215) 864-7123 fax


Dated:  May 2, 2008

Eric Mahr (DC Bar # 459350)

Daniel J. Matheson (DC Bar # 502490)

WILMER CUTLER PICKERING

    HALE AND DORR LLP

1875 Pennsylvania Avenue, NW

Washington, DC 20006

(202) 663-6000

(202) 663-6363 fax


Attorneys for CEPHALON, INC.

1.      I am a partner at the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, attorneys for Defendant Cephalon, Inc. ("Cephalon").  I am a member in good standing of the Bar of the District of Columbia.  I make this declaration in support of Cephalon's Memorandum of Points and Authorities in Support of its Motion to Dismiss.

2.      Attached as Exhibit 1 is a true and accurate copy of the Complaint, *Cephalon, Inc. v. Mylan Pharmaceuticals, Inc., et al.*, Civ. A. No. 03-1394, Doc. No. 1 (D.N.J., filed March 28, 2003).

3.      Attached as Exhibit 2 is a true and accurate copy of Barr Laboratories' Answer, Affirmative Defenses, and Counterclaims, *Cephalon, Inc. v. Mylan Pharmaceuticals, Inc., et al.*, Civ. A. No. 03-1394, Doc. No. 3 (D.N.J., filed April 30, 2003).

4.      Attached as Exhibit 3 is a true and accurate copy of Ranbaxy Laboratories, Ltd.'s First Amended Answer to Complaint and Counterclaims, *Cephalon, Inc. v. Mylan Pharmaceuticals, Inc., et al.*, Civ. A. No. 03-1394, Doc. No. 95 (D.N.J., filed Feb. 22, 2005).

5.      Attached as Exhibit 4 is a true and accurate copy of Teva Pharmaceuticals USA, Inc.'s First Amended Answer to Complaint, *Cephalon, Inc. v. Mylan Pharmaceuticals, Inc., et al.*, Civ. A. No. 03-1394, Doc. No. 97 (D.N.J., filed Feb. 23, 2005).

6.      Attached as Exhibit 5 is a true and accurate copy of Mylan Pharmaceuticals' Second Amended Answer to Complaint and Counterclaims for Patent Infringement, *Cephalon, Inc. v. Mylan Pharmaceuticals, Inc., et al.*, Civ. A. No. 03-1394, Doc. No. 99-1 (D.N.J., filed Feb. 25, 2005).

7.      Attached as Exhibit 6 is a true and accurate copy of the Brief of Respondent Federal Trade Comm'n, *Schering-Plough Corp. v. Federal Trade Comm'n*, 402 F.3d 1056 (11th Cir. 2005) (No. 04-10688).

8.      Attached as Exhibit 7 is a true and accurate copy of the Brief for the United States as *Amicus Curiae*, *Andrx Pharmaceuticals, Inc. v. Kroger Co.*, 543 U.S. 939 (2004) (No. 03-779).

9.      Attached as Exhibit 8 is a true and accurate copy of Robert D. Willig and John Bigelow, "Antitrust Policy Toward Agreements That Settle Patent Litigation," 49 ANTITRUST BULLETIN 655 (2004).

10.     Attached as Exhibit 9 is a true and accurate copy of the Reply Brief for the Petitioner Federal Trade Comm'n in Support of its Petition for Writ of *Certiorari*, *Federal Trade Comm'n  v. Schering-Plough Corp.*, 126 S.Ct. 2929 (2006) (No. 05-273).

11.     Attached as Exhibit 10 is a true and accurate copy of United States Reissued Patent No. RE37,516 (Grebow *et al*.) (issued January 15, 2002).

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge.


                                        /s/ Eric Mahr
                                        _____
                                        Eric Mahr

# Exhibit 1

Mary Sue Henifin (MH5353)
Victor F. Souto (VS7903)
Hale and Dorr LLP
650 College Road East
Princeton, New Jersey 08540
(609) 750-7600
Attorney(s) for Plaintiff, Cephalon, Inc.

RECEIVED–CLERK
U.S. DISTRICT COURT
2008 MAR 28 P 1: 35

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CEPHALON, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MYLAN PHARMACEUTICALS, INC.,<br>MYLAN LABORATORIES, INC.,<br>TEVA PHARMACEUTICALS USA, INC.,<br>TEVA PHARMACEUTICAL INDUSTRIES,<br>LTD., BARR LABORATORIES, INC., and<br>RANBAXY LABORATORIES LIMITED,<br><br>Defendants. | Civil Action No._____ |

## **COMPLAINT**

Plaintiff Cephalon, Inc. ("Cephalon"), by its attorneys, hereby alleges as follows for its

Complaint against Mylan Pharmaceuticals, Inc. ("Mylan Pharmaceuticals"), Mylan Laboratories,

Inc. ("Mylan Laboratories"), Teva Pharmaceuticals USA, Inc. ("Teva USA"), Teva

Pharmaceutical Industries, Ltd. ("Teva Industries"), Barr Laboratories, Inc. ("Barr"), and

Ranbaxy Laboratories Limited ("Ranbaxy"):

### **Nature of the Action**

This is an action for patent infringement arising under the patent laws of the United

States, Title 35, United States Code, 35 U.S.C. §§ 271 and 281. This action relates to four

Abbreviated New Drug Applications ("ANDA") filed by Mylan Pharmaceuticals, Teva USA,

Barr, and Ranbaxy, respectively, with the U.S. Food and Drug Administration ("FDA") for approval to market a generic version of Cephalon's PROVIGIL® drug product.

## Parties

1.      Cephalon is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 145 Brandywine Parkway, West Chester, Pennsylvania.

2.      Upon information and belief, Mylan Pharmaceuticals is a corporation organized and existing under the laws of the State of West Virginia, with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia. Mylan Pharmaceuticals is registered to do business in New Jersey and has registered prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Mylan Pharmaceuticals is a wholly-owned subsidiary of Mylan Laboratories.

3.      Upon information and belief, Mylan Laboratories is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 130 Seventh Street, 1030 Century Building, Pittsburgh, Pennsylvania. Upon information and belief, Mylan Laboratories is doing business in this district directly, as well as through its wholly-owned subsidiary Mylan Pharmaceuticals, and its wholly-owned subsidiary Bertek Pharmaceuticals, Inc. ("Bertek"), a Delaware corporation. Upon information and belief, Mylan Laboratories has caused Mylan Pharmaceuticals and Bertek to register to do business in the State of New Jersey, and to register prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Mylan Laboratories has ultimate control over the activities of Mylan Pharmaceuticals and

- 2 -

Bertek. Hereinafter, Mylan Pharmaceuticals and Mylan Laboratories are referred to collectively as "Mylan."

4.      Upon information and belief, Teva USA is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania, and with regular and established places of business in Elmwood Park, Fairfield, Fair Lawn, Englewood Cliffs, Paterson, and Waldwick, New Jersey. Teva USA is registered to do business in New Jersey and has registered prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Teva USA is a wholly-owned subsidiary of Teva Industries.

5.      Upon information and belief, Teva Industries is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, Petach Tikva, Israel. Upon information and belief, Teva Industries is doing business in the United States and in this district directly, as well as through its wholly-owned subsidiary Teva USA, and its wholly-owned subsidiary Plantex USA, Inc. ("Plantex"), a New Jersey corporation with its principal place of business at Two University Drive, Hackensack, New Jersey. Upon information and belief, Teva Industries has caused Teva USA and Plantex to register to do business in the State of New Jersey, and has caused Teva USA to register prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Teva Industries has ultimate control over the activities of Teva USA and Plantex. Hereinafter, Teva USA and Teva Industries are referred to collectively as "Teva."

- 3 -

6.      Upon information and belief, Barr is a corporation organized and existing under the laws of the State of New York, with its principal place of business at Two Quaker Road, Pomona, New York, and with regular and established places of business in Plainsboro and Northvale, New Jersey.  Barr is registered to do business in New Jersey and has registered prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services.

7.      Upon information and belief, Ranbaxy is a corporation organized and existing under the laws of India, with its principal place of business at 19 Nehru Place, New Delhi, India. Upon information and belief, Ranbaxy is doing business in the United States and in this district directly, as well as through its wholly-owned subsidiaries Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy Pharmaceuticals"), a Delaware corporation with its principal place of business at 600 College Road East, Princeton, New Jersey, and its wholly-owned subsidiary Ohm Laboratories, Inc. ("Ohm Laboratories"), a New Jersey corporation with its principal place of business at 1385 Livingston Avenue, North Brunswick, New Jersey.  Upon information and belief, Ranbaxy has caused Ranbaxy Pharmaceuticals and Ohm Laboratories to register to do business in New Jersey, and has caused Ranbaxy Pharmaceuticals to register prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services.  Upon information and belief, Ranbaxy has ultimate control over the activities of Ranbaxy Pharmaceuticals and Ohm Laboratories.

### Jurisdiction and Venue

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 1400(b), 2201 and 2202.

- 4 -

9.      Each of Mylan Pharmaceuticals, Mylan Laboratories, Teva USA, Teva Industries, Barr, and Ranbaxy is subject to personal jurisdiction in this judicial district.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

### Cephalon's PROVIGIL® Patent

11.     Cephalon is the owner by assignment of U.S. Reissue Patent No. RE37,516 ("the RE '516 Patent"), entitled "Acetamide Derivative Having Defined Particle Size," which the United States Patent and Trademark Office duly and legally issued on January 15, 2002. A true and correct copy of the RE '516 Patent is attached hereto as Exhibit A. The claims of the RE '516 Patent are valid and enforceable. Cephalon owns all right and title to the RE '516 Patent and has the right to sue for and obtain equitable relief and damages for infringement. The RE '516 Patent expires on October 6, 2014.

12.     PROVIGIL® modafinil, which is covered by claims of the RE '516 Patent, is the commercial formulation of modafinil developed, manufactured and sold by Cephalon. PROVIGIL® was approved by the FDA on December 24, 1998, for treatment of excessive daytime sleepiness associated with narcolepsy. The FDA's official publication of approved drugs (the "Orange Book") includes PROVIGIL® listed together with the RE '516 Patent.

13.     PROVIGIL® modafinil is further protected by marketing exclusivity under 21 U.S.C. § 355(j)(5)(D)(ii) until December 24, 2003, and by orphan drug exclusivity until December 24, 2005.

### Infringement by Mylan

14.     By letter dated February 12, 2003 (the "Mylan Notice Letter"), Mylan Pharmaceuticals notified Cephalon that Mylan Pharmaceuticals had submitted ANDA No. 76-

- 5 -

594 (the "Mylan ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and

Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture,

use and sale of tablets containing 100 mg and 200 mg of modafinil (the "Mylan ANDA

Modafinil Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration

date of the RE '516 Patent. Upon information and belief, Mylan Pharmaceuticals intends to

engage in commercial manufacture, use and sale of the Mylan ANDA Modafinil Tablets

promptly upon receiving FDA approval to do so.

      15.    By filing ANDA No. 76-594, Mylan Pharmaceuticals has necessarily represented

to the FDA that the Mylan ANDA Modafinil Tablets have the same active ingredient as

PROVIGIL®, have the same route of administration, dosage form, and strengths as

PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same

proposed labeling as PROVIGIL®.

      16.    In the Mylan Notice Letter, Mylan Pharmaceuticals notified Cephalon that its

ANDA contained a "paragraph IV certification" that, in Mylan Pharmaceuticals' opinion, no

valid claim of the RE '516 Patent will be infringed by the manufacture, use, offer for sale, or sale

of the Mylan ANDA Modafinil Tablets.

      17.    Mylan Pharmaceuticals' submission of ANDA No. 76-594 to obtain approval to

engage in the commercial manufacture, use, offer to sell or sale of the Mylan ANDA Modafinil

Tablets, prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of

the valid claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

      18.    Mylan Pharmaceuticals' commercial manufacture, use, offer to sell or sale of the

Mylan ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute

further acts of infringement of such patent under 35 U.S.C. § 271. Mylan Pharmaceuticals'

filing of its ANDA, and Mylan Pharmaceuticals' intention to engage in the commercial

manufacture, use, offer to sell or sale of the Mylan ANDA Modafinil Tablets upon receiving

FDA approval, create an actual case or controversy with respect to infringement of the RE '516

Patent.

19.    Upon FDA approval of the Mylan ANDA, Mylan Pharmaceuticals will infringe

the RE '516 Patent by making, using, offering to sell, and selling the Mylan ANDA Modafinil

Tablets in the United States, and by actively inducing and contributing to infringement by others,

unless enjoined by this Court.

20.    Upon information and belief, while the Mylan ANDA was filed in the name of

Mylan Pharmaceuticals, it also was filed for the benefit of, and with the knowledge and approval

of, Mylan Laboratories.

21.    Upon information and belief, the officers and directors of Mylan Pharmaceuticals

and Mylan Laboratories directed the preparation and filing of the Mylan ANDA.

22.    Mylan Laboratories is liable for Mylan Pharmaceuticals' infringement of the

RE '516 Patent because, upon information and belief, Mylan Laboratories caused or participated

in, contributed to, aided, abetted, directed and induced the submission of the Mylan ANDA.

23.    Cephalon will be substantially and irreparably damaged and harmed if Mylan's

infringement is not enjoined. Cephalon does not have an adequate remedy at law.

24.    This action is being brought before the expiration of forty-five days from the date

Cephalon received the Mylan Notice Letter, which Cephalon received no earlier than February

19, 2003.

## **Infringement by Teva**

25.    By letter dated February 25, 2003 (the "Teva Notice Letter"), Teva USA notified Cephalon that Teva USA had submitted ANDA No. 76-596 (the "Teva ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use, and sale of tablets containing 100 mg and 200mg of modafinil (the "Teva ANDA Modafinil Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration date of the RE '516 Patent.  Upon information and belief, Teva USA intends to engage in commercial manufacture, use and sale of the Teva ANDA Modafinil Tablets promptly upon receiving FDA approval to do so.

26.    By filing ANDA No. 76-596, Teva USA has necessarily represented to the FDA that the Teva ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®, have the same route of administration, dosage form, and strengths as PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as PROVIGIL®.

27.    In the Teva Notice Letter, Teva USA notified Cephalon that its ANDA contained a "paragraph IV certification" that, in Teva USA's opinion, the commercial manufacture, use or sale of the Teva ANDA Modafinil Tablets will not infringe any valid and enforceable claim of the RE '516 Patent.

28.    Teva USA's submission of ANDA No. 76-596 to obtain approval to engage in the commercial manufacture, use, offer to sell or sale of the Teva ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

29.    Teva USA's commercial manufacture, use, offer to sell or sale of the Teva ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further acts of

- 8 -

infringement of such patent under 35 U.S.C. § 271.  Teva USA's filing of its ANDA, and Teva USA's intention to engage in the commercial manufacture, use, offer to sell or sale of the Teva ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or controversy with respect to infringement of the RE '516 Patent.

30.     Upon FDA approval of the Teva ANDA, Teva USA will infringe the RE '516 Patent by making, using, offering to sell, and selling the Teva ANDA Modafinil Tablets in the United States, and by actively inducing and contributing to infringement by others, unless enjoined by this Court.

31.     Upon information and belief, while the Teva ANDA was filed in the name of Teva USA, it also was filed for the benefit of, and with the knowledge and approval of, Teva Industries.

32.     Upon information and belief, the officers and directors of Teva USA and Teva Industries directed the preparation and filing of the Teva ANDA.

33.     Teva Industries is liable for Teva USA's infringement of the RE '516 Patent because, upon information and belief, Teva Industries caused or participated in, contributed to, aided, abetted, directed and induced the submission of the Teva ANDA.

34.     Cephalon will be substantially and irreparably damaged and harmed if Teva's infringement is not enjoined.  Cephalon does not have an adequate remedy at law.

35.     This action is being brought before the expiration of forty-five days from the date Cephalon received the Teva Notice Letter, which Cephalon received no earlier than February 27, 2003.

- 9 -

## Infringement by Barr

36.    By letter dated February 20, 2003 (the "Barr Notice Letter"), Barr notified Cephalon that Barr had submitted ANDA No. 76-597 (the "Barr ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use, and sale of tablets containing 100 mg and 200 mg of modafinil (the "Barr ANDA Modafinil Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration date of the RE '516 Patent.  Upon information and belief, Barr intends to engage in commercial manufacture, use and sale of the Barr ANDA Modafinil Tablets promptly upon receiving FDA approval to do so.

37.    By filing ANDA No. 76-597, Barr has necessarily represented to the FDA that the Barr ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®, have the same route of administration, dosage form, and strengths as PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as PROVIGIL®.

38.    In the Barr Notice Letter, Barr notified Cephalon that its ANDA contained a "paragraph IV certification" that, in Barr's opinion, the RE '516 Patent is invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use and/or sale of the Barr ANDA Modafinil Tablets.

39.    Barr's submission of ANDA No. 76-597 to obtain approval to engage in the commercial manufacture, use, offer to sell, or sale of the Barr ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

40.    Barr's commercial manufacture, use, offer to sell, or sale of the Barr ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further acts of

- 10 -

infringement of such patent under 35 U.S.C. § 271. Barr's filing of its ANDA, and Barr's intention to engage in the commercial manufacture, use, offer to sell, or sale of the Barr ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or controversy with respect to infringement of the RE '516 Patent.

41.     Upon FDA approval of the Barr ANDA, Barr will infringe the RE '516 Patent by making, using, offering to sell, and selling the Barr ANDA Modafinil Tablets in the United States, and by actively inducing and contributing to infringement by others, unless enjoined by this Court.

42.     Cephalon will be substantially and irreparably damaged and harmed if Barr's infringement is not enjoined. Cephalon does not have an adequate remedy at law.

43.     This action is being brought before the expiration of forty-five days from the date Cephalon received the Barr Notice Letter, which Cephalon received no earlier than February 27, 2003.

## Infringement by Ranbaxy

44.     By letter dated March, 21, 2003 (the "Ranbaxy Notice Letter"), Ranbaxy Pharmaceuticals notified Cephalon that Ranbaxy had submitted ANDA No. 76-595 (the "Ranbaxy ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use, and sale of tablets containing 100 mg and 200 mg of modafinil (the "Ranbaxy ANDA Modafinil Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration date of the RE '516 Patent. Upon information and belief, Ranbaxy intends to engage in commercial manufacture, use and sale of the Ranbaxy ANDA Modafinil Tablets promptly upon receiving FDA approval to do so.

- 11 -

45.      By filing ANDA No. 76-595, Ranbaxy has necessarily represented to the FDA
that the Ranbaxy ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®,
have the same route of administration, dosage form, and strengths as PROVIGIL®, are
bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as
PROVIGIL®.

46.      In the Ranbaxy Notice Letter, Ranbaxy Pharmaceuticals notified Cephalon that
the Ranbaxy ANDA contained a "paragraph IV certification" that, in Ranbaxy's opinion, no
valid claim of the RE '516 Patent will be infringed by the manufacture, use, sale, or offer to sell
of the Ranbaxy ANDA Modafinil Tablets.

47.      Ranbaxy's submission of ANDA No. 76-595 to obtain approval to engage in the
commercial manufacture, use, offer to sell, or sale of the Ranbaxy ANDA Modafinil Tablets,
prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid
claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

48.      Ranbaxy's commercial manufacture, use, offer to sell, or sale of the Ranbaxy
ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further
acts of infringement of such patent under 35 U.S.C. § 271.  Ranbaxy's filing of its ANDA, and
Ranbaxy's intention to engage in the commercial manufacture, use, offer to sell, or sale of the
Ranbaxy ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or
controversy with respect to infringement of the RE '516 Patent.

49.      Upon FDA approval of the Ranbaxy ANDA, Ranbaxy will infringe the RE '516
Patent by making, using, offering to sell, and selling the Ranbaxy ANDA Modafinil Tablets in
the United States, and by actively inducing and contributing to infringement by others, unless
enjoined by this Court.

- 12 -

50.    Upon information and belief, while the Ranbaxy ANDA was filed in the name of Ranbaxy, it also was filed for the benefit of, and with the knowledge and approval of, Ranbaxy's wholly-owned United States subsidiaries Ranbaxy Pharmaceuticals and Ohm Laboratories.

51.    Cephalon will be substantially and irreparably damaged and harmed if Ranbaxy's infringement is not enjoined.  Cephalon does not have an adequate remedy at law.

52.    This action is being brought before the expiration of forty-five days from the date Cephalon received the Ranbaxy Notice Letter, which Cephalon received no earlier than March 21, 2003.

<u>**Prayer for Relief**</u>

WHEREFORE, Cephalon prays that this Court grant the following relief:

A.    A declaration that the RE '516 Patent is valid and enforceable;

B.    <u>As Against Mylan</u>:

(1)    A declaration that a claim or claims of the RE '516 Patent are infringed by the Mylan ANDA Modafinil Tablets, that Mylan Pharmaceuticals' submission of its ANDA No. 76-594 is an act of infringement, and that Mylan's making, using, offering to sell, selling, or importing the Mylan ANDA Modafinil Tablets will infringe the RE '516 Patent;

(2)    A declaration that Mylan Laboratories is directly liable for Mylan Pharmaceuticals' infringement, and/or jointly and severally liable for inducing Mylan Pharmaceuticals' infringement;

(3)    An Order providing that the effective date of any approval of Mylan Pharmaceuticals' ANDA No. 76-594 shall be a date which is not earlier than the date of the expiration of the RE '516 Patent;

(4)    An Order permanently enjoining Mylan Pharmaceuticals, Mylan Laboratories and their affiliates and subsidiaries, and each of their officers, agents, servants and employees, from making, using, offering to sell, selling, or importing the Mylan ANDA Modafinil Tablets until after the date of the expiration of the RE '516 Patent;

(5)    Damages or other monetary relief to Cephalon if Mylan Pharmaceuticals or Mylan Laboratories engage in the commercial manufacture, use, offer to sell, sale, or importation of the Mylan ANDA Modafinil Tablets prior to the expiration of the RE '516 Patent;

(6)    Reasonable attorneys fees, filing fees and reasonable costs of suit incurred by Cephalon in this action; and

(7)    Such further and other relief as this Court deems proper and just.


C.    As Against Teva:

(1)    A declaration that a claim or claims of the RE '516 Patent are infringed by the Teva ANDA Modafinil Tablets, that Teva USA's submission of its ANDA No. 76-596 is an act of infringement, and that Teva's making, using, offering to sell, selling, or importing the Teva ANDA Modafinil Tablets will infringe the RE '516 Patent;

(2)    A declaration that Teva Industries is directly liable for Teva USA's infringement, and/or jointly and severally liable for inducing Teva USA's infringement;

(3)    An Order providing that the effective date of any approval of Teva USA's ANDA No. 76-596 shall be a date which is not earlier than the date of the expiration of the RE '516 Patent;

(4)    An Order permanently enjoining Teva USA, Teva Industries and their affiliates and subsidiaries, and each of their officers, agents, servants and employees, from

- 14 -

making, using, offering to sell, selling, or importing the Teva ANDA Modafinil Tablets until after the date of the expiration of the RE '516 Patent;

(5)     Damages or other monetary relief to Cephalon if Teva USA or Teva Industries engage in the commercial manufacture, use, offer to sell, sale, or importation of the Teva ANDA Modafinil Tablets prior to the expiration of the RE '516 Patent;

(6)     Reasonable attorneys fees, filing fees and reasonable costs of suit incurred by Cephalon in this action; and

(7)     Such further and other relief as this Court deems proper and just.


D.    <u>As Against Barr</u>:

(1)     A declaration that a claim or claims of the RE '516 Patent are infringed by the Barr ANDA Modafinil Tablets, that Barr's submission of its ANDA No. 76-597 is an act of infringement, and that Barr's making, using, offering to sell, selling, or importing the Barr ANDA Modafinil Tablets will infringe the RE '516 Patent;

(2)     An Order providing that the effective date of any approval of Barr's ANDA No. 76-597 shall be a date which is not earlier than the date of the expiration of the RE '516 Patent;

(3)     An Order permanently enjoining Barr and its affiliates and subsidiaries, and each of their officers, agents, servants and employees, from making, using, offering to sell, selling, or importing the Barr ANDA Modafinil Tablets until after the date of the expiration of the RE '516 Patent;

(4)     Damages or other monetary relief to Cephalon if Barr engages in the commercial manufacture, use, offer to sell, sale, or importation of the Barr ANDA Modafinil Tablets prior to the expiration of the RE '516 Patent;

(5)     Reasonable attorneys fees, filing fees and reasonable costs of suit incurred by Cephalon in this action; and

(6)     Such further and other relief as this Court deems proper and just.

E.     <u>As Against Ranbaxy:</u>

(1)     A declaration that a claim or claims of the RE '516 Patent are infringed by the Ranbaxy ANDA Modafinil Tablets, that Ranbaxy's submission of its ANDA No. 76-595 is an act of infringement, and that Ranbaxy's making, using, offering to sell, selling, or importing the Ranbaxy ANDA Modafinil Tablets will infringe the RE '516 Patent;

(2)     An Order providing that the effective date of any approval of Ranbaxy's ANDA No. 76-595 shall be a date which is not earlier than the date of the expiration of the RE '516 Patent;

(3)     An Order permanently enjoining Ranbaxy and its affiliates and subsidiaries, and each of their officers, agents, servants and employees, from making, using, offering to sell, selling, or importing the Ranbaxy ANDA Modafinil Tablets until after the date of the expiration of the RE '516 Patent;

(4)     Damages or other monetary relief to Cephalon if Ranbaxy engages in the commercial manufacture, use, offer to sell, sale, or importation of the Ranbaxy ANDA Modafinil Tablets prior to the expiration of the RE '516 Patent;

- 16 -

(5)    Reasonable attorneys fees, filing fees and reasonable costs of suit incurred by Cephalon in this action; and

(6)    Such further and other relief as this Court deems proper and just.

F.    Such other relief as the Court deems proper and just.

CEPHALON, INC.,

By its attorneys,

_____
Mary Sue Henifin (MH5353)
Victor F. Souto (VS7903)
Hale and Dorr LLP
650 College Road East, 4th Floor
Princeton, New Jersey  08540
(609) 750-7600

OF COUNSEL:

William F. Lee
David B. Bassett
Peter J. Kolovos
Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000

Dated:  March 28, 2003

# Exhibit 2

WINSTON & STRAWN
Brian J. McCarthy (BM-4161)
One Gateway Center
Newark, NJ 07102
(973) 621-2230

*Attorneys for Defendant*
*Barr Laboratories, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CEPHALON, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| **MYLAN PHARMACEUTICALS, INC.,** ) | |
| **MYLAN LABORATORIES, INC.,** ) | **Civil Action No. 03-CV-1394 (JCL)** |
| **TEVA PHARMACEUTICALS USA, INC.,** ) | |
| **TEVA PHARMACEUTICAL INDUSTRIES,** ) | |
| **LTD., BARR LABORATORIES, INC., and** ) | |
| **RANBAXY LABORATORIES LIMITED,** ) | |
| ) | |
| **Defendants.** ) | |

### BARR LABORATORIES' ANSWER, AFFIRMATIVE DEFENSES,
### AND COUNTERCLAIMS

Defendant Barr Laboratories, Inc. ("Barr"), by and through the undersigned

attorneys, answers the Complaint for Patent Infringement of Plaintiff Cephalon, Inc.

("Cephalon") as follows:

#### Nature of the Action

**COMPLAINT:**



1.    This is an action for patent infringement arising under the patent laws of the
United States, Title 35, United States Code, 35 U.S.C. §§ 271 and 281. This action relates to
four Abbreviated New Drug Applications ("ANDA") filed by Mylan Pharmaceuticals, Teva

USA, Barr, and Ranbaxy, respectively, with the U.S. Food and Drug Administration ("FDA") for approval to market a generic version of Cephalon's PROVIGIL® drug product.

ANSWER: Paragraph 1 contains legal conclusions to which no answer is required. To the extent an answer is required, Barr admits that Cephalon's complaint is for patent infringement and for declaratory judgment of patent infringement but denies that Cephalon is entitled to such relief. Barr further admits that it filed an Abbreviated New Drug Applications ("ANDA") with the U.S. Food and Drug Administration ("FDA") seeking approval to market generic versions of Cephalon's PROVIGIL® drug products. Barr lacks knowledge or information sufficient to form a belief as to the truth of the allegations as they relate to the remaining Defendants, and therefore denies those allegations.

## Parties

**COMPLAINT:**

2.    Cephalon is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 145 Brandywine Parkway, West Chester, Pennsylvania.

ANSWER: Admitted.

**COMPLAINT:**

3.    Upon information and belief, Mylan Pharmaceuticals is a corporation organized and existing under the laws of the State of West Virginia, with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia. Mylan Pharmaceuticals is registered to do business in New Jersey and has registered prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Mylan Pharmaceuticals is a wholly-owned subsidiary of Mylan Laboratories.

ANSWER: Barr lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 3, and therefore denies those allegations.

**COMPLAINT:**

4.    Upon information and belief, Mylan Laboratories is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 130

2

Seventh Street, 1030 Century Building, Pittsburgh, Pennsylvania. Upon information and belief, Mylan Laboratories is doing business in this district directly, as well as through its wholly-owned subsidiary Mylan Pharmaceuticals, and its wholly-owned subsidiary Bertek Pharmaceuticals, Inc. ("Bertek"), a Delaware corporation. Upon information and belief, Mylan Laboratories has caused Mylan Pharmaceuticals and Bertek to register to do business in the State of New Jersey, and to register prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Mylan Laboratories has ultimate control over the activities of Mylan Pharmaceuticals and Bertek. Hereinafter, Mylan Pharmaceuticals and Mylan Laboratories are referred to collectively as "Mylan."

        **ANSWER:** Barr lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 4, and therefore denies those allegations.

**COMPLAINT:**

    5.    Upon information and belief, Teva USA is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania, and with regular and established places of business in Elmwood Park, Fairfield, Fair Lawn, Englewood Cliffs, Paterson, and Waldwick, New Jersey. Teva USA is registered to do business in New Jersey and has registered prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Teva USA is a wholly-owned subsidiary of Teva Industries.

        **ANSWER:** Barr lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 5, and therefore denies those allegations.

**COMPLAINT:**

    6.    Upon information and belief, Teva Industries is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, Petach Tikva, Israel. Upon information and belief, Teva Industries is doing business in the United States and in this district directly, as well as through its wholly-owned subsidiary Teva USA, and its wholly-owned subsidiary Plantex USA, Inc. ("Plantex"), a New Jersey corporation with its principal place of business at Two University Drive, Hackensack, New Jersey. Upon information and belief, Teva Industries has caused Teva USA and Plantex to register to do business in the State of New Jersey, and has caused Teva USA to register prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Teva Industries has ultimate control over the activities of Teva USA and Plantex. Hereinafter, Teva USA and Teva Industries are referred to collectively as "Teva."

**ANSWER:** Barr lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 6, and therefore denies those allegations.

**COMPLAINT:**

7.      Upon information and belief, Barr is a corporation organized and existing under the laws of the State of New York, with its principal place of business at Two Quaker Road, Pomona, New York, and with regular and established places of business in Plainsboro and Northvale, New Jersey. Barr is registered to do business in New Jersey and has registered prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services.

**ANSWER:** Admitted.

**COMPLAINT:**

8.      Upon information and belief, Ranbaxy is a corporation organized and existing under the laws of India, with its principal place of business at 19 Nehru Place, New Delhi, India. Upon information and belief, Ranbaxy is doing business in the United States and in this district directly, as well as through its wholly-owned subsidiaries Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy Pharmaceuticals"), a Delaware corporation with its principal place of business at 600 College Road East, Princeton, New Jersey, and its wholly-owned subsidiary Ohm Laboratories, Inc. ("Ohm Laboratories"), a New Jersey corporation with its principal place of business at 1385 Livingston Avenue, North Brunswick, New Jersey. Upon information and belief, Ranbaxy has caused Ranbaxy Pharmaceuticals and Ohm Laboratories to register to do business in New Jersey, and has caused Ranbaxy Pharmaceuticals to register prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Ranbaxy has ultimate control over the activities of Ranbaxy Pharmaceuticals and Ohm Laboratories.

**ANSWER:** Barr lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8, and therefore denies those allegations.

**Jurisdiction and Venue**

**COMPLAINT:**

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 1400(b), 2201 and 2202.

**ANSWER:** Paragraph 9 contains legal conclusions to which no answer is required. To the extent an answer is required, Barr admits that this Court has subject matter jurisdiction over Cephalon's infringement claims on the patent-in-suit.

**COMPLAINT:**

10.    Each of Mylan Pharmaceuticals, Mylan Laboratories, Teva USA, Teva Industries, Barr, and Ranbaxy is subject to personal jurisdiction in this judicial district.

**ANSWER:**  Paragraph 10 contains legal conclusions to which no answer is required.  To the extent an answer is required, Barr admits that this Court has personal jurisdiction over Barr.  Barr lacks knowledge or information sufficient to form a belief as to the truth of the allegations as they relate to the remaining Defendants, and therefore denies those allegations.

**COMPLAINT:**

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

**ANSWER:**  Paragraph 11 contains legal conclusions to which no answer is required.  To the extent an answer is required, Barr admits that venue, as to Barr, is proper in this District.  Barr lacks knowledge or information sufficient to form a belief as to the truth of the allegations as they relate to the remaining Defendants, and therefore denies those allegations.

### Cephalon's PROVIGIL® Patent

**COMPLAINT:**

12.    Cephalon is the owner by assignment of U.S. Reissue Patent No. RE37,516 ("the RE '516 Patent"), entitled "Acetamide Derivative Having Defined Particle Size," which the United States Patent and Trademark Office duly and legally issued on January 15, 2002.  A true and correct copy of the RE '516 Patent is attached hereto as Exhibit A.  The claims of the RE '516 Patent are valid and enforceable.  Cephalon owns all right and title to the RE '516 Patent and has the right to sue for and obtain equitable relief and damages for infringement.  The RE '516 Patent expires on October 6, 2014.

**ANSWER:**  Barr admits that Cephalon is listed on the face of the patent as the assignee of U.S. Reissue Patent No. RE37,516 ("the RE '516 Patent"), entitled "Acetamide Derivative Having Defined Particle Size."  Barr further admits that the United States Patent and Trademark Office issued the RE '516 Patent on January 15, 2002.  Barr also admits, based upon

5

the FDA's website, that the RE '516 Patent expires on October 6, 2014. Barr denies the

remaining allegations of Paragraph 12, including the allegation that the claims of the RE '516

patent are valid and enforceable and any implication that Barr's ANDA products infringe any

claim of the RE '516 patent.

**COMPLAINT:**

13. PROVIGIL® modafinil, which is covered by claims of the RE '516 Patent, is the commercial formulation of modafinil developed, manufactured and sold by Cephalon. PROVIGIL® was approved by the FDA on December 24, 1998, for treatment of excessive daytime sleepiness associated with narcolepsy. The FDA's official publication of approved drugs (the "Orange Book") includes PROVIGIL® listed together with the RE '516 Patent.

**ANSWER:** Barr admits that Cephalon sells Provigil®. Barr further admits that,

according to the FDA's website, the agency approved Cephalon's Provigil® New Drug

Application on or about December 24, 1998 and that Provigil® is indicated to improve

wakefulness in patients with excessive daytime sleepiness associated with narcolepsy. Barr also

admits that the RE '516 Patent is listed in the FDA's Orange Book as a result of Cephalon's

submission of that patent to the agency for listing. Barr denies the remaining allegations of

Paragraph 13.

**COMPLAINT:**

14. PROVIGIL® modafinil is further protected by marketing exclusivity under 21 U.S.C. § 355(j)(5)(D)(ii) until December 24, 2003, and by orphan drug exclusivity until December 24, 2005.

**ANSWER:** Barr admits that the FDA's website indicates that modafinil has been

granted marketing exclusivity until December 24, 2003, and orphan drug exclusivity until

December 24, 2005. Barr denies the remaining allegations of Paragraph 14.

## Infringement by Mylan

**COMPLAINT:**

15.    By letter dated February 12, 2003 (the "Mylan Notice Letter"), Mylan Pharmaceuticals notified Cephalon that Mylan Pharmaceuticals had submitted ANDA No. 76-594 (the "Mylan ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use and sale of tablets containing 100 mg and 200 mg of modafinil (the "Mylan ANDA Modafinil Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration date of the RE '516 Patent.  Upon information and belief, Mylan Pharmaceuticals intends to engage in commercial manufacture, use and sale of the Mylan ANDA Modafinil Tablets promptly upon receiving FDA approval to do so.

    **ANSWER:**  Barr is without sufficient information to form a belief as to the truth

or falsity of the allegations of Paragraph 15, and, therefore, denies these allegations.

**COMPLAINT:**

16.    By filing ANDA No. 76-594, Mylan Pharmaceuticals has necessarily represented to the FDA that the Mylan ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®, have the same route of administration, dosage form, and strengths as PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as PROVIGIL®.

    **ANSWER:**  Barr is without sufficient information to form a belief as to the truth

or falsity of the allegations of Paragraph 16, and, therefore, denies these allegations.

**COMPLAINT:**

17.    In the Mylan Notice Letter, Mylan Pharmaceuticals notified Cephalon that its ANDA contained a "paragraph IV certification" that, in Mylan Pharmaceuticals' opinion, no valid claim of the RE '516 Patent will be infringed by the manufacture, use, offer for sale, or sale of the Mylan ANDA Modafinil Tablets.

    **ANSWER:**  Barr is without sufficient information to form a belief as to the truth

or falsity of the allegations of Paragraph 17, and, therefore, denies these allegations.

**COMPLAINT:**

18.    Mylan Pharmaceuticals' submission of ANDA No. 76-594 to obtain approval to engage in the commercial manufacture, use, offer to sell or sale of the Mylan ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 18, and, therefore, denies these allegations.

**COMPLAINT:**

19.    Mylan Pharmaceuticals' commercial manufacture, use, offer to sell or sale of the Mylan ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further acts of infringement of such patent under 35 U.S.C. § 271.  Mylan Pharmaceuticals' filing of its ANDA, and Mylan Pharmaceuticals' intention to engage in the commercial manufacture, use, offer to sell or sale of the Mylan ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or controversy with respect to infringement of the RE '516 Patent.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 19, and, therefore, denies these allegations.

**COMPLAINT:**

20.    Upon FDA approval of the Mylan ANDA, Mylan Pharmaceuticals will infringe the RE '516 Patent by making, using, offering to sell, and selling the Mylan ANDA Modafinil Tablets in the United States, and by actively inducing and contributing to infringement by others, unless enjoined by this Court.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 20, and, therefore, denies these allegations.

**COMPLAINT:**

21.    Upon information and belief, while the Mylan ANDA was filed in the name of Mylan Pharmaceuticals, it also was filed for the benefit of, and with the knowledge and approval of, Mylan Laboratories.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 21, and, therefore, denies these allegations.

**COMPLAINT:**

22.    Upon information and belief, the officers and directors of Mylan Pharmaceuticals and Mylan Laboratories directed the preparation and filing of the Mylan ANDA.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 22, and, therefore, denies these allegations.

**COMPLAINT:**

23.    Mylan Laboratories is liable for Mylan Pharmaceuticals' infringement of the RE '516 Patent because, upon information and belief, Mylan Laboratories caused or participated in, contributed to, aided, abetted, directed and induced the submission of the Mylan ANDA.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 23, and, therefore, denies these allegations.

**COMPLAINT:**

24.    Cephalon will be substantially and irreparably damaged and harmed if Mylan's infringement is not enjoined. Cephalon does not have an adequate remedy at law.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 24, and, therefore, denies these allegations.

**COMPLAINT:**

25.    This action is being brought before the expiration of forty-five days from the date Cephalon received the Mylan Notice Letter, which Cephalon received no earlier than February 19, 2003.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 25, and, therefore, denies these allegations.

**Infringement by Teva**

**COMPLAINT:**

26.    By letter dated February 25, 2003 (the "Teva Notice Letter"), Teva USA notified Cephalon that Teva USA had submitted ANDA No. 76-596 (the "Teva ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use, and sale of tablets containing 100 mg and 200 mg of modafinil (the "Teva ANDA Modafinil Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration date of the RE '516 Patent. Upon information and belief, Teva USA intends to engage in commercial manufacture, use and sale of the Teva ANDA Modafinil Tablets promptly upon receiving FDA approval to do so.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 26, and, therefore, denies these allegations.

**COMPLAINT:**

9

27.    By filing ANDA No. 76-596, Teva USA has necessarily represented to the FDA that the Teva ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®, have the same route of administration, dosage form, and strengths as PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as PROVIGIL®.

**ANSWER:**  Barr is without sufficient information to form a belief as to the truth

or falsity of the allegations of Paragraph 27, and, therefore, denies these allegations.

**COMPLAINT:**

28.    In the Teva Notice Letter, Teva USA notified Cephalon that its ANDA contained a "paragraph IV certification" that, in Teva USA's opinion, the commercial manufacture, use or sale of the Teva ANDA Modafinil Tablets will not infringe any valid and enforceable claim of the RE '516 Patent.

**ANSWER:**  Barr is without sufficient information to form a belief as to the truth

or falsity of the allegations of Paragraph 28, and, therefore, denies these allegations.

**COMPLAINT:**

29.    Teva USA's submission of ANDA No. 76-596 to obtain approval to engage in the commercial manufacture, use, offer to sell or sale of the Teva ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

**ANSWER:**  Barr is without sufficient information to form a belief as to the truth

or falsity of the allegations of Paragraph 29, and, therefore, denies these allegations.

**COMPLAINT:**

30.    Teva USA's commercial manufacture, use, offer to sell or sale of the Teva ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further acts of infringement of such patent under 35 U.S.C. § 271.  Teva USA's filing of its ANDA, and Teva USA's intention to engage in the commercial manufacture, use, offer to sell or sale of the Teva ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or controversy with respect to infringement of the RE '516 Patent.

**ANSWER:**  Barr is without sufficient information to form a belief as to the truth

or falsity of the allegations of Paragraph 30, and, therefore, denies these allegations.

**COMPLAINT:**

31.    Upon FDA approval of the Teva ANDA, Teva USA will infringe the RE '516 Patent by making, using, offering to sell, and selling the Teva ANDA Modafinil Tablets in the United States, and by actively inducing and contributing to infringement by others, unless enjoined by this Court.

ANSWER:  Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 31, and, therefore, denies these allegations.

COMPLAINT:

32.    Upon information and belief, while the Teva ANDA was filed in the name of Teva USA, it also was filed for the benefit of, and with the knowledge and approval of, Teva Industries.

ANSWER:  Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 32, and, therefore, denies these allegations.

COMPLAINT:

33.    Upon information and belief, the officers and directors of Teva USA and Teva Industries directed the preparation and filing of the Teva ANDA.

ANSWER:  Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 33, and, therefore, denies these allegations.

COMPLAINT:

34.    Teva Industries is liable for Teva USA's infringement of the RE '516 Patent because, upon information and belief, Teva Industries caused or participated in, contributed to, aided, abetted, directed and induced the submission of the Teva ANDA.

ANSWER:  Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 34, and, therefore, denies these allegations.

COMPLAINT:

35.    Cephalon will be substantially and irreparably damaged and harmed if Teva's infringement is not enjoined.  Cephalon does not have an adequate remedy at law.

ANSWER:  Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 35, and, therefore, denies these allegations.

11

**COMPLAINT:**

36.     This action is being brought before the expiration of forty-five days from the date Cephalon received the Teva Notice Letter, which Cephalon received no earlier than February 27, 2003.

**ANSWER:**  Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 36, and, therefore, denies these allegations.

## Infringement by Barr

**COMPLAINT:**

37.     By letter dated February 20, 2003 (the "Barr Notice Letter"), Barr notified Cephalon that Barr had submitted ANDA No. 76-597 (the "Barr ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use, and sale of tablets containing 100 mg and 200 mg of modafinil (the "Barr ANDA Modafinil Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration date of the RE '516 Patent.  Upon information and belief, Barr intends to engage in commercial manufacture, use and sale of the Barr ANDA Modafinil Tablets promptly upon receiving FDA approval to do so.

**ANSWER:**  Barr admits that first sentence of Paragraph 37.  Barr further admits that once FDA approves its ANDA, Barr plans to take all legal and commercially reasonable steps necessary to market, sell, and offer to sell its generic modafinil products.  Barr denies the remaining allegations of Paragraph 37.

**COMPLAINT:**

38.     By filing ANDA No. 76-597, Barr has necessarily represented to the FDA that the Barr ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®, have the same route of administration, dosage form, and strengths as PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as PROVIGIL®.

**ANSWER:**  Barr admits that by filing ANDA No. 76-597, Barr has represented to the FDA Barr's belief that ANDA No. 76-597 satisfies the statutory requirements for agency approval, as set forth in 21 U.S.C. § 355(j).  Barr denies the remaining allegations of Paragraph 38.

**COMPLAINT:**

12

39.    In the Barr Notice Letter, Barr notified Cephalon that its ANDA contained a "paragraph IV certification" that, in Barr's opinion, the RE '516 Patent is invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use and/or sale of the Barr ANDA Modafinil Tablets.

ANSWER: Admitted.

**COMPLAINT:**

40.    Barr's submission of ANDA No. 76-597 to obtain approval to engage in the commercial manufacture, use, offer to sell, or sale of the Barr ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

ANSWER: Barr admits that filing an ANDA containing a paragraph IV certification to an Orange Book listed patent, such as the RE '516 Patent, vests this Court with subject matter jurisdiction pursuant to 35 U.S.C. § 271(e) as to that patent. Barr denies the remaining allegations of Paragraph 40, including any implication that Barr's ANDA products infringe any claim of the RE '516 patent.

**COMPLAINT:**

41.    Barr's commercial manufacture, use, offer to sell, or sale of the Barr ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further acts of infringement of such patent under 35 U.S.C. § 271. Barr's filing of its ANDA, and Barr's intention to engage in the commercial manufacture, use, offer to sell, or sale of the Barr ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or controversy with respect to infringement of the RE '516 Patent.

ANSWER: Barr admits that filing an ANDA containing a paragraph IV certification to an Orange Book listed patent, such as the RE '516 Patent, vests this Court with subject matter jurisdiction pursuant to 35 U.S.C. § 271(e) as to that patent. Barr denies the remaining allegations of Paragraph 41, including any implication that Barr's ANDA products infringe any claim of the RE '516 patent.

**COMPLAINT:**

42.    Upon FDA approval of the Barr ANDA, Barr will infringe the RE '516 Patent by making, using, offering to sell, and selling the Barr ANDA Modafinil Tablets in the United

States, and by actively inducing and contributing to infringement by others, unless enjoined by this Court.

        **ANSWER:** Denied.

**COMPLAINT:**

43.    Cephalon will be substantially and irreparably damaged and harmed if Barr's infringement is not enjoined. Cephalon does not have an adequate remedy at law.

        **ANSWER:** Denied.

**COMPLAINT:**

44.    This action is being brought before the expiration of forty-five days from the date Cephalon received the Barr Notice Letter, which Cephalon received no earlier than February 27, 2003.

        **ANSWER:** Admitted.

## Infringement by Ranbaxy

**COMPLAINT:**

45.    By letter dated March, 21, 2003 (the "Ranbaxy Notice Letter"), Ranbaxy Pharmaceuticals notified Cephalon that Ranbaxy had submitted ANDA No. 76-595 (the "Ranbaxy ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use, and sale of tablets containing 100 mg and 200 mg of modafinil (the "Ranbaxy ANDA Modafinil Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration date of the RE '516 Patent. Upon information and belief, Ranbaxy intends to engage in commercial manufacture, use and sale of the Ranbaxy ANDA Modafinil Tablets promptly upon receiving FDA approval to do so.

        **ANSWER:** Barr is without sufficient information to form a belief as to the truth

or falsity of the allegations of Paragraph 45, and, therefore, denies these allegations.

**COMPLAINT:**

46.    By filing ANDA No. 76-595, Ranbaxy has necessarily represented to the FDA that the Ranbaxy ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®, have the same route of administration, dosage form, and strengths as PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as PROVIGIL®.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 46, and, therefore, denies these allegations.

**COMPLAINT:**

47.     In the Ranbaxy Notice Letter, Ranbaxy Pharmaceuticals notified Cephalon that the Ranbaxy ANDA contained a "paragraph IV certification" that, in Ranbaxy's opinion, no valid claim of the RE '516 Patent will be infringed by the manufacture, use, sale, or offer to sell of the Ranbaxy ANDA Modafinil Tablets.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 47, and, therefore, denies these allegations.

**COMPLAINT:**

48.     Ranbaxy's submission of ANDA No. 76-595 to obtain approval to engage in the commercial manufacture, use, offer to sell, or sale of the Ranbaxy ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 48, and, therefore, denies these allegations.

**COMPLAINT:**

49.     Ranbaxy's commercial manufacture, use, offer to sell, or sale of the Ranbaxy ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further acts of infringement of such patent under 35 U.S.C. § 271. Ranbaxy's filing of its ANDA, and Ranbaxy's intention to engage in the commercial manufacture, use, offer to sell, or sale of the Ranbaxy ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or controversy with respect to infringement of the RE '516 Patent.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 49, and, therefore, denies these allegations.

**COMPLAINT:**

50.     Upon FDA approval of the Ranbaxy ANDA, Ranbaxy will infringe the RE '516 Patent by making, using, offering to sell, and selling the Ranbaxy ANDA Modafinil Tablets in the United States, and by actively inducing and contributing to infringement by others, unless enjoined by this Court.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 50, and, therefore, denies these allegations.

**COMPLAINT:**

51.    Upon information and belief, while the Ranbaxy ANDA was filed in the name of Ranbaxy, it also was filed for the benefit of, and with the knowledge and approval of, Ranbaxy's wholly-owned United States subsidiaries Ranbaxy Pharmaceuticals and Ohm Laboratories.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 51, and, therefore, denies these allegations.

**COMPLAINT:**

52.    Cephalon will be substantially and irreparably damaged and harmed if Ranbaxy's infringement is not enjoined.  Cephalon does not have an adequate remedy at law.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 52, and, therefore, denies these allegations.

**COMPLAINT:**

53.    This action is being brought before the expiration of forty-five days from the date Cephalon received the Ranbaxy Notice Letter, which Cephalon received no earlier than March 21, 2003.

**ANSWER:** Barr is without sufficient information to form a belief as to the truth or falsity of the allegations of Paragraph 53, and, therefore, denies these allegations.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The manufacture, use, or sale of Barr's ANDA products has not infringed, does not infringe, and would not, if marketed, infringe any claim of the RE '516 patent.

### Second Affirmative Defense

Any additional defenses or counterclaims that discovery may reveal or set forth in the answer of any co-defendant in this action.

16

## COUNTERCLAIM FOR DECLARATORY JUDGMENT

For its counterclaim against Plaintiff Cephalon, Inc. ("Cephalon"), Defendant Barr Laboratories, Inc. ("Barr") states as follows:

### Parties

1.     Cephalon is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 145 Brandywine Parkway, West Chester, Pennsylvania.

2.     Barr is a corporation organized and existing under the laws of the State of New York and maintaining its principal place of business at Two Quaker Road, Pomona, New York, 10970.

### Background

A.    **FDA Approval of New Brand-Name Drugs.**

3.     The Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. § 301 *et seq.*, as amended by the Hatch-Waxman Amendments, sets forth the rules that the U.S. Food and Drug Administration ("FDA") follows when considering whether to approve the marketing of both brand-name and generic drugs.

4.     Under the FFDCA, an applicant seeking to market a new brand-name drug must prepare a New Drug Application ("NDA") for consideration by the FDA. *See* 21 U.S.C. § 355.

5.     An NDA must include, among other things, the number of any patent that claims the "drug" or a "method of using [the] drug" for which the NDA was submitted and for which a claim of patent infringement could reasonably be asserted against an unauthorized party. *See* 21 U.S.C. §§ 355(b)(1), (c)(2); 21 C.F.R. §§ 314.53(b), (c)(2).

6.      Upon approval of the NDA, the FDA publishes patent information for the approved drug in the "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book." *See* 21 U.S.C. § 355(j)(7)(A)(iii).

**B.      Generic Competition – Abbreviated New Drug Applications ("ANDAs").**

7.      Generic drugs are versions of brand-name prescription drugs that typically contain the same active ingredients, but not necessarily the same inactive ingredients, as the brand-name original.

8.      In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, also known as the Hatch-Waxman Amendments, to the FFDCA. *See* Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified at 21 U.S.C. § 355 and 35 U.S.C. §§ 156, 271(e)). Congress passed the Hatch-Waxman Amendments, which simplified the procedure for obtaining approval of generic drugs, for the purpose of decreasing the cost of pharmaceuticals through increased competition. Under the Hatch-Waxman Amendments, a generic manufacturer submits what is called an Abbreviated New Drug Application ("ANDA").

9.      To receive approval of its ANDA, an applicant must show, *inter alia*, that its generic drug is "bioequivalent" to the listed reference drug. *See* 21 U.S.C. § 355(j)(4)(F).

10.     An ANDA also must contain a "certification" to every patent that the NDA holder has submitted to the FDA for listing in the Orange Book. *See* 21 U.S.C. § 355(j)(2)(A)(vii); 21 C.F.R. § 314.94(a)(12).

11.     A so-called "paragraph IV" certification asserts that the listed patent is invalid, unenforceable, and/or will not be infringed and, on that basis, seeks FDA approval of the generic product prior to patent expiration. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

12. An applicant submitting an ANDA containing a paragraph IV certification must notify both the patent holder and NDA holder of its paragraph IV certification. *See* 21 U.S.C. § 355(j)(2)(B)(i).

13. Upon receiving notice of the paragraph IV certification, the patent holder has 45 days in which to file an infringement suit against the generic manufacturer. *See* 21 U.S.C. § 355(j)(5)(B)(iii); 35 U.S.C. § 271(e)(2)(A).

14. Patent holders have a significant strategic incentive to file suit within 45 days because doing so, regardless of merit, prevents the FDA from approving the generic maker's ANDA for a period of 30 months. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

15. If the court hearing the infringement action decides the patent is valid, enforceable, and would be infringed by the product proposed in the ANDA, the FDA will not approve the ANDA until the patent expires. *See* 21 U.S.C. § 355(j)(5)(B)(iii). If, however, the court hearing the infringement action rules before the expiration of the 30-month period that the patent is invalid, unenforceable, or not infringed, the FDA may approve the ANDA. *Id.*

## C.    Barr's ANDA.

16. Barr filed an ANDA (No. 76-597) with the FDA seeking generic approval to market 100 and 200 mg tablets of generic modafinil. The ANDA shows that Barr's ANDA products are bioequivalent to the products that are the subject of NDA No. 20-717, which is owned by Cephalon.

17. Cephalon listed its U.S. Patent No. RE37,516 ("the RE '516 patent") in the Orange Book in connection with NDA No. 20-717.

18. Because Barr seeks FDA approval to market its ANDA products before expiration of the RE '516 patent, Barr's ANDA includes a paragraph IV certification to that patent.

## Jurisdiction and Venue

19.     Barr realleges and incorporates by reference the allegations of paragraphs 1-18.

20.     Present, genuine, and justiciable controversies exist between Plaintiff Cephalon and Defendant Barr regarding the RE '516 patent.

21.     Subject matter jurisdiction over these counterclaims is proper under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

22.     Venue is proper under 28 U.S.C. §§ 1391 and 1400.

## Counterclaim I
## Declaration of Non-Infringement of the '516 Patent

23.     Barr realleges and incorporates by reference the allegations of paragraphs 1-22.

24.     This counterclaim arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seeks a declaration that the claims of the RE '516 patent will not be infringed by the manufacture, use, or sale of the products described in Barr's ANDA No. 76-597.

25.     A present, genuine, and justiciable controversy exists between Plaintiff Cephalon and Defendant Barr regarding the issue of whether the manufacture, use, or sale of Barr's proposed ANDA products would infringe the claims of the RE '516 patent.

26.     The manufacture, use, or sale of Barr's ANDA products would not infringe the claims of the RE '516 patent.

27.     Barr is entitled to a declaration that the manufacture, use, or sale of its ANDA products would not infringe the claims of the RE '516 patent.

## REQUEST FOR RELIEF

WHEREFORE, Defendant Barr Laboratories, Inc. respectfully requests that this Court enter a Judgment and Order in its favor and against Plaintiff Cephalon, Inc. as follows:

(a)    declaring that Barr has not infringed the claims of U.S. Patent No. RE37,516;

(b)    declaring that Barr's manufacture, use, or sale of products covered by ANDA No. 76-597 would not infringe the claims of the U.S. Patent No. RE37,516;

(c)    declaring that this is an exceptional case under 35 U.S.C. § 285 and awarding Barr its attorneys' fees, costs, and expenses in this action; and

(d)    awarding Barr any further and additional relief as the Court deems just and proper.

## JURY DEMAND

Barr demands trial by jury as to all issues so triable.

Dated:  April 30, 2003                     Respectfully submitted,

Brian J. McCarthy (BM-4161)
WINSTON & STRAWN
1 Gateway Center
Newark, NJ 07102
(973) 621-2230
(973) 623-4640 (fax)

George C. Lombardi
Christine J. Siwik
Denise Taliaferro
WINSTON & STRAWN
35 West Wacker Drive
Chicago, IL  60601
(312) 558-5600
(312) 558-5700 (fax)

Robert C. Millonig
Eldora Ellison Floyd
Sterne, Kessler, Goldstein & Fox P.L.L.C.
1100 New York Avenue, N.W.
Washington, D.C.  20005-3934
(202) 371-2600

Counsel for Defendant Barr Laboratories, Inc.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to Local Civil Rule 11.2, I hereby certify that the within action is not the subject of any other action pending in any Court, or of any pending arbitration or administrative proceeding.

Dated:  April 30, 2003

_____
Brian J. McCarthy

## CERTIFICATE OF SERVICE

I certify that the foregoing Barr Laboratories' Answer, Affirmative Defenses, and Counterclaim has been served on the 30th day of April, 2003, upon the following counsel as follows:

**by Federal Express:**

Mary Sue Henifin
Victor F. Souto
Hale and Dorr LLP
650 College Road East, 4th Floor
Princeton, NJ  08540
(609) 750-7600
(609) 750-7700 (fax)

William F. Lee
David B. Bassett
Peter J. Kolovos
Hale and Dorr LLP
60 State Street
Boston, MA  02109
(617) 526-6000
(617) 526-5000 (fax)

Dated:  April 30, 2003

_____
Brian J. McCarthy

- 22 -

# Exhibit 3

Robert G. Shepherd, Esq. (RGS-5946)
Brooks R. Bruneau, Esq. (BRB-5523)
**MATHEWS, COLLINS, SHEPHERD & MCKAY, P.A.**
100 Thanet Circle, Suite 306
Princeton, NJ 08540-3674
(609) 924-8555 Telephone
(609) 924-3036 Facsimile

Attorneys for Defendant,
RANBAXY LABORATORIES LIMITED

<div align="center">

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK VICINAGE

</div>

| | |
|---|---|
| CEPHALON, INC., <br><br> Plaintiff, <br><br> v. <br><br> MYLAN PHARMACEUTICALS, INC., MYLAN LABORATORIES, INC., TEVA PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICAL INDUSTRIES, LTD., BARR LABORATORIES, INC., AND RANBAXY LABORATORIES LIMITED, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 03-1394 (JCL) <br><br> **FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS** <br><br> Document Electronically Filed |

Defendant Ranbaxy Laboratories Ltd. of New Delhi, India, ("Ranbaxy") answers the Complaint of Plaintiff Cephalon, Inc. ("Cephalon") as follows:

## NATURE OF THE ACTION

Ranbaxy admits that the Complaint purports to state a cause of action for patent infringement, but Ranbaxy denies any liability or wrongdoing whatsoever.

## PARTIES

1. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 of the Complaint and on that basis denies the allegations contained in Paragraph 1 of the Complaint.

2. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint and on that basis denies the allegations contained in this Paragraph 2 of the Complaint.

3. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 of the Complaint and on that basis denies the allegations contained in this Paragraph 3 of the Complaint.

4. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4 of the Complaint and on that basis denies the allegations contained in this Paragraph 4 of the Complaint.

5. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 of the Complaint and on that basis denies the allegations contained in Paragraph 5 of the Complaint.

6. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of the Complaint and on that basis denies the allegations contained in Paragraph 6 of the Complaint.

7.  Ranbaxy admits that it is a corporation organized and existing under the laws of India.  Ranbaxy admits that it has a principal place of business at 19, Nehru Place, New Delhi 110 024, India.  Ranbaxy admits that Ranbaxy Pharmaceuticals Inc. is a corporation organized and existing under laws of the State of Delaware.  Ranbaxy admits that Ranbaxy Pharmaceuticals Inc. has a principal place of business at 600 College Road East, Suite 2100, Princeton, New Jersey 08540.  Ranbaxy admits that Ohm Laboratories is a corporation organized and existing under laws of the State of New Jersey.  Ranbaxy admits that Ohm Laboratories has a principal place of business at 1385 Livingston Avenue, North Brunswick, New Jersey. Ranbaxy denies the remaining allegations in Paragraph 7 of the Complaint.

## JURISDICTION AND VENUE

8.  Ranbaxy admits that the Court has jurisdiction over the subject matter alleged in the Complaint pursuant to 28 U.S.C. §§ 1331 and 1338(a), and that venue is proper under 28 U.S.C. § 1400(b).  Ranbaxy denies all other allegations of Paragraph 8.

9.  Ranbaxy admits that it is subject to personal jurisdiction in this judicial district. Ranbaxy denies the remaining allegations contained in Paragraph 9 of the Complaint.

10. Ranbaxy admits that venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## ALLEGATIONS REGARDING CEPHALON'S PATENT

11. Ranbaxy admits that U.S. Reissue Patent No. RE37,516 E ("'516 Reissue Patent") entitled "Acetamide Derivative Having Defined Particle Size" indicates on its face that it was issued on January 15, 2002, was initially assigned to Cephalon, and expires no later than October 6, 2014.  Ranbaxy denies that any claim of the '516 Reissue Patent is valid or infringed. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 11 of the Complaint and on that basis denies the remaining allegations contained in Paragraph 11 of the Complaint.

12. Ranbaxy admits that the 22nd edition of the FDA publication entitled *Approved Drug Products with Therapeutic Equivalence Evaluations* (2002) (the "Orange Book") lists

PROVIGIL® as a proprietary name for modafinil, lists Cephalon as the applicant for PROVIGIL®, lists the '516 Reissue Patent with respect to PROVIGIL®, and lists December 24, 1998 as the date of approval. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 12 of the Complaint and on that basis denies the remaining allegations contained in Paragraph 12 of the Complaint.

13. Ranbaxy admits that the Orange Book lists PROVIGIL® as protected by New Chemical Entity status until December 24, 2003 and by Orphan Drug Exclusivity until December 24, 2005. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 13 of the Complaint and on that basis denies the remaining allegations contained in Paragraph 13 of the Complaint.

## ALLEGATIONS REGARDING DEFENDANT MYLAN

14. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 of the Complaint and on that basis denies the allegations contained in Paragraph 14 of the Complaint.

15. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 of the Complaint and on that basis denies the allegations contained in Paragraph 15 of the Complaint.

16. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of the Complaint and on that basis denies the allegations contained in Paragraph 16 of the Complaint.

17. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Complaint and on that basis denies the allegations contained in Paragraph 17 of the Complaint.

18. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 of the Complaint and on that basis denies the allegations contained in Paragraph 18 of the Complaint.

19. Ranbaxy is without knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 19 of the Complaint and on that basis denies the allegations contained in Paragraph 19 of the Complaint.

20. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of the Complaint and on that basis denies the allegations contained in Paragraph 20 of the Complaint.

21. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of the Complaint and on that basis denies the allegations contained in Paragraph 21 of the Complaint.

22. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of the Complaint and on that basis denies the allegations contained in Paragraph 22 of the Complaint.

23. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23 of the Complaint and on that basis denies the allegations contained in Paragraph 23 of the Complaint.

24. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 24 of the Complaint and on that basis denies the allegations contained in Paragraph 24 of the Complaint.

## ALLEGATIONS REGARDING DEFENDANT TEVA

25. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 25 of the Complaint and on that basis denies the allegations contained in Paragraph 25 of the Complaint.

26. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 26 of the Complaint and on that basis denies the allegations contained in Paragraph 26 of the Complaint.

27. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 of the Complaint and on that basis denies the allegations contained in Paragraph 27 of the Complaint.

28. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 of the Complaint and on that basis denies the allegations contained in Paragraph 28 of the Complaint.

29. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 of the Complaint and on that basis denies the allegations contained in Paragraph 29 of the Complaint.

30. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 of the Complaint and on that basis denies the allegations contained in Paragraph 30 of the Complaint.

31. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 of the Complaint and on that basis denies the allegations contained in Paragraph 31 of the Complaint.

32. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of the Complaint and on that basis denies the allegations contained in Paragraph 32 of the Complaint.

33. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33 of the Complaint and on that basis denies the allegations contained in Paragraph 33 of the Complaint.

34. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34 of the Complaint and on that basis denies the allegations contained in Paragraph 34 of the Complaint.

35. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35 of the Complaint and on that basis denies the allegations contained in Paragraph 35 of the Complaint.

## ALLEGATIONS REGARDING DEFENDANT BARR

36. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 of the Complaint and on that basis denies the

allegations contained in Paragraph 36 of the Complaint.

37. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 of the Complaint and on that basis denies the allegations contained in Paragraph 37 of the Complaint.

38. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38 of the Complaint and on that basis denies the allegations contained in Paragraph 38 of the Complaint.

39. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39 of the Complaint and on that basis denies the allegations contained in Paragraph 39 of the Complaint.

40. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40 of the Complaint and on that basis denies the allegations contained in Paragraph 40 of the Complaint.

41. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41 of the Complaint and on that basis denies the allegations contained in Paragraph 41 of the Complaint.

42. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42 of the Complaint and on that basis denies the allegations contained in Paragraph 42 of the Complaint.

43. Ranbaxy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43 of the Complaint and on that basis denies the allegations contained in Paragraph 43 of the Complaint.

## ALLEGATIONS REGARDING DEFENDANT RANBAXY

44. Ranbaxy admits that it sent a letter dated March 18, 2003, to Cephalon that informed Cephalon that Ranbaxy had submitted Abbreviated New Drug Application No. 76-595 ("ANDA") with the U.S. Food and Drug Administration ("FDA"), under Section 505(j)(2)(B)(ii) of the Federal Food, Drug, and Cosmetic Act ("FDCA") in order to obtain approval to engage in

the commercial manufacture, use or sale of drug products containing modafinil. Ranbaxy admits the Orange Book lists an expiration date of October 6, 2014 for the '516 Reissue Patent. Ranbaxy admits its proposed drug products are in the form of tablets, which contain 100 mg and 200 mg of modafinil as the active ingredient. Ranbaxy admits that it presently intends to manufacture, use, sell and offer to sell drug products for which the ANDA has been submitted once the FDA approves the ANDA. Ranbaxy denies the remaining allegations contained in Paragraph 44 of the Complaint.

45. Ranbaxy admits that the ANDA stated that the dosage form, route of administration, indications and usage, active ingredient, potency and labeling (except DESCRIPTION and HOW SUPPLIED sections) for Ranbaxy's Modafinil Tablets 100 mg and 200 mg are the same as those for Provigil® Tablets, 100 mg and 200 mg. Ranbaxy admits that the ANDA stated that the required bio-availability/bio-equivalent studies indicate that Ranbaxy's Modafinil Tablets 100 mg and 200 mg are bio-equivalent to Provigil® Tablets, 100 mg and 200 mg. Ranbaxy denies the remaining allegations contained in Paragraph 45 of the Complaint.

46. Ranbaxy admits that the March 18, 2003, letter to Cephalon notified Cephalon that the ANDA certifies under FDCA Section 505(j)(2)(A)(vii) paragraph IV, that in the opinion of Ranbaxy and to the best of its knowledge, no valid claim of the '516 Reissue Patent will be infringed by the manufacture, use, sale or offer to sell of the drug products for which the ANDA has been submitted. Ranbaxy denies the remaining allegations contained in Paragraph 46 of the Complaint.

47. Ranbaxy denies the allegations contained in Paragraph 47 of the Complaint.

48. Ranbaxy denies the allegations contained in Paragraph 48 of the Complaint.

49. Ranbaxy denies the allegations contained in Paragraph 49 of the Complaint.

50. Ranbaxy admits that the ANDA was filed with the knowledge and approval of Ranbaxy Pharmaceuticals Inc. and Ohm Laboratories. Ranbaxy denies the remaining allegations contained in Paragraph 50 of the Complaint.

51. Ranbaxy denies the allegations contained in Paragraph 51 of the Complaint.

52. Ranbaxy admits that this action was filed on or about March 28, 2003, which is within 45 days from the date Ranbaxy sent the March 18, 2003 letter to Cephalon.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

53. The '516 Reissue Patent is invalid in its entirety for failure to satisfy one or more of the statutory requirements of 35 U.S.C. §§ 101 *et seq.*

### Second Affirmative Defense

54. Ranbaxy is not infringing, nor has it ever infringed, any claim of the '516 Reissue Patent.

### Third Affirmative Defense

55. The '516 Reissue Patent is unenforceable due to inequitable conduct by the named inventors and the attorneys who prosecuted the applications that lead to the '516 Reissue Patent and the original U.S Patent No. 5,618,845. Specifically, named inventors Peter Grebow, Vincent Corvari, and David Stong and prosecuting attorneys Rick Burgoon and Robert Hrubiec, had knowledge of material facts relevant to patentability, knew them to be material, and yet withheld them from the U.S. Patent and Trademark Office (the "PTO") with deceptive intent. They also made knowing and intentional misrepresentations of material facts relevant to patentability to the PTO with deceptive intent. The details of these intentional omissions and misrepresentations are set forth below.

56. The modafinil compositions and methods claimed in the '516 Reissue Patent were developed and manufactured by scientists at Labortoire L. Lafon ("Lafon"), not scientists at Cephalon. The '516 Reissue Patent's specification gives the false impression that Cephalon and the named inventors developed and manufactured the modafinil compositions and methods described in the '516 Reissue Patent. Nowhere in the specification or the prosecution history did the named inventors or the prosecuting attorneys inform the PTO that and the claimed modafinil compositions and methods were developed and manufactured by Lafon. These facts were material to patentability because they relate to derivation, inventorship, and obviousness.

-8-

57. The named inventors and prosecuting attorneys did not inform the PTO that Lafon sold and delivered modafinil tablets and modafinil API to Cephalon prior to the critical date of October 6, 1993 under a Supply Agreement and a License Agreement executed in January of 1993. The modafinil tablets and modafinil API sold and delivered to Cephalon prior to the critical date were covered by some, if not all, of the composition claims recited in the '516 Reissue Patent. The sale and delivery of modafinil tablets and modafinil API under the Supply Agreement were material to patentability because those transactions relate to inventorship, obviousness, derivation and the "on-sale" bar.

58. The named inventors and prosecuting attorneys misrepresented in the patent specification and in Peter Grebow's September 26, 1995 declaration that the United States and Foreign clinical studies followed the same protocol. In fact, the Foreign clinical trial conducted by Lafon administered half of the daily dose of modafinil in each of two daily doses, whereas the United States clinical trial conducted by Cephalon administered the entire daily dose in a single dose. The difference in protocol could explain the alleged difference in adverse effects, if any, observed in the U.S. clinical trial. However, Cephalon relied upon the alleged difference in adverse effects to support patentability without telling the Examiner about the critical protocol change. This misrepresentation was material to patentability because it relates to utility, derivation, inventorship and obviousness.

59. The named inventors and prosecuting attorneys concealed from the PTO that the U.S. clinical trial described in the '516 Reissue Patent, which used modafinil compositions covered by at least one of the composition claims, and which followed the method of administration covered by at least one of the method claims, occurred prior to both the critical date and the alleged conception date. The subjects of the first United States clinical trial were members of the public, and they were under no obligation of confidentiality to Cephalon or the clinical investigators. The non-confidential, public clinical trial was material to patentability because it constitutes a public use under 35 U.S.C. Section 102(b) and renders the compositions and methods "known and used" under Section 102(a).

60. The named inventors and prosecuting attorneys misrepresented to the PTO that the dog plasma level data discussed in the '516 Reissue Patent demonstrated that the claimed small particle modafinil compositions result in higher peak plasma levels than the large particle modafinil compositions of the prior art. Notwithstanding their representations to the PTO, the named inventors and prosecuting attorneys knew that the test results were not statistically significant. Cephalon's DM-93-014 report to the United States Food and Drug Administration ("FDA") includes representations directly contradictory to those made to the PTO. That report, completed at least as early as November 8, 1996, concluded that there was no statistically significant difference in the peak plasma levels as a function of modafinil particle size. Cephalon intentionally withheld that FDA report and the contradictory representations therein from the PTO during prosecution of both the underlying '845 Patent and the '516 Reissue Patent. This information was material to patentability because it implicates utility, derivation, and obviousness, and expressly contradicts an argument asserted in favor of patentability.

61. Lafon had already considered the importance of maintaining particle size controls over modafinil drug product prior to Cephalon's alleged invention. Lafon provided Cephalon with particle size information for all of the lots of modafinil API Lafon sold and delivered to Cephalon, including API Lot 003. The '516 Reissue Patent gives the false impression that Cephalon was the first to measure particle size for modafinil and the first to recognize the importance of particle size. The named inventors and their attorneys also misrepresented to the PTO that one or more of the named inventors had discovered that the dissolution rate of modafinil increases with a decrease in particle size. In fact, Lafon scientists discovered the relationship between modafinil dissolution rate and particle size in 1989. Moreover, Lafon had communicated the relevant dissolution and particle size data to Cephalon in March of 1993. In addition, Peter Grebow represented to the PTO that there were no publications suggesting that the utility of modafinil could be improved by reducing its particle size when in fact he knew of a document published in September of 1993, more than one year prior to the filing date, which suggests that modafinil bioavailability differences may be caused by the particle size

-10-

distribution. These misrepresentations and omissions were material to patentability because they relate to inventorship, derivation, obviousness and prior publication under Sections 102(a) and 102(b).

62. The inventors and their attorneys misrepresented to the PTO in the '516 Reissue Patent specification itself that the adverse events observed in the United States clinical trial at 800 mg doses were completely unexpected. Peter Grebow, a named inventor, further misled the PTO when he reiterated that contention in his September 26, 1995 declaration in support of patentability. In reality, Lafon informed Cephalon in February of 1993 that a single 600 mg dose of modafinil may cause adverse effects, and that information was specifically known to Peter Grebow. Furthermore, the named inventors report in the specification that no clinically significant adverse events occurred in the Foreign clinical trials conducted by Lafon. In fact, numerous serious adverse events were observed during those Foreign clinical trials. Peter Grebow was aware of those instances of adverse events and even forwarded Lafon's "serious adverse event" information to a Canadian counterpart. This information was material to patentability because it relates to inventorship, utility, derivation and obviousness.

## COUNTERCLAIMS

Defendant/Counterclaimant Ranbaxy Laboratories Ltd. of New Delhi, India, ("Ranbaxy") brings the following Counterclaims against Plaintiff/Counterdefendant Cephalon, Inc. ("Cephalon"):

## JURISDICTION AND VENUE

63. This is an action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Patent Laws of the United States, based upon an actual controversy between the parties, to declare that Ranbaxy is free to continue to seek approval of Ranbaxy's Abbreviated New Drug Application ("ANDA"), and upon approval by the FDA, to manufacture, use, market, sell and offer to sell its modafinil products in the United States. This is a compulsory counterclaim under Rule 13(a) of the Federal Rules of Civil Procedure and the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and 2201.

-11-

64. Venue is proper under 28 U.S.C. §§ 1391(b), 1400 and by Cephalon's choice of forum.

## PARTIES

65. Ranbaxy is a corporation organized and existing under the laws of India with a principal place of business at 19, Nehru Place, New Delhi 110 024, India.

66. Ranbaxy is informed and believes that Cephalon is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 145 Brandywine Parkway, West Chester, Pennsylvania.

## COUNTERCLAIM FOR DECLARATION OF PATENT NONINFRINGEMENT

67. Ranbaxy incorporates by reference and realleges each of the allegations set forth in Paragraphs 63 through 66 of these counterclaims.

68. Cephalon has filed in this Court an infringement action to enforce U.S. Reissue Patent No. RE37,516 E ("'516 Reissue Patent") against Ranbaxy. Ranbaxy has denied that it has infringed or continues to infringe any claim of the '516 Reissue Patent. An actual controversy therefore exists between the parties.

69. Neither Ranbaxy's ANDA seeking approval to market products containing modafinil, nor the modafinil drug products for which the ANDA has been submitted, nor any other product made, used, sold or offered for sale by Ranbaxy infringe the '516 Reissue Patent.

70. Because Cephalon maintains in this action that Ranbaxy's ANDA and the modafinil drug products for which the ANDA has been submitted infringe the '516 Reissue Patent, a declaration of rights between the parties is both appropriate and necessary to establish that Ranbaxy has not infringed, does not infringe, and will not infringe the '516 Reissue Patent.

## COUNTERCLAIM FOR A DECLARATION OF PATENT INVALIDITY

71. Ranbaxy incorporates by reference and realleges each of the allegations set forth in Paragraphs 63 through 70 of these counterclaims.

72. The '516 Reissue Patent is invalid for failure to satisfy one or more of the statutory requirements of 35 U.S.C. §§ 101 *et seq.*

-12-

73. Because Cephalon has asserted the '516 Reissue Patent against Ranbaxy, declaratory relief is both appropriate and necessary to establish that the '516 Reissue Patent is invalid and thus cannot be asserted against Ranbaxy.

## COUNTERCLAIM FOR DECLARATION OF PATENT UNENFORCEABILITY

74. Ranbaxy incorporates by reference and realleges each of the allegations set forth in Paragraphs 55 through 62 of its Answer, and Paragraphs 63 through 73 of these counterclaims.

75. The '516 Reissue Patent is unenforceable due to inequitable conduct by the named inventors and the attorneys who prosecuted the applications that lead to the '516 Reissue Patent and the original U.S Patent No. 5,618,845. Specifically, named inventors Peter Grebow, Vincent Corvari, and David Stong and prosecuting attorneys Rick Burgoon and Robert Hrubiec, had knowledge of material facts relevant to patentability, knew them to be material, and yet withheld them from the PTO with deceptive intent. They also made knowing and intentional misrepresentations of material facts relevant to patentability to the PTO with deceptive intent. The details of these intentional omissions and misrepresentations are set forth above in the incorporated paragraphs 55 through 62.

76. Because Cephalon has asserted the '516 Reissue Patent against Ranbaxy, declaratory relief is both appropriate and necessary to establish that the '516 Reissue Patent is unenforceable due to inequitable conduct.

## DEMAND FOR JUDGMENT

WHEREFORE, Ranbaxy prays for the following relief:

A. That all claims against Ranbaxy be dismissed with prejudice and that all relief requested by Cephalon be denied;

B. That a judgment be entered that Ranbaxy's ANDA seeking approval to market modafinil products has not infringed and does not infringe any claims of the '516 Reissue Patent, and that Ranbaxy has a lawful right to continue with its ANDA for modafinil products and to allow Ranbaxy to manufacture, market and/or sell its modafinil products once approved by the FDA;

C. That a judgment be entered declaring that the claims of the '516 Reissue Patent are invalid;

D. That a judgment be entered declaring that the '516 Reissue Patent is unenforceable;

E. That Cephalon and its agents, representatives, attorneys and those persons in the active concert or participation with them who receive actual notice thereof, be preliminarily and permanently enjoined from initiating infringement litigation against, or threatening Ranbaxy or any of its customers, dealers or suppliers or any prospective or present sellers, dealers, distributors or customers of Ranbaxy with infringement litigation, or charging any of them either orally or in writing with infringement of the '516 Reissue Patent;

F. That a judgment be entered that this action is an exceptional case within the provision of 35 U.S.C. § 285 and that Ranbaxy is therefore entitled to a recovery of its reasonable attorneys fees upon prevailing in this action;

G. That Ranbaxy be awarded such other and further relief as is just and proper.

Respectfully submitted,

Dated: February 22, 2005    By:  s/ Robert G. Shepherd
Robert G. Shepherd, Esq. (RGS-5946)
Brooks R. Bruneau, Esq. (BRB-5523)
**MATHEWS, COLLINS, SHEPHERD & MCKAY, P.A.**
100 Thanet Circle, Suite 306
Princeton, NJ 08540-3674
(609) 924-8555 Telephone
(609) 924-3036 Facsimile
Attorneys for Defendant,
Ranbaxy Laboratories Limited

**ADMITTED PRO HAC VICE:**

Darrell L. Olson, Pro Hac Vice
Vito A. Canuso III, Pro Hac Vice
William R. Zimmerman, Pro Hac Vice
Benjamin A. Katzenellenbogen, Pro Hac Vice
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, 14th Floor
Irvine, California 92614
(949) 760-0404 Telephone
(949) 760-9503 Facsimile

-14-

## CERTIFICATE OF SERVICE

It is hereby certified that the undersigned has this day served a true and correct copy of **RANBAXY'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS** via First Class Mail, postage prepaid to the following counsel:

| | |
|---|---|
| Alfred J. Lechner, Jr. Esq.<br>Robert A. White, Esq.<br>**MORGAN, LEWIS & BOCKIUS LLP**<br>502 Carnegie Center<br>Princeton, New Jersey 08540 | William F. Lee, Esq.<br>David B. Bassett, Esq.<br>Peter J. Kolovos, Esq.<br>Gregory P. Teran, Esq.<br>**WILMER CUTLER PICKERING HALE & DORR, LLP**<br>60 State Street<br>Boston, Massachusetts 02109 |
| Arnold B. Calmann, Esq.<br>Jeffrey Soos, Esq.<br>**SAIBER, SCHLESINGER, SATZ & GOLDSTEIN, LLC**<br>One Gateway Center, 13th Floor<br>Newark, New Jersey 07102-5003 | John A. McCahill, Esq.<br>Steven Lieberman, Esq.<br>**ROTHWELL, FIGG, ERNST & MANBECK, P.C.**<br>1425 K Street, N.W., Ste. 800<br>Washington, DC 20005 |
| Allyn Zissel Lite, Esq.<br>**LITE, DEPALMA, GREENBERG & RIVAS, LLC**<br>Two Gateway Center, 12th Floor<br>Newark, New Jersey 07102-5003 | Steven J. Lee, Esq.<br>John Bateman, Esq.<br>Mira H. Martinez, Esq.<br>Bethany B. Mongeau, Esq.<br>**KENYON & KENYON**<br>One Broadway<br>New York, New York 10004 |
| James Richter, Esq.<br>Brian J. McCarthy, Esq.<br>**WINSTON & STRAWN**<br>One Gateway Center, 4th Floor<br>Newark, New Jersey 07102-5398 | Kevin J. O'Shea, Esq.<br>George C. Lombardi, Esq.<br>**WINSTON & STRAWN**<br>35 W. Wacker Drive<br>Chicago, Illinois 60601 |
| James E. Cecchi, Esq.<br>Lindsey Taylor, Esq.<br>**CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWARD & OLSTEIN**<br>Five Becker Farm Road, 2nd Floor<br>Roseland, NJ 07068 | Christine J. Siwik, Esq.<br>**RAKOCZY, MOLINO MAZZOCHI & SIWIK, LLP**<br>6 West Hubbard Street, Suite 500<br>Chicago, Illinois 60610 |

Dated this 22nd Day of February, 2005            s/ Robert G. Shepherd

-15-

-16-

# Exhibit 4

**LITE DePALMA GREENBERG & RIVAS, LLC**
Allyn Z. Lite (AL-6774)
Michael E. Patunas (MP-2306)
Two Gateway Center, 12th Floor
Newark, New Jersey 07102-5003
(973) 623-3000
Attorneys for Defendant, Teva Pharmaceuticals USA, Inc.

Of Counsel:

**KENYON & KENYON**
Steven J. Lee (SL-1043)
John W. Bateman
Bethany B. Mongeau
One Broadway
New York, NY 10004
(212) 425-7200

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CEPHALON, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 03-1394 (JCL) |
| | ) | |
| MYLAN PHARMACEUTICALS, INC., | ) | **FIRST AMENDED** |
| TEVA PHARMACEUTICALS USA, INC., | ) | **ANSWER TO COMPLAINT** |
| BARR LABORATORIES, INC., and | ) | |
| RANBAXY LABORATORIES LIMITED, | ) | |
| | ) | DOCUMENT FILED ELECTRONICALLY |
| Defendants. | ) | |
| | ) | |

For its Answer to the Complaint of plaintiff, CEPHALON, INC. ("Cephalon"), defendant

Teva Pharmaceuticals USA, Inc. ("Teva USA") responds to each of the paragraphs thereof as

follows:

**Nature of the Action**

Teva USA admits that the Complaint purports to state a cause of action under the patent laws of the United States, Title 35, United States Code, 35 U.S.C. §§ 271 and 281. Teva USA admits that the Complaint purports to relate to four Abbreviated New Drug Applications ("ANDA") filed by Mylan Pharmaceuticals, Teva USA, Barr, and Ranbaxy, respectively, with the U.S. Food and Drug Administration ("FDA") for approval to market a generic version of Cephalon's PROVIGIL® drug product.

**Parties**

1.      Teva USA is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint and, therefore, denies them.

2.      Teva USA is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint and, therefore, denies them.

3.      Teva USA is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 of the Complaint and, therefore, denies them.

4.      Teva USA admits that it is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania, with manufacturing facilities in Elmwood Park and Fairfield, New Jersey, with a mailing address in Fair Lawn, NJ, and that it is registered to do business in New Jersey. Teva USA admits that Teva has drugs products listed in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services; otherwise, denied.

5.      Teva USA has been informed by counsel for plaintiffs that the Complaint has been withdrawn as to Teva Industries, Ltd. ("Teva Industries"), and accordingly does not respond to Paragraph 5.

6.      Teva USA is without knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 6 of the Complaint and, therefore, denies them.

7.      Teva USA is without knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 7 of the Complaint and, therefore, denies them.

## Jurisdiction and Venue

8.      Teva USA admits jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and

otherwise denies the allegations of paragraph 8.

9.      Teva USA does not contest that it is subject to personal jurisdiction as alleged in

paragraph 9 of the Complaint for the purposes of the present action only.  Since the complaint

has been withdrawn as to Teva Industries, no answer is required.  As to the other allegations

alleged in paragraph 9 of the Complaint, Teva USA is without knowledge or information

sufficient to form a belief as to their truth and, therefore, denies them.

10.      For purposes of the present action only, Teva USA does not contest that venue is

proper in this district as to Teva USA.

## Cephalon's PROVIGIL® Patent

11.      Teva USA admits that Cephalon is listed as the owner by assignment on the face

of U.S. Reissue Patent No. RE37,516 ("the RE '516 Patent"), entitled "Acetamide Derivative

Having Defined Particle Size," attached to the Complaint as Exhibit A.  Teva USA admits that

the RE '516 Patent was attached to the Complaint as Exhibit A.  Teva USA denies that the

claims of the RE '516 Patent are valid and enforceable and that the patent was "duly and legally"

issued.  Teva USA is without knowledge or information sufficient to form a belief as to the truth

of the remainder of the allegations in paragraph 11 of the Complaint and, therefore, denies them.

12.      Teva USA admits that PROVIGIL® is listed in the "Orange book;" that the RE

'516 patent is listed in the "Orange Book" with respect to PROVIGIL®; that the "Orange Book"

lists the "Indication Designated" as "Treatment of excessive daytime sleepiness in narcolepsy;"
and that the "Orange Book" lists the FDA approval date as December 24, 1998.  As to the
remainder of the allegations, Teva USA is without knowledge or information sufficient to form a
belief as to the truth of the allegations in paragraph 12 of the Complaint and, therefore, denies
them.

      13.    Teva USA admits that for PROVIGIL® modafinil, the "Orange Book" lists the
date of expiration for marketing exclusivity as December 24, 2003 and for orphan drug
exclusivity as December 24, 2005 and otherwise is without knowledge or information sufficient
to form a belief as to the truth of the allegations of this paragraph and therefore denies them

<div align="center">

**Infringement Complaint Against Mylan**

</div>

      14-24.  Teva USA is without knowledge or information sufficient to form a belief as to
the truth of the allegations in paragraphs 14-24 of the Complaint as to Mylan Pharmaceuticals
and, therefore, denies them.

<div align="center">

**Infringement Complaint Against Teva**

</div>

      25.    Teva USA admits that it provided notice of its submission of ANDA No. 76-596
as required by §505(j)(2)(B)(i) and (ii) to Cephalon, Inc. as the holder of NDA # 20-717 for
Provigil® (Modafinil) Tablets.  Otherwise, denied.

      26.    Teva USA states that it has submitted ANDA No. 76-596 and that the ANDA
refers to a drug product that is the "same as" listed drug PROVIGIL®, as defined under 21 CFR
§§314.92(1)(a).  Further, Teva USA states that it has submitted material to the FDA regarding
the bioequivalence testing and proposed labeling of the subject drug product; otherwise, denied.

      27.    Teva USA admits that it provided notice of its submission of ANDA No. 76-596
as required by §505(j)(2)(B)(i) and (ii) to Cephalon, Inc. as the holder of NDA # 20-717 for
Provigil® (modafinil) Tablets and it informed Cephalon that ANDA No. 76-596 contained a

"paragraph IV certification" that "the commercial manufacture, use or sale of the Teva's formulation of Modafinil Tablets, 100 mg and 200 mg, will not infringe any valid and enforceable claim" of the RE '516 Patent.

28.    Teva USA admits that the filing of its ANDA to obtain approval to engage in the commercial manufacture, use, offer to sell or sale of its modafinil tablets constitutes a technical act of "infringement" under 35 U.S.C. § 271(e)(2) for the limited purpose of establishing federal subject jurisdiction but denies that the commercial manufacture, use or sale of its modafinil tablets would infringe any valid and enforceable claim of the RE '516 Patent.

29.    This paragraph calls for a legal conclusion, is not an allegation of fact, and therefore is denied.

30.    Denied.

31.    Denied.

32.    Denied, as to Teva USA.

33.    Denied.

34.    Denied.

35.    Teva USA admits that the action was filed on March 28, 2003 and that Teva USA mailed the Notice Letter on February 25, 2003; otherwise, denied.

**Infringement Complaint Against Barr**

36-43.  Teva USA is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraphs 36-43 of the Complaint as to Barr Laboratories, Inc. and, therefore, denies them.

**Infringement Complaint Against Ranbaxy**

44-52.  Teva USA is without knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraphs 44-52 of the Complaint as to Ranbaxy Pharmaceuticals

and, therefore, denies them.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

53.    The claims of the RE '516 Patent are invalid because they fail to comply with one

or more of 35 U.S.C. §§ 101, 102, 103 and 112.

### Second Affirmative Defense

54.    Teva USA's commercial manufacture, use and/or sale of its modafinil tablets

would not infringe any valid and enforceable claim of the RE '516 patent.

### Third Affirmative Defense

55.    The RE '516 patent is unenforceable due to inequitable conduct by the named

inventors and the attorneys who prosecuted the applications that lead to the RE '516 patent and

the original U.S. Patent No. 5,618,845 ("the '845 Patent").  Specifically, named inventors Peter

Grebow, Vincent Corvari, and David Stong and prosecuting attorneys Rick Burgoon and Robert

Hrubiec, had knowledge of material facts relevant to patentability, knew them to be material, and

yet withheld them from the U.S. Patent and Trademark Office (the "PTO") with deceptive intent.

They also made knowing and intentional misrepresentations of material facts relevant to

patentability to the PTO with deceptive intent.  The details of these intentional omissions and

misrepresentations are set forth below.

56.    The modafinil compositions and methods claimed in the RE '516 patent were

developed and manufactured by scientists at Laboratoire L. Lafon ("Lafon"), not scientists at

Cephalon. The specification of the RE '516 patent gives the false impression that Cephalon and the named inventors developed and manufactured the modafinil compositions and methods described in the RE '516 patent. Nowhere in the specification or the prosecution history did the named inventors or the prosecuting attorneys inform the PTO that the claimed modafinil compositions and methods were developed and manufactured by Lafon. These facts were material to patentability because they relate to derivation, inventorship, and obviousness.

57.     The named inventors and prosecuting attorneys did not inform the PTO that Lafon sold and delivered modafinil tablets and modafinil active pharmaceutical ingredient ("API") to Cephalon prior to the critical date of October 6, 1993 under a Supply Agreement and a License Agreement executed in January of 1993. The modafinil tablets and modafinil API sold and delivered to Cephalon prior to the critical date were covered by some, if not all, of the composition claims recited in the RE '516 patent. The sale and delivery of modafinil tablets and modafinil API under the Supply Agreement were material to patentability because those transactions relate to inventorship, obviousness, derivation, and the "on-sale" bar.

58.     The named inventors and prosecuting attorneys misrepresented in the patent specification and in Peter Grebow's September 26, 1995 declaration that the United States and Foreign clinical studies followed the same protocol. In fact, the Foreign clinical trial conducted by Lafon administered half of the daily dose of modafinil in each of two daily doses, whereas the United States clinical trial conducted by Cephalon administered the entire daily dose in a single dose. The difference between the protocols could explain the alleged difference in adverse effects, if any, observed in the U.S. clinical trial. However, Cephalon relied upon the alleged difference in adverse effects to support patentability without telling the Examiner about the

critical protocol change. This misrepresentation was material to patentability because it relates to utility, derivation, inventorship and obviousness.

59.    The named inventors and prosecuting attorneys concealed from the PTO that the U.S. clinical trial described in the RE '516 patent, which used modafinil compositions covered by at least one of the composition claims, and which followed the method of administration covered by at least one of the method claims, occurred prior to both the critical date and the alleged conception date. The subjects of the first United States clinical trial were members of the public, and they were under no obligation of confidentiality to Cephalon or the clinical investigators. The non-confidential, public clinical trial was material to patentability because it constitutes a public use under 35 U.S.C. § 102(b) and renders the compositions and methods "known and used" under § 102(a).

60.    The named inventors and prosecuting attorneys misrepresented to the PTO that the dog plasma level data discussed in the RE '516 patent demonstrated that the claimed small particle modafinil compositions result in higher peak plasma levels than the large particle modafinil compositions of the prior art. Notwithstanding their representations to the PTO, the named inventors and prosecuting attorneys knew that the test results were not statistically significant. Cephalon's DM-93-014 report to the U.S. Food and Drug Administration (the "FDA") includes representations directly contradictory to those made to the PTO. That report, completed at least as early as November 8, 1996, concluded that there was no statistically significant difference in the peak plasma levels as a function of modafinil particle size. Cephalon intentionally withheld that FDA report and the contradictory representations therein from the PTO during prosecution of both the underlying '845 Patent and the RE '516 patent.

This information was material to patentability because it implicates utility, derivation, and

obviousness, and expressly contradicts an argument asserted in favor of patentability.

61.    Lafon had already considered the importance of maintaining particle size controls

over modafinil drug product prior to Cephalon's alleged invention.  Lafon provided Cephalon

with particle size information for all of the lots of modafinil API Lafon sold and delivered to

Cephalon, including API Lot 003.  The RE '516 patent gives the false impression that Cephalon

was the first to measure particle size for modafinil and the first to recognize the importance of

particle size.  The named inventors and their attorneys also misrepresented to the PTO that one

or more of the named inventors had discovered that the dissolution rate of modafinil increases

with a decrease in particle size.  In fact, Lafon scientists discovered the relationship between

modafinil dissolution rate and particle size in 1989.  Moreover, Lafon had communicated the

relevant dissolution and particle size data to Cephalon in March of 1993.  In addition, Peter

Grebow represented to the PTO that there were no publications suggesting that the utility of

modafinil could be improved by reducing its particle size when in fact he knew of a document

published in September of 1993, more than one year prior to the filing date, which suggests that

the differences in modafinil bioavailability may be caused by the particle size distribution.

These misrepresentations and omissions were material to patentability because they relate to

inventorship, derivation, obviousness, and prior publication under §§ 102(a) and 102(b).

62.    The inventors and their attorneys misrepresented to the PTO in the RE '516 patent

specification itself that the adverse events observed in the United States clinical trial at 800 mg

doses were completely unexpected.  Peter Grebow, a named inventor, further misled the PTO

when he reiterated that contention in his September 26, 1995 declaration in support of

patentability.  In reality, Lafon informed Cephalon in February of 1993 that a single 600 mg dose

of modafinil may cause adverse effects, and that information was specifically known to Peter

Grebow. Furthermore, the named inventors report in the specification that no clinically

significant adverse events occurred in the Foreign clinical trials conducted by Lafon. In fact,

numerous serious adverse events were observed during those Foreign clinical trials. Peter

Grebow was aware of those instances of adverse events and even forwarded Lafon's "serious

adverse event" information to a Canadian counterpart. This information was material to

patentability because it relates to inventorship, utility, derivation, and obviousness.

WHEREFORE, Teva USA prays that this Court enter a judgment and decree against

Cephalon:

(a)     Dismissing the Complaint herein in its entirety with prejudice;

(b)     Declaring and adjudging that the RE '516 patent is invalid and not infringed;

(c)     Declaring and adjudging that the RE '516 patent is unenforceable;

(d)     Permanently enjoining Cephalon, its officers, agents, directors, servants,

        employees, subsidiaries, and assigns, and all those acting under the authority of or

        in privy with them or with any of them, from asserting or otherwise seeking to

        enforce the RE '516 patent against Teva.

(e)     Declaring and adjudging that this case is exceptional and awarding Teva USA its

        attorney fees and costs.

(f)     For such other and further relief as the Court deems just and proper.

Dated: February 23, 2005          **LITE DEPALMA GREENBERG & RIVAS, LLC**

                          By:   /s/ Michael E. Patunas
                                Allyn Z. Lite (AL-6774)
                                Michael E. Patunas (MP-2306)
                                Two Gateway Center; 12th Floor
                                Newark, New Jersey  07102
                                (973) 623- 3000

KENYON & KENYON
Steven J. Lee (SL-1043)
John W. Bateman
Bethany Mongeau
One Broadway
New York, NY 10004
(212) 425 - 7200

*Attorneys for Defendant,*
*Teva Pharmaceuticals USA, Inc.*

# Exhibit 5

Arnold B. Calmann (AC-3245)
Jeffrey Soos (JS-0589)
**SAIBER SCHLESINGER SATZ & GOLDSTEIN, LLC**
One Gateway Center, 13th Floor
Newark, New Jersey 07102-5311
(973) 622-3333

E. Anthony Figg
Steven Lieberman
John A. McCahill
R. Elizabeth Brenner
Lisa N. Phillips
**ROTHWELL, FIGG, ERNST & MANBECK, P.C.**
1425 K Street, N.W., Suite 800
Washington, D.C. 20005
(202) 783-6040

Attorneys for Defendant
Mylan Pharmaceuticals Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CEPHALON, INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>MYLAN PHARMACEUTICALS INC., )<br>TEVA PHARMACEUTICALS USA, INC, )<br>BARR LABORATORIES, INC, and )<br>RANBAXY LABORATORIES LIMITED, )<br><br>Defendants. ) | Civil Action No. 03-CV-1394 (JCL)<br><br><br><br>*DOCUMENT ELECTRONICALLY FILED* |

## MYLAN PHARMACEUTICALS' SECOND AMENDED ANSWER
## TO COMPLAINT AND COUNTERCLAIMS FOR PATENT INFRINGEMENT

Defendant Mylan Pharmaceuticals Inc. ("Mylan"), hereby answers the Complaint served

upon Mylan as follows:

00371241.WPD

## Parties

1.      Cephalon is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 145 Brandywine Parkway, West Chester, Pennsylvania.

**Answer**:      Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 1 and therefore denies them.

2.      Upon information and belief, Mylan Pharmaceuticals is a corporation organized and existing under the laws of the State of West Virginia, with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia. Mylan Pharmaceuticals is registered to do business in New Jersey and has registered prescription drug products in the *New Jersey Generic Formulary* of the new Jersey Department of Health and Senior Services. Upon information and belief, Mylan Pharmaceuticals is a wholly-owned subsidiary of Mylan Laboratories.

**Answer**:      Mylan admits the allegations of paragraph 2.

3.      Upon information and belief, Mylan Laboratories is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 130 Seventh Street, 1030 Century Building, Pittsburgh, Pennsylvania. Upon information and belief, Mylan Laboratories is doing business in this district directly, as well as through its wholly-owned subsidiary Mylan Pharmaceuticals, and its wholly-owned subsidiary Bertek Pharmaceuticals, Inc. ("Bertek"), a Delaware corporation. Upon information and belief, Mylan Laboratories has caused Mylan Pharmaceuticals and Bertek to register to do business in the State of New Jersey, and to register prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Mylan Laboratories has ultimate control over the activities of Mylan Pharmaceuticals and Bertek. Hereinafter, Mylan Pharmaceuticals and Mylan Laboratories are referred to collectively as "Mylan."

**Answer**:      Mylan denies the allegations of the first sentence of paragraph 3, but avers

that Mylan Laboratories is a corporation organized and existing under the laws of the

Commonwealth of Pennsylvania, with its principal place of business at 1500 Corporate Drive,

Suite 400, Canonsburg, PA. Mylan denies the allegations of the second, third and forth sentences

of paragraph 3.

00371241.WPD                          -2-

Mylan admits that, throughout the remainder of the complaint, Plaintiff refers to Mylan

Pharmaceuticals and Mylan Laboratories collectively as "Mylan."

4.    Upon information and belief, Teva USA is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1090 Horsham Road, North Wales, Pennsylvania, and with regular and established places of business in Elmwood Park, Fairfield, Fair Lawn, Englewood Cliffs, Paterson, and Waldwick, New Jersey. Teva USA is registered to do business in New Jersey and has registered prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Teva USA is a wholly-owned subsidiary of Teva Industries.

**Answer**:    Mylan lacks sufficient knowledge or information to form a belief as to the

truth of the allegations of paragraph 4 and therefore denies them.

5.    Upon information and belief, Teva Industries is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, Petach Tikva, Israel. Upon information and belief, Teva Industries is doing business in the United States and in this district directly, as well as through its wholly-owned subsidiary Teva USA, and its wholly-owned subsidiary Plantex USA, Inc. ("Plantex"), a New Jersey corporation with its principal place of business at Two University Drive, Hackensack, New Jersey. Upon information and belief, Teva Industries has caused Teva USA and Plantex to register to do business in the State of New Jersey, and has caused Teva USA to register prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Teva Industries has ultimate control over the activities of Teva USA and Plantex. Hereinafter, Teva USA and Teva Industries are referred to collectively as "Teva."

**Answer**:    Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 5 and therefore denies them.

6.    Upon information and belief, Barr is a corporation organized and existing under the laws of the State of New York, with its principal place of business at Two Quaker Road, Pomona, New York, and with regular and established places of business in Plainsboro and Northvale, New Jersey. Barr is registered to do business in New Jersey and has registered prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services.

**Answer**:    Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 6 and therefore denies them.

00371241.WPD                          -3-

7.      Upon information and belief, Ranbaxy is a corporation organized and existing under the laws of India, with its principal place of business at 19 Nehru Place, New Delhi, India. Upon information and belief, Ranbaxy is doing business in the United States and in this district directly, as well as through its wholly-owned subsidiaries Ranbaxy Pharmaceuticals, Inc. ("Ranbaxy Pharmaceuticals"), a Delaware corporation with its principal place of business at 600 College Road East, Princeton, New Jersey, and its wholly-owned subsidiary Ohm Laboratories, Inc. ("Ohm Laboratories"), a New Jersey corporation with its principal place of business at 1385 Livingston Avenue, North Brunswick, New Jersey. Upon information and belief, Ranbaxy has caused Ranbaxy Pharmaceuticals and Ohm Laboratories to register to do business in New Jersey, and has caused Ranbaxy Pharmaceuticals to register prescription drug products in the *New Jersey Generic Formulary* of the New Jersey Department of Health and Senior Services. Upon information and belief, Ranbaxy has ultimate control over the activities of Ranbaxy Pharmaceuticals and Ohm Laboratories.

**Answer**:      Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 7 and therefore denies them.

## Jurisdiction and Venue

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 1400(b), 2201 and 2202.

**Answer**:      Mylan admits that Plaintiff asserts that subject matter jurisdiction exists

pursuant to on 28 U.S.C. §§ 1331, 1338(a), 1400(b), 2201 and 2202.

9.      Each of Mylan Pharmaceuticals, Mylan Laboratories, Teva USA, Teva Industries, Barr, and Ranbaxy is subject to personal jurisdiction in this judicial district.

**Answer**:      Mylan admits that it is subject to personal jurisdiction in this judicial

district, but lacks sufficient knowledge or information to form a belief as to the remaining

allegations of paragraph 9 and therefore denies them.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

**Answer**:      Mylan admits that as to Mylan venue is proper in this District.

## Cephalon's PROVIGIL® Patent

11.     Cephalon is the owner by assignment of U.S. Reissue Patent No. RE37,516 ("the RE '516 Patent"), entitled "Acetamide Derivative Having Defined Particle Size," which the United States Patent and Trademark Office duly and legally issued on January 15, 2002. A true and correct copy of the RE '516 Patent is attached hereto as Exhibit A. The claims of the RE '516 Patent are valid and enforceable. Cephalon owns all right and title to the RE '516 Patent and has the right to sue for and obtain equitable relief and damages for infringement. The RE '516 Patent expires on October 6, 2014.

**Answer**:     Mylan admits that United States Reissue Patent No. RE 37,516 (the "RE

'516 Patent") indicates on its face that it issued on January 15, 2002. Mylan admits that the true

and correct copy of the RE '516 is attached as Exhibit A to the Complaint. Mylan avers that it

relies on the official records of the United States Patent and Trademark Office with respect to the

status and content of the RE '516 Patent and, to the extent that the allegations of paragraph 11

are inconsistent with these records, they are denied.

12.     PROVIGIL® modafinil, which is covered by claims of the RE '516 Patent, is the commercial formulation of modafinil developed, manufactured and sold by Cephalon. PROVIGIL® was approved by the FDA on December 24, 1998, for treatment of excessive daytime sleepiness associated with narcolepsy. The FDA's official publication of approved drugs (the "Orange Book") includes PROVIGIL® listed together with the RE '516 Patent.

**Answer**:     Mylan admits that PROVIGIL® modafinil is the commercial formulation

of modafinil but denies, the remaining allegations of sentence 1 of paragraph 12. Mylan admits

that PROVIGIL® was approved by the FDA on December 24, 1998, with the treatment of

excessive daytime sleepiness associated with narcolepsy as its sole approved indication. Mylan

admits that the FDA's publication entitled "Approved Drug Products with Therapeutic

Equivalence Evaluations" (the "Orange Book") lists the RE '516 Patent under the patent data for

PROVIGIL® modafinil.

13.     PROVIGIL® modafinil is further protected by marketing exclusivity under 21 U.S.C. § 355(j)(5)(D)(ii) until December 24, 2003, and by orphan drug exclusivity until December 24, 2005.

**Answer**:     Mylan denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 13 and therefore denies them.

### Infringement by Mylan

14.     By letter dated February 12, 2003 (the "Mylan Notice Letter"), Mylan Pharmaceuticals notified Cephalon that Mylan Pharmaceuticals had submitted ANDA NO. 76-594 (the "Mylan ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use and sale of tablets containing 100 mg and 200 mg of modafinil (the "Mylan ANDA Modafinil Tablets"), a generic version of PROVIGIL®modafinil tablets, before the expiration date of the RE '516 Patent. Upon information and belief, Mylan Pharmaceuticals intends to engage in commercial manufacture, use and sale of the Mylan ANDA Modafinil Tablets promptly upon receiving FDA approval to do so.

**Answer**:     Mylan admits the allegations contained in the first sentence of paragraph

14 of the complaint. Mylan avers that upon FDA approval of Mylan's ANDA, Mylan will take

such steps as are commercially and legally reasonable with respect to the marketing of its

Modafinil Product, and otherwise denies the remaining allegations of paragraph 14 of the

Complaint.

15.     By filing ANDA No. 76-594, Mylan Pharmaceuticals has necessarily represented to the FDA that Mylan ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®, have the same route of administration, dosage form, and strengths as PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as PROVIGIL®.

**Answer**:     Mylan admits that by filing its ANDA No. 76-594 Mylan has represented

to the FDA Mylan's belief that ANDA No. 76-594 satisfies the statutory requirements for agency

approval under the applicable statute and regulations, Mylan denies the remaining allegations of

paragraph 15 of the complaint to the extent that they are inconsistent with ANDA No. 76-594,

which speaks for itself.

16.    In the Mylan Notice Letter, Mylan Pharmaceuticals notified Cephalon that its ANDA contained a "paragraph IV certification" that, in Mylan Pharmaceuticals' opinion, no valid claim of the RE '516 Patent will be infringed by the manufacture, use, offer for sale, or sale of the Mylan ANDA Modafinil Tablets.

**Answer:**    Mylan admits that it authored the Mylan Notice Letter, which speaks for

itself. The remaining allegations of paragraph 16 are denied to the extent that they are

inconsistent with the Mylan Notice Letter.

17.    Mylan Pharmaceuticals' submission of ANDA No. 76-594 to obtain approval to engage in the commercial manufacture, use, offer to sell or sale of the Mylan ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

**Answer:**    Mylan denies the allegations of paragraph 17 of the complaint.

18.    Mylan Pharmaceuticals' commercial manufacture, use, offer to sell or sale of the Mylan ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further acts of infringement of such patent under 35 U.S.C. § 271. Mylan Pharmaceuticals' filing of its ANDA, and Mylan Pharmaceuticals' intention to engage in the commercial manufacture, use, offer to sell or sale of the Mylan ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or controversy with respect to infringement of the RE '516 Patent.

**Answer:**    Mylan denies the allegations of paragraph 18 of the complaint.

19.    Upon FDA approval of the Mylan ANDA, Mylan Pharmaceuticals will infringe the RE '516 Patent by making, using, offering to sell, and selling the Mylan ANDA Modafinil Tablets in the United States, and by actively inducing and contributing to infringement by others, unless enjoined by this Court.

**Answer:**    Mylan denies the allegations of paragraph 19 of the complaint.

20.    Upon information and belief, while the Mylan ANDA was filed in the name of Mylan Pharmaceuticals, it also was filed for the benefit of, and with the knowledge and approval of, Mylan Laboratories.

**Answer:**    Mylan admits that the Mylan ANDA was filed in the name of Mylan

Pharmaceuticals, but denies the remainder of the allegations of paragraph 20 of the complaint.

21.     Upon information and belief, the officers and directors of Mylan Pharmaceuticals and Mylan Laboratories directed the preparation and filing of the Mylan ANDA.

**Answer:**     Mylan denies the allegations of paragraph 21 of the complaint.

22.     Mylan Laboratories is liable for Mylan Pharmaceuticals' infringement of the RE '516 Patent because, upon information and belief, Mylan Laboratories caused or participated in, contributed to, aided, abetted, directed and induced the submission of the Mylan ANDA.

**Answer:**     Mylan denies the allegations contained in paragraph 22 of the complaint.

23.     Cephalon will be substantially and irreparably damaged and harmed if Mylan's infringement is not enjoined.  Cephalon does not have an adequate remedy at law.

**Answer:**     Mylan denies the allegations contained in paragraph 23 of the complaint.

24.     This action is being brought before the expiration of forty-five days from the date Cephalon received the Mylan Notice Letter, which Cephalon received no earlier than February 19, 2003.

**Answer:**     Mylan admits the allegations contained within paragraph 24 of the

complaint.

## Infringement by Teva

25.     By letter dated February 25, 2003 (the "Teva Notice Letter"), Teva USA notified Cephalon that Teva USA had submitted ANDA NO. 76-596 (the "Teva ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use, and sale of tablets containing 100 mg and 200mg of modafinil (the "Teva ANDA Modafinil Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration date of the RE '516 Patent.  Upon information and belief, Teva USA intends to engage in commercial manufacture, use and sale of the Teva ANDA Modafinil Tablets promptly upon receiving FDA approval to do so.

**Answer:**     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 25 and therefore denies them.

26.     By filing ANDA No. 76-596, Teva USA has necessarily represented to the FDA that the Teva ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®, have the same route of administration, dosage form, and strengths as PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as PROVIGIL®.

**Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 26 and therefore denies them.

27.     In the Teva Notice Letter, Teva USA notified Cephalon that its ANDA contained
a "paragraph IV certification" that, in Teva USA's opinion, the commercial manufacture, use or
sale of the Teva ANDA Modafinil Tablets will not infringe any valid and enforceable claim of
the RE '516 Patent.

**Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 27 and therefore denies them.

28.     Teva USA's submission of ANDA No. 76-596 to obtain approval to engage in the
commercial manufacture, use, offer to sell or sale of the Teva ANDA Modafinil Tablets, prior to
the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid claims
of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

**Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 28 and therefore denies them.

29.     Teva USA's commercial manufacture, use, offer to sell or sale of the Teva ANDA
Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further acts of
infringement of such patent under 35 U.S.C. § 271.  Teva USA's filing of its ANDA, and Teva
USA's intention to engage in the commercial manufacture, use, offer to sell or sale of the Teva
ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or controversy
with respect to infringement of the RE '516 Patent.

**Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 29 and therefore denies them.

30.     Upon FDA approval of the Teva ANDA, Teva USA will infringe the RE '516
Patent by making, using, offering to sell, and selling the Teva ANDA Modafinil Tablets in the
United States, and by actively inducing and contributing to infringement by others, unless
enjoined by this Court.

**Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 30 and therefore denies them.

31.     Upon information and belief, while the Teva ANDA was filed in the name of Teva USA, it also was filed for the benefit of, and with the knowledge and approval of, Teva Industries.

**Answer:**     Mylan lacks sufficient knowledge or information to form a belief as to the truth of the allegations of paragraph 31 and therefore denies them.

32.     Upon information and belief, the officers and directors of Teva USA and Teva Industries directed the preparation and filing of the Teva ANDA.

**Answer:**     Mylan lacks sufficient knowledge or information to form a belief as to the truth of the allegations of paragraph 32 and therefore denies them.

33.     Teva Industries is liable for Teva USA's infringement of the RE '516 Patent because, upon information and belief, Teva Industries caused or participated in, contributed to, aided, abetted, directed and induced the submission of the Teva ANDA.

**Answer:**     Mylan lacks sufficient knowledge or information to form a belief as to the truth of the allegations of paragraph 33 and therefore denies them.

34.     Cephalon will be substantially and irreparably damaged and harmed if Teva's infringement is not enjoined.  Cephalon does not have an adequate remedy at law.

**Answer:**     Mylan lacks sufficient knowledge or information to form a belief as to the truth of the allegations of paragraph 34 and therefore denies them.

35.     This action is being brought before the expiration of forty-five days from the date Cephalon received the Teva Notice Letter, which Cephalon received no earlier than February 27, 2003.

**Answer:**     Mylan lacks sufficient knowledge or information to form a belief as to the truth of the allegations of paragraph 35 and therefore denies them.

**Infringement by Barr**

36.     By letter dated February 20, 2003 (the "Barr Notice Letter"), Barr notified Cephalon that Barr had submitted ANDA No. 76-597 (the "Barr ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)), seeking

approval to engage in the commercial manufacture, use, and sale of tablets containing 100 mg and 200 mg of modafinil (the "Barr ANDA Modafinil Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration date of the RE '516 Patent. Upon information and belief, Barr intends to engage in commercial manufacture, use and sale of the Barr ANDA Modafinil Tablets promptly upon receiving FDA approval to do so.

> **Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to the truth of the allegations of paragraph 36 and therefore denies them.

37.     By filing ANDA No. 76-597, Barr has necessarily represented to the FDA that the Barr ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®, have the same route of administration, dosage form, and strengths as PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as PROVIGIL®.

> **Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to the truth of the allegations of paragraph 37 and therefore denies them.

38.     In the Barr Notice Letter, Barr notified Cephalon that its ANDA contained a "paragraph IV certification" that, in Barr's opinion, the RE '516 Patent is invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use and/or sale of the Barr ANDA Modafinil Tablets.

> **Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to the truth of the allegations of paragraph 38 and therefore denies them.

39.     Barr's submission of ANDA No. 76-597 to obtain approval to engage in the commercial manufacture, use, offer to sell, or sale of the Barr ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

> **Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to the truth of the allegations of paragraph 39 and therefore denies them.

40.     Barr's commercial manufacture, use, offer to sell, or sale of the Barr ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further acts of infringement of such patent under 35 U.S.C. § 271. Barr's filing of its ANDA, and Barr's intention to engage in the commercial manufacture, use, offer to sell, or sale of the Barr ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or controversy with respect to infringement of the RE '516 Patent.

**Answer:**        Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 40 and therefore denies them.

41.    Upon FDA approval of the Barr ANDA, Barr will infringe the RE '516 Patent by
making, using, offering to sell, and selling the Barr ANDA Modafinil Tablets in the United
States, and by actively inducing and contributing to infringement by others, unless enjoined by
this Court.

**Answer:**        Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 41 and therefore denies them.

42.    Cephalon will be substantially and irreparably damaged and harmed if Barr's
infringement is not enjoined.  Cephalon does not have an adequate remedy at law.

**Answer:**        Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 42 and therefore denies them.

43.    This action is being brought before the expiration of forty-five days from the date
Cephalon received the Barr Notice Letter, which Cephalon received no earlier than February 27,
2003.

**Answer:**        Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 43 and therefore denies them.

**Infringement by Ranbaxy**

44.    By letter dated March 21, 2003 (the "Ranbaxy Notice Letter"), Ranbaxy
Pharmaceuticals notified Cephalon that Ranbaxy had submitted ANDA No. 76-595 (the
"Ranbaxy ANDA") to the FDA under Section 505(j) of the Federal Food, Drug and Cosmetic
Act (21 U.S.C. § 355(j)), seeking approval to engage in the commercial manufacture, use, and
sale of tablets containing 100 mg and 200 mg of modafinil (the "Ranbaxy ANDA Modafinil
Tablets"), a generic version of PROVIGIL® modafinil tablets, before the expiration date of the
RE '516 Patent.  Upon information and belief, Ranbaxy intends to engage in commercial
manufacture, use and sale of the Ranbaxy ANDA Modafinil Tablets promptly upon receiving
FDA approval to do so.

**Answer:**        Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 44 and therefore denies them.

00371241.WPD                                        -12-

45.     By filing ANDA No. 76-595, Ranbaxy has necessarily represented to the FDA that the Ranbaxy ANDA Modafinil Tablets have the same active ingredient as PROVIGIL®, have the same route of administration, dosage form, and strengths as PROVIGIL®, are bioequivalent to PROVIGIL®, and have the same or substantially the same proposed labeling as PROVIGIL®.

**Answer:**     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 45 and therefore denies them.

46.     In the Ranbaxy Notice Letter, Ranbaxy Pharmaceuticals notified Cephalon that the Ranbaxy ANDA contained a "paragraph IV certification" that, in Ranbaxy's opinion, no valid claim of the RE '516 Patent will be infringed by the manufacture, use, sale, or offer to sell of the Ranbaxy ANDA Modafinil Tablets.

**Answer:**     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 46 and therefore denies them.

47.     Ranbaxy's submission of ANDA No. 76-595 to obtain approval to engage in the commercial manufacture, use, offer to sell, or sale of the Ranbaxy ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, constitutes infringement of one or more of the valid claims of the RE '516 Patent under 35 U.S.C. § 271(e)(2)(A).

**Answer:**     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 47 and therefore denies them.

48.     Ranbaxy's commercial manufacture, use, offer to sell, or sale of the Ranbaxy ANDA Modafinil Tablets, prior to the expiration of the RE '516 Patent, would constitute further acts of infringement of such patent under 35 U.S.C. § 271. Ranbaxy's filing of its ANDA, and Ranbaxy's intention to engage in the commercial manufacture, use, offer to sell, or sale of the Ranbaxy ANDA Modafinil Tablets upon receiving FDA approval, create an actual case or controversy with respect to infringement of the RE '516 Patent.

**Answer:**     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 48 and therefore denies them.

49.     Upon FDA approval of the Ranbaxy ANDA, Ranbaxy will infringe the RE '516 Patent by making, using, offering to sell, and selling the Ranbaxy ANDA Modafinil Tablets in the United States, and by actively inducing and contributing to infringement by others, unless enjoined by this Court.

00371241.WPD                                    -13-

**Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 49 and therefore denies them.

50.     Upon information and belief, while the Ranbaxy ANDA was filed in the name of Ranbaxy, it also was filed for the benefit of, and with the knowledge and approval of, Ranbaxy's wholly-owned United States subsidiaries Ranbaxy Pharmaceuticals and Ohm Laboratories.

**Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 50 and therefore denies them.

51.     Cephalon will be substantially and irreparably damaged and harmed if Ranbaxy's infringement is not enjoined.  Cephalon does not have an adequate remedy at law.

**Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 51 and therefore denies them.

52.     This action is being brought before the expiration of forty-five days from the date Cephalon received the Ranbaxy Notice Letter, which Cephalon received no earlier than March 21, 2003.

**Answer**:     Mylan lacks sufficient knowledge or information to form a belief as to

the truth of the allegations of paragraph 52 and therefore denies them.

Mylan denies each and every allegation of the complaint not specifically admitted,

controverted, or denied herein.

00371241.WPD                                        -14-

## SEPARATE DEFENSES

### First Separate Defense

53.     The complaint fails to state a claim upon which relief can be granted.

### Second Separate Defense

54.     The RE '516 Patent is invalid under one or more provisions of Title 35 of the

United States Code.

### Third Separate Defense

55.     The RE '516 patent is unenforceable due to inequitable conduct by the named

inventors and others who participated in the prosecution of the applications that led to the RE

'516 patent.  Specifically, the prosecuting attorneys and named inventors, Messrs. Rick Burgoon,

Robert Hrubiec, Peter Grebow, Vincent Corvari, and David Stong, had knowledge of the

following material facts set forth below relevant to patentability, knew these facts to be material

to patentability, and withheld them from or misrepresented them to the U.S. Patent and

Trademark Office with deceptive intent:

56.     The modafinil tablets used in all of the foreign and U.S. clinical studies and

experiments discussed in the RE '516 patent were previously developed and manufactured, i.e.,

invented, by scientists at Laboratoire L. Lafon, and provided by Lafon to the named inventors.

These facts were not disclosed to the PTO.  Lafon scientists and others in Europe developed the

protocols for, and performed the foreign clinical studies discussed in, the RE '516 patent as well

as assisted the named inventors in the development of the protocol used in the U.S. clinical trial

discussed in the RE '516 patent.  This also was not disclosed to the PTO.  The RE '516 patent is

thus false and misleading on its face for at least the following reasons:

00371241.WPD                                    -15-

57.    None of the named inventors had any role in the development of the early and late

lot modafinil API and tablets discussed in the RE '516 patent, including inter alia, the tablets (lot

006) manufactured from Lafon lot L-1 (003) API.  This information was prior art under 35

U.S.C. § 102(f) and was not disclosed to the PTO by any of the named inventors or prosecuting

attorneys.  The RE '516 patent's failure to disclose Lafon's role in the alleged invention gives the

false and misleading impression that the named inventors developed the modafinil tablets made

from lot L-1 (003) API.

58.    None of the named inventors had any role in the foreign clinical study discussed

in the RE '516 patent, which was the work of Lafon scientists and others in Europe.  This was

prior art under 35 U.S.C. § 102(f) and was not disclosed to the PTO.  The patent's failure to

acknowledge that this information was derived from Lafon gives the false and misleading

impression that the foreign clinical study was the work of the named inventors.

59.    Lafon scientists gave the named inventors verbal and written information and

substantial assistance for the development of the protocol the named inventors used in the U.S.

clinical trial.  This was prior art under 35 U.S.C. § 102(f) and was not disclosed to the PTO.  The

RE '516 patent's failure to acknowledge Lafon's role in the development of the U.S. clinical trial

protocol gives the false and misleading impression that the named inventors alone developed the

U.S. clinical trial protocol.

60.    The composition claims of the RE '516 patent read directly on the modafinil

tablets manufactured from "late lot" modafinil API, including, inter alia, tablets made from Lot

L-1 (003) API, previously developed and manufactured–that is, in fact–invented, by Lafon

scientists.  This was prior art under 35 U.S.C. § 102(f) and was not disclosed to the PTO.  The

00371241.WPD                                    -16-

use of modafinil to treat narcolepsy was also invented by Lafon scientists. This too was not disclosed to the PTO. The patent gives the false and misleading impression that the named inventors invented the claimed compositions and methods.

61.     Lafon tablets (006) made from Lot L-1 (003) modafinil API and Lafon's treatment protocols fall within the scope of some, if not all, of the claims in the RE '516 patent. These tablets and protocols were sold and delivered to Cephalon more than one year prior to the October 6, 1994 critical date under supply and license agreements executed in 1993. This sale constitutes an invalidating prior sale under 35 U.S.C. § 102(b) that was not disclosed to the PTO.

62.     All of the asserted claims of the RE '516 patent read on compositions and methods used in Cephalon's U.S. clinical trials, which were completed prior to October 6, 1993. The U.S. clinical trial thereby constitutes an invalidating public use under 35 U.S.C. § 102(b) that was not disclosed to the PTO.

63.     The U.S. and foreign clinical trials discussed in the patent used different dosing protocols. Whereas the U.S. protocol was a once-a-day treatment, the foreign protocol was a twice-a-day treatment. The difference in dosage protocol explains, at least in part any discrepancy between the foreign and U.S. clinical trial results observed by the named inventors. prior art under 35 U.S.C. § 102(f) and was The patent is false and misleading in failing to disclose the fact that the protocols were different. The named inventors and prosecuting attorneys knew of the dosing protocol differences and falsely and misleadingly relied upon discrepancies in results without telling the PTO about the dosing protocol differences.

64.     Contrary to what is stated in the RE '516 patent, the named inventors concluded from the results of the bioavailability tests conducted on dogs, that there was not a statistically

significant difference between the bioavailability of large and small particle size modafinil in

dogs. This conclusion is shown in, and supported by, the DM-93-014 report that Cephalon

submitted to the FDA.

65.    The named inventors were not the first persons to consider the importance of

maintaining particle size controls for modafinil tablets. Lafon scientists provided to the named

inventors particle size information for all of the lots of modafinil API that it had previously

manufactured, including all of the lots discussed in the RE '516 patent, and suggested to the

named inventors that any differences in bioavailability between the early and late lots of

modafinil API and tablets may have been due to differences in particle size. The patent is false

and misleading in failing to give Lafon scientists credit for suggesting to the named inventors

that any differences in bioavailability between the foreign and U.S. modafinil clinical trials may

have been due to differences in particle size. This was prior art under 35 U.S.C. § 102(f) that

was not disclosed to the PTO.

66.    The named inventors were not the first to discover that modafinil is a very slightly

soluble compound. This is information they obtained from Lafon. It is prior art under 35 U.S.C.

§ 102(f) that was not disclosed to the PTO.

67.    Mylan reserves the right to add any additional defenses or counterclaims that

discovery may reveal or may be set forth in the answer of any co-defendant in this action.

**WHEREFORE**, Mylan prays that this Court enter judgment:

a.    dismissing the complaint with prejudice, and denying each and every prayer for

relief contained therein;

b.    declaring that the claims of the RE '516 Patent are invalid;

c.    declaring that the RE '516 Patent is unenforceable;

d.    declaring that Mylan does not infringe any valid claim of the RE '516 Patent;

e.    declaring that this case is exceptional within the meaning of 35 U.S.C. § 285, and

all costs and expenses of this action, including reasonable attorneys' fees, be

awarded to Mylan;

f.    awarding to Mylan such further relief as this Court may deem necessary, just, or

proper.


## COUNTERCLAIM FOR DECLARATORY JUDGMENT

For its counterclaim, Counterclaim-Plaintiff, Mylan Pharmaceuticals, Inc. ("Mylan"),

alleges as follows:

### JURISDICTION AND VENUE

68.    This Court has jurisdiction over the subject matter of the counterclaims under 28

U.S.C. §§ 2201, 2202, 1331, and 1338.

69.    Venue is proper in this district court pursuant to 28 U.S.C. §§ 1391(b), (c) and

1400(b).

70.    Upon information and belief, this Court has personal jurisdiction over Cephalon,

Inc.

### THE PARTIES

71.    Mylan Pharmaceuticals Inc. is a corporation organized and existing under the laws

of the state of West Virginia with its principal place of business at 781 Chestnut Ridge Road,

Morgantown, West Virginia.

00371241.WPD                                    -19-

72.    Upon information and belief, Cephalon, Inc. ("Cephalon") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 145 Brandywine Parkway, West Chester, Pennsylvania.

**FACTUAL BACKGROUND**

73.    Cephalon is the assignee of United States Reissue Patent No. RE 37,516 ("the RE '516 Patent"), entitled "Acetamide Derivative Having Defined Particle Size," which issued on January 15, 2002.

74.    The RE '516 Patent is listed in the FDA's publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book") under the patent data for PROVIGIL® modafinil.

75.    Cephalon has been selling its PROVIGIL® modafinil product since its approval by the United States Food and Drug Administration ("FDA") on December 24, 1998.

76.    Mylan has submitted Abbreviated New Drug Application number 76-594 ("Mylan's ANDA") to the United States Food and Drug Administration ("FDA") under Section 505(j) of the Federal Food, Drug and Cosmetic Act seeking approval to engage in the commercial manufacture, use, offer for sale, and sale of the modafinil products defined by the Mylan ANDA ("Mylan's Modafinil Products").

77.    Included in Mylan's ANDA were certifications under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Paragraph IV Certifications") with respect to both of the patents listed in the Orange Book under Cephalon's PROVIGIL® modafinil product.  With respect to the RE '516 Patent, Mylan certified that the patent was invalid.

78.     Cephalon received, by registered letter, notices of the Paragraph IV certifications filed in Mylan's ANDA against both of the listed patents on February 19, 2003.  The notice letters included detailed analysis regarding each of the certifications made by Mylan.

79.     Within forty-five days after receipt of the notice letters, Cephalon filed a complaint in this Court for patent infringement against Mylan, along with other co-defendants. In its complaint, Cephalon asserts that the RE '516 Patent was infringed by Mylan's act of filing its ANDA and will be infringed by the manufacture, use, offer for sale and sale of Mylan's Modafinil Products once Mylan's ANDA is approved.

## COUNT I
### DECLARATORY JUDGMENT OF
### INVALIDITY OF THE RE '516 PATENT

80.     Mylan repeats and realleges the allegations of paragraphs 68-79 as if set forth herein.

81.     There is a substantial and continuing controversy between Mylan and Cephalon as to Cephalon's assertion of infringement of the RE '516 Patent.

82.     The claims of the RE '516 Patent are invalid under 35 U.S.C. §§ 101, 102, 103 and/or 112.

83.     The manufacture, use, sale, offer for sale, of Mylan's ANDA Modafinil products does not infringe any valid claim of the RE '516 Patent.

## COUNT II
### DECLARATORY JUDGMENT OF
### UNENFORCEABILITY OF THE RE '516 PATENT

84.     Mylan repeats and realleges the allegations of paragraphs 55-83 as if set forth herein.

00371241.WPD                                    -21-

85.    There is a substantial and continuing controversy between Mylan and Cephalon as to Cephalon's assertion of infringement of the RE '516 Patent.

86.    The RE '516 patent is unenforceable due to inequitable conduct by the named inventors and others who participated in the prosecution of the applications that led to the RE '516 patent. Specifically, the prosecuting attorneys and named inventors, Messrs. Rick Burgoon, Robert Hrubiec, Peter Grebow, Vincent Corvari, and David Stong, had knowledge of the following material facts relevant to patentability, knew these facts to be material to patentability, and withheld them from or misrepresented them to the U.S. Patent and Trademark Office with deceptive intent,. The details of these intentional omissions and misrepresentations are set forth above in incorporated paragraphs 55-66.

## REQUEST FOR RELIEF

**WHEREFORE**, Mylan prays that this Court enter judgment:

a.    declaring that the claims of the RE '516 Patent are invalid;

b.    declaring that the RE '516 Patent is unenforceable;

c.    declaring that the RE '516 Patent is not infringed by the use, sale or offer for sale of Mylan's ANDA Modafinil product;

d.    declaring that this case is exceptional within the meaning of 35 U.S.C. § 285, and all costs and expenses of this action, including reasonable attorneys' December 15, 2004 fees, be awarded to Mylan;

e.    awarding to Mylan such further relief as this Court may deem necessary, just, or proper.

00371241.WPD

-22-

SAIBER, SCHLESINGER, SATZ & GOLDSTEIN, LLC
Attorneys for Defendant
Mylan Pharmaceuticals Inc.


By:   ___/s/ Arnold B. Calmann_____
          Arnold B. Calmann (AC-3245)
          Jeffrey Soos (JS-0589)
          One Gateway Center, 13th Floor
          Newark, New Jersey 07102-5311
          (973) 622-3333

          E. Anthony Figg
          Steven Lieberman
          John A. McCahill
          R. Elizabeth Brenner
          Lisa N. Phillips
          ROTHWELL, FIGG, ERNST & MANBECK, P.C.
          1425 K Street, N.W., Suite 800
          Washington, D.C. 20005
          (202) 783-6040

Dated: February 25, 2005

# Exhibit 6

No. 04-10688-AA

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

SCHERING-PLOUGH CORP.,
UPSHER-SMITH LABORATORIES, INC.,
*Petitioners,*

v.

FEDERAL TRADE COMMISSION,
*Respondent.*

PETITION FOR REVIEW
OF A FINAL ORDER OF THE
FEDERAL TRADE COMMISSION

BRIEF OF RESPONDENT
FEDERAL TRADE COMMISSION

WILLIAM E. KOVACIC
*General Counsel*

SUSAN A. CREIGHTON
*Director, Bureau of Competition*

JOHN D. GRAUBERT
*Principal Deputy General Counsel*

BRADLEY S. ALBERT
ELIZABETH R. HILDER
MICHAEL B. KADES
*Attorneys, Bureau of Competition*

JOHN F. DALY
*Deputy General Counsel for Litigation*

IMAD D. ABYAD
*Attorney*

FEDERAL TRADE COMMISSION
600 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, DC 20580

FEDERAL TRADE COMMISSION
600 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, DC 20580
(202) 326-2375

July 27, 2004

Appeal No. 04-10688
*Schering-Plough Corp. v. FTC*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Rules 26.1 and 27.1(a)(9) of the Rules of the Court of Appeals for the Eleventh Circuit, respondent Federal Trade Commission hereby submits the following list of persons who have an interest in the outcome of this matter, and whose names were omitted from petitioners Schering-Plough Corporation's and Upsher-Smith Laboratories, Inc.'s Certificates of Interested Persons:

Alden F. Abbott, Assistant Director, Bureau of Competition, FTC.

Imad D. Abyad, Attorney, Office of General Counsel, FTC.

Bradley S. Albert, Attorney, Bureau of Competition, FTC.

Jeffrey W. Brennan, Attorney, Bureau of Competition, FTC.

D. Michael Chappell, Administrative Law Judge, FTC.

Susan A. Creighton, Director, Bureau of Competition, FTC.

John F. Daly, Deputy General Counsel for Litigation, FTC.

Federal Trade Commission, Respondent.

Andrew Ginsburg, Attorney, Bureau of Competition, FTC.

John D. Graubert, Principal Deputy General Counsel, FTC.

Pamela Jones Harbour, Commissioner, FTC.

C1-2

Appeal No. 04-10688
*Schering-Plough Corp. v. FTC*

Elizabeth R. Hilder, Attorney, Bureau of Competition, FTC.

Michael B. Kades, Attorney, Bureau of Competition, FTC.

William E. Kovacic, General Counsel, FTC.

Thomas Krattenmaker, Advisor, Bureau of Competition, FTC.

Thomas B. Leary, Commissioner, FTC.

Markus H. Meier, Deputy Assistant Director, Bureau of Competition, FTC.

Judith A. Moreland, Bureau of Competition, FTC.

Timothy J. Muris, Chairman, FTC.

Melvin H. Orlans, Bureau of Competition, FTC.

David R. Pender, Deputy Assistant Director, Bureau of Competition, FTC.

Orson Swindle, Commissioner, FTC.

Mozelle W. Thompson, Commissioner, FTC.

Michael S. Wroblewski, Assistant General Counsel for Policy Studies, FTC.

## STATEMENT REGARDING ORAL ARGUMENT

The Federal Trade Commission agrees with the petitioners that this case raises important issues at the intersection of patent law and antitrust law, and that oral argument may assist this Court's resolution of this case.

# TABLE OF CONTENTS

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -v-

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -xiii-

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . -xiv-

STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . -1-

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

     A.    Nature of the Case, the Course of Proceedings, and the Disposition

          Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

     B.    Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

          1.    Schering's K-Dur 20 . . . . . . . . . . . . . . . . . . . . . . . . . -3-

          2.    The Hatch-Waxman Regulatory Framework . . . . . . . . . . . -3-

          3.    The Economic Impact of Generic Entry . . . . . . . . . . . . . . -4-

          4.    The Schering-Upsher Settlement . . . . . . . . . . . . . . . . . . -7-

          5.    The Schering-AHP Settlement . . . . . . . . . . . . . . . . . . . -9-

          6.    The Commission's Ruling . . . . . . . . . . . . . . . . . . . . . . -10-

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

I.      THE COMMISSION'S FINDINGS ARE DUE A HIGH DEGREE

        OF DEFERENCE AND THE MERE EXISTENCE OF

        ALTERNATIVE INFERENCES OR CONCLUSIONS IS

        INSUFFICIENT TO SET THEM ASIDE  . . . . . . . . . . . . . . . . . . -17-

II.     SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S

        FINDING THAT SCHERING PAID UPSHER TO DELAY

        GENERIC ENTRY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

        A.     The Commission Found Substantial Evidence That Schering

               Paid for Upsher's Deferred Entry . . . . . . . . . . . . . . . . . . . . -23-

        B.     Petitioners' Alternative Explanations for the $60 Million

               Payment are Contrary to the Record Evidence . . . . . . . . . . -28-

III.    IT IS UNDISPUTED THAT SCHERING PAID AHP IN

        EXCHANGE FOR THE LATTER'S DELAYED ENTRY TO THE

        MARKET  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

IV.     THE COMMISSION PROPERLY APPLIED A RULE OF REASON

        ANALYSIS TO CONCLUDE THAT SCHERING PAID ITS

        COMPETITORS NOT TO COMPETE  . . . . . . . . . . . . . . . . . . . . -37-

        A.     A Patentee's "Exclusionary Right Cannot be Exploited

               in Every Way" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

B.    The Commission Fully Considered the Exclusionary Power of

Schering's Patent, Consistent with *Valley Drug* . . . . . . . . .  -43-

C.    Direct Record Evidence of Anticompetitive Effects Obviates

the Need for Indirect Product Market Analysis  . . . . . . . . .  -50-

D.    No Countervailing, Procompetitive Benefits of the Challenged

Agreements Were Present in This Case  . . . . . . . . . . . . . . .  -54-

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -59-

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

## FEDERAL CASES

*Addyston Pipe & Steel Co. v. United States,*

    175 U.S. 211, 20 S. Ct. 96 (1899) ................................. 39

*Andrx Pharms., Inc. v. Biovail Corp. International,*

    256 F.3d 799 (D.C. Cir. 2001) ............................... 40, 46

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.,*

    784 F.2d 1325 (7th Cir. 1986) ................................. 51

*Blackburn v. Sweeney,*

    53 F.3d 825 (7th Cir. 1995) .................................. 39

*Brand Name Prescription Drugs Antitrust Litigation,*

    186 F.3d 781 (7th Cir. 1999) ................................... 5

*California Dental Association v. FTC,*

    526 U.S. 756, 119 S. Ct. 1604 (1999) ......................... 53, 54

*CFTC v. Wellington Precious Metals, Inc.,*

    950 F.2d 1525 (11th Cir. 1992) ................................. 22

*Cinderella Career and Finishing Schools, Inc. v. FTC,*

    425 F.2d 583 (D.C. Cir. 1970) ................................. 21

*Colonial Stores Inc. v. FTC,*

    450 F.2d 733 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Colony Square Co. v. Prudential Insurance Co. of America,*

    819 F.2d 272 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Copperweld Corp. v. Independence Tube Corp.,*

    467 U.S. 752, 104 S. Ct. 2731 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Engine Specialties, Inc. v. Bombardier Ltd.,*

    605 F.2d 1 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Equifax, Inc. v. FTC,*

    678 F.2d 1047 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

*Ethyl Gasoline Corp. v. United States,*

    309 U.S. 436, 60 S. Ct. 618 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*FTC v. Algoma Lumber Co.,* 291 U.S. 67, 54 S. Ct. 315 (1934) . . . . . . . . . . . . 14

*FTC v. Indiana Federation of Dentists,*

    476 U.S. 447, 106 S. Ct. 2009 (1986) . . . . . . . . . . . . . . . . . 10, 14, 15, 50, 51

*Foremost Dairies, Inc. v. FTC,*

    348 F.2d 674 (5th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Froelich v. Senior Campus Living LLC,*

    355 F.3d 802 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hernandez v. National Transport Safety Board,*

    15 F.3d 157 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Kopac v. NLRB,*

    668 F.2d 946 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Markman v. Westview Instruments, Inc.,*

    517 U.S. 370, 116 S. Ct. 1384 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Mylan Pharms., Inc. v. Shalala,*

    81 F. Supp. 2d 30 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*NLRB v. Bogart Sportswear Manufacturing Co., Inc.,*

    485 F.2d 1203 (5th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Olin Corp. v. FTC,*

    986 F.2d 1295 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Palmer v. BRG of Georgia, Inc.,*

    874 F.2d 1417 (11th Cir. 1989), *rev'd*, 498 U.S. 46, 111 S. Ct. 401

    (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Palmer v. BRG of Georgia, Inc.,*

    498 U.S. 46, 111 S. Ct. 401 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Parker v. Bowen,*

    788 F.2d 1512 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

-vii-

*Terazosin Hydrochloride Antitrust Litigation,*

    164 F. Supp. 2d 1340 (S.D. Fla. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Todd v. Exxon Corp.,*

    275 F.3d 191 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Toys "R" Us v. FTC,*

    221 F.3d 928 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Baker Hughes, Inc.,*

    908 F.2d 981 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Griffith,*

    334 U.S. 100, 68 S. Ct. 941 (1948), *overruled on other grounds* . . . . . . . . 39

*United States v. Line Material Co.,*

    333 U.S. 287, 68 S. Ct. 550 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Masonite Corp.,*

    316 U.S. 265, 62 S. Ct. 1070 (1942) . . . . . . . . . . . . . . . . . . . . . . . . 42, 55, 57

*United States v. Microsoft Corp.,*

    253 F.3d 34 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Ramirez-Chilel,*

    289 F.3d 744 (11th Cir. 2002), *cert. denied,* 537 U.S. 1114, 123 S. Ct. 850

    (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

-viii-

*United States v. Singer Manufacturing Co.,*

     374 U.S. 174, 83 S. Ct. 1773 (1963) . . . . . . . . . . . . . . . . . . . . . . . . 42, 45, 55

*Universal Camera Corp. v. NLRB,*

     340 U.S. 474, 71 S. Ct. 456 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Valley Drug Co. v. Geneva Pharms., Inc.,*

     344 F.3d 1294 (11th Cir. 2003), *petition for cert. filed* (No. 03-1175, Feb.

     16, 2004), *conditional petition for cert. filed sub nom. Walgreen Co. v.*

     *Abbott Labs.* (No. 03-1178, Feb. 13, 2004) . . . . . . . . . . . . . . . . . . . . . passim

*Verizon Committees, Inc. v. Law Offices of Curtis V. Trinko, LLP,*

     __ U.S. __, 124 S. Ct. 872 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

*Yarn Processing Patent Validity Litigation,*

     541 F.2d 1127 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*

     395 U.S. 100, 89 S. Ct. 1562 (1969), *rev'd on other grounds,*

     401 U.S. 321, 91 S. Ct. 725 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

## FEDERAL STATUTES

5 U.S.C. § 557(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15 U.S.C. § 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

-ix-

15 U.S.C. § 45(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

16 C.F.R. § 3.54(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

21 U.S.C. § 355(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21 U.S.C. § 355(j)(2)(A)(vii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21 U.S.C. § 355(j)(5)(B)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21 U.S.C. § 355(j)(5)(B)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Pub. L. No. 98-417, 98 Stat. 1585 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pub. L. No. 108-173, 117 Stat. 2461 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 57

## STATE STATUTES

Conn. Gen. Stat. Ann. § 17b-274 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## MISCELLANEOUS

ABA Section of Antitrust Law, *Antitrust Law Developments* (5th ed. 2002)  . . . 53

XII Phillip E. Areeda, Herbert Hovenkamp, *Antitrust*

　　*Law* (1999 & 2004 Supp.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 45, 56, 57

David A. Balto, *Pharmaceutical Patent Settlements: The Antitrust Risks,*

　　55 Food & Drug L.J. 321 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Richard E. Caves, et al., *Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry*, Brookings Papers on Economic Activity, Microeconomics (1991) . . . . . . . . . . . . . . . . . . . . . . . . 5

Congressional Budget Office, *How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry* (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Thomas F. Cotter, *Refining the "Presumptive Illegality" Approach to Settlements of Patent Disputes Involving Reverse Payments: A Commentary on Hovenkamp, Janis & Lemley*, 87 Minn. L. Rev. 1789 (2003) . . . . . . . . . . 38

Henry G. Grabowski & John M. Vernon, *Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act*, 35 J.L. & Econ. 331 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Herbert Hovenkamp et al., *Anticompetitive Settlement of Intellectual Property Disputes*, 87 Minn. L. Rev. 1719 (2003) . . . . . . . . . . . . . . . . . . . . 38, 44, 45

H.R. Rep. No. 98-857, 1984 U.S.C.C.A.N. 2647 . . . . . . . . . . . . . . . . . . . . . . . . 56

Maureen A. O'Rourke & Joseph F. Brodley, *An Incentives Approach to Patent Settlements: A Commentary on Hovenkamp, Janis and Lemley*, 87 Minn. L. Rev. 1767 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

-xi-

Carl Shapiro, *Antitrust Limits to Patent Settlements*, 34 RAND J. Econ. 391

(2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 41

U.S. Dep't of Justice & Federal Trade Commission, *Antitrust Guidelines for the*

*Licensing of Intellectual Property* (1995) . . . . . . . . . . . . . . . . . . . . . . . . 4

www.Andrx.com . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

www.Schering-Plough.com . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

## GLOSSARY

For ease of reference, the following abbreviations and citation forms are used in this brief:

Op. - The Commission's Opinion

ID - Initial Decision of the Administrative Law Judge

CX - Complaint Counsel Exhibit

SPX - Schering-Plough Exhibit

USX - Upsher-Smith Exhibit

Tr. - Transcript of Trial Testimony before the Administrative Law Judge

IH - Transcript of Investigational Hearing Testimony*

Dep. - Transcript of Deposition Testimony*

---

    \*     References to investigational hearing or deposition transcripts included in the trial record as exhibits are made using the exhibit number with the witness's name and type of interview provided in parentheses (*e.g.*, CX 1511 (Kapur Dep.)).

# STATEMENT OF JURISDICTION

This is an appeal from an Order of the Federal Trade Commission, entered pursuant to Section 5(b) of the Federal Trade Commission Act, 15 U.S.C. § 45(b). This Court has jurisdiction to review the Commission's Order pursuant to Section 5(c) of the Act, 15 U.S.C. § 45(c).

-xiv-

## STATEMENT OF ISSUES PRESENTED

1. Whether the Commission's factual findings – including its finding that petitioner Schering paid potential generic competitors to delay market entry – are supported by substantial evidence.

2. Whether the Commission properly concluded that petitioners' agreements to delay the introduction of lower-cost generic drugs were unreasonable restraints of trade, in light of the established competitive benefits of generic entry in this case and petitioners' failure to demonstrate any procompetitive justifications.

3. Whether the Commission's analytical framework is consistent with this Court's guidance in *Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294 (11th Cir. 2003), *petition for cert. filed* (No. 03-1175, Feb. 16, 2004), *conditional petition for cert. filed sub nom. Walgreen Co. v. Abbott Labs.* (No. 03-1178, Feb. 13, 2004).

<u>STATEMENT OF THE CASE</u>

*Nature of the Case, Course of Proceedings, and the Disposition Below*

This case concerns a challenge by the Federal Trade Commission (the "FTC" or the "Commission") to agreements between Schering-Plough Corporation ("Schering"), the manufacturer of a brand-name drug called "K-Dur 20," and two manufacturers of generic counterparts, Upsher-Smith Laboratories, Inc. ("Upsher") and American Home Products Corporation ("AHP"). In those agreements, the parties settled pending patent litigation, and the two generic manufacturers agreed to forbear marketing their generic drugs until specified dates in exchange for guaranteed cash payments totaling $60 million to Upsher and $15 million to AHP. As a result of these agreements, Schering continued to enjoy supracompetitive profits from K-Dur 20 for several more years, at the expense of consumers.

The Commission issued its administrative complaint on March 30, 2001, charging that Schering's agreements with Upsher and AHP violated the FTC Act, 15 U.S.C. § 45. AHP entered into a consent agreement in April 2002 and is no longer party to this action. Trial against Schering and Upsher took place between January 23 and March 22, 2002. The administrative law judge's Initial Decision ("ID") dismissed the complaint. ID 103-112. The Commission reversed, concluding on *de novo* review that the ALJ had erred in several key factual

-2-

findings as well as in his legal analysis. *See* Opinion of the Commission  ("Op.").
The Commission entered an order against Schering and Upsher to cease the
practices in question, and this review proceeding followed.

*Statement of the Facts*

### 1. Schering's K-Dur 20

Schering's K-Dur 20 is a potassium chloride supplement generally taken as a
long-term therapy in conjunction with drugs for high blood pressure or congestive
heart disease.  It was the most frequently prescribed potassium supplement, with
annual sales reaching $170 million by 1997.  The active ingredient in K-Dur 20,
potassium chloride, is in common use and is unpatentable.  Schering owns a
*formulation* patent (the '743 patent) that relates only to the type and viscosity of
the material that coats the potassium chloride crystals, providing the tablet with its
extended-release mechanism.  Thus, a generic manufacturer can use the active
ingredient in K-Dur 20 without infringing Schering's patent, so long as it uses a
coating not covered by that patent.  Upsher and AHP asserted (to the FDA and in
litigation) that their products were such non-infringing generic substitutes.

### 2. The Hatch-Waxman Regulatory Framework

This case arises in the regulatory context of the Drug Price Competition and
Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984),

-3-

commonly known as the "Hatch-Waxman Act."[1] The Act allowed for accelerated

FDA approval of a drug through an Abbreviated New Drug Application

("ANDA") upon showing that the new "generic" drug is "bioequivalent" to an

already approved "pioneer" or "brand-name" drug. 21 U.S.C. § 355(j). The FDA

may not approve the ANDA prior to the expiration of any patent that covers the

existing drug unless the applicant certifies that the referenced patent is either

invalid or is not infringed by the new generic product (a so-called "Paragraph IV

Certification"). 21 U.S.C. § 355(j)(2)(A)(vii). The patent holder may challenge

such certification by filing a patent infringement suit within 45 days of receiving

notification of it, thus invoking a 30-month stay period during which the FDA

approval is put on hold awaiting judicial resolution of the patent litigation. 21

U.S.C. § 355(j)(5)(B)(iii).

## 3. The Economic Impact of Generic Entry

Although the ownership of a patent does not automatically confer market

power on the patentee,[2] empirical research in the pharmaceutical industry shows

that the impact of the entry of generic substitutes on the sale of certain brand-name

---

[1]    This Court reviewed the relevant regulatory background in *Valley Drug, supra*, 344 F.3d at 1296-98.

[2]    *See Antitrust Guidelines for the Licensing of Intellectual Property* § 2.2 (U.S. Dep't of Justice & FTC 1995).

drugs is both rapid and dramatic.[3] In these circumstances a brand-name manufacturer that can forestall generic entry frequently does have market power.[4] Within the first full year after launch of a generic product, branded drugs lose an average of 44% of their sales to the new, significantly lower-priced generic entrant.[5] State drug-substitution laws and the policies of private health organizations contribute significantly to this dramatic impact. Virtually all states encourage generic competition through laws that allow pharmacists to dispense an "AB-rated" generic drug when presented with a prescription for its branded counterpart, unless the physician directs otherwise.[6] Similarly, many health plans, including Medicaid and other public assistance programs, capitalize on those substitution laws by encouraging or even mandating the use of generic versions of

---

[3]     *E.g.*, Henry G. Grabowski & John M. Vernon, *Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act*, 35 J.L. & Econ. 331 (1992); Richard E. Caves, et al., *Patent Expiration, Entry, and Competition in the U.S. Pharmaceutical Industry*, Brookings Papers on Economic Activity, Microeconomics (1991).

[4]     *See Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 787 (7th Cir. 1999) (Posner, C.J.).

[5]     Congressional Budget Office, *How Increased Competition from Generic Drugs Has Affected Prices and Returns in the Pharmaceutical Industry*, xiii (1998).

[6]     An "AB-rated" generic drug is one that has been approved by the FDA as bioequivalent to a reference drug.

-5-

branded drugs whenever possible. Schering Answer ¶ 19; Goldberg, Tr. 122. *See, e.g.*, Conn. Gen. Stat. Ann. § 17b-274 (mandating the dispensing of generic substitutes to recipients of public assistance).

K-Dur 20's rapid sales erosion as a result of generic entry was predicted by Schering and Upsher, and then realized once generic substitutes entered the market. Op. 19, 22. Although Schering's patent covering K-Dur 20 did not expire until 2006, Schering did not expect its patent to prevent all generic competition, nor did Upsher expect to wait until patent expiration before entering.[7] Indeed, Schering predicted that generic entry would occur long before its patent's expiration, and adjusted its business forecasts accordingly to show a dramatic drop in the sales of K-Dur 20. Op. 20; CX 746 at SP2300375; CX 115 at SP004794; CX 122A at SP2300295; CX 122F at SP2300316; CX 122J at SP2300325-326.[8]

---

[7]     As noted above, Schering's patent did not cover the product's active ingredient, but only a particular *formulation* of the product.

[8]     Schering's internal business documents warned that "direct generic competition is expected" and might arrive by 1997 or 1998. CX 13 at SP003044; Op. 20. Indeed, by 1997, Schering was actively planning for generic competition, by preparing to launch its own generic version of K-Dur 20 – even purchasing the packaging supplies. CX 682; *see also* CX 122B at SP2300298; CX 122E at SP2300310. Schering has launched generic versions of its own drugs in the past only in response to or in anticipation of other generic entry. CX 1510 (Kapur IH) at 30-31.

## 4.  The Schering-Upsher Settlement

In August 1995, Upsher filed an ANDA to market "Klor Con M20," a generic version of Schering's K-Dur 20. Op. 3.  In connection with its ANDA, Upsher made a Paragraph IV Certification that Schering's patent was either invalid or not infringed, and notified Schering accordingly. Op. 4.  On December 15, 1995, Schering sued Upsher for patent infringement, thus triggering the 30-month automatic stay on Upsher's ANDA. *Id.*

In March 1997, Upsher received tentative FDA approval of its ANDA, CX 233, and a week later, asked the court hearing the patent litigation to lift the 30-month stay on FDA final approval. Op. 34.  Upsher represented to the court that the only impediment to its immediate entry was the automatic Hatch-Waxman stay. *Id.*; CX 1705 at USLPLD004242 (*in camera*); Kerr, Tr. 6744-45; CX 1706 at USLPLD004262, 67 (*in camera*).  Upsher also took various concrete steps to prepare for product launch, including purchasing raw materials and reserving time with its contract manufacturer for production of commercial-scale quantities. CX 1502 (Gould Dep.) at 13-16, 17, 40-42; CX 266.

Schering and Upsher began negotiating a settlement about a month prior to the June 1997 trial date. Op. 44; Troup, Tr. 5407-10.  Upsher's status as the first filer of an ANDA for a generic K-Dur 20 dramatically strengthened its negotiating

-7-

position, and it made clear to Schering that it expected to be paid to stay off the
market.[9] CX 1529 (Troup IH) at 111-12. Indeed, from the very beginning,
Upsher's president, Ian Troup, made a demand of $60-70 million from Schering,
Tr. 320 – a figure that fell between the parties' estimates of Schering's loss in the
event of generic entry, CX 128 at SP2300325a; CX 150 at USL08536, 38, 39; and
Upsher's loss in the event of delayed entry until 2001. CX 283 at SP018781; *see
also* Troup, Tr. 5413-14; CX 338 at SP1200268.

On June 17, 1997, on the eve of trial, Schering and Upsher entered into an
agreement that settled their patent litigation. Op. 4. Schering agreed to pay
Upsher – unconditionally – the $60 million it had demanded. Op. 4; CX 348. In
return, Upsher agreed to forgo marketing its Klor Con M20 product until
September 2001. Op. 4; CX 348 at USL03186. Upsher also agreed to grant
Schering a license to market six Upsher products in prescribed territories. Op. 4.
The unconditional payments were justified to Schering's board of directors as a
"prerequisite of any deal" and as dictated by Upsher's desire for a "guaranteed

---

[9]    Under certain circumstances, the first filer of an ANDA is granted a
180-day "exclusivity period" during which it can market its new drug free from
other generic competition. 21 U.S.C. § 355(j)(5)(B)(iv). Thus, Schering faced
competition not only from Upsher, but also from the other generic manufacturers
that were potentially blocked from entry until Upsher began marketing its product.

income stream" to compensate it for lost Klor Con M20 revenue. CX 338 at
SP1200270.

### 5. The Schering-AHP Settlement

In December 1995, ESI Lederle Inc., a division of AHP, also filed an ANDA
for a generic version of K-Dur 20, with its own Paragraph IV Certification. Op. 5.
On February 16, 1996, Schering sued AHP for patent infringement, prompting a
stay in AHP's ANDA, and in late 1996, Schering and AHP began settlement
discussions. *Id.* Schering's first proposal was for AHP to abandon its generic
version and instead receive compensation from Schering for promoting K-Dur 20.
CX 459; CX 466. In March 1997, AHP rejected the "co-promotion" idea, and
proposed instead that Schering "make an appropriate payment" to AHP, in return
for which, AHP would "forebear [sic] from entering the market" until "some
subsequent time (for example, in 2002)," an offer which Schering eventually
accepted with slightly different terms. CX 458; CX 459.

Schering and AHP settled the case in principle in January 1998 and the final
agreements were concluded in June 1998. Op. 5. A portion of the settlement
covered various product licenses, but it is undisputed that, separately, Schering
agreed to pay AHP $15 million not to market any generic version of Schering's K-
Dur 20 before January 2004. Op. 80 n.101.

-9-

### 6. The Commission's Ruling

The Commission first determined that it would not condemn the agreements as *per se* or presumptively unlawful. Op. 10-14. The presence of the patent dispute was "a complicating factor," the Commission said, and accordingly "the issues cannot be resolved in a summary way." Op. 14. Rather, the Commission found it "necessary to recognize that patent issues exist," Op. 14, and to consider possible procompetitive justifications. Op. 13.

The Commission's extensive examination of the agreements under the rule of reason began with a consideration of the particular market context of branded versus generic competition. Citing abundant evidence that entry of generic K-Dur 20 was predicted to, and did, lower prices and take substantial sales away from Schering, and that such entry "was a uniquely significant market event, and recognized as such by both parties," Op. 19, the Commission found direct proof that delaying generic K-Dur 20 entry would injure competition and consumers. Relying on the established principle that such direct proof of anticompetitive effects obviates the need for indirect, structural market analysis, the Commission held the ALJ had plainly erred in requiring an indirect approach based on "market definition" and a presumption keyed to market shares. Op. 16-17; *see generally FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 460-61, 106 S. Ct. 2009,

-10-

2018-19 (1986) ("*IFD*"). The Commission accordingly set aside the ALJ's market findings. Op. 19 & n. 35.[10]

The Commission then considered the agreement in the context of the patent dispute. It began with the observation that it would be reasonable to assume that a settlement between the parties providing for a future entry date without cash payments would reflect the strength of the patent as viewed by the parties. Such a settlement, resulting directly from the perceived exclusionary power of the patent, would not be illegal, the Commission explained. Op. 25-26. Turning to the large cash payments in this case, the Commission reasoned that absent some other consideration for the payments, it would be logical to conclude that Schering was buying more protection from competition than the parties expected from the litigation. The Commission confirmed this inference by examining the plain language of the agreements and the history of negotiations between the parties. Op. 26-27.

The Commission also considered whether a detailed examination of the patent issues within the antitrust case would be a better way to take account of the patent dispute when assessing competitive effects. While acknowledging that in some cases such an inquiry might be warranted, it concluded that in this instance it

---

[10]    Schering incorrectly states that the Commission left the ALJ's market findings "undisturbed." Schering Br. 29 n.14.

was not. It relied on the same principles articulated by this Court in *Valley Drug*, namely: (1) the agreements should be judged as of the time they were entered, when the outcome of the patent litigation was uncertain; and (2) it would be undesirable to base liability on an after-the-fact adjudication of the patent case, because parties cannot predict how such a retrospective determination by an antitrust tribunal would turn out. Op. 31, 32-35.

The Commission addressed in detail Schering's claim that the $60 million payment to Upsher was entirely for licenses conveyed under the settlement agreement and not for Upsher's promise to forgo entry. Op. at 39-79. In its comprehensive findings of fact, the Commission relied heavily on contemporaneous business records of the parties, and discounted certain trial testimony as against the weight of the evidence. First, the Commission noted that the terms of the contract made Upsher's agreement to forbear entry a condition of Schering payments. Op. 41-42. Second, it found that pre-agreement evidence demonstrated that the amount and unconditional nature of Schering's payment to Upsher were based on Upsher's demand that it be compensated for anticipated revenues it would forgo by agreeing to delay the launch of Klor Con M20. Op. 42-52. Third, the Commission rejected Schering's principal defense – based on an

-12-

internal sales forecast for Upsher's product – that the Upsher licenses were worth $60 million.

The Commission found that Schering's product review was perfunctory and not consistent with what Schering required in the past to evaluate a similar commercial opportunity, Op. 52-70, and concluded: "It is not credible that Schering would have been satisfied with such a cursory examination, if management really was concerned about the value of the Upsher licenses." Op. 79. Moreover, a more thorough, virtually contemporaneous Schering analysis of a comparable product demonstrated that Schering in fact thought these products did not justify a substantial non-contingent payment. Op. 55-60. Finally, the Commission examined evidence of the parties' post-settlement conduct, and found it consistent with the conclusion that Schering did not pay Upsher $60 million for product licenses. Op. 70-78.

As a final step in the rule of reason analysis, the Commission considered possible procompetitive justifications. Op. 36-39. It acknowledged that certain beneficial effects on competition were "theoretically possible," Op. 13, but found no evidence that those theories applied to the challenged agreements.

Schering's agreement with AHP on its face showed a promise to defer entry in exchange for payments. Following the analytical approach it applied to the

-13-

Upsher agreement, and considering once again that the parties were settling a patent dispute with uncertainty about the litigation outcome,[11] the Commission could therefore readily conclude that this agreement was an unreasonable restraint. Op. 80-81.

Having found both agreements unlawful, the Commission vacated the ALJ's decision and entered a prospective order.

### Standard of Review

"The findings of the Commission as to the facts, if supported by evidence, shall be conclusive." 15 U.S.C. § 45(c). Thus, reviewing courts may not "make [their] own appraisal of the [evidence], picking and choosing ... among uncertain and conflicting inferences." *IFD*, 476 U.S. at 454, 106 S. Ct. at 2015 (quoting *FTC v. Algoma Lumber Co.*, 291 U.S. 67, 73, 54 S. Ct. 315, 318 (1934)); *accord Foremost Dairies, Inc. v. FTC*, 348 F.2d 674, 676 (5th Cir. 1965) ("[I]t is not our function to weigh the evidence or consider the credibility of witness.... Furthermore, reasonable inferences drawn from the facts by the Commission are not to be disturbed"). Rather, "the court must accept the Commission's findings of fact if they are supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *IFD*, 476 U.S. at 454, 106 S. Ct. at

---

[11]    Testimony at trial indicated that AHP had raised serious issues regarding Schering's patent position. Banaker, Tr. 6386-92, 6405-11.

-14-

2015-16. This deferential standard also applies to the Commission's findings regarding the economic effects of particular conduct. *Olin Corp. v. FTC*, 986 F.2d 1295, 1297 (9th Cir. 1993).

Review of the Commission's legal analysis and conclusions is *de novo*, "although even in considering such issues the courts are to give some deference to the Commission's informed judgment." *IFD*, 476 U.S. at 454, 106 S. Ct. at 2016; *accord Colonial Stores Inc. v. FTC*, 450 F.2d 733, 740 n.14 (5th Cir. 1971) ("even when the Commission's findings are framed in terms of legal conclusions, their presumptive validity is considerable").

## SUMMARY OF ARGUMENT

This Court recognized in *Valley Drug* that the Hatch-Waxman Act encouraged generic manufacturers to challenge weak or narrow patents, 344 F.3d at 1298, and that the mere assertion of a patent does not excuse all forms of anticompetitive conduct. *Id.* at 1304-05. In this case, after an extensive rule of reason analysis of the record evidence, the Commission found that through these settlements, Schering avoided challenges to its patent and unlawfully obtained a period of freedom from competition, for which it agreed to share a portion of its resulting supracompetitive profits with its rivals.

-15-

Schering and Upsher ("petitioners") insist that these significant payments had nothing to do with delayed generic entry, but instead were "up-front royalties" for licenses obtained by Schering to market various Upsher products. The Commission found as a fact, based on substantial evidence, that the payments were, "in whole or in substantial part, consideration for delay rather than for products licensed from the generic." Op. 10. Petitioners attempt to re-try this factual issue in this Court, but the Commission is entitled to draw its own inferences and conclusions from the evidence and those conclusions must be upheld even if other conceivable inferences can be proposed. This standard does not change if the Commission disagrees with its ALJ: it is ultimately the Commission's responsibility to find the relevant facts.

Furthermore, the Commission's approach is fully consistent with this Court's direction in *Valley Drug* that the fact finder consider the potential exclusionary power of the relevant patent. Plainly, the Court did not intend that a fact-finder replicate full-blown patent litigation – the *Valley Drug* panel actually had such an analysis available but deemed it irrelevant to the question at hand. How successful the patentee was likely to be in excluding, through the judicial process, the threatened competition can be answered by the actions of the parties themselves, without speculation about the outcome of a now-hypothetical case.

-16-

Nor was the Commission positing that the parties would have entered an *alternate* settlement that would have been less anticompetitive: the question was whether *this* settlement produced less competition than was likely to have occurred absent the payments. The Commission's conclusion that it did has ample support in the record.

Petitioners' purportedly procompetitive justifications for the agreements are either merely hypothetical with no basis in the facts of this case, or would not excuse an antitrust violation. Moreover, Congress has articulated the relevant policy considerations in the Hatch-Waxman Act, which recognized the value of legitimate patent protection, but also encouraged patent challenges and accelerated market entry of low-cost generic drugs. These objectives are subverted when patent holders buy off potential challengers in order to deter generic entry.

## ARGUMENT

**I.    THE COMMISSION'S FINDINGS ARE DUE A HIGH DEGREE OF DEFERENCE AND THE MERE EXISTENCE OF ALTERNATIVE INFERENCES OR CONCLUSIONS IS INSUFFICIENT TO SET THEM ASIDE**

Congress mandated that the Commission's findings of fact be "conclusive" if supported by evidence. 15 U.S.C. § 45(c). This Court and its predecessor have long applied this mandate with a high degree of deference to the Commission:

-17-

> [The Commission is] an administrative agency whose primary function, by explicit Congressional mandate, is the finding of facts. We have consistently reiterated – and we emphasize the point again now – that when Congress has vested in a Federal agency plenary authority to investigate and regulate particular forms of commercial or economic activity, entrusting it with primary responsibility for the resolution of complex and usually sharply disputed factual issues, appellate court review of the exercise of that authority is confined by the narrow perimeter of the substantial evidence rule.

*Colonial Stores*, 450 F.2d at 739 (footnotes omitted). Indeed, only *patently unreasonable* findings may be set aside. *Id.* ("Findings of fact cannot and will not be set aside if the evidence in the record reasonably supports the administrative conclusion, *even though suggested alternative conclusions may be equally or even more reasonable and persuasive*") (emphasis added); *see also Equifax, Inc. v. FTC*, 678 F.2d 1047, 1052 (11th Cir. 1982) ("The fact that two reasonable inferences could be drawn from the evidence does not detract from the Commission's decision to choose one of those inferences").

Petitioners' argument that this high standard of deference is somehow diluted because the Commission disagreed with the ALJ is simply wrong. *See* Schering Br. 5. The Supreme Court has made clear that the substantial evidence standard "is not modified in any way when the [agency] and its [ALJ] disagree." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S. Ct. 456, 469 (1951).

-18-

In this respect petitioners confuse the standard of review of the Commission's decision in this Court, a highly deferential one, with the *de novo* standard of the Commission's review of the ALJ's findings. Under the Administrative Procedure Act as well as the FTC's own rules, the Commission has *de novo* review authority over initial ALJ decisions and retains the authority to decide both the legal and factual questions in administrative litigation.[12] Thus, the question on review here is not what the ALJ found, but whether the Commission's findings are supported by substantial evidence in the record.

Many of petitioners' arguments on appeal boil down to a mere preference for the ALJ's findings of fact over the Commission's. *See, e.g.*, Upsher Br. 23-24; Schering Br. 61-64. These arguments ignore not only the Commission's role as ultimate fact-finder, but also the Commission's careful explanations of why it rejected certain of the ALJ's findings. In some instances, the ALJ's findings were based primarily on self-serving testimony, disregarding contemporaneous business documents that were clearly contradictory. *See, e.g.*, Op. 54 (discounting direct testimony of Schering witnesses in favor of *their own* prior, contemporaneous

---

[12]    5 U.S.C. § 557(b) (the agency "has all the powers which it would have in making the initial decision"); 16 C.F.R. § 3.54(a) (same); *see generally Hernandez v. Nat'l. Transp. Safety Bd.*, 15 F.3d 157, 158 (10th Cir. 1994) (NTSB serves as the ultimate finder of fact, even with respect to credibility determinations); *NLRB v. Bogart Sportswear Mfg. Co., Inc.*, 485 F.2d 1203, 1210 (5th Cir. 1973) (NLRB not bound by examiner's credibility determinations).

contact reports, and other written market research questionnaires and reports); Op. 71 (testimony concerning post-deal communications regarding Niacor-SR contradicted by contemporaneous documents). In other instances, the findings were simply not relevant because the ALJ had misconstrued the legal standard. *See, e.g.,* Op. 17 (ALJ improperly rejected direct evidence of anticompetitive effects for lack of "pricing studies"). The ALJ also copied verbatim much of his "Conclusions of Law and Analysis," including "credibility" determinations, from petitioners' trial briefs – a practice broadly condemned by reviewing courts. *See Colony Square Co. v. Prudential Ins. Co. of America*, 819 F.2d 272, 274-75 (11th Cir. 1987).[13] Even on review of a district court decision, where FRCP 52 applies, the reviewing court may rightly be suspicious of such findings and conclusions, and more readily find that "important evidence has been overlooked or inadequately considered" in such circumstances. *Id.* at 275 n.9.

Moreover, petitioners misconstrue the Commission's disagreement with the ALJ findings that were ostensibly related to the "credibility" of witnesses. Schering Br. 62-63; Upsher Br. 11. The Commission's disagreement did not flow from its judgment on the witness's *truthfulness* – as might perhaps be revealed by demeanor – but from its different view of the *weight* that ought to be accorded to

---

[13]     *Compare* ID 106 (¶ 2-3)-107 *with Upsher Trial Brief* at 1-3 and *Upsher Reply Brief* at 34-35; *see generally Reply Brief of Complaint Counsel* at 3.

the testimony, given the witness's basis of knowledge, consistency with contemporaneous recollection, and prior testimony. *See Kopac v. NLRB*, 668 F.2d 946 (7th Cir. 1982) (distinguishing credibility in the broad sense of persuasive force from witness demeanor). *See, e.g.*, Op. 43 (criticizing ALJ's reliance on self-serving testimony "without *weighing* contradictory, and *more reliable*, evidence") (emphasis added); Op. 54 (finding the contemporaneous memorandum of the Schering official in charge of the matter at issue "*more probative than* the deposition and direct testimony" of others) (emphasis added). The ALJ in fact made no findings based on witness demeanor. Op. 8 n.14. His references to "credibility" of evidence were plainly shorthand for "the weight of the evidence."

The Commission's careful treatment of the ALJ's findings distinguishes this case from *Cinderella Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970). *See* Schering Br. 62 n.28. Although certain parts of that court's reasoning are questionable, *e.g.*, 425 F.2d at 586-87, the court clearly based its ultimate decision on its view that the Commission was "dismissing the proceedings at the [ALJ] hearing *out of hand*." *Id.* at 588 (emphasis added). As discussed above, that can hardly be said of this Commission decision. *Parker v. Bowen*, 788 F.2d 1512 (11th Cir. 1986), is similarly distinguishable. *See* Upsher Br. 11. The *Parker* panel expressly held that the reviewing agency "is not bound by the ALJ's

-21-

credibility findings, but when it rejects such findings, it should ordinarily do so expressly, articulating the reasons for its conclusion." 788 F.2d at 1520. That is exactly what the Commission did in this case.[14]

Thus, the Commission's findings of fact – even when different from the ALJ's – were carefully considered, amply supported by the record, and are therefore conclusive.[15]

---

[14] The facts of the other cases cited by the petitioners on the issue of "credibility" highlight their misconstruction of the term in this case. *United States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002), *cert. denied*, 537 U.S. 1114, 123 S. Ct. 850 (2003), was a criminal case that required the court's judgment on the *contradictory testimonies* of the officers and the defendant, while *CFTC v. Wellington Precious Metals, Inc.*, 950 F.2d 1525 (11th Cir. 1992), concerned civil contempt stemming from an investment fraud and disgorgement order where the contemnor's *truthfulness* was at the heart of the proceeding. Similarly, petitioners' invocation of *Equifax*, *see* Upsher Br. 25, is inapposite because of "the peculiar circumstances of [that] case." 678 F.2d at 1052. The *Equifax* court found that a key Commission inference "flies squarely in the face of *the Commission's own findings*." *Id.* (emphasis added). The Commission's challenged inferences here contradict *the ALJ's findings*, not with its own.

[15] Schering's assertion that 12 citations in the Opinion are to matters not in the record, Schering Br. 56 n.26, reflects some confusion. For example, CX 1529 at 101-02 was admitted at Tr. 8625. Similarly, Schering itself read CX 1495 at 96-97 into the record at Tr. 1419-21. More important, even aside from those 12 citations, there is ample support in the record for each of the propositions in the Commission's opinion for which the referenced materials were cited. *Compare* CX 1508 at 42 *with* Hoffman, Tr. 3563; CX 1529 at 101-02 *with* Troup, Tr. 5439; CX 1532 at 30 *with* CX 1531 at 88-89 , CX 1532 at 25-28; CX 1531 at 67-68 *with* CX 1531 at 54, CX 1532 at 17-18; CX 1495 at 128-29 *with* CX 558; CX 1495 at 96 *with* CX 558, CX 577, CX 1484 at 45, 57, 59; CX 1484 at 76-77 *with* Audibert, Tr. 4111; CX 1495 at 123-24 *with* CX 1494 at 84-85; CX 1483 at 109-10 *with* SPX 5; CX 1515 at 103 *with* Lauda, Tr. 4383; CX 1483 at 95-96 *with* Audibert, Tr.

-22-

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S FINDING THAT SCHERING PAID UPSHER TO DELAY GENERIC ENTRY

The primary factual question at issue in this appeal is whether Schering's large payments to Upsher were a *quid pro quo* for the generic competitor's promise to defer introduction of its lower-cost generic version of K-Dur, or whether, as petitioners claim, these payments were entirely up-front royalties for licenses of other products. Based on "the cumulative impact of the extensive record evidence in this case," Op. 41, the Commission rejected petitioners' claim, finding instead a direct nexus between Schering's payments and the agreed entry date of September 2001. *See* Op. 39-79.

### A. The Commission Found Substantial Evidence That Schering Paid for Upsher's Deferred Entry

The Commission began its analysis with the parties' agreement. It found that the agreement's express terms indicated "that at least part of the consideration for the $60 million payment was Upsher's commitment to delay entry." Op. 41. Paragraph 3 of the agreement (which sets forth Upsher's obligation not to market its generic before September 2001, CX 348), is one of the *quids pro quo* for Schering's payments. Schering's own in-house counsel conceded this point at trial. Hoffman, Tr. 3565-67. Moreover, the $60 million payments were

---

4172-76; CX 1483 at 50-52 *with* Audibert, Tr. 4177-78.

guaranteed. The substantial payments, supposedly for product licenses, were not dependent on the development, regulatory approval, or marketability of these products. Instead, they were tied solely to Upsher's agreement to defer its generic K-Dur 20 entry. If Schering did not pay the $60 million, then Upsher would be free to market its generic product before the agreed-upon date. CX 348 ¶¶ 3, 12.

Upsher's attempts to construe the agreement differently only highlight the true nature of the contracting parties' deal. Upsher Br. 21-23. As an initial matter, merely calling the payments "upfront royalty payments" cannot alter the true nature of the agreement's *quid pro quo*,[16] especially given the context of this case where Schering was aware of the antitrust risks of the payments. Hoffman, Tr. 3541. Similarly, the fact that the named payor was formally a different corporate entity than Schering is immaterial because the entity, by the terms of the agreement itself, was merely a *designated affiliate* of Schering. CX 348 ¶ 7.

More important, however, Upsher's argument highlights the fact that in reality, Schering did not pay $60 million for the licenses. Upsher argues that it had additional obligations under the agreement, such as manufacturing. But very few, if any, of those tasks were performed, Op. 71-72, and *none* of them constituted a condition on Schering's payments. CX 348. Indeed, not only did Schering fail to

---

[16]    *Cf. Yarn Processing Patent Validity Litigation*, 541 F.2d 1127, 1135-37 (5th Cir. 1977) ("royalty" label doesn't alter anticompetitive purpose and effect).

-24-

insist on performance, but it continued to make payments – *without any protests* – despite Upsher's failure to perform and, indeed, its slowdown and eventual cancellation of the Niacor program. Op. 72, 78.[17]

The Commission also relied on substantial evidence from the settlement negotiations that demonstrated that Schering was paying Upsher to compensate it for deferring its generic K-Dur 20 entry, not for product licenses. Op. 44-52.[18] For example, testimony from petitioners' own witnesses showed that:

- Upsher insisted from the very first negotiation session that any settlement must include cash payments to compensate it for staying off the market, Op. 44; CX 1494 (Driscoll IH) at 65-66; CX 1495 (Driscoll Dep.) at 58-59; CX 1511 (Kapur Dep.) at 19-20; indeed, "throughout the settlement negotiations, Upsher made the connection

---

[17]    Niacor was the principal Upsher product in the licensing component of the Schering-Upsher agreement, with the other licenses essentially added for lagniappe. *See* Op. 53 n.83 (summarizing record evidence).

[18]    Remarkably, Schering now claims that the Upsher settlement negotiation evidence sheds no light on whether Schering paid Upsher for delay or for product licenses. Schering Br. 56 n. 27. Throughout the administrative hearing, however, Schering's counsel had argued, in the context of the AHP agreement, that this type of evidence was "crucial," Tr. 2508, and that examining it was the "central way" to "find out what the parties said about various offers and counteroffers … what the parties agreed to and what they didn't agree to." Tr. 2501-02.

-25-

between delayed entry and the payment of money by Schering," Op. 52;

- the $60 million amount of Upsher's demand was specifically tied to what Schering could lose in K-Dur 20 sales if Upsher entered, CX 1494 (Driscoll IH) at 66-67, and to what Upsher expected to lose if it deferred its entry, CX 283; Op. 44; and

- the $60 million figure could not have been based on the value of any product licenses because that amount was chosen before Schering ever evaluated any of Upsher's products, Op. 44-45; Lauda, Tr. 4342-43; *see also* CX 1516 (Lauda Dep.) at 40.

Finally, Schering's memorandum to its Board seeking approval for the transaction confirmed that Schering fully understood that Upsher demanded money "to make up for the income that [Upsher] had projected to earn from sales" of Klor Con M20, and that satisfying this demand was a "prerequisite" to the agreement. CX 338 at SP1200270. Because replacing Upsher's lost sales was a precondition of any settlement, common sense confirms that Schering paid for more than the Niacor license. If the $60 million were entirely for Niacor, then the settlement would not have met Upsher's "lost revenue" requirement for settlement.

The Commission also looked to evidence about what Schering and other companies were willing to pay for a sustained-release niacin product license when such a license was not tied to an agreement to defer generic entry. Op. 53. This evidence showed that, when evaluating the prospects for a stand-alone license, not a single company anywhere offered up-front payments. Op. 65 n.85. Schering had refused to offer any guaranteed money for Niaspan, another sustained-release niacin product, CX 554, and just eight days before the Upsher settlement, it decided to terminate discussions. Op. 60; CX 558. Schering's U.K. subsidiary had no interest in the Niacor license when the benefit of delaying Upsher's marketing of a generic K-Dur 20 was not part of the deal. Op. 73 n.96; USX 595 at USL13152. And more than forty other companies that Upsher approached about Niacor either never responded, rejected the license outright, or refused to offer any up-front money. Op. 48 n.81.

This evidence as a whole establishes that Schering did not pay the $60 million for the Upsher licenses, but instead used the product licenses to provide an ostensible justification for the payments for an agreed entry date.[19]

---

[19]     Upsher complains that "Upsher-Smith's liability under the antitrust laws cannot turn solely upon whether the product rights it was licensing to Schering were worth $60 million *from Schering's standpoint.*" Upsher Br. 17 (emphasis is Upsher's). It did not. Upsher's antitrust liability stems, in fact, from its agreement to delay its market entry in exchange for a portion of Schering's supracompetitive rents. And for its part, the record amply shows that Upsher

-27-

### B.    Petitioners' Alternative Explanations for the $60 Million Payments Are Contrary to the Record Evidence

Petitioners' attempts to re-litigate these factual issues in this Court (including claims that their contentions were "undisputed" or "unrebutted") are seriously off the mark.  The Court need only examine a few examples:

**Contention:**  Schering's assessment of the Niacor opportunity was consistent with and supported by the analysis of a similar product, Niaspan, that the company had just concluded before the Upsher negotiations.  Schering Br. 15, 53, 57.

**Response:**  In fact, just eight days before the Upsher settlement, Schering had concluded after an extensive analysis over many months that Niaspan did not "represent a large-enough opportunity in the marketplace" to warrant further investigation or investment.  Op. 65; CX 558.  Schering's lead negotiator, Martin

---

insisted from the very beginning – before its licenses were even on the negotiating table – that it must be paid *for the lost revenue* that it would incur from its delayed entry.  CX 338 (Schering's report to its board of Upsher's insistence on getting paid to compensate it for lost revenue); CX 1495 (Driscoll Dep.) at 58-59 (Upsher's demand for payment came in the initial meeting of May 21, 1997); Troup, Tr. 5420 (possibility of Schering licensing some of Upsher's generic products first raised by Raman Kapur, President of Schering's subsidiary, Warrick, at the May 28, 1997, meeting).  Moreover, Upsher was well aware from its lack of success shopping Niacor-SR for European distribution that no buyer was likely to make an up-front payment of $60 million for this product in a legitimate deal.  Op. 48 n.81.  But even if the Commission had relied on the buyer's perspective in a valuation analysis, that would not be in the least controversial.  *See, e.g., Froelich v. Senior Campus Living LLC*, 355 F.3d 802, 813 n.5 (4th Cir. 2004).

-28-

Driscoll, explained that in light of the growth of statins as a treatment option, *"Niaspan's market opportunity is narrowing even prior to its introduction"*. CX 558 at 2720 (emphasis added). Kos Pharmaceuticals' Niaspan had an almost identical pharmacological profile to Upsher's Niacor,[20] but from the start of its investigation of Niaspan, Schering questioned the product's safety and efficacy. *E.g.*, CX 1484 (Audibert Dep.) at 39-40; *see* Op. 56-59 (summarizing record evidence). Schering requested but did not receive additional data on safety and efficacy. CX 1484 (Audibert Dep.) at 1-4, 12-25; CX 558 at SP002719. Schering conducted its own market research, which confirmed the limitations of niacin products such as Niaspan and Niacor. CX 576; Op. 58-59.

If anything, Niacor presented an even riskier opportunity than Niaspan. As Upsher's own economic expert acknowledged, "more than in most other industries, there is a substantial risk that any particular product in the pipeline at any time won't get into the market." Kerr, Tr. 6316. Niaspan's FDA medical review had been completed, and Kos was down to discussing labeling with the FDA at the time negotiations with Schering started. CX 543; Audibert, Tr. 4102-05. Niacor's

---

[20] *See* Op. 61-62 (comparing clinical data of the two products). The comparison shows Niaspan and Niacor are clinically comparable. Both are sustained-release niacins which Schering was interested in as complementary agents to statins, the primary compounds used to treat high cholesterol. CX 1494 (Driscoll IH) at 8-24.

FDA application, on the other hand, had not even been filed when Schering and Upsher executed their agreement. Prospects for the product were dependent, of course, on FDA approval. Thus, Niacor faced even greater hurdles than Niaspan – and Schering knew that when it entered the Upsher agreement.

Similarly, Schering's attempt to equate Niaspan's projected market (U.S.) with Niacor's (mainly Europe), Schering Br. 58-59, is undermined by the *contemporaneous documentary* evidence. The reports of the Niaspan negotiations revealed that Schering (and Kos) viewed the European and Japanese markets for sustained-release niacins as limited. *See, e.g.,* CX 1470 at SP002748; Op. 58, 66-67. Schering's own market research confirmed that the European market preferred fibric acids to niacins. Op. 59; CX 576 at SP020710. That view was confirmed by the lack of interest from European companies, including one of Schering's own European subsidiaries, which had already rejected offers for Niacor directly from Upsher. USX 595 at USL13150. *See also* CX 854, CX 857, CX 875.[21]

The investigation of Niaspan was actually never completed and significant additional information would have had to be considered, such as a review of patent

_____

[21]    Moreover, Schering's statement that "the worldwide cholesterol market Schering acquired rights to was as big as, or bigger than, the U.S. market" is misleading. Schering Br. 58. The relevant market is not the one for cholesterol-reducing drugs *in general,* but rather the specific market for *sustained-release niacins,* such as Niaspan and Niacor.

status, regulatory labeling, manufacturing capabilities, and product liability. CX 546 at SP002770. Schering had seen enough, however, to refuse to offer any money up-front for Niaspan. Op. 60; CX 1495 (Driscoll Dep.) at 122; CX 554.

In contrast, Schering's consideration of Upsher's Niacor was, at best, cursory. *See* Op. 61-69 (summarizing record evidence). Audibert completed his work in a "little bit more" than a day. Audibert, Tr. 4164. *See* Op. 62-64 (summarizing methodology). Schering conducted this assessment without any of the due diligence it ordinarily requires when evaluating a licensing opportunity (*e.g.*, patent status, finalized labeling, product liability), *see* CX 546, and without resolving the safety and efficacy issues which Niacor shared with Niaspan. *See* Op. 61-62, 66. Nevertheless, Schering committed to make $60 million in unconditional up-front payments, significantly more than it had *ever* committed up-front in a license, only days after rejecting Niaspan, for a product with comparable clinical limitations, riskier prospects for FDA approval, and a less desirable commercial market. Op. 59-60.

**Contention:** The $60 million figure was based on the parties' internal forecasts concerning Niacor and the market valuation of Kos based on Niaspan. Schering Br. 53-64; Upsher Br. 20, 27, 29.

-31-

**Response:** That figure was already on the table before any "side deal"

entered the discussions, based on Upsher's demand for payment for "lost revenue."

Op. 44-45; CX 1494 (Driscoll IH) at 65-66 and CX 1495 (Driscoll Dep.) at 58-59

(Upsher's demand for payment came in the initial meeting of May 21, 1997);

Troup, Tr. 5413-14, 5416-17, 5420 (possibility of Schering licensing some of

Upsher's generic products first raised by Schering at May 28, 1997, meeting).

This demand was based both on an assessment of Schering's potential lost K-Dur

20 profits as well as Upsher's projected lost sales of Klor Con M20. Op. 44.[22]

This target, in turn, was passed on to Thomas Lauda, who was ultimately

responsible for the valuation of Niacor. Lauda testified he was told that the

negotiators "were looking to have a value of about $60 [million]." CX 1516

(Lauda Dep.) at 40; CX 1515 (Lauda IH) at 85-86; Op. 61.

   Without purporting to confirm or reject Audibert's sales projections, the

Commission could nevertheless readily find that this analysis did not support a

corporate decision to put $60 million down for Niacor. Op. at 40. The limitations

---

[22]    The $60 million equaled approximately 8 months of Schering's
profits, Bresnahan, Tr. 607-08; *see also* Tr. 532-33, but four years of Upsher's
forecasted lost profits. CX 283. These facts illustrate the fundamental economic
incentives at play: the incumbent can well afford to compensate would-be
competitors for sitting back and not upsetting the status quo. For this reason the
Commission gives close scrutiny to settlement agreements that provide for
substantial payments from the pioneer drug manufacturer to the generic
competitor.

of a straight sales projection are manifest.[23]  Neither Audibert nor anyone else at

Schering analyzed or incorporated the risks involved in purchasing the rights to

Niacor.  Among other things, neither Audibert nor anyone else at Schering

evaluated the likelihood of Niacor's obtaining regulatory approval in the United

States or in Europe, or whether Upsher could in fact grant Schering an exclusive

license outside the United States.  Op. 69-70.

Audibert's calculations, which were the only forecast in support of

Schering's payments, predicted losses for the first five years of the deal.  CX 338.

His positive valuation of Niacor depended entirely on the profits generated in the

later years, those most difficult to forecast.  Mr. Lauda himself explained that such

a forecast has little use in determining whether to license a product, let alone how

much to pay for it: "Well, you know, if I'm losing money the first five years, I may

not want to do the deal anyway, because my risk is I'm going to make money ten

years from today."  CX-1515 (Lauda IH) at 105.

As for Upsher, after one optimistic forecast in March 1994, the five most

recent Upsher projections in 1996 and 1997 estimated annual Niacor sales at no

---

[23]      A sales forecast (particularly for a product in development) is "a lot of
guess work," CX 1494 (Driscoll IH) at 42-43, depends heavily on assumptions,
and is only "part of the economic profile of the [licensing] opportunity."  CX 1550
(Poorvin Dep.) at 79.  Licensing decisions are based on "a lot of reasons," CX
1515 (Lauda IH) at 106 – a sales forecast being but *one of the many
considerations that are used*."  CX 1550 (Poorvin Dep.) at 79 (emphasis added).

more than $25 million. CX 234 at USL12785; CX 321 at USL 05248; CX 322 at
USL05287; CX 778 at USL15531; CX 1094 at USL11935; *see also* Troup Tr.
5533-541.

> **Contention:** The Schering Board was asked to approve the Niacor license
>
> only if it was sufficiently valuable to Schering apart from the
>
> litigation settlement agreement (which specified a generic entry date).
>
> Schering Br. 15, 61.

**Response:** Not so. In fact, in the memorandum to the Board seeking
approval of the agreement, Schering's managers told the Board that the
agreement's payment terms were dictated by Upsher's insistence on a guaranteed
"income stream to replace the income that Upsher-Smith had anticipated earning"
and now expected to forgo by agreeing to stay off the market until 2001. CX 338
at SP1200268; Op. 44 n.78. The sentence in the Board memorandum cited by
Schering merely recounts what Schering purportedly told Upsher during the
negotiations ("... we informed them that any such deal should stand on its own
merit independent of the settlement"). CX 338 at SP1200268. The Board
members never saw a copy of the agreement and had no independent basis for
evaluating the Niacor license, assuming instead (incorrectly) that management had
done the necessary due diligence. CX 1485 (Becherer Dep.) at 13-14, 34, 40-41.

-34-

Schering management withheld critical information from the Board – in particular, that Schering's U.K. subsidiary had previously rejected an opportunity to license Niacor. *See* Op. 48 n.81, 78 n.96; USX 595 at USL13150. At least one director thought that information was relevant. CX 1485 (Becherer Dep.) at 32-33.

> **Contention:** The reason Schering and Upsher never proceeded to bring Niacor to market was the poor showing of Kos's product Niaspan after the parties executed their settlement agreement. Schering Br. 20, 60; Upsher Br. 28-29.

**Response:** Schering had *already* discounted Niaspan's chances in the course of its own analysis of the product – this was one of the primary reasons Schering itself discontinued negotiations with Kos. CX 558; Op. 60, 78 n.100. Indeed, Schering showed little interest in pursuing Niacor after signing the agreement with Upsher. Op. 71, 78. Upsher, for its part, had already begun to shut down work on Niacor, without telling Schering, before the Kos results were announced. *See* Op. 70-73; Lauda, Tr. 4377-78; CX 963 at 12581-83; CX 1357. Upsher explained to Schering on October 6, 1998, that its abandonment of Niacor was based "[f]irst and foremost" on concerns the FDA had raised concerning a pharmacokinetic study for Niacor. CX 1111.

### III.    IT IS UNDISPUTED THAT SCHERING PAID AHP IN EXCHANGE FOR THE LATTER'S DELAYED ENTRY TO THE MARKET

The Schering agreement with AHP delayed the entry of AHP's generic product until 2004. Here too, Schering entered a side agreement that purported to license from AHP certain products in exchange for payments of $15 million. Op. 80 n.101. Schering conceded, however, that it paid another $15 million to induce the settlement, $5 million up-front and another $10 million for the agreed entry date, contingent only on the FDA approval of the *AHP generic version* of K-Dur. *Id.* The FDA approval was obtained and the $10 million was paid. *Id.* There is no question here, therefore, that Schering paid at least $15 million simply to induce AHP's delay of market entry until 2004.

Here again, as in the Upsher case, Schering seriously misstates the record in its attempt to engage this Court in re-litigating factual issues. Schering claims, for example, that it had an extremely strong patent case against AHP, and that its evidence in this regard was unrebutted. That is wrong. Complaint Counsel *did* have a qualified witness, Dr. Banaker, who *did* testify on the claim interpretation question. *E.g.,* Tr. 6387-89. He agreed with the positions articulated by AHP's experts in the underlying patent case that there was no infringement, and disagreed with the opinions of Mr. Miller and Dr. Banker, Schering's experts in this case. *Compare* Tr. 6387-92 *with* Tr. 6399, 6405, 6472 (*in camera*), 6477 (*in camera*),

-36-

6479 (*in camera*), 6485-86 (*in camera*). Moreover, it is apparent from Schering's own exhibit that the judge in the underlying patent case did not believe that Schering had an especially strong case. *See generally* SPX 687 at ESIHRG000127. Even Schering's expert, Mr. Miller, conceded that the judge had commented that the patent could be invalid if it were read as broadly as Schering was advocating. Miller, Tr. 3388-89.

Thus, substantial record evidence supports the Commission's conclusion that Schering made sizable payments to AHP – as it did to Upsher – to delay its entry to the market with a generic equivalent of K-Dur.

## IV.   THE COMMISSION PROPERLY APPLIED A RULE OF REASON ANALYSIS TO CONCLUDE THAT SCHERING PAID ITS COMPETITORS NOT TO COMPETE

The Commission's approach to this case was entirely consistent with *Valley Drug*. Both the Commission and the *Valley Drug* panel recognized that the presence of a patent makes *per se* treatment inappropriate. This Court did not purport to define for all cases the method of assessing the "exclusionary power" of the applicable patent, but it observed that the size of the "exit" payments or other circumstances might well "raise[] suspicion that the parties lack[ed] faith" in the strength of their patent. 344 F.3d at 1309-10; *see also id.* at 1308. On the scant

-37-

record in that case, the Court found it inappropriate to draw inferences from the size of the payments alone.

The present case is the case foreshadowed by *Valley Drug*. This Court was suspicious of payments to potential competitors but sought additional information – just as the Commission was, and did, in the present case. Such payments can be used to share the supracompetitive returns that would flow when potential competitors defer market entry, thus resulting in less competition than would likely occur absent the payments.[24] On the basis of a fully-litigated record, the Commission was able to conclude that the guaranteed delay in generic entry here did *not* flow from the exclusionary power of Schering's patent but rather from payments not to compete.

---

[24]    *See, e.g.,* Herbert Hovenkamp et al., *Anticompetitive Settlement of Intellectual Property Disputes*, 87 Minn. L. Rev. 1719, 1749-51 (2003); Maureen A. O'Rourke & Joseph F. Brodley, *An Incentives Approach to Patent Settlements: A Commentary on Hovenkamp, Janis and Lemley*, 87 Minn. L. Rev. 1767, 1781-82 (2003); Thomas F. Cotter, *Refining the "Presumptive Illegality" Approach to Settlements of Patent Disputes Involving Reverse Payments: A Commentary on Hovenkamp, Janis & Lemley*, 87 Minn. L. Rev. 1789, 1800-01 (2003); Carl Shapiro, *Antitrust Limits to Patent Settlements*, 34 RAND J. Econ. 391, 407-08 (2003).

**A.    A Patentee's "Exclusionary Right Cannot be Exploited in Every Way"[25]**

The Supreme Court has repeatedly held that concerted actions to eliminate or reduce market competition are illegal restraints of trade, whether through market allocation agreements, *e.g., Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 111 S. Ct. 401 (1990) (*per curiam*); or by paying a competitor to stay off the market, *e.g., Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211, 20 S. Ct. 96 (1899). After all, "[t]he anti-trust laws are as much violated by the prevention of competition as by its destruction." *United States v. Griffith*, 334 U.S. 100, 107 68 S. Ct. 941 (1948), *overruled on other grounds, Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S. Ct. 2731 (1984).[26]

Furthermore, agreements to keep competition out of the market have been condemned even if the entrant's prospects for successful entry are not assured. *E.g., Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995) (unlawful for attorneys to

---

[25]    *Valley Drug*, 344 F.3d at 1304.

[26]    Ordinarily, these agreements "are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused." *Copperweld, supra,* 467 U.S. at 768, 104 S. Ct. at 2740. As discussed below, the Commission concluded, however, that "*per se*" condemnation is inappropriate in this case. Regardless of the terminology, "[t]he analytic focus should be on what conclusions regarding the competitive impact of a challenged restraint can confidently be drawn from the facts demonstrated by the parties." *Valley Drug*, 344 F.3d at 1304 (citations omitted).

agree not to advertise in one another's cities); *Engine Specialties, Inc. v.*

*Bombardier Ltd.*, 605 F.2d 1 (1st Cir. 1979) (unlawful for maker of snowmobiles

and maker of minicycles to agree that the former would not enter the latter's

market).[27] As the leading antitrust treatise put it, "the law does not condone the

purchase of protection from uncertain competition any more than it condones the

elimination of actual competition." XII Phillip E. Areeda, Herbert Hovenkamp,

*Antitrust Law* ¶ 2030b at 175 (1999) (hereinafter "*Areeda & Hovenkamp*"). *See*

*also Microsoft*, 253 F.3d at 79 ("it would be inimical to the purpose of the Sherman

Act to allow monopolists free reign to squash nascent, albeit unproven, competitors

at will").

An allegation of patent infringement creates such uncertainty because a

patentee's right to exclude others is – like any other property right – not absolute.

*See* Shapiro, *supra* note 24, at 395. As this Court emphasized in *Valley Drug*,

patent litigation is increasingly complex and highly uncertain. 344 F.3d at 1308 &

---

[27]    The prospects for successful entry may be a factor in establishing damages, but this case concerns only antitrust *liability*. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S. Ct. 1562, 1580 (1969) (Section 16 of Clayton Act authorizes injunctive relief "upon the demonstration of 'threatened' injury. That remedy is characteristically available even though the plaintiff has not yet suffered actual injury") (footnotes omitted), *rev'd on other grounds*, 401 U.S. 321, 91 S. Ct. 725 (1971); *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806, 808 (D.C. Cir. 2001) (plaintiff need establish only *threat* of injury for injunctive relief standing); *United States v. Microsoft Corp.*, 253 F.3d 34, 79-80 (D.C. Cir. 2001) (*per curiam*) (distinguishing liability from remedies).

n.20. The fact that a patent has been issued by the Patent & Trademark Office ("PTO") is no guarantee that the courts will uphold its validity, despite the statutory presumption of validity. *See* Op. 30-31. Nor can it be said with any certainty that a court will find that an allegedly infringing product actually infringes – a matter on which the patent holder has the burden of proof. As commentators have explicated, *and the experts on both sides in this case agreed*, a patent's exclusionary power is *probabilistic* in nature.[28]

Thus, it is incorrect to start, as petitioners do, from the premise that the patentee could exclude all competitors for the term of the patent. As petitioners' expert acknowledged, a settlement agreement can be anticompetitive even if it results in entry before the end of the patent term. Willig, Tr. 7243.

A patentee has the right to try to exclude allegedly infringing products by instituting a lawsuit – or even by merely threatening a lawsuit. *Zenith Radio, supra*, 395 U.S. at 135, 89 S. Ct. at 1583 ("The heart of [a patentee's] legal monopoly is the right *to invoke the State's power* to prevent others from utilizing his discovery without his consent.") (emphasis added). But the exercise of that right is entirely different from a patent holder's decision to avoid risking its patent

---

[28]     *See, e.g.*, Shapiro, *supra* note 24, at 395; *see also* Bresnahan, Tr. 522-23; Willig, Tr. 7243.

and buying off a potential challenger by an agreement to share supracompetitive returns.[29]

Courts have long held, accordingly, that a settlement may be unlawful if the patent holder obtains "protection from competition which the patent law, unaided by restrictive agreements, does not afford." *United States v. Masonite Corp.*, 316 U.S. 265, 279, 62 S. Ct. 1070, 1078 (1942). Thus, the owner of a patent "cannot extend his statutory grant by contract or agreement." *Id.*, 316 U.S. at 277, 62 S. Ct. at 1077; *see also Singer*, 374 U.S. at 196-97, 83 S. Ct. at 1785; *United States v. Line Material Co.*, 333 U.S. 287, 308, 68 S. Ct. 550, 561 (1948); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456, 60 S. Ct. 618, 625 (1940).

Thus, as a matter of law and economics, the relevant inquiry is whether this settlement provided less competition than would have been *expected* absent the

---

[29]     In an often-cited concurrence in *United States v. Singer Mfg. Co.*, Justice White found a *separate* antitrust violation in "the *collusive termination of a Patent Office interference proceeding* pursuant to an agreement between Singer and [its Swiss competitor]." 374 U.S. 174, 197, 83 S. Ct. 1773 (1963) (White, J., concurring) (emphasis added). The parties entered the agreement, wrote Justice White, "to help one another *to secure as broad a patent monopoly as possible*, invalidity considerations notwithstanding." *Id.* (White, J., concurring) (emphasis added). Justice White pointed out that "the desire to secure broad claims in a patent may well be unexceptional – *when purely unilateral action is involved*," but does not justify the collusive agreement to terminate a PTO interference proceeding. 374 U.S. at 199 (emphasis added). Thus, that Schering *might have* won its patent litigations and therefore *unilaterally* precluded Upsher and AHP from entering the market does not justify paying off those competitors to *guarantee* that they remain off the market.

-42-

payments.  Viewed in this light, Schering's payments to Upsher and AHP

*increased in real economic terms* the chances that Schering would be able to

exclude Upsher or AHP from entering the market with their competing products.

For Schering could then rely not only on its patent's exclusionary power – however

strong or weak it may be – but also on the agreements' more certain exclusionary

terms that precluded Upsher's entry before September 2001, and AHP's entry

before January 2004.  Schering thus obtained *additional* ability to exclude Upsher

and AHP, not from its patent rights, but rather from *the contractual rights for*

*which it paid* tens of millions of dollars.

**B.     The Commission Considered the Exclusionary Power of**
**Schering's Patent, Consistent with *Valley Drug***

Contrary to petitioners' assertions, the Commission properly took into

consideration the Schering patent's exclusionary power.  Petitioners' assertions

apparently are rooted in the mistaken assumption that the exclusionary power of a

patent can *only* be assessed by a plenary trial on the issues of patent validity and

infringement, including possibly a *Markman* hearing to decide the patent claims'

construction.[30]  That is simply not true.

---

[30]     *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S. Ct.
1384 (1996).

-43-

The Commission's consideration of the exclusionary power of Schering's patent began with the simple but fundamental principle that, short of a final court judgment on the issue, the parties' collective expectation of the outcome of their litigation – as reflected in a genuine, arms-length settlement – represents the most accurate assessment of the subject patent's exclusionary power.  The parties' litigations in this case would have fixed *only* the time of entry of the alleged infringers, because no money damages were at issue.[31]  Therefore, *a hypothetical no-payment compromise* on the entry date would most accurately reflect their collectively expected outcome of litigation – i.e., the exclusionary power of Schering's patent.[32]  *See* Hovenkamp, *supra* note 24, at 1762.[33]

-------

[31]    This is common in the context of patent litigation under the Hatch-Waxman Act because the alleged infringer there (*i.e.*, the ANDA applicant) need not enter the market in order to challenge the referenced patent.  *See Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 32 (D.D.C. 2000) (filing of ANDA with Paragraph IV Certification "automatically creates a cause of action for patent infringement").

[32]    Although factors such as the parties' risk aversion and information asymmetry may, *in theory*, affect whether the parties' settlement reflects their true expected outcome of litigation, there was no record evidence in this case that those factors played a role in shaping the parties' agreements.

[33]    Contrary to Schering's and *amicus* Generic Pharmaceutical Association's ("GPHA") assertions, the Commission did not assume that "absent the payment, there would have been a different settlement with an earlier entry date."  Schering Br. 44, 52-53; GPHA Br. 19-25.  Nor did the Commission assume that the parties could have replaced Schering's payments with a license.  GPHA Br. 4, 26.  The comparison that the Commission undertook was between the parties'

-44-

Thus, any payment provision in the settlement agreements – beyond the expected savings in litigation costs[34] – will affect the compromise entry date in one direction or another: a payment from the alleged infringer to the patent holder – *i.e.,* a royalty – would be made to gain an earlier entry than a compromise on the date alone. A payment of this kind is unremarkable and indisputably within the limits of a patent's exclusionary power. A payment in the opposite direction, however – a so-called "reverse payment" – purchases a *later* time of entry than a compromise on the date alone. A patentee would not make a substantial payment if it believed it could exclude the competition for that period solely on the basis of its patent. *Areeda & Hovenkamp, supra,* ¶ 2046 at 349-50 (2004 Supp.). This much more unusual form of payment, *id.* at 338, raises serious antitrust concerns because its effect is to *extend* the patent holder's expected exclusionary rights, *see Singer*, 374 U.S. at 197 (White, J., concurring); and to delay the entry of low-cost

_____

*actual* settlement terms and their expected litigation outcome, *not* with another settlement that the parties would or should have entered. *See* Op. 26 (citing Bresnahan, Tr. 614).

[34]    The expected savings in the cost of litigation represent merely the transaction costs of litigation versus settlement and, therefore, do not affect the substantive merits of the dispute (i.e., the expected outcome of litigation). *See* Hovenkamp, *supra* note 24, at 1750-51.

-45-

competitive alternatives.[35]  The Commission's opinion summarizes this sound logic in the following words:

> In light of the uncertainties facing parties at the time of settlement, it is reasonable to assume that an agreed-on entry date, without cash payments, reflects a compromise of differing litigation expectations.
>
> * * *
>
> If there has been a payment from the patent holder to the generic challenger, there must have been some offsetting consideration.  Absent proof of other offsetting consideration, it is logical to conclude that the *quid pro quo* for the payment was an agreement by the generic to defer entry beyond the date that represents an otherwise reasonable litigation compromise.

Op. 25-26 (footnotes & citations omitted).

The foregoing does *not* mean, however, that the Commission condemned Schering's agreements *solely* because the patentee made a payment to the alleged infringers.  In fact, the Commission was careful to emphasize that its analysis did not militate "that all such payments should be viewed as *per se* illegal or 'inherently suspect.'"  Op. 29.  Although the Commission viewed the so-called

---

[35]      *See Andrx Pharms.*, 256 F.3d at 809 (patentee's payment to alleged infringer may strongly suggest an anticompetitive agreement) (citing David A. Balto, *Pharmaceutical Patent Settlements: The Antitrust Risks*, 55 Food & Drug L.J. 321, 335 (2000)).

"reverse payments" as raising a "red flag,"[36] that simply meant "a further inquiry" was warranted – an inquiry which the Commission carried out thoroughly. Op. 29.

In this case, there was ample record evidence to support the Commission's conclusion that the parties expected generic competition to K-Dur 20 well before the agreed entry date, and that the parties negotiated an exchange of money for Upsher's and AHP's delayed entry. CX 118; CX 123; CX 150; CX 234; CX 750. In fact, Upsher had represented to the court hearing the patent litigation that the only impediment to its immediate entry was the automatic Hatch-Waxman stay. Op. at 34; Kerr, Tr. 6744-45; CX 1706 at USLPLD004262, 4271 (*in camera*); CX 1705 (*in camera*). As described above, moreover, the Commission found from the parties' documents and negotiating history that Schering's payments were in large part consideration for the agreed entry dates and not for more benign purposes.

Moreover, the evidence of the likely and actual impact of generic K-Dur entry allowed the Commission to assess how easy it was for Schering to avoid Upsher's competition through their agreement. While the *Valley Drug* panel wondered how the payment in that case compared to the parties' expected lost profits, *see* 344 F.3d at 1310, the Commission in this case was able to answer that question. Schering's payments were designed to replace Upsher's lost profits, were

---

[36]    This term means essentially the same thing as this Court's reference to a "suspicion" in *Valley Drug*. 344 F.3d at 1309-10.

calculated based on Upsher's expected lost revenue, and were significantly less than the losses Schering expected from generic competition. In short, Schering made an offer that, regardless of the strength of Schering's patent claim, Upsher could not refuse. *See* note 22, *supra*.

The Commission in this case, for good reasons, did not purport to make an express evaluation of the merits of the underlying patent dispute. Op. 29-35. But that is not the same as ignoring the patent's exclusionary power. Indeed, this Court in *Valley Drug* had before it a final court ruling on the validity of Abbott's patent, but deemed it irrelevant to the antitrust analysis. 344 F.3d at 1306-07 (because agreements are to be judged *ab initio*, "the mere subsequent invalidity of the patent does not render the patent irrelevant to the appropriate antitrust analysis"). This Court's *Valley Drug* decision did not mandate that an antitrust tribunal make the sort of plenary assessment of the underlying merits of the patent dispute that would occur in a patent infringement suit.[37] The method of analyzing the patent's

_____

[37]    It bears noting here that this Court's decision was focused on the narrow question of whether the challenged agreements – which involved *admittedly infringing* products – should be condemned summarily as illegal *per se*. This Court held that they should not be because they involved patent rights. The Court described its own holding as "appropriately narrow" because it came at an "early stage of the litigation," when many of the critical facts had not yet been established by the district court. *Valley Drug*, 344 F.3d at 1306, 1310. In contrast, the Commission benefitted from a fully developed trial record that established all the facts necessary for its rule of reason analysis and decision.

-48-

exclusionary power was left to the district court on remand. Thus, in this case, to the extent assessing the Schering patent's exclusionary power could be made by less speculative means, the substantive issues of the underlying patent dispute need not be tackled.

The Commission's considered approach stands in sharp contrast to that of the *Valley Drug* district court, whose decision lacked *any* consideration of Abbott's patents. The district court had simply characterized the two Abbott agreements as geographic market allocations between horizontal competitors, and declared them *per se* illegal. *Terazosin Hydrochloride Antitrust Litig.*, 164 F. Supp. 2d 1340 (S.D. Fla. 2000). It did not recognize Abbott's status as a patentee or of the effect of its patent rights on the appropriate antitrust analysis. *Valley Drug*, 344 F.3d at 1306. It also rejected out of hand the argument that because the challenged agreements were analogous to patent settlements, they should be subjected to rule of reason antitrust analysis. *Terazosin*, 164 F. Supp. 2d at 1353. This Court's proper rejection of that *per se* decision provides no basis for overturning the Commission's ruling, which expressly rejected a *per se* standard and which took the patent context into account in its rule of reason analysis.

-49-

**C.    Direct Record Evidence of Anticompetitive Effects Obviates the Need for Indirect Product Market Analysis**

Petitioners complain that the Commission ignored the ALJ's findings and conclusions to the effect that Complaint Counsel failed to prove a relevant product market and market power.  Upsher Br. 42-44.  The Commission rejected the ALJ's view that it was a fatal flaw for Complaint Counsel not to prove their case in the most common way – by defining the "relevant product market" and calculating the various market shares – and for good reason.  The Initial Decision failed to take account of the well-established principle that where direct evidence of anticompetitive effect is available, there is no need to engage in the conventional product market analysis.  *IFD*, 476 U.S. at 461, 106 S. Ct. at 2019 ("the finding of actual, sustained adverse effects on competition … is *legally sufficient* to support a finding that the challenged restraint was unreasonable *even in the absence of elaborate market analysis*") (emphasis added) (footnotes omitted).  *See Palmer v. BRG of Georgia, Inc.*, 874 F.2d 1417, 1437 & n.27 (11th Cir. 1989) (Clark, J., dissenting) ("[b]ecause they have shown anticompetitive effects, the plaintiffs would not have to establish a relevant market or that the defendants had market power"), *rev'd*, 498 U.S. 46, 111 S. Ct. 401 (1990) (*per curiam*).[38]

---

[38]    *See also Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (evidence of "an actual adverse effect on competition … arguably is more direct evidence of market power than calculations of elusive market share figures"); *Toys*

-50-

Nor does the lack of "pricing studies," which had been cited by the ALJ as precluding proof of direct anticompetitive effects, undermine the Commission's analysis or conclusion, especially when multiple studies confirm what the Commission found here: the first generic entrant takes substantial sales from its branded counterpart at a much lower price. Op. 21-22 (collecting studies). As the Supreme Court stated in *Indiana Federation of Dentists*, when a particular practice "is likely enough to disrupt the proper functioning of the price-setting mechanism of the market ... it may be condemned even absent proof that it resulted in higher prices." *IFD*, 476 U.S. at 461-62, 106 S. Ct. at 2019. The Commission noted that the justification for use of direct evidence in the absence of pricing evidence is even stronger here than it was in *Indiana Federation of Dentists* because "the predicate offense was not just an effort to withhold useful information, but rather an agreement to defer entry by a potential competitor." Op. 17. Thus, the Commission's reliance on direct evidence of anticompetitive effects in lieu of indirect market analysis is consistent with well-established precedent.

---

*"R" Us v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (market power can be proved "through direct evidence of anticompetitive effects"); *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 992 (D.C. Cir. 1990) ("'market share is just a way of estimating market power, which is the ultimate consideration,' and ... 'when there are better ways to estimate market power, the court should use them'") (quoting *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986)).

Moreover, there is ample evidence in the record of the agreements' actual

anticompetitive effects. Generic entry, the record evidence showed, was a

uniquely significant market event for Schering's K-Dur 20. Due to various

regulatory and industry factors, the entry of Upsher's generic drug was expected to

*and did* cause Schering a *rapid and substantial* loss in the sales volume of K-Dur

20 in favor of the lower-priced generic substitute.[39] Within two months of

Upsher's entry, Schering's K-Dur 20 lost more than half its sales to Klor Con M20.

*See* Op. 19-23 (summarizing record evidence). The price of the generic, moreover,

was approximately 50% of K-Dur 20. Bresnahan, Tr. 474; Rosenthal, Tr. 1559;

*see also* CX 1490 (Coleman Dep.) at 26-27 (price of Upsher's Klor Con M20 was

approximately 50% less than K-Dur 20); CX 1511 (Kapur Dep.) at 137-138

(Schering's own generic was priced at 40-45% of K-Dur 20). The day of

---

[39]    Klor Con M20 would have been – and in September 2001 became –
the first "AB-rated" generic counterpart to Schering's K-Dur 20. In other words, it
was considered by the FDA to be "bioequivalent" to – and thus substitutable for –
its referenced brand-name drug. Hoffman, Tr. 2278; Teagarden, Tr. 197. Most
state laws permit a pharmacist to substitute an AB-rated generic drug for its brand-
name counterpart, unless directed otherwise by the prescribing physician.
Hoffman, Tr. 2278; Teagarden, Tr. 197-98; CX 1493 (Dolan Dep.) at 81; Schering
Answer ¶ 18. Some states mandate such substitution if not directed otherwise by
the physician. Bresnahan, Tr. 1178; Addanki, Tr. 5998. Moreover, the policies
of Medicaid and managed care plans also encourage generic substitution. CX 18 at
SP2300044; Goldberg, Tr. 122-24.

reckoning that Schering was able to forestall through these agreements was indeed a devastating one.

As shown above, there was ample evidence in the record – both from historical experience as well as from the actual effects of Upsher's entry in 2001 – of the anticompetitive effects of the challenged agreements.[40]  As discussed below, what was missing in the record, however, was any empirical evidence of the procompetitive effects of those agreements.[41]

---

[40]     Although there can be no serious argument on these points, petitioners attempt to obfuscate the issue.  Schering's artful attempt to misconstrue the requirements of *California Dental Association v. FTC*, Upsher Br. 53, is readily exposed, however, by the express language of the Court.  526 U.S. 756, 775 n.12, 119 S. Ct. 1604, 1615 n.12 (1999).  The reference to "empirical evidence" in the cited footnote is to the "evidence of *procompetitive* effects" that *petitioners* here must carry – not to Complaint Counsel's burden of showing the *likely* anticompetitive effects of the agreements.  *Id.* (emphasis added).  Similarly, the Court's query "whether the effects *actually* are anticompetitive" refers to the *nature* of the likely effects, rather than to empirical evidence of their existence.  *Id.* (emphasis is Schering's).

[41]     Upsher proposes the odd proposition that the Commission should have to find anticompetitive effects of its delayed entry into the market without reference to what happened when Upsher actually did enter the market.  *See* Upsher Br. 50.  On the contrary, such evidence is highly probative of the competitive conditions the parties preempted through a sharing of supracompetitive profits.  *See* ABA Section of Antitrust Law, *Antitrust Law Developments* at 877 (5th ed. 2002) (collecting cases).

-53-

**D.    No Countervailing, Procompetitive Benefits of the Challenged Agreements Were Present in This Case**

The Commission recognized in its decision that "agreements of the kind challenged here can be procompetitive in limited circumstances." Op. 13. Indeed, the fact that such efficiencies could be even "theoretically possible" led the Commission to decline dealing with the agreements in a summary fashion. *Id.* (citing *California Dental Ass'n*, 526 U.S. at 777-78, 119 S. Ct. at 1616-17). But, as the Commission stated, "the mere articulation of hypothetical circumstances where reverse payments could ultimately facilitate an efficiency-enhancing settlement does not mean that a particular settlement is legal." Op. 37. Rather, given the evidence that the agreements resulted in less competition than likely would have otherwise occurred, the burden shifted to the petitioners to "demonstrate that these hypothetical circumstances describe the realities of the present case." *Id.* Petitioners here never did so.

Petitioners hypothesized, for example, that "reverse payments" may enable a cash-starved generic to enter the market earlier than it would have been able to without such payments. Willig, Tr. 7180, 7188, 7258. The Commission agreed that in such *hypothetical* circumstances, reverse payments may be procompetitive. Op. 13. Petitioners here, however, never established that Upsher (or AHP) was so cash-starved that Schering's payments enabled them to enter earlier than they

-54-

would have been able to absent the payments. In fact, as the Commission noted, the evidence showed that Upsher passed the $60 million payments on to its shareholders. Op. 38 (citing Kralovec, Tr. 5067). Moreover, Upsher stipulated this issue out of the case. CX 1693; *see* Op. 37-38 & n.70.

Nor is Schering's complaint that it had to succumb to judicial pressure for settlement sufficient to justify its payment of $15 million to AHP in exchange for the latter's agreement to stay off the market until 2004. Judicial pressure to settle protracted litigation is not a justification for paying off a competitor not to compete. Moreover, as the Commission pointed out, Schering's purported justification is further undermined by the fact that there was no evidence in the record that Schering even explored other, lawful terms of settlement, Op. 82, despite the fact that it was well aware of its own counsel's reservations regarding a payment for delay. Hoffman, Tr. 3541-42.

Petitioners' and *amicus* GPHA's public policy arguments are equally unconvincing. Schering Br. 47-52; Upsher Br. 53-57; GPHA Br. 26-30. Although public policy certainly favors the private settlement of disputes, patentees have known for more than sixty years that antitrust law imposes limits on the form of settlement. *See Masonite*, 316 U.S. at 277; *Singer*, 374 U.S. at 196-97. Moreover, this Commission ruling in this narrow area has not, and likely will not, deter future

-55-

settlements. Just in the last 16 months, Schering itself has entered into at least four settlements with generic competitors in which Schering granted its challenger a license.[42] Indeed, the Commission's considered and thorough approach – and particularly its principled refusal to undertake a mini-trial on the highly complex merits of the patent dispute – likely will provide litigants a higher degree of predictability, and thus facilitate legitimate settlements.

Similarly, the public policy in favor of research and innovation is enshrined in – and thus corollarily limited by – the exclusionary power of the patent which, as shown above, does not extend to paying off potential competitors not to compete. *See* Part IV.A., *supra*. When it enacted the Hatch-Waxman Act, Congress did seek to preserve the incentives for innovative research and development in the pharmaceutical industry,[43] but it also recognized the need to encourage generic entry by encouraging challenges to pharmaceutical patents. *See Areeda & Hovenkamp, supra,* ¶ 2046 at 340 (2004 Supp.). As the Supreme Court recognized in *Masonite*, "[s]ince patents are privileges restrictive of a free

---

[42]    *See* Schering news releases at http://www.schering-plough.com/schering_plough/news/release.jsp?releaseID=380214; *id.* at ID=394601; *id.* at ID=463286; Andrx press release regarding Claritin settlement (Oct. 23, 2003), available at www.andrx.com.

[43]    *See* H.R. Rep. No. 98-857, pt. 1, at 14-15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647-48.

economy, the rights which Congress has attached to them must be strictly construed so as not to derogate from the general law beyond the necessary requirements of the patent statute." 316 U.S. at 280, 62 S. Ct. at 1078.  Finally, the existing incentives for innovation are not likely to be unduly affected by the Commission's ruling, which arose in the relatively unique factual setting of Hatch-Waxman settlements. *Areeda & Hovenkamp, supra,* ¶ 2046 at 338 (2004 Supp.).

   *Amicus* GPHA criticizes the Commission's decision further by asserting that this case "mirrors the situation" in *Verizon Comms., Inc. v. Law Offices of Curtis V. Trinko, LLP,* __ U.S. __, 124 S. Ct. 872 (2004), and therefore the Commission should keep its hands off settlements such as the ones involved in this case.  GPHA Br. 7-16.  But the situations in *Trinko* and in this case are nothing alike.  First, *Trinko*'s "caution" in applying the antitrust laws concerned markets that are subject to "a regulatory structure designed to deter and remedy anticompetitive harm." *Trinko,* 124 S. Ct. at 881.  The Hatch-Waxman Act does not contain the competition-regulating functions of the 1996 Telecom Act that the *Trinko* Court found significant.[44]  GPHA's argument also ignores the substantial differences

---

   [44]     Indeed, the need for additional antitrust constraints explains why Congress recently amended the Hatch-Waxman Act to require that settlements like the ones in this case be filed with the government's antitrust agencies. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, §§ 1111-1117, 117 Stat. 2461-2463.

between the roles of the FCC under the 1996 Telecom Act and that of the FDA under the Hatch-Waxman Act. The pervasive market regulatory scheme that Congress authorized the FCC to create and implement – including the very type of competitive restraints of which plaintiffs there complained, *id.* at 881-82 – is nothing like the ministerial role that the FDA plays in administering patent-related issues under the Hatch-Waxman Act.

Moreover, GPHA itself acknowledged that competition "costs the brand-name company far more than the generic company gains." GPHA Br. 4. Accordingly, as the facts of this case illustrate, there is a powerful incentive for pioneers and generics to settle litigation by splitting the supracompetitive profits generated by the pioneers. Unless tempered by antitrust constraints, brand and generic companies will always be better off with the brand paying off the generic. Rather than having generics filing ANDAs and challenging weak patents or designing around narrow ones, generic companies will file ANDAs and be paid not to compete. Such a result would undercut two important benefits of the Hatch-Waxman Act – i.e., encouraging patent challenges and accelerating generic competition. Schering, Upsher, and the GPHA implicitly endorse such a regime: the brand would benefit by having *guaranteed* protection from competition, and the generic would benefit by earning more than it expects from challenging the

-58-

patent and competing.  Only consumers would suffer, deprived of legitimate

competition.  This case is not about whether all payments in patent settlements are

anticompetitive.  If the settlements here are not illegal, however, then no

settlements with a payment will be.

## **CONCLUSION**

For the foregoing reasons, the petition for review should be denied and the

Commission's Order affirmed.

Respectfully submitted,

WILLIAM E. KOVACIC
*General Counsel*

SUSAN A. CREIGHTON
*Director, Bureau of Competition*

BRADLEY S. ALBERT
ELIZABETH R. HILDER
MICHAEL B. KADES
*Attorneys, Bureau of Competition*

JOHN D. GRAUBERT
*Principal Deputy General Counsel*

JOHN F. DALY
*Deputy General Counsel for Litigation*

FEDERAL TRADE COMMISSION
600 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, DC 20580

IMAD D. ABYAD
*Attorney*

FEDERAL TRADE COMMISSION
600 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, DC 20580
(202) 326-2375

-59-

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 13,902 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 11th Cir. R. 32-4.

_____          _____
Date                                             Imad D. Abyad

                                                 *Attorney for*
                                                 FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

I certify that on July 27, 2004, I caused a copy of the foregoing brief to be

delivered by overnight courier to each of the following:

John W. Nields
HOWREY SIMON ARNOLD & WHITE, LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004

Christopher M. Curran
WHITE & CASE LLP
601 Thirteenth Street, N.W.
Washington, DC 20005

_____

Imad D. Abyad

*Attorney for*
FEDERAL TRADE COMMISSION

# Exhibit 7

No. 03-779

# In the Supreme Court of the United States

---

ANDRX PHARMACEUTICALS, INC., PETITIONER

*v.*

KROGER COMPANY, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT*

---

## BRIEF FOR THE UNITED STATES
## AS AMICUS CURIAE

---

THEODORE B. OLSON
  *Solicitor General*
    *Counsel of Record*

R. HEWITT PATE
  *Assistant Attorney General*

THOMAS G. HUNGAR
  *Deputy Solicitor General*

MAKAN DELRAHIM
  *Deputy Assistant Attorney
  General*

LISA S. BLATT
  *Assistant to the Solicitor
  General*

CATHERINE G. O'SULLIVAN
DAVID SEIDMAN
  *Attorneys*

WILLIAM E. KOVACIC
  *General Counsel
  Federal Trade Commission
  Washington, D.C. 20580*

  *Department of Justice
  Washington, D.C. 20530-0001
  (202) 514–2217*

**QUESTION PRESENTED**

Whether the court of appeals erred in holding that an interim agreement between the parties to patent infringement litigation constituted a per se violation of Section 1 of the Sherman Act, 15 U.S.C. 1.

(I)

TABLE OF CONTENTS

Page

Statement .................................................................................... 1

Discussion .................................................................................. 7

I.   Patent infringement settlements precluding
     entry by the alleged infringer in exchange for
     reverse payments may raise antitrust concerns,
     but such agreements are not automatically subject
     to per se condemnation .................................................... 8

II.  The Sixth Circuit's decision involves an agree-
     ment that has been construed to exclude non-
     infringing and potentially non-infringing
     products and does not squarely conflict with
     the Eleventh Circuit's decision in *Valley
     Drug* ................................................................................ 11

III. The Sixth Circuit's decision involves an un-
     usual context—an interim patent settlement
     agreement—that has not occurred with
     significant frequency ....................................................... 15

IV.  Subsequent amendments to the Hatch-Waxman
     Act militate against this Court's review of the
     Sixth Circuit's decision at this time ............................ 18

Conclusion ................................................................................. 19

TABLE OF AUTHORITIES

Cases:

*Andrx Pharm., Inc.* v. *Biovail Corp.*, 256 F.3d
   799 (D.C. Cir. 2001), cert. denied, 535 U.S. 931
   (2002) ............................................................................. 4, 17

*Bristol-Myers Squibb Co.*, No. C-4076 (FTC Apr. 14,
   2003) ................................................................................. 9

*Broadcast Music, Inc.* v. *CBS*, 441 U.S. 1 (1979) ............. 8

(III)

IV

Case—Continued:                                                    Page

   *Ciprofloxacin Hydrochloride Antitrust Litig., In re,*
     261 F. Supp. 2d 188 (E.D.N.Y. 2003) ......................        15
   *Dawson Chem. Co.* v. *Rohm & Haas Co.,* 448
     U.S. 176 (1980) .......................................................        8
   *Dunlop Co.* v. *Kelsey-Hayes Co.,* 484 F.2d 407
     (6th Cir. 1973), cert. denied, 415 U.S. 917 (1974) ..........        6
   *Ethyl Gasoline Corp.* v. *United States,* 309 U.S.
     436 (1940) .............................................................        12
   *Hoechst Marion Roussel, Inc., Carderm Capital L.P.,*
     *& Andrx Corp., In re,* No. 9293 (FTC May 11,
     2001) .....................................................................        4
   *Independent Serv. Orgs. Antitrust Litig., In re,*
     203 F.3d 1322 (Fed. Cir. 2000), cert. denied, 531
     U.S. 1143 (2001) ....................................................        9
   *McDermott, Inc.* v. *AmClyde,* 511 U.S. 202 (1994) ..........        8
   *Palmer* v. *BRG of Ga., Inc.,* 498 U.S. 46 (1990) ...............        5
   *Schering-Plough Corp., In re,* No. 9297
     (F.T.C. Dec. 18, 2003), appeal docketed, No. 04-10688-
     AA (11th Cir. filed Feb. 13, 2004) ............................    10, 11, 13
   *State Oil Co.* v. *Khan,* 522 U.S. 3 (1997) ....................    8, 12, 13
   *United States* v. *Masonite Corp.,* 316 U.S. 265
     (1942) ...................................................................        9
   *United States* v. *Topco Assocs., Inc.,* 405 U.S. 596
     (1972) ...................................................................        5
   *Valley Drug Co.* v. *Geneva Pharm., Inc.,* 344 F.3d
     1294 (11th Cir. 2003), petition for cert. pending,
     No. 03-1178 (filed Feb. 13, 2004), conditional petition
     for cert. pending *sub nom. Walgreen Co.* v. *Abbott*
     *Lab.,* No. 03-1175 (filed Feb. 16, 2004) ................    11, 12, 15, 17

Statutes:

   Drug Price Competition and Patent Term
     Restoration Act of 1984 (Hatch-Waxman Act),
       Pub. L. No. 98-417, 98 Stat. 1585 .....................        1-2
       21 U.S.C. 355(b) ................................................        2

V

Statutes—Continued:                                                    Page

    21 U.S.C. 355(j) ................................................................    2
    21 U.S.C. 355(j)(2)(A)(vii) ...........................................    2
    21 U.S.C. 355(j)(5)(B)(iii) .........................................    2, 3, 17
    21 U.S.C. 355(j)(5)(B)(iv) ...........................................    2, 3
Federal Trade Commission Act § 5, 15 U.S.C. 45 ...............    4
Medicare Prescription Drug, Improvement, and
    Modernization Act of 2003, Pub. L. No. 108-173,
    117 Stat. 2066:
        § 1102, 117 Stat. 2457 (to be codified at
            21 U.S.C. 355(j)(5)(B)(iv)(II)(bb)) ...........................    18
        § 1102, 117 Stat. 2458 (to be codified at
            21 U.S.C. 355(j)(5)(D)(i)(I)(bb)) ...............................    18
        §§ 1111-1117, 117 Stat. 2461-2463 .............................    19
Sherman Act § 1, 15 U.S.C. 1 ...........................................    5, 8
28 U.S.C. 1292(b) ..............................................................    6
35 U.S.C. 261 .....................................................................    8-9
35 U.S.C. 271(d)(4) ...........................................................    9

Miscellaneous:

Thomas F. Cotter, *Refining the "Presumptive*
    *Illegality" Approach to Settlements of Patent*
    *Disputes Involving Reverse Payments: A*
    *Commentary on Hovenkamp, Janis & Lemley*,
    87 Minn. L. Rev. 1789 (2003) ..............................    10, 16
Federal Trade Comm'n, *Generic Drug Entry*
    *Prior to Patent Expiration: An FTC Study* (July
    2002) <http://www.ftc.gov/os/2002/07/genericdrug
    study.pdf> .................................................................    16
Federal Trade Comm'n & U.S. Dep't of Justice,
    *Antitrust Guidelines for Collaborations Among*
    *Competitors* (Apr. 2000) <http://www.ftc.gov/os/
    2000/04/ftcdojguidelines.pdf> ...........................    13-14
Herbert Hovenkamp et al., *Anticompetitive*
    *Settlement of Intellectual Property Disputes*,
    87 Minn. L. Rev. 1719 (2003) ...................    9, 10, 14, 16

VI

Miscellaneous—Continued:                                                    Page
Maureen A. O'Rourke & Joseph F. Brodley, *An
Incentives Approach to Patent Settlements: A
Commentary on Hovenkamp, Janis and Lemley*,
87 Minn. L. Rev. 1767 (2003) ...............................................    10
Carl Shapiro, *Antitrust limits to patent settle-
ments*, 34 RAND J. Econ. 391 (2003) ............................    9, 10
U.S. Dep't of Justice & Federal Trade
Comm'n, *Antitrust Guidelines for the Licensing
of Intellectual Property* (Apr. 1995) <http://www.
usdoj.gov/atr/public/guidelines/ipguide.pdf> ...................    14

# In the Supreme Court of the United States

No. 03-779

Andrx Pharmaceuticals, Inc., petitioner

*v.*

Kroger Company, et al.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT*

## BRIEF FOR THE UNITED STATES
## AS AMICUS CURIAE

This brief is filed in response to the Court's invitation to the Solicitor General to express the views of the United States. The position of the United States is that this Court's review is unnecessary at this time. The decision below may not conflict with any other court of appeals' decision, this case arises in a somewhat atypical factual setting, and statutory changes post-dating the events at issue here may affect the frequency with which similar questions will arise in the future.

### STATEMENT

1. Respondents, Kroger Co. and other pharmaceutical purchasers, contend that an agreement among parties to a patent infringement suit violated the federal antitrust laws. The patent suit arose in the statutory context created by the Drug Price Competition and Patent Term Restoration Act of

(1)

2

1984 (Hatch-Waxman Act), Pub. L. No. 98-417, 98 Stat. 1585. The Hatch-Waxman Act establishes procedures designed to facilitate the entry of lower-priced generic drugs while maintaining incentives to invest in new drug development.

Under the Act, a company seeking approval from the Food and Drug Administration (FDA) to market a new drug must file a New Drug Application (NDA) demonstrating the safety and efficacy of its product. 21 U.S.C. 355(b). Once an NDA has been approved, another company seeking to market a generic version of the drug may file an Abbreviated New Drug Application (ANDA) demonstrating that its product is bioequivalent to the brand-name counterpart. 21 U.S.C. 355(j). The FDA may approve the marketing of a generic drug prior to the expiration of a patent relating to the brand name drug if the applicant makes a "paragraph IV certification" that certifies that the patent in question is invalid or is not infringed by the generic product. 21 U.S.C. 355(j)(2)(A)(vii). If the patent holder files a patent infringement suit within 45 days after receiving notification of such a certification, the FDA's approval is automatically stayed for 30 months, unless the patent expires or is judicially determined to be invalid or not infringed before that time. 21 U.S.C. 355(j)(5)(B)(iii). The first company to file an ANDA with a paragraph IV certification relating to a particular brand name drug is granted the exclusive right to market a generic version for 180 days after it begins commercial marketing or a court holds the patent invalid or not infringed. 21 U.S.C. 355 (j)(5)(B)(iv).[1]

2. Cardizem CD is a brand-name prescription drug which contains a controlled-release formulation of diltiazem hydrochloride. The formulation's dissolution profile—0%-45% of the total diltiazem to be released within 18 hours—is pro-

---

[1] In 2003, Congress amended the Hatch-Waxman Act in various respects. See pp. 18-19, *infra*.

3

tected by U.S. Patent No. 5,470,584 (the '584 patent). Pet. App. 6a-7a. On September 22, 1995, petitioner, Andrx Pharmaceuticals, Inc., filed an ANDA with the FDA seeking approval to market a generic version of Cardizem CD. Petitioner thereafter filed a paragraph IV certification stating that its generic product did not infringe any of the patents listed with the FDA covering Cardizem CD. Because petitioner was the first to file an ANDA and paragraph IV certification with the FDA, it was eligible for the 180-day exclusivity period under 21 U.S.C. 355(j)(5)(B)(iv). Pet. App. 6a.

In January 1996, Carderm Capital, L.P., the owner of the '584 patent, and Hoechst Marion Roussel, Inc. (HMR), Carderm's licensee and the manufacturer of Cardizem CD, filed a patent infringement suit against petitioner, which triggered the 30-month stay of FDA approval under 21 U.S.C. 355(j)(5)(B)(iii). Pet. App. 7a. Petitioner counter-claimed against HMR, alleging antitrust violations and unfair competition. *Ibid.*

In September 1997, shortly after the FDA announced that it would approve petitioner's ANDA, effective upon termination of the automatic 30-month stay, petitioner and HMR entered into an agreement that settled petitioner's antitrust and unfair competition counterclaims and provided for interim arrangements relating to the patent infringement claims (the Agreement). The Agreement provided that (a) petitioner "would not market a bioequivalent or generic version of Cardizem CD in the United States" until it obtained "a favorable, final and unappealable determination" in the patent case or HMR licensed petitioner or a third party; (b) petitioner would continue to prosecute its ANDA and not relinquish its 180-day exclusivity rights; and (c) HMR would make quarterly payments to petitioner from the date that FDA approval of the ANDA became effective until entry of a final and unappealable judgment in the patent case (or

4

certain other events).  Pet. App. 8a.  HMR began making payments to petitioner under the Agreement in July 1998.

In September 1998, petitioner supplemented its ANDA to seek approval for a reformulated generic version of Cardizem CD that permitted not less than 65% of total diltiazem to be released within 18 hours.  Pet. App. 40a-41a.  The FDA approved the supplemented ANDA on June 9, 1999.  *Id.* at 9a.  HMR, apparently conceding that the reformulated product did not infringe the '584 patent, immediately stipulated that it would not bring an infringement claim as to the reformulated product.  In addition, the two firms settled the pending patent case (neither abandoning its position regarding infringement) and terminated the Agreement, although petitioner agreed not to market the generic versions of Cardizem CD at issue in the patent case without a license from HMR.  *Id.* at 44a-45a.  By that time, HMR's payments to petitioner pursuant to the Agreement totaled $89.83 million.  *Id.* at 18a.  Two weeks later, petitioner began marketing its generic version of Cardizem CD at a price below that of HMR's brand-name product.  *Id.* at 45a.

The Federal Trade Commission (FTC) investigated the Agreement, and in March 2000, issued an administrative complaint against petitioner, HMR, and Carderm, alleging that the Agreement was anticompetitive in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. 45.  *In re Hoechst Marion Roussel, Inc., Carderm Capital L.P., & Andrx Corp. (In re HMR)*, No. 9293, Compl. (FTC Mar. 16, 2000) <http://www.ftc.gov/os/2000/03/hoechstandrx complaint.htm>.  The matter was settled with a consent order providing prospective relief.  Decision and Order (FTC May 11, 2001) <http://www.ftc.gov/os/2001/05/hoech stdo.htm>.  A subsequent ANDA filer also challenged the Agreement on antitrust grounds.  *Andrx Pharm., Inc.* v. *Biovail Corp.*, 256 F.3d 799 (D.C. Cir. 2001), cert. denied, 533 U.S. 931 (2002).

5

3.  Respondents and other purchasers of pharmaceuticals filed suit[2] against petitioner and HMR, alleging that the Agreement was an unlawful restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. 1.  The core allegation was that the Agreement not only delayed the marketing of petitioner's generic product but also, because petitioner's exclusivity period would not expire until 180 days after petitioner entered the market, effectively precluded anyone else from bringing a generic form of Cardizem CD to market.  Pet. App. 10a-11a.

4.  The district court granted partial summary judgment in favor of the plaintiffs, holding that the defendants had entered into an "agreement between horizontal competitors that allocates the entire United States market for Cardizem CD and its bioequivalents to [HMR], and thus constitutes a restraint of trade that has long been held illegal *per se* under established Supreme Court precedent." Pet. App. 35a (citing *Palmer* v. *BRG of Ga., Inc.*, 498 U.S. 46 (1990), and *United States* v. *Topco Assocs., Inc.*, 405 U.S. 596 (1972)).  The court construed the Agreement "[o]n its face" to restrain petitioner from marketing not only "its generic version of Cardizem CD in July 1998 when FDA approval was expected and obtained," but also "other bioequivalent or generic versions of Cardizem CD which were not at issue in the pending [HMR]/Andrx patent case, including the reformulated generic drug described in its September 11, 1998 prior approval supplement to its ANDA." *Id.* at 65a; see also *id.* at 59a-60a, 61a.  Thus, the court concluded, the Agreement "restrained [petitioner] from marketing non-infringing or potentially non-infringing versions of Cardizem CD." *Id.* at 65a.  Moreover, by restraining petitioner from "relinquishing

---

[2]  The actions were consolidated for pretrial proceedings in the Eastern District of Michigan.  Apparently, all parties other than petitioner and respondents here have reached settlements.  Pet. App. 14a n.9; Pet. ii.

6

or otherwise compromising its right to the 180-day period of exclusivity," *ibid.*, the court found that the Agreement "allocated the entire United States market for Cardizem CD and its bioequivalents to [HMR] during the life of that Agreement." *Id.* at 66a. The court distinguished the Agreement from a patent license with territorial restrictions, such as that held not to offend the antitrust laws in *Dunlop Co.* v. *Kelsey-Hayes Co.*, 484 F.2d 407 (6th Cir. 1973), cert. denied, 415 U.S. 917 (1974), noting that the Agreement extended beyond allegedly infringing formulations. Pet. App. 74a-75a.

Two months after granting partial summary judgment, the district court certified the question of the per se status of the Agreement for interlocutory appeal pursuant to 28 U.S.C. 1292(b), along with an issue relating to defendants' motion to dismiss the plaintiffs' antitrust claims for failure to plead antitrust injury. C.A. App. 606 (Order No. 16). The court of appeals granted leave to appeal. Pet. App. 83a-85a.

5. The court of appeals held that the district court properly granted partial summary judgment for the plaintiffs as to the illegality of the Agreement, concluding that "[t]he Agreement whereby HMR paid Andrx $40 million per year not to enter the United States market for Cardizem CD and its generic equivalents is a horizontal market allocation agreement and, as such, is *per se* illegal under the Sherman Act." Pet. App. 4a. The Agreement, the court of appeals explained, "was, at its core, a horizontal agreement to eliminate competition in the market for Cardizem CD throughout the entire United States, a classic example of a *per se* illegal restraint of trade." *Id.* at 18a. The court rejected the defendants' reliance on the fact that the Agreement arose in the context of patent infringement litigation, concluding that "the Agreement cannot be fairly characterized as merely an

7

attempt to enforce patent rights or an interim settlement of the patent litigation." *Id.* at 19a.[3]

## DISCUSSION

Agreements settling patent infringement cases can raise difficult, important, and unsettled issues at the intersection of intellectual property law and antitrust law. A rule treating as a per se violation of the antitrust laws every patent infringement settlement agreement that precludes the marketing of allegedly infringing products in exchange for payments from the patentee to the alleged infringer (so called "reverse payments") would conflict with the well-established principle that per se treatment is reserved for conduct that has a predictable and pernicious anticompetitive effect.

This case, however, is not an appropriate vehicle for the Court to provide guidance as to the application of the antitrust laws to settlements in patent infringement cases involving reverse payments. The district court construed the Agreement at issue in this case to cover petitioner's marketing not only of allegedly infringing products but also of non-infringing or potentially non-infringing products that were not at issue in the patent litigation. Moreover, this case involves the relatively rare situation in which the parties entered into an *interim* agreement that did not resolve the parties' underlying patent dispute. These atypical aspects of the case militate against further review, particularly at this interlocutory stage.

---

[3] After observing that the court's determination that the Agreement was illegal per se did "not resolve the issues of causation and damages," Pet. App. 21a, the court of appeals further held that the district court properly denied the defendants' motion to dismiss the complaint for failure to allege an antitrust injury. *Id.* at 4a, 21a-33a. Petitioner has not sought review of that holding.

8

### I. Patent Infringement Settlements Precluding Entry By the Alleged Infringer In Exchange For Reverse Payments May Raise Antitrust Concerns, But Such Agreements Are Not Automatically Subject To Per Se Condemnation

Although "public policy wisely encourages settlements" of legal disputes, *McDermott, Inc.* v. *AmClyde*, 511 U.S. 202, 215 (1994), it does not follow that all settlements are consistent with the public interest. Settlements of patent infringement claims are often predicated on an agreement that the alleged infringer will not make and sell the allegedly infringing product in competition with the patentee and its licensees, or that it will do so only pursuant to the terms of a license agreement. Were it not for the existence of the patent and the allegation of infringement, a court would likely treat such an agreement as an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. Indeed, but for the patent and the alleged infringement, the hypothetical settlement agreement would likely be seen as "a naked restrain[t] of trade with no purpose except stifling of competition," *Broadcast Music, Inc.* v. *CBS*, 441 U.S. 1, 20 (1979) (citation and internal quotation marks omitted), and therefore treated as unlawful per se based on its "predictable and pernicious anticompetitive effect" and its "limited potential for procompetitive benefit." *State Oil Co.* v. *Khan*, 522 U.S. 3, 10 (1997).

In the patent context, however, a settlement involving restrictions on the sale of allegedly infringing products is not necessarily anticompetitive. A patent grants the patent holder the lawful "right to exclude others from profiting by the patented invention." *Dawson Chem. Co.* v. *Rohm & Haas Co.*, 448 U.S. 176, 215 (1980). Thus, patent holders can lawfully refuse to license competitors to produce the patented article, or can grant exclusive territorial or other limited licenses to one or more chosen licensees. *Ibid.*; 35

9

U.S.C. 261, 271(d)(4); *In re Independent Serv. Orgs. Anti-trust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000), cert. denied, 531 U.S. 1143 (2001).

At the same time, a restrictive agreement that occurs in connection with a patent litigation settlement is subject to antitrust scrutiny if the patent holder obtains "protection from competition which the patent law, unaided by restrictive agreements, does not afford," *United States* v. *Masonite Corp.*, 316 U.S. 265, 279 (1942). There may be particular reason for concern about the competitive consequences of a settlement that includes payments from the patent holder to the alleged infringer. Such reverse payments can be a device for the sharing of monopoly rents made possible by the alleged infringer's exclusion from the market and can result in less competition than would likely have prevailed in the absence of the payment. Herbert Hovenkamp et al., *Anticompetitive Settlement of Intellectual Property Disputes*, 87 Minn. L. Rev. 1719, 1749 (2003); Carl Shapiro, *Antitrust limits to patent settlements*, 34 RAND J. Econ. 391, 408 (2003).

There is insufficient basis, however, for per se condemnation of all settlement agreements in patent infringement cases that preclude marketing of allegedly infringing products in exchange for payments from the patentee to the alleged infringer. Reverse payments may have the salutary effect of facilitating efficient settlements that advance consumer welfare. For example, reverse payments may reflect a savings in the patent holder's expected litigation costs. Thus, consent orders entered into by the FTC reflect the view that payments to the alleged infringer up to the value of the patent holder's expected litigation costs in enforcing the patent are not anticompetitive.[4] The FTC has identified

---

[4] *Bristol-Myers Squibb Co.*, No. C-4076 (FTC Apr. 14, 2003) (consent order), <http://www.ftc.gov/os/2003/04/bristolmyerssquibbdo.pdf>;

10

other possible "legitimate justifications" for reverse pay-
ments, such as a "'cash starved' generic" drug firm that
could productively use "some up-front support from the pio-
neer manufacturer," a "generic challenger [that] is more op-
timistic about the litigation outcome than the pioneer,"
"widely differing risk preferences," and a "judgment-proof
generic manufacturer [whose] downside risks of damage ex-
posure are small." *In re Schering-Plough Corp.* (*Schering*),
No. 9297 (FTC Dec. 18, 2003), slip op. 37-38 (<http://www.
ftc.gov/os/adjpro/d9297/031218commissionopinion.pdf>), appeal
docketed, No. 04-10688-AA (11th Cir. filed Feb. 13, 2004); see
also Shapiro, *supra*, 34 RAND J. Econ. at 408 & n.29 (citing
risk aversion and asymmetric information about market
conditions).

At the same time, a rule of reason analysis permits anti-
trust liability to attach to patent settlements involving re-
verse payments in appropriate circumstances.  Applying a
rule of reason analysis and based on a fully litigated factual
record, the FTC condemned the settlements in the *Schering*
decision, finding that the patentee paid the generic firms to
defer their entry; that the entry of those lower-cost generics
would be a "direct consumer benefit" (*Schering*, slip op. 20);
that the payments were not ancillary to a pro-competitive

---

*Schering-Plough*, No. 9297 (FTC Apr. 3, 2002) (consent order as
to American Home Products Corp.), <http://www.ftc.gov/os/2002/04/
scheringplough_do.htm>.  Commentators generally take this position as
well.  See, *e.g.*, Hovenkamp, *supra*, 87 Minn. L. Rev. at 1759; Thomas F.
Cotter, *Refining the "Presumptive Illegality" Approach to Settlements of
Patent Disputes Involving Reverse Payments: A Commentary on
Hovenkamp, Janis & Lemley*, 87 Minn. L. Rev. 1789, 1802 (2003); Shapiro,
*supra*, 34 RAND J. Econ. at 407-408; Maureen A. O'Rourke & Joseph F.
Brodley, *An Incentives Approach to Patent Settlements: A Commentary
on Hovenkamp, Janis and Lemley*, 87 Minn. L. Rev. 1767, 1782, 1787
(2003) (distinguishing expected litigation costs from other collateral costs
and from considerations of patent validity).

11

settlement; and accordingly that such agreements were anticompetitive. *Id.* at 25, 26, 31. As the FTC observed, in a settlement without a reverse payment, it is reasonable to infer that the settlement reflects the parties' expectations about the outcome of the patent litigation. As a result, any restraint upon entry by the generic applicant results from its views of the patent's strength. By contrast, a reverse payment can enable competitors to share the profits created by the generic firm's non-entry into the market. The FTC has thus concluded that, unless there are offsetting pro-competitive considerations, an agreement involving a payment from the patentee to an alleged infringer logically results in a later generic entry date and less competition than would be expected absent the payment. *Id.* at 26.

## II. The Sixth Circuit's Decision Involves An Agreement That Has Been Construed To Exclude Non-Infringing and Potentially Non-Infringing Products And Does Not Squarely Conflict With The Eleventh Circuit's Decision In *Valley Drug*

The petition seeks (Pet. 7, 9-18) to have this Court resolve an alleged conflict between the decision below and the subsequent decision in *Valley Drug Co.* v. *Geneva Pharmaceuticals, Inc.*, 344 F.3d 1294 (11th Cir. 2003), petition for cert. pending, No. 03-1178 (filed Feb. 13, 2004), conditional petition for cert. pending sub nom. *Walgreen Co.* v. *Abbott Laboratories*, No. 03-1175 (filed Feb. 16, 2004). The two decisions, however, do not present a square conflict that necessitates this Court's review at this time. The Eleventh Circuit in *Valley Drug* rejected the characterization of interim patent settlement agreements as per se illegal, but relied on the fact that the parties agreed that the ANDAs that were the subjects of the infringement suits *admittedly infringed* a patent. 344 F.3d at 1304-1306 & n.18. The Eleventh Circuit recognized that the agreements before it

12

were also alleged to prohibit the marketing of *non-in-fringing* products and to prohibit the waiving of the ANDA filer's 180-day exclusivity period. With respect to those allegations, however, the court stated that "th[o]se prohibitions may be beyond the scope of [the patent's holder's] lawful right to exclude and, if so, would expose appellants to anti-trust liability for any actual exclusionary effects resulting from these provisions." *Id.* at 1306 n.18; cf. *Ethyl Gasoline Corp.* v. *United States*, 309 U.S. 436, 456 (1940). The Eleventh Circuit's rejection of a per se rule was thus addressed to "the failure * * * to market *admittedly infring-ing* products." 344 F.3d at 1306 n.18 (emphasis added).

It is less than clear that the Sixth Circuit's decision departs from the holding in *Valley Drug*. The better reading of the Sixth Circuit's opinion is that it does not deem illegal per se every settlement agreement that includes a reverse payment in exchange for the exclusion from the market of an allegedly infringing product. To be sure, petitioner and its amici point to seemingly broad language in the Sixth Circuit's opinion that they construe to require application of a per se rule in such circumstances. See, *e.g.*, Pet. 10 (citing Pet. App. 18a); Am. Intell. Prop. Law Ass'n Amicus Br. (AIPLA Br.) at 2-3. If construed in that manner, the court of appeals' decision would be erroneous. As discussed, a per se rule is reserved for the limited instance in which an exclusion from the market has "such predictable and pernicious anticompetitive effect" that "experience with [that] particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *State Oil Co.*, 522 U.S. at 10 (citation omitted). Certain settlements of patent litigation may benefit consumers and the public, regardless of the presence of a payment to the alleged infringer, and thus application of a per se rule would be inappropriate.

13

The Sixth Circuit's opinion is better read, however, as limited to the particular agreement before the court, which had been construed by the district court to restrain petitioner "from marketing *non-infringing* or *potentially non-infringing* versions of Cardizem CD," thus reaching versions "not at issue in the * * * patent case, including" the non-infringing reformulated generic drug that the FDA approved and petitioner eventually marketed. Pet. App. 65a (emphasis added); accord *id.* at 59a-61a. The FTC's complaint similarly had construed the agreement to restrain petitioner "from selling any other bioequivalent or generic version of Cardizem CD, regardless of whether such product would infringe Hoechst MRI's or Carderm's patents." *In re HMR*, *supra*, Compl. at ¶ 23. The district court moreover found that the Agreement restrained Andrx from "relinquishing or otherwise compromising its right to the 180-day period of exclusivity," thereby possibly delaying entry by other generic firms. Pet. App. 65a. Both of those restraints extended beyond the legitimate scope of the patent claims by reaching non-infringing products and conduct by petitioner that the patent conferred no right to exclude or demand.[5]

The district court rejected petitioner's arguments that the challenged provisions should be treated as ancillary to a lawful agreement, Pet. App. 75a-81a,[6] and concluded that, as

---

[5] In its *Schering* decision, the FTC observed that the Sixth Circuit "found that it was *per se* illegal for a pioneer drug company to pay money to a generic manufacturer in return for a commitment to delay entry," whereas the Eleventh Circuit in *Valley Drug* "expressly considered contrary authority and declined to apply the *per se* label." *Schering*, slip op. 12-13. The FTC noted, however, that the Sixth Circuit's decision "can be distinguished on its facts" because "there were additional potentially anticompetitive commitments by the generic." *Id.* at 18 n.26.

[6] An agreement not to compete that is ancillary to a lawful agreement is properly analyzed under the rule of reason, rather than the per se rule. Federal Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for*

14

construed, it constituted a per se violation of the antitrust laws. Whether or not the district court's conclusions as to ancillarity and the applicability of the Agreement to non-infringing products are correct, it is hardly novel to condemn as illegal per se an agreement between an incumbent and a potential competitor that is not ancillary to any lawful agreement and that precludes the potential competitor from entering the market with a product that does not infringe any patent owned by the incumbent. See Hovenkamp, *supra*, 87 Minn. L. Rev. at 1764-1765 ("While the language in the [district court's] opinion is a little opaque, if it meant that Andrx promised not to sell products that Cardizem did not claim in its patent to begin with, then that portion of the agreement was per se unlawful notwithstanding the presence of a patent dispute.").

The court of appeals gave no indication that it departed from the district court's analysis, and its opinion suggests that it relied on the district court's construction of the Agreement. Thus, in rejecting petitioner's "attempts to avoid *per se* treatment," the court of appeals stated that "the Agreement cannot be fairly characterized as merely an attempt to enforce patent rights or an interim settlement of the patent litigation," "*[a]s explained in greater detail in the district court's opinion.*"    Pet. App. 18a-19a (emphasis added).  The court then cited a portion of the district court's opinion (*id*. at 19a, citing *id*. at 67a-80a) that included the district court's determinations that the Agreement extended to non-infringing versions, *id*. at 77a, 79a, and in effect excluded other competitors, *id*. at 77a, 80a.  Moreover, in footnote 13

---

*Collaborations Among Competitors* § 3.2 (Apr. 2000) <http://www.ftc. gov/os/2000/04/ftcdojguidelines.pdf>; U.S. Dep't of Justice & Federal Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 3.4 (Apr. 1995) <http://www.usdoj.gov/atr/public/guidelines/ ipguide.pdf>.

15

of its opinion (*id.* at 19a n.13), the court cited to a discussion in *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 261 F. Supp. 2d 188, 241 (E.D.N.Y. 2003), that specifically referenced the district court's reliance in this case on the Agreement's coverage of two products that were not at issue in the pending patent litigation.

In *Valley Drug*, the Eleventh Circuit was properly hesitant to recognize a square conflict between the two decisions. The Eleventh Circuit thus noted that the Sixth Circuit may have been influenced not only by the Agreement's provisions for reverse payments but also "by other provisions of the agreement which might more readily seem to exceed the potential exclusionary power of the patent." 344 F.3d at 1311 n.26.[7] Given the uncertainty over the scope and impact of the Sixth Circuit's decision, review at this time may be premature.

### III. The Sixth Circuit's Decision Involves An Unusual Context—An Interim Patent Settlement Agreement—That Has Not Occurred With Significant Frequency

Petitioner also argues (Pet. 19-27) that the Court's review of the question whether interim agreements are unlawful per se is warranted because the issue is one of great and recurring importance. Settlements with reverse payments in an amount far exceeding litigation costs (such as the agree-

---

[7] To be sure, the Eleventh Circuit also criticized the Sixth Circuit for failing "to measure the several provisions [of the Agreement] against the exclusionary power of the patents, or differentiate between provisions that fell within the scope of the patent's protection and those which did not." 344 F.3d at 1311 n.26. But the Sixth Circuit did not expressly preclude such an inquiry, and indeed, to the extent the court's approval of per se treatment rests on the Agreement's coverage of non-infringing or potentially non-infringing products, that reasoning would suggest a need for precisely such an inquiry to be conducted on remand. In any event, there is as yet no clear conflict on this issue.

16

ment in this case), however, appear to be rare outside the Hatch-Waxman context. Thomas F. Cotter, *Refining the "Presumptive Illegality" Approach to Settlements of Patent Disputes Involving Reverse Payments: A Commentary on Hovenkamp, Janis & Lemley*, 87 Minn. L. Rev. 1789, 1797-1798, 1800 (2003). A variety of factors unique to the pharmaceutical industry, including the effects of state laws and various policies of health care institutions that accelerate and magnify the economic impact of generic entry and the contours of the Hatch-Waxman regulatory scheme, have created incentives for the use of reverse payment provisions in pharmaceutical patent litigation. For example, reverse payment settlements may be attractive to the patentee in this context because they may forestall entry not only by the alleged infringer, but by other generic firms as well. Hovenkamp, *supra*, 87 Minn. L. Rev. at 1757.

More significantly, the question presented by petitioner appears to have limited significance even in the Hatch-Waxman context because this case involves an *interim* settlement agreement that did not finally resolve the parties' underlying patent dispute. After undertaking an exhaustive study of litigation agreements over an eight-year period relating to drug products for which paragraph IV certifications have been filed, the FTC has found such interim agreements to be rare. Aside from the agreements challenged here and in *Valley Drug*, the FTC study found only one other interim agreement between a patentee and an alleged infringer, and no such agreements entered into after the FTC's investigations in this area became public in April 1999. Federal Trade Comm'n, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* 34 (July 2002) <http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf>.

Such interim settlement agreements are particularly unlikely given that the Hatch-Waxman Act effectively grants an automatic 30-month preliminary injunction in favor of a

17

patent holder that timely files an infringement action. Under 21 U.S.C. 355(j)(5)(B)(iii), the FDA is barred from approving the alleged infringer's ANDA for 30 months, thus blocking the generic drug's entry, unless the patent on the pioneer drug is judicially declared invalid or not infringed. 21 U.S.C. 355(j)(5)(B)(iii).[8]  In contrast to the agreements in this case and in *Valley Drug*, all of the decisions pending in the lower courts cited by petitioner (Pet. 13-16) involve final settlements that conclusively resolve the parties' patent dispute. The distinction is important because the calculus of competitive costs and benefits is substantially different for interim settlements and final settlements. While final settlements of infringement claims may have anticompetitive effects, they may "facilitate innovation and investment in the patented technology by eliminating litigation risks and providing certainty over patent rights." AIPLA Br. at 14. The type of interim agreement at issue in this case, on the other hand, may have none of those effects, because it leaves questions of patent validity and infringement to be litigated. Consequently, this Court's consideration of the question presented might be of limited practical importance and would

---

[8]  The interim agreements at issue in this case and in *Valley Drug* arose from peculiar circumstances in which the automatic 30-month stay that is ordinarily available to the patent holder was not in place. In the present case, HMR did not sue a later ANDA filer, Biovail, for infringement, *Andrx Pharmaceuticals, Inc.* v. *Biovail Corp.*, 256 F.3d at 803, and thus the automatic 30-month stay on FDA approval that an infringement suit would have triggered did not arise against Biovail's ANDA. Petitioner's 180-day exclusivity rights, however, could still block Biovail's entry into the market, and the Agreement was entered just a few months after Biovail filed its ANDA. In *Valley Drug*, the patent holder, Abbott, failed to file an infringement suit with respect to one ANDA within the statutory period necessary to trigger the 30-month stay on FDA approval. The parties entered into their interim agreements shortly after the generic firm received final approval by the FDA with respect to the product not subject to the 30-month stay. 344 F.3d at 1299.

18

not necessarily offer guidance regarding the antitrust liability that may attach to final patent infringement settlements.

IV.  **Subsequent Amendments To The Hatch-Waxman Act Militate Against This Court's Review Of The Sixth Circuit's Decision At This Time**

This Court's review also may be unwarranted in light of certain amendments to the Hatch-Waxman Act that were enacted by Congress in 2003, after the parties entered into the agreements at issue in this case and in *Valley Drug.* Those amendments provide that the Act's 180-day exclusivity will be awarded on a product basis, rather than a patent-by-patent basis, Pub. L. No. 108-173, § 1102, 117 Stat. 2458 (to be codified at 21 U.S.C. 355(j)(5)(D)(i)(I)(bb)), and permit all ANDA applicants that filed on the first day that an ANDA could be filed to be eligible for the 180-day exclusivity period, 117 Stat. 2457 (to be codified at 21 U.S.C. 355(j)(5)(B)(iv)(II)(bb)).  The former change may reduce the number of times that the FDA may grant the 180-day exclusivity to a company that has filed the first ANDA containing a paragraph IV certification.  The latter change, by allowing multiple ANDA applicants to obtain the 180-day exclusivity period, may increase the transaction costs for pioneer drug companies that seek to enter into agreements with those applicants.  On balance, therefore, the 2003 amendments may reduce the number of agreements containing reverse payments.

Congress also amended the Act to require pioneer drug companies and generic applicants to file all patent settlement agreements and certain other agreements with the U.S. Department of Justice and the FTC within 10 days of execution. §§ 1111-1117, 117 Stat. 2461-2463.  Because the amendments are complex and relatively new, it is not yet clear how they will affect competitive concerns relating to interim agree-

19

ments between pioneer and generic drug manufacturers. Accordingly, review by the Court of the question presented may be premature.

## CONCLUSION

The petition for a writ of certiorari should be denied.

Respectfully submitted.

<div style="margin-left:40%">

THEODORE B. OLSON
  *Solicitor General*

R. HEWITT PATE
  *Assistant Attorney General*

THOMAS G. HUNGAR
  *Deputy Solicitor General*

MAKAN DELRAHIM
  *Deputy Assistant Attorney General*

LISA S. BLATT
  *Assistant to the Solicitor General*

</div>

WILLIAM E. KOVACIC            CATHERINE G. O'SULLIVAN
  *General Counsel*           DAVID SEIDMAN
  *Federal Trade Commission*    *Attorneys*

JULY 2004

# Exhibit 8

*The Antitrust Bulletin/Fall 2004*                                          655

# Antitrust policy toward agreements that settle patent litigation

BY ROBERT D. WILLIG* and JOHN P. BIGELOW**

## I.   Introduction

In this article, we apply standard economic tools to analyze some of the central issues involved in formulating antitrust enforcement policy toward agreements that settle patent litigation. These issues have come to a head in a recent series of Federal Trade Commission (FTC) cases challenging as anticompetitive agreements settling patent disputes between pioneer drug companies and potential generic entrants.[1]

---

*    Professor of Economics and Public Affairs, Princeton University, Princeton, NJ.

**    Senior Economist, Princeton Economics Group, Princeton, NJ.

AUTHORS' NOTE: *This research was begun in connection with work we performed on behalf on Schering-Plough Corporation. We are grateful to Vladimir Mares for his assistance with this work, and to the referee for very helpful editorial suggestions.*

[1]    FTC has brought complaints against Abbott Laboratories and Geneva Pharmaceuticals, Inc. Abbott Labs., FTC Docket No. C-3946 (May 22, 2000) (complaint), *available at* http://www.ftc.gov/os/2000/05/c3946omplaint.htm; Hoechst Marion Roussel, Inc., FTC Docket No. 9293 (Mar. 16, 2000) (complaint), *available at* http://www.ftc.gov.os/2000/03/hoechstandrxcomplaint.htm; Schering-Plough Corp., FTC Docket No. 9297 (Mar. 30, 2001), *available at* http://www.ftc.gov/os/2001/04/scheringpart3cmp.pdf and *In re* Schering-Plough Corp., Opin-

© 2004 by Federal Legal Publications, Inc.

656 : *The antitrust bulletin*

This article analyzes whether such settlements are socially desirable and whether the payment of net consideration by the patent holder to the potential entrant is a reliable indicator that the settlement is socially undesirable.

The setting we analyze has an incumbent patent holder and a potential entrant who may be sued for infringement, and who may or may not prevail in the resulting patent litigation. As long as the patent has substantial value and assuming no other substitutes are available, the market will be "monopolized" by the incumbent before the potential entrant comes in.[2] After entry, which may unleash a flow of subsequent additional entry, the market will be more competitive. Under these conditions, the incumbent and the entrant have incentives of various kinds to settle their patent dispute outside of litigation. We assume that any settlements of the patent dispute are voluntary and must be viewed as superior to litigation by both the incumbent and the entrant. They may be risk averse, and may face significant litigation costs. They may recognize that the flow of monopoly profit (or rents from previous innovative activities) exceeds the total flow of duopoly or competitors' profits, and seek a settlement that maintains the monopoly outcome for both of them. Short-run (or "static") consumer welfare and social welfare are both advanced by longer spells of competition, by avoiding the expenditure of litigation costs, and by diminishing the risks borne by those with risk aversion.[3]

---

ion of the Commission, available at http://www.ftc.gov/os/adjpro /d9297/031218commissionopinion.pdf (Dec. 18, 2003). Some of the private cases include *In re* Terazosin Hydrochloride Antitrust Litig., 164 F. Supp. 2d 1340 (S.D. Fla. 2000), and *In re* Cardizem CD Antitrust Litig., 105 F. Supp. 2d 682 (E.D. Mich. 2000).

[2]    In the FTC cases mentioned above, there have been significant factual disputes over whether the patents and agreements at issue conferred monopoly power either before or after generic entry. To simplify our analyses in this article, we assume that the patent holder has monopoly power or is protecting its rents from innovation absent entry by generic competitors. We do not intend to imply that the relevant products markets in the FTC cases are properly limited to only the patented and generic products.

[3]    There may be tradeoffs between long-run and short-run consumer welfare due to the effect of preventing settlements on innovation and the

It is plain that some settlement agreements would profitably perpetuate monopoly, to the harm of social and consumer welfare, while other settlement agreements would be highly beneficial by avoiding litigation costs and risks, and by bringing on competition sooner than litigation would have been likely to do so. Is there a bright-line test that can help separate the socially beneficial from the monopolizing patent settlement agreements? Are any patent settlement agreements likely to promote consumers' benefits? If so, would they involve cash changing hands, or could they be even better for consumers if cash were forced off the table as a matter of antitrust policy? One proposal that has been considered is to condemn any patent settlement agreement between active or potential competitors that in essence is found to have included a money, or money equivalent, payment by the patent holder to the entrant as per se or presumptively illegal.[4] This article expresses and explains several broad conclusions from the analysis, which are highly relevant for finding the right answers to these questions.[5]

First, there are likely to exist voluntary mutually beneficial settlements between the patent holder who claims infringement and the firm seeking to enter that are favorable to consumer and social welfare. Under such socially desirable settlements, entry is permitted at an intermediate date that is consonant with and reflects the relative odds of the parties' success in the patent litigation that would ensue absent settlement.

---

impact of innovation on consumer and social welfare, which we do not address in this article. *See* James Langenfeld & Wenqing Li, *Intellectual Property and Agreements to Settle Patent Disputes: The Case of Settlement Agreements with Payments from Branded to Generic Drug Manufacturers*, 70 ANTITRUST L.J. 777 (2003).

[4]   For example, see the court ruling in *In re Cardizem Antitrust Litig.*, 105 F. Supp. 2d at 705—06.

[5]   For a general discussion of the other literature on these issues, see Thomas Cotter, *Antitrust Implications of Patent Settlements Involving Reverse Payments: Defending a Rebuttable Presumption of Illegality in Light of Some Recent Scholarship*, 71 ANTITRUST L.J. 1069 (2004). For application of some rigorous economic tools to these issues, see Carl Shapiro, *Antitrust Limits to Patent Settlements*, 34 RAND J. ECON. 391 (2003).

*658 : The antitrust bulletin*

For example, suppose that the remaining life of the patent were 10 years and all agree that the probability is 60% that the incumbent would win the patent litigation. Then, in the simplest case, 6 years from now is the time of entry that would be consistent with the 60% litigation probability.[6] Under such a settlement, there would be 6 years of continuing monopoly and 4 years of competition over the next 10 years. Under the litigation risk, there is a 60% chance of 10 years of monopoly and a 40% chance of zero years of monopoly, yielding an expected value of 6 years of monopoly and 4 years of competition.

The possibility of such settlements can be highly beneficial to society because they

assure entry will occur at a time that is consistent with the expected (average) value of the entry time resulting from the litigation, while eliminating the costs of litigation that fall on the firms;

eliminate the social costs of the use of judicial resources;

eliminate the risks that litigation poses to consumers of early versus relatively late competitive pricing;

eliminate the risk that litigation poses to the risk-averse entrant of early versus relatively late commencement of market operation and the resulting flow of competitive net revenues; and

eliminate the risk that litigation poses to the risk-averse incumbent of early versus relatively late loss of its flow of monopoly net revenues.

The hallmark of such socially beneficial settlements is the agreement on the date of intermediate entry.

Given that the incumbent and the entrant have similar views of the probabilities of the litigation outcomes and the time value of money, their bargaining over the agreed entry date will tend to yield earlier entry to the extent that the litigation costs and the litigation risk aversion of the incumbent are greater than those of the entrant, because the incumbent has more to lose from bearing the risks of litigation. Where the monopoly over the patented product is more important to the over-

---

[6]    Consideration of discount rates would make this arithmetic a bit more complex.

all finances of the incumbent, the risk associated with litigation is greater. Accordingly, the incumbent would likely face greater risk-aversion costs of litigation, and thus the intermediate settlement date to which the incumbent would be willing to agree will be earlier than the litigation probabilities alone would indicate.

Second, in contrast to the socially beneficial settlements with intermediate dates of entry, the agreements that are the most profitable for the firms (without consideration of legality) might entail the payment of a substantial sum by the patent holder to the entrant in exchange for the promise that the entrant will not actually come into the market, or at least not until the patent has lost its impact and financial value. Monopolizing agreements of this kind can be expected to be harmful to consumer and social welfare, since they might establish a relatively long spell of monopoly as the result of a payment—rather than as a result of any valid intellectual property rights. The principal hallmark of such a socially adverse agreement is the later date at which entry is first permitted.

It is true that another general trait of a monopolizing agreement is the payment by the patent holder to the entrant of money or a money equivalent sufficient to induce the entrant to give up its chance of early entry by winning the patent litigation. This raises the policy question of whether financial payment from the patent holder to the entrant is properly viewed as a general hallmark of a monopolizing agreement. One possible viewpoint is that *any* such payment is likely to be adverse to consumer and social welfare. Although not condemning such payments as per se illegal at this time, the FTC and others have argued that if the payment had not been part of the agreement, then there would have been an alternative agreement with an earlier date of entry that would have benefited consumers.[7]

Economic analysis shows that this viewpoint is wrong, and there should not be a policy of per se or presumptive condemnation of settlement agreements just because they include a financial payment from the patent holder to the entrant. For example, the financial pay-

---

7    See *In re Schering-Plough Corp.*, Opinion of the Commission, *available at* http://www.ftc.gov/os/adjpro/d9297/031218commissionopinion.pdf (Dec. 18, 2003) at 26.

660 : *The antitrust bulletin*

ment may be simply an arm's-length payment for other consideration, and may not affect the terms of the settlement at the core of the litigation at all. A side deal is less likely to affect the core terms if the "net consideration" is relatively small, where net consideration is defined as the amount by which the payment exceeds the fair market value of what is received in return outside of the settlement of the core contention in the litigation.

We will address in detail, however, the more interesting possibility that financial payments might be essential for a settlement of the core contentions to be reached. Among the circumstances that might make financial payments essential are differences between the firms in their information about the possible states of the market before the patent expires, or in their expectations regarding their likelihood of success in the litigation. Additionally, the firms may differ in the effect that entry by third-party competitors would have upon them. Under such circumstances, a prohibition against agreements that include financial payment by the patent holder could well make settlement impossible, rather than stimulating agreements with earlier dates of entry.

Information asymmetries between the incumbent and the entrant are a significant source of impediments to socially beneficial settlements without a financial component permitted. For example, consider the case where the incumbent firm has far better information than the entrant about the state of the market and, in particular, about how long the patent will have economic value before a superior substitute emerges from the pipeline of products. Although the entrant does not have this information, it is aware that the incumbent does, and of necessity this known disparity of information influences the bargaining between them. If the entrant were offered a relatively early entry date by the incumbent, then the entrant would infer from the offer that the incumbent knows that the patent is likely to lose its value relatively early. This would be a rational inference for the entrant, because the better informed incumbent is more likely to make aggressively early offers the sooner the competing product is expected to arrive in the market. As a consequence, the bargaining is only likely to reach an agreement if the value of the patent is relatively low, because only then are the views consistent between the incumbent (who knows) and the entrant (who infers) the low value of future market sales.

If the value of the patent is relatively high, bargaining is unlikely to reach agreement. The incumbent is relatively unwilling to make aggressive concessions that cost it valuable duration of its monopoly. However, the entrant perceives relatively little value to the incumbent's offers of increments of time for earlier entry, since the entrant underestimates the real value of earlier entry. Thus, without a cash dimension permitted, no settlement agreement is apt to be found when the incumbent has private favorable information about the value of the patent in the market.

Here, the use of cash transfers in the context of a negotiated settlement will help to overcome the obstacles to agreement brought about by the incumbent's superior information. When the incumbent is privately aware that the patent's value is relatively high, then the incumbent will predictably add cash to the settlement offer if permitted. This can dramatically raise the chance of the parties reaching a settlement because there is no endemic disparity in the evaluation of cash, as there is in the valuation of increments of time in the market under the conditions of information asymmetry. Under very reasonable circumstances, settlements with cash transfers to the potential entrant will result in a shorter expected time of entry than the expected time of entry under litigation—and thus benefit consumers. Accordingly, a bar on the use of cash transfers in the settlement agreement would be a counterproductive policy, making settlements impossible under circumstances where the use of a cash payment would permit socially beneficial settlements to avoid litigation.[8]

Similarly, when the two parties hold different expectations regarding their respective likelihoods of success in the litigation or when they view the effect of subsequent entry by third-party competitors differently, they are likely to value quite differently concessions of

---

[8]    Shapiro, *supra* note 5, recognizes that asymmetric information of the kind described here can render payments from the patent-holder to the entrant efficient for beneficial settlements. In n. 29, he cites the testimony of Robert Willig on this point in Schering-Plough Corp., FTC Docket No. 9297. However, in a later article, he seems to recommend a presumption that a large patent settlement net payment from a patent-holder to an entrant is anticompetitive. See Carl Shapiro, *Antitrust Analysis of Patent Settlements Between Rivals*, Antitrust, Summer, 2003, at 70.

more or less time on the market for the entrant. If the value placed on concession of additional time by the incumbent is (or is perceived to be) of greater cost to the incumbent than it is (or is perceived to be) of value to the entrant, such bargaining limited to the time of entry will be ineffective and may lead to no settlement agreement. The value of cash payments, by contrast, may be readily agreed upon by both parties. As such, the use of cash payments can overcome obstacles to bargaining that would otherwise preclude settlement, without necessarily increasing the expected time of entry under litigation—and thus without damaging consumers.

The circumstances of information asymmetry, expectational asymmetry, or subsequent entry are not rare, and so it can be expected that a policy of condemnation of agreements with financial payments would be unnecessarily costly to society in repressing socially beneficial settlements, and fomenting otherwise unnecessary litigation. Antitrust policy should encourage settlement agreements with dates of entry that are socially advantageous relative to the expected dates of entry under the litigation alternatives, taking into account the benefits of avoiding the costs and risks of litigation. Excessive attention to the issue of whether there is any financial dimension to the agreement should not be permitted to obscure this appropriate framework for determining the public interest, because the financial dimension of the agreement is not necessarily a reliable indicator of the social desirability of the settlement.

The remainder of this article is organized as follows. Section II describes a simple model of interaction between an incumbent patent holder and would-be entrant cum patent infringer who have the option of resorting to litigation to settle their patent dispute. Section III describes how cooperative bargaining can bring about outcomes that are preferred to litigation, not only by the parties, but also by society at large. Part A of section III describes the simplest case in which both firms are risk neutral and do not discount the future. Part B of section III explores how the analysis of part A changes as these assumptions are relaxed. Section IV addresses the role of cash or other financial consideration in patent litigation settlements. In section IV, we describe a variety of circumstances in which financial consideration is not only consistent with social welfare, it is an essential in that

settlements that are socially preferred to the litigation alternative cannot be achieved without financial consideration and can be achieved when the parties are permitted to include such consideration among the terms of a settlement agreement. Section V contains some concluding remarks. The discussion in these sections is intended to be informal and intuitive. The mathematical appendix to this article contains formal derivations of the results, and the sections of the appendix are numbered to match the various sections of the main body of the article.

## II.   The model

Our results are obtained from a model of the interaction between an incumbent firm that holds a patent on a brand-name product and a would-be entrant that contemplates production of a generic version of the same product. As long as the patent is enforced, the incumbent is the only firm that can produce this good, and we assume the market exhibits a monopoly outcome for the duration of the patent. If the entrant is allowed to produce the good, we assume the market exhibits a duopoly outcome. The incumbent's profit (per unit of time) is greater under monopoly than the two firms' total profits under duopoly. The flows of consumers' and social surplus are less under monopoly than under duopoly.

If the entrant seeks to join the market, the incumbent must decide whether or not to litigate over the patent. If the incumbent decides to do so, the entrant must decide whether or not to contest the litigation and persist in its attempt to enter. If the two firms do litigate, which is costly, the outcome of the litigation is uncertain, and each side may have its own view of the probability that it will prevail. If the parties reach a settlement, then they agree on a future date at which the entrant may join the market. Until that time, the incumbent is assumed to possess a monopoly, and after that time throughout the remaining life of the patent, the two firms share a duopoly.

Under these assumptions, if the litigation occurs, all parties (the incumbent, the entrant and consumers) face two possible outcomes— monopoly for the full duration of the patent or duopoly for the full duration of the patent. The probabilities of these outcomes are the probabilities that the incumbent or the entrant respectively will win

664 : *The antitrust bulletin*

the litigation. Under a settlement, the life of the patent is divided between monopoly and duopoly periods.

We will refer frequently to the expected date of entry under litigation. This is the hypothetical date of entry that is attained by dividing the life of the patent into first a monopoly and then a duopoly segment in proportion to the two firms' probabilities of winning the litigation. That is, if the remaining life of the patent is 8 years, and the incumbent's probability of winning the litigation is 75%, then the expected date of entry is 75% of the way through those 8 years, or 6 years. Except where we explicitly address the parties' attitudes toward bearing risk or their attitude toward the time value of money, we assume that for both firms and for consumers, an expected date of entry $x\%$ of the way through the life of the patent is of the same value as an $x\%$ chance of the monopoly outcome, and a corresponding $(100 - x)\%$ chance of the duopoly outcome.[9] Settlements may, of course, also involve an exchange of consideration.

## III.  Cooperative bargaining without cash transfers

### A.  *Bargaining in the simplest case*

Now assume that cash transfer payments are prohibited, but that the parties are free to negotiate over the time of entry as a means of avoiding the costs of litigation. In this setting, there are potential settlements that are mutually agreeable to the parties because these settlements offer each of the parties an outcome that is superior to the litigation alternative. The reason for this conclusion is the cost of conducting the litigation. If the two parties agree on entry at the expected date of entry described above, then their expected profits from selling the product are just what they would be under litigation, but they save the cost of the litigation itself.

There is, in fact, a range of mutually agreeable potential settlements. The entrant, who prefers earlier entry to later, would be willing to postpone entry somewhat past the expected date of entry under liti-

---

9    These assumptions serve only to avoid arithmetical complications from discounting and risk aversion that do not substantively affect our results.

gation if the postponement were not so protracted that the cost to the entrant in lost profits were more than what it saved in avoided litigation costs. Likewise, the incumbent, who prefers later entry to earlier entry, would be willing to accelerate entry relative to the expected date under litigation if the cost in foregone profit were not greater than the saved litigation costs.

Since earlier entry is also preferred by consumers to later entry, this means there are some settlements that are mutually agreeable to the parties that are better for consumers than litigation. Whether or not one of these outcomes will be achieved depends on how the firms' process of bargaining over a settlement reaches an outcome. One standard theory of bargaining from economic theory is the Nash cooperative solution, which expresses the outcome that two parties will achieve in terms of the possible payoffs available to them and their "threat points," which are the payoffs they can achieve if bargaining breaks down. In our context, the threat points are determined by the payoffs achieved from litigation, since that is the outcome if bargaining breaks down.

In the mathematical appendix, we calculate the value of the Nash cooperative bargaining solution. That calculation shows that if both firms' litigation costs are small, then the cooperative bargaining solution will be close to the threat points, which means that the agreed-upon entry date will be close to the expected date of entry under litigation. Entry is hastened, reducing the expected duration of monopoly equilibrium and improving consumers' surplus when the entrant's litigation costs are sufficiently small relative to the incumbent's. How small they need to be depends on how large the incumbent's monopoly profits are relative to its duopoly profits.

In any event, the Nash bargaining solution makes both firms better off than they are under litigation. Thus, when it also makes consumers better off, the Nash bargaining solution completely dominates litigation.

## B.  Variations on the bargaining solution

So far our analysis has abstracted away from the complications induced either by the parties' attitudes toward risk bearing or by their attitude toward the time value of money. As it happens, neither of these simplifications has a substantive effect on our results.

666 : *The antitrust bulletin*

Consider first the question of risk bearing. Litigation is uncertain. Conducting litigation means bearing risk. For firms with risk-averse decision-making, the riskiness of litigation is an additional cost.[10] The cost of bearing risk may be expressed as a "risk premium," which is the amount a risk-averse firm would be willing to pay to avoid bearing an actuarially fair risk, with a given variance. Conceptually, the risk premium may be added to the direct costs of litigation. The sum of these two costs (direct plus risk bearing) is the effective cost of the litigation.

Increasing the effective costs of litigation in this way expands the range of viable bargaining solutions the parties might reach in a settlement. Moreover, to the extent that the costs of risk bearing are incurred more heavily by one party, the strength of that party's bargaining position is weakened and the outcome of bargaining is more favorable to the other party. The incumbent is particularly affected by this because even if the two parties have the same attitudes toward risk bearing in general, litigation is more risky to the incumbent, who stands to lose the monopoly profit or rents on its investments, than it is to the entrant. The more profitable is the monopoly equilibrium, the more risk the incumbent bears when litigation takes place. The risk component of

---

[10]    While it is sometimes argued that managers of firms whose owners are capable of diversification make or ought to make decisions according to risk neutrality, there is good reason to believe that managerial risk aversion is more likely. A second source of agency costs is risk aversion on the part of managers. The investors, with diversified portfolios of stocks, will be concerned only about any nondiversifiable risk with respect to any one firm's ventures. Managers, though, have a substantial part of their personal wealth tied up in their firms. If the firms do poorly or, worse, go bankrupt, the managers will lose their jobs and any wealth tied up in their firms stock. Managers therefore will be concerned about total risk, and their personal risk aversion will magnify this concern.    There is little one can do to get rid of [manager s] risk aversion. They will remain undiversified, because of the nature of their human capital. . . . Easterbrook, *Two Agency-Cost Explanations of Dividends*, 74 AM. ECON. REV. 650, 653—54 (1984). [T]he argument against risk-avoiding diversification by the MNE [multinational enterprise] is likely to fail . . . . Another objection is that the business manager himself faces nondiversifiable risks if his company does badly. . . . Those managers who run enterprises . . . may simply have room to pursue a number of personal goals, including risk avoidance. . . . RICHARD E. CAVES, MULTINATIONAL ENTERPRISE AND ECONOMIC ANALYSIS 26 (1982).

the cost of litigation is, therefore, correspondingly larger. This operates to the benefit of the entrant, making outcomes with earlier entry possible bargaining solutions. In this context, what benefits the entrant also benefits consumers, who also prefer earlier entry.

Another variation occurs when the parties discount the future relative to the present. When the model is adapted to allow for discounting by both parties, the formula for the bargaining solution changes, but retains the character that earlier solutions are achieved when the incumbent's litigation costs rise relative to those of the entrant, and vice versa.

## IV.  The role of cash transfers in welfare-enhancing settlements

There are a variety of circumstances under which the ability to make a cash payment one of the components of a settlement can be essential to the achievement of a settlement that enhances social welfare. The starkest examples of these circumstances occur where no settlement is possible without a cash payment, yet with a cash payment settlements can be achieved that are preferred to the litigation alternative by both firms and consumers. In this section, we survey some of these sets of circumstances. It should be emphasized that the particular circumstances and examples here are chosen to make the foundational points in a self-contained logical treatment. However, as a result, the specifics we analyze here are oversimplified and far more narrow than the range of circumstances where the same general conclusions are apt to apply.

### A.  *Asymmetric information about market duration*

In practice, the duration of the market for a good produced with a patentable technology is likely to be uncertain. One may reasonably expect that one technology will eventually be displaced by another, but when that will happen depends on a number of uncertain factors. Moreover, it is reasonable to suppose that the incumbent firm (and patent holder) is likely to be better informed about these matters than the entrant. One simple way of modeling this is to assume that the incumbent actually knows the duration of the economic value of the

668 : *The antitrust bulletin*

market and that the entrant only knows a probability that the duration is longer rather than shorter. We will say that the market is strong if the duration is long, and weak if the duration is short.

1. EXPECTATIONS AND THE WILLINGNESS TO SETTLE WITHOUT CASH PAYMENTS   This asymmetry of information introduces a new problem. The entrant now has reason to be skeptical of an incumbent who offers to agree to negotiated entry at time $t$. The basis for this reaction is similar to the skepticism a prudent buyer of a used car brings to a car owner's willingness to sell. The used car buyer knows that the better the car, the less willing the seller ought to be to part with it. Analogously, the entrant in our model knows that the stronger the market is, the less willing the incumbent will be to agree to a settlement that guarantees relatively early entry.[11]

Consider an incumbent willing to accept a settlement that allows entry to occur at a certain date. By accepting the settlement, the incumbent saves its litigation costs and increases its per month profits compared to its expected profits under litigation up to the settlement's date of entry. After the settlement's date of entry, the incumbent's per month profit falls from the expected value under litigation to the duopoly value for all time remaining in the economic life of the market. Thus, an incumbent who knows that the economic value of the market is of long duration will be less likely to prefer the settlement to litigation. An entrant who encounters an incumbent willing to settle for entry at a certain date must know that the expected gain that accrues to the incumbent before the settlement entry date is at least as large as the expected loss after the settlement date. This means that an incumbent who knows that market conditions are weak will always be willing to accept any bargaining solution that would also be acceptable to an incumbent with knowledge that market conditions are strong.

---

[11]   Our analysis is founded on the Nobel-Prize-winning insight that asymmetrical information creates impediments to the market workings of exchange and negotiation. For the first classic exposition, and the example of used-car markets, see George Akerlof, *The Market for Lemons: Qualitative Uncertainty and the Market Mechanism*, 84 Q. J. ECON. 488 (1970).

Thus, when settlements may not include a cash component, they must be one of two types: those in which incumbents with either state of knowledge about the strength of the market conditions would take part, and those in which only the incumbents with knowledge that the market conditions are weak would take part. In other words, an inescapable feature of any settlement from which cash payments are excluded is that it would be acceptable to the incumbent who had knowledge that the market conditions were weak.

2. WHEN SETTLEMENTS WITHOUT CASH PAYMENTS ARE IMPOSSIBLE     As a consequence of the forces just discussed, settlements may be impossible without a cash component. Suppose the incumbent's litigation costs are large enough that litigation would not be worthwhile under the knowledge that the market is weak. That is, when the parties resort to litigation, an incumbent who knows the market is weak will prefer to back down or "default," saving litigation costs rather than contest the litigation. As a result, were a settlement offered with any entry postponement, the incumbent with knowledge that the market is weak would accept it, and entry would take place right away. Here, whether there were such a settlement or whether the incumbent just refused its litigation option, there would be no costs of litigation actually incurred by either party.

In this environment, the entrant's incentive for seeking a settlement is to avoid litigation with the incumbent with knowledge that the market is strong. However, the entrant will be unwilling to accept much postponement of entry, because of the probability that the incumbent knows that the market is weak and no concession would be necessary from the entrant to forestall litigation. Consequently, any postponement of entry that is acceptable to the entrant may well be unacceptably short from the perspective of the incumbent with knowledge that the market is strong. The result may well be that there is no settlement possible without a cash payment.

3. CASH PAYMENTS ENABLE SETTLEMENTS THAT ARE SOCIALLY SUPERIOR TO LITIGATION     Now suppose a negotiated settlement is permitted to include a positive cash payment from the incumbent to the entrant. Such payments offer the possibility of enabling incumbents to reveal their private information by the choices they make over settlement offers that include components of both the entry date and an amount

670 : *The antitrust bulletin*

of cash. To see how, suppose the two types of incumbents (one with knowledge that the market is weak and the other with knowledge that the market is strong) are offered the choice between two settlement offers. The first settlement offer promises early entry, and has no or a very small cash payment. The second offer entails a later entry date, and a larger cash payment to the entrant. When the second offer allows for entry after the end of the time period during which the weak market will have value, the two types of incumbents evaluate the tradeoff between the two offers differently. Because the second offer involves a later date of entry than the first, then the incumbent earns greater expected profit by accepting it. However, for the incumbent knowing that the market is weak, that gain in expected profit stops at the early date when the patent is known to lose its market value. For the incumbent knowing that the market is strong, in contrast, the gain continues because the patent is known to retain its value for a longer duration. Thus, the gain in expected profit will be greater for the incumbent with the state of knowledge that the market is strong. For appropriately chosen cash payments, the increase in expected profit from the later settlement will exceed the increased cost of the cash payment for only the incumbent with the knowledge of the strong market. Here, the incumbent with knowledge that the market is weak picks the settlement offer with the earlier entry date, while the incumbent with knowledge that the market is strong picks the settlement offer with the later entry date and greater cash payment to the entrant. This systematic difference enables the entrant to infer the information about the strength of the market that is held by the incumbent from the choices made in the negotiation by the incumbent.[12]

---

[12]  This is an example of the market adaptations to asymmetric information that were first identified and termed signaling by A. M. Spence and extended to self-selection by J. Stiglitz in their Nobel-Prize-winning work. The original papers are: Michael Spence, *Job Market Signaling*, 87 Q. J. ECON. 355 (1973); and Michael Rothschild & Joseph Stiglitz, *Equilibrium in Competitive Insurance Markets: An Essay on the Economics of Imperfect Information*, 90 Q. J. ECON. 629 (1976). A recent survey is John Riley, *Silver Signals: Twenty-Five Years of Screening and Signaling*, 39 J. ECON. LITERATURE 432 (2001).

In this manner, self selection among offers with the additional dimension of cash payments or other net consideration can overcome the breakdown of settlement bargaining described in the previous section. To see how a settlement agreement with a cash payment can yield improvements for all concerned (i.e., a "Pareto" improvement) over what is possible without cash payments, consider examples in which litigation is not worthwhile for an incumbent with the state of knowledge that the market is weak. If settlement bargains are not allowed to include a cash payment, then the parties litigate. When the market is weak, the incumbent defaults and drops his suit. When the market is strong, the incumbent fights. As a result, when the market is weak there are no litigation costs expended and no period of monopoly. When the market is strong, then the litigation costs are borne and the expected duration of monopoly depends on the incumbent's probability of winning the litigation and the duration of the value of the patent.

In contrast, consider the Pareto improvement whereby the entrant offers a settlement with an entry date somewhat earlier than the strong market's expected entry date under litigation, and with a cash payment from the incumbent to the entrant. In particular, let the cash payment be less than the incumbent's litigation costs by a bit more than the compensation to the incumbent for agreeing to earlier entry (relative to the strong market's expected entry date under litigation). In view of the package of entry date and cash payment, the incumbent with knowledge that the market is strong would find this settlement a bit preferable to litigation. If instead the market were weak, the incumbent would continue to prefer to default. The entrant will prefer the new settlement to litigation because entry is earlier than expected with litigation, and the entrant receives cash rather than having to incur litigation costs. Consumers are made better off by the reduction in the expected duration of monopoly equilibrium.

Thus, under the information asymmetry about these market conditions, settlement is impossible to achieve without cash payments. However, in this case, the use of cash payments as a component of settlements enables an agreement to be achieved that dominates anything that is possible if cash payments were forbidden. The use of a cash payment has not resulted in later entry. These welfare-improving settlements

increase consumer's surplus because they *reduce* the expected duration of the monopoly equilibrium, while still benefiting the parties who would otherwise be unable to avert litigation, and its consequent costs.

## B. *Asymmetric expectations: misplaced optimism*

As a general matter litigation can be harder to settle when the parties disagree about their chances of success in the litigation. Disagreement about their chances of success will generally lead to disagreements about which settlements adequately compensate them for giving up their expected gains from litigation. In disputes of the kind we study here, allowing the parties to make a cash payment part of their settlement agreement can overcome this difficulty and permit settlements to be reached that are beneficial to consumer welfare.

Consider, first, the case in which the entrant is overly optimistic regarding its chances of success at litigation. That is, the entrant (mistakenly) believes the chance of the incumbent winning the litigation is so small that the gap between the entrant's view of the expected date of entry under litigation, and the incumbent's view (here assumed to be correct) is so large that even the prospect of saving their litigation costs is insufficient to bring the two parties together on a mutually acceptable agreement in terms of a date of entry. In such a case, no settlement without a cash payment is possible.

It is, however, possible that a cash payment from the incumbent to the entrant could bridge the gap. The reason for this is that the two parties attach different values at the margin to moving the date of entry. To the incumbent, moving the date of entry by one day later increases profit by the difference between one day's worth of monopoly and one day's worth of duopoly. To the entrant, though, moving the date of entry by one day later diminishes profit only by one day's worth of duopoly. Since monopoly profit exceeds the sum of the profits of two duopolists (essentially by definition, since monopoly maximizes profit for the market), the difference between one day's worth of monopoly and one day's worth of duopoly is greater than one day's worth of duopoly. Consequently, each dollar the incumbent is willing to pay the entrant extends the last entry date the entrant is willing to accept by more days than the extension of the

earliest date the incumbent is willing to accept. Thus, a large enough payment may enable the parties to reach an agreement, and under the right conditions may enable them to reach an agreement with date of entry being earlier than the actual expected date of entry under litigation. In such cases, cash payments enable a settlement that is preferred to litigation by both firms and by consumers, and there is no settlement possible at all without a cash payment.

## C. *Asymmetric expectations: varied assessments of success*

To further illustrate the power of asymmetric expectations to prevent negotiated settlements when cash is not permitted, we consider another example of the phenomenon. In this case, we allow both parties to hold expectations at odds with the truth. To focus on this effect, we dispense with the assumptions that the parties are risk averse and even with the assumption that litigation is costly.

Absent any cost to litigation, and ruling out cash payments, the incumbent will agree only to settlements that offer entry at a later date than the incumbent's expected date of entry under litigation, and the entrant will only agree to settlements in which entry comes earlier than the entrant's expected date of entry under litigation. If the former comes after the latter, as it will if the two parties are collectively overoptimistic (i.e., the incumbent's probability that it will win the litigation and the entrant's probability that it will win add up to more than 100%), then no settlement without cash is possible.

However, since it is still true that the marginal value of a day of monopoly to the incumbent is greater than the marginal value of a day of duopoly to the entrant, the use of a cash payment can bring the two parties together. Depending on what is the true probability of the incumbent winning the litigation, the two parties can be brought together for a settlement that includes both cash and a date of entry that is an improvement over litigation for consumers.

## D. *Predictable entry by a nonlitigant*

Thus far in the analyses discussed, the incumbent/patent holder has faced the prospect of competition from only the putative patent

infringer against which it faces the prospect of litigation. If both of the litigants face the predictable prospect of additional entry by generic producers not party to the litigation, the chances of achieving a settlement may be further complicated. Once again, however, while settlements without cash payments may be impossible in the face of such predictable entry, allowing the parties the ability to include cash payments in their settlement agreement can overcome the obstacles to achieving a settlement without harming consumer welfare.

In order to focus on the impact of predictable entry by a nonlitigant, assume that litigation is costless, that all parties are risk neutral and that all parties agree on the incumbent's probability of prevailing in the patent litigation. Additionally, assume that all parties know that at a certain date an additional generic competitor will enter the market with a substitute product that does not infringe on the incumbent's patent. We distinguish between the two entrants by referring to one as the litigant-entrant and to the other as the nonlitigant-entrant. Assume further that if only one firm is in the market a monopoly condition exists, and if two firms are in the market a duopoly equilibrium is achieved. Assume moreover that three firms provide sufficiently strong competition that a competitive equilibrium is achieved with zero economic profit and no loss of consumers' surplus. This assumption simplifies the analysis and exposition, without likely changing the qualitative nature of the results.

Consider this situation first from the point of view of the litigant-entrant. As far as the entrant is concerned, the market has no value past the point at which the nonlitigant entrant comes in, since zero profits must prevail after that point if both entrants are in the market. Therefore, the litigant-entrant compares any proposed settlement entry date with an expected entry date obtained by dividing the time until entry by the nonlitigant entrant in proportion to the probability of the incumbent prevailing in the litigation. For example, suppose the life of the patent were 10 years, the nonlitigant entrant were expected to join the market in year 8 and the probability of the incumbent winning the litigation were 50%. Then for the entrant the situation is as if the full life of the patent were only 8 years, and with a 50% chance of prevailing in the litigation, the effective expected date of entry under the litigation is 4 years. Accordingly, the entrant will agree only to settlements that allow entry within 4 years.

On the other hand, in this same example, from the point of view of the incumbent a settlement that allows for entry after 4 years have passed is not equivalent to litigation. Under litigation, the incumbent has a 50% chance of 8 years of monopoly followed by 2 years of duopoly, or a 50% chance of 8 years of duopoly followed by 2 years of zero profit competition. To the incumbent this is equivalent to 4 years of monopoly, 5 years of duopoly, and 1 year of zero profit competition. A settlement that calls for entry after only 4 years have elapsed, however, gives the incumbent 4 years of monopoly, 4 years of duopoly, and 2 years of zero profit competition. Thus, the two parties will be unable to reach a mutually agreeable settlement in terms of entry date because the expected value to the incumbent of the proposal that the litigant-entrant enter after 4 years is less than the expected value of litigation (5 years of profits with duopoly under litigation rather than 4 under the proposal).

Nevertheless, as before, the disparity in the way that the parties evaluate entry time at the margin means that a cash payment exists that would move the last date at which the entrant is willing to accept entry far enough out in time so that it is consistent with the first date at which the incumbent is willing to accept entry. Hence, in this situation, net consideration paid to the litigant-entrant by the incumbent is necessary for the parties to reach any settlement at all. Such settlements may well exist that make consumers and the parties better off because the settlement would lead to an earlier entry date than expected under litigation.

## E. *A different compromise*

The notion that there could be a different compromise—a better settlement for consumers—lies at the heart of the invalid, but simplest, argument that has been made for the purpose of supporting a per se condemnation of settlements that include a payment from the incumbent to the entrant. According to this argument, if the payment were cut, the allowed entry date could be moved somewhat earlier, to the benefit of consumers. The savings of the payment by the incumbent would be sufficient to compensate it for accepting less time before entry occurs. The loss of receipt of the payment would be compensated to the entrant by its extra time in the market. That is, the argument goes, instead of pay-

ing financial consideration to the entrant, the incumbent could substitute allowance of an earlier entry date, and this would be of benefit to consumers. Thus—this argument asserts—the existence of a settlement with a payment from the incumbent to the entrant implies that there must be another settlement with no payment and with an earlier entry date, and hence with more competition.[13]

This argument is invalid because, as we have shown above, there are many different sets of circumstances where the two firms will be unable to reach a mutually agreeable settlement without the payment of net consideration by the incumbent to the entrant. In the absence of such a payment, the firms will continue to litigate and the outcome of the litigation may be worse for consumers than the settlement that could have been achieved with a payment of net consideration because such settlements may result in entry sooner than the expected entry date under litigation. This invalid simple argument merely assumes that an earlier entry date can substitute for the payment of net consideration. But, as proven in this article, that assumption is inapplicable under at least the circumstances of asymmetric information, asymmetric expectations, and predictable entry by a nonlitigant before the end of the patent's life.

It is worth summarizing why there can be no settlement without the payment, i.e., why the firms cannot just trade for additional time without the use of net financial consideration as another dimension. With asymmetric information, the inclusion of payment in the incumbent's settlement offer conveys information to the entrant about the strength or longevity of the market that is needed for the entrant correctly to value the settlement dimension of the time entry is permitted. Here, an attempt to eliminate the payment in favor of an advancement to the entry date would cause the settlement to collapse, because the attempted substitution would significantly alter the entrant's inferred view of the strength of the market.

Our analysis of misplaced optimism provides another example where there is no way to settle the matter if the only negotiating

---

[13]   Timothy Bresnahan articulated this argument, under various additional assumptions, and among other arguments, in his testimony in Schering-Plough Corp., FTC Docket 9297.

dimension were the time of entry. The entry time each firm is willing to offer is not adequate compensation from the other firm's point of view, given the undue optimism about the outcome of litigation. A cash payment from the incumbent to the entrant could bridge the gap, nevertheless, if it were combined with an entry date that is later than the best date the incumbent would offer in the absence of a cash payment. Such a later date reduces the entrant's duopoly profits. However, it increases the incumbent's monopoly profits (or rents to innovation) enough to fund the cash payment to the entrant. The entrant may accept such a combination settlement because the cash is worth more to the entrant than the duopoly profits the entrant could have earned during that period. The payment of net consideration enables settlements that were otherwise impossible. The firms cannot eliminate the payment and compromise on an earlier entry date, because no such date is acceptable to both the incumbent and the entrant in comparison to litigation. There is a possible settlement with net compensation paid by the incumbent to the entrant that is preferred by consumers to continued litigation, because it achieves an earlier entry than would be expected under litigation.

## V.   Conclusion

The sets of circumstances analyzed above, namely asymmetries of information, asymmetries of expectations or the imminence of entry by unrelated competitors are not endemically rare. Accordingly, a policy of condemnation of agreements with financial payments would be unnecessarily costly to society in repressing socially beneficial settlements, and fomenting otherwise unnecessary litigation. In circumstances such as those analyzed here, payment by the incumbent to the entrant is not a reliable sign of an anticompetitive settlement. The only indicator with a degree of policy certainty under the situations we have analyzed is the expected date of entry under the agreement compared to the expected date of entry without the agreement. Antitrust policy should be configured to encourage a settlement agreement if its date of entry is socially advantageous relative to the expected date of entry under the litigation alternative, taking into account the benefits of avoiding the costs and risks of the litigation. This appropriate benchmark for the public interest should not be obscured by excessive atten-

678  :  *The antitrust bulletin*

tion to the false issue of whether there is any financial dimension to the agreement, because the financial-payment criterion is not a reliable indicator of the social desirability of the settlement.

The principal lesson of this article is that it could be quite typically (and perhaps dramatically) socially counterproductive to employ a per se rule against agreements to settle patent litigation that entail net consideration paid by a patent holder to a potential entrant. With this lesson in mind, the next question is what should be the framework for antitrust analysis that eschews an unwarranted per se or presumptively illegal rule, but that nevertheless does regard patent settlements as appropriate subjects of antitrust scrutiny. This is a complex question, which we shall not attempt fully to answer here. Nevertheless, it is critical, in our view, that the answer take into account the lessons of the analyses presented here. Moreover, the analytic framework exercised here is a powerful tool for making progress toward a more complete answer.

One element of a possible standard for further study would be that a necessary condition for antitrust concern, in the context of the issues we have explored, is that any net consideration paid by the patent holder to the entrant must be shown to have significantly extended the expected duration of the exercise of monopoly power in a relevant market.[14] From the vantage point of the analysis presented here, this standard seems to have several virtues. First, it would make it plain that antitrust attention would be aroused by the payment of substantial cash transfers to potential competitors for an agreement to postpone significantly their rivalrous activities in a relevant market, even in the context of the settlement of intellectual property litigation.

Second, it would provide a framework for evaluating the question of whether the amount that was found to be paid could, as a matter of plain logic, purchase a significant postponement of competition. For example, in the setting of the analyses in this article, unless the net consideration were substantial relative to the flows of market profits, it could not induce the incumbent and the entrant voluntarily to agree to a significant postponement of competition.

---

[14]   This test does not address other important issues related to the FTC reverse payments cases. *See* Langenfeld & Li, *supra* note 3.

*Patent litigation* : 679

Finally, it would focus attention on identifying the appropriate but-for benchmark to compare with the settlement agreement that includes payment of net consideration. One contribution of this article is the demonstration that the benchmark for such comparisons may necessarily be the expected outcome of the patent litigation. Relatively common features of the economic environment create difficult barriers that might preclude settlement without some payment of net consideration. In such circumstances, the important social value of litigation settlement must be weighed, as well as the likelihood that the settlement brings competition sooner than could be expected from the process of litigation.

680 : *The antitrust bulletin*

## Appendix

This appendix contains formal derivations of the results described informally in the text of the article. The sections of the appendix are numbered to match the corresponding sections of the main article.

## II. The model

The two firms are the incumbent (firm $I$) and the would-be entrant (firm $E$). The potential economic life of the patent runs from the current time, $t = 0$ through $t = \theta > 0$. The monopolist's instantaneous rate of profit is $\alpha$ and each firms' instantaneous rate of profit is $\beta$ under duopoly. The maximum social surplus (consumers' plus producers') is $S$, the deadweight loss due to monopoly is $\mu$, and the deadweight loss due to duopoly is $\delta$. Assume[1]

$$\alpha > 2\beta, \quad \mu > \delta > 0, \quad \& \quad S > \alpha + \mu. \tag{1}$$

Let $p$, where $0 < p < 1$, be the probability the incumbent wins the litigation, and let $C_I > 0$ and $C_E > 0$ be the costs of litigation to the incumbent and the entrant respectively.[2] The expected payoffs (profits) to the incumbent and the entrant from litigation are

$$\overline{Y}^I(\theta) = p\alpha\theta + (1-p)\beta\theta - C_I \quad \text{and}$$

$$\overline{Y}^E(\theta) = (1-p)\beta\theta - C_E. \tag{2}$$

The consumers' surplus from litigation is

$$\overline{V}(\theta) = p\theta(S - \alpha - \mu) + (1-p)\theta(S - 2\beta - \delta). \tag{3}$$

The total social surplus from litigation is

---

[1]  In a simple market with a linear demand curve and constant marginal cost, $\alpha = S/2$, $\beta = 2S/9$, $\mu = S/4$, and $\delta = S/9$.

[2]  For the moment we assume that $p(\alpha - \beta)\theta \geq C_I$ and that $(1-p)\beta\theta \geq C_E$. Otherwise, litigation would not be a profitable or a credible strategy for one of the firms. We revisit this assumption below.

$$\overline{W}(\theta) = p\theta(S - \mu) + (1 - p)\theta(S - \delta) - C_I - C_E. \qquad (4)$$

Let $t \in (0, \theta)$ denote the agreed upon date of entry pursuant to a settlement and suppose the incumbent firm makes a net transfer payment of $B$ to the entrant. The expected payoffs (profits) to the two firms under such an agreement are

$$Y^I(t, B \mid \theta) = \alpha t + (\theta - t)\beta - B = \theta\beta + (\alpha - \beta)t - B \text{ and}$$

$$Y^E(t, B \mid \theta) = (\theta - t)\beta + B \qquad (5)$$

as long as $t \leq \theta$.[3] The consumers' surplus and social surplus realized by this agreement are

$$V(t \mid \theta) = t(S - \alpha - \mu) + (\theta - t)(S - 2\beta - \delta) \text{ and}$$

$$W(t \mid \theta) = t(S - \mu) + (\theta - t)(S - \delta) \qquad (6)$$

respectively.

## III.  Cooperative bargaining without cash transfers

### A.  *Bargaining in the simplest case*

If cash transfer payments are prohibited, then $B = 0$. As the time of entry, $t$, varies from 0 to $\theta$ the payoff-possibility frontier given by

$$\alpha\beta\theta = \beta Y^I + (\alpha - \beta)Y^E \mid Y^E \leq \beta\theta \qquad (7)$$

is traced out. The range of viable outcomes from bargaining is the set that make each party at least as well off as they would be under litigation, i.e., those dates for which

---

[3]    If $t > \theta$, then by the time the entrant is able to join the market, there has ceased to be any profitable demand. In that case the incumbent enjoys monopoly profits through the entire interval $[0, \theta]$, and the entrant earns no profits. We will return to this possibility in more detail when we consider asymmetric information.

682 : *The antitrust bulletin*

$$p\theta - \frac{C_I}{\alpha - \beta} \leq t \leq p\theta + \frac{C_E}{\beta} \tag{8}$$

The Nash bargaining solution is determined by the maximization of:

$$(Y^I - \overline{Y}^I) \times (Y^E - \overline{Y}^E) \tag{9}$$

subject to (7), that is

$$Y^{I*} = \overline{Y}^I + \frac{1}{2\beta}(\alpha\beta\theta - \beta\overline{Y}^I - (\alpha - \beta)\overline{Y}^E)$$

$$Y^{E*} = \overline{Y}^E + \frac{1}{2(\alpha - \beta)}(\alpha\beta\theta - \beta\overline{Y}^I - (\alpha - \beta)\overline{Y}^E). \tag{10}$$

Substituting (2) into (10), the payoffs from the Nash bargaining solution are

$$Y^{I*} = pa\theta + (1 - p)\beta\theta - \frac{1}{2}\Big(C_I - \frac{\alpha - \beta}{\beta}C_E\Big)$$

$$Y^{E*} = (1 - p)\beta\theta - \frac{1}{2}\Big(C_E - \frac{\beta}{\alpha - \beta}C_I\Big). \tag{11}$$

Using (5) and (11) the negotiated time of entry in the Nash bargaining solution is

$$t^* = p\theta + \frac{1}{2}\Big(\frac{C_E}{\beta} - \frac{C_I}{\alpha - \beta}\Big). \tag{12}$$

## B. Variations on the bargaining solution

1. RISK AVERSION   Suppose the firms' attitudes towards risk may be represented by Von-Neumann Morgenstern utility functions, $U^I(Y^I)$ and $U^E(Y^E)$ respectively, which depend on total payoffs over the period $[0, \theta]$. The risk-bearing costs of litigation are captured in the risk premia $\pi_I$ and $\pi_E$ respectively where

$$pU^I(\alpha\theta - C_I) + (1 - p)U^I(\beta\theta - C_I) = U^I\big[p\alpha\theta + (1 - p)\beta\theta - C_I - \pi_I\big]$$

$$pU^E(-C_E) + (1 - p)U^E(\theta\beta - C_E) = U^E\big[(1 - p)\beta\theta - C_E - \pi_E\big]. \tag{13}$$

Since risk-averse individuals' preferences among risky alternatives may be represented by their expected values less the appropriate risk premium, the analysis of section A may be repeated with the adjusted litigation costs

$$C_I{}^* = C_I + \pi_I \quad \text{and} \quad C_E{}^* = C_E + \pi_E \qquad (14)$$

By a well-known result in the theory of risk bearing, these risk premia are approximately proportional to the variance of the risk, with the factor of proportionality being determined by the individual's coefficient of risk aversion. That is

$$\pi_I = \frac{1}{2}\sigma_I^2 r_I \quad \text{and} \quad \pi_E = \frac{1}{2}\sigma_E^2 r_E \qquad (15)$$

where

$$\sigma_I^2 = p(1-p)(\alpha-\beta)^2\theta^2 \quad \text{and} \quad \sigma_E^2 = p(1-p)\beta^2\theta^2 \qquad (16)$$

denote the variances of the incumbent's and the entrant's payoffs from litigation respectively, and where $r_I$ and $r_E$ are their coefficients of absolute risk aversion.[4]

The possible dates of entry, $t$, in a bargaining solution are now

$$p\theta - \frac{C_I + \pi_I}{\alpha - \beta} \le t \le p\theta + \frac{C_E + \pi_E}{\beta} \qquad (17)$$

$$p\theta - \frac{C_I}{\alpha - 1} - \frac{r_I}{2}p(1-p)(\alpha-\beta)^2\theta^2 \le t \le p\theta + \frac{C_E}{\beta} + \frac{r_E}{2}p(1-p)\beta\theta^2.$$

If both firms have the same coefficient of absolute risk aversion, $r$, the entry date in the Nash bargaining solution becomes

$$t^* = p\theta + \frac{1}{2}\left(\frac{C_E}{\beta} - \frac{C_I}{\alpha - \beta}\right) - \frac{r}{4}p(1-p)\theta^2(\alpha - 2\beta). \qquad (18)$$

As $\alpha$ increases it initially has an ambiguous effect on $t^*$. The middle term becomes smaller in absolute value, increasing $t^*$, and the third

---

4    That means $r_I = - U''\,(\bar{Y}) \div U'\,(\bar{Y})$, with an analogous formula for $r_E$.

term becomes larger in absolute value, reducing $r^*$. However, as $\alpha$ continues to grow, the reductions in the second term grow small and the increases in the third term continue linearly. Therefore, as $\alpha$ grows $r^*$ eventually becomes progressively smaller. In other words, as the monopoly equilibrium becomes progressively more profitable to the incumbent, litigation becomes progressively more costly to him because of the risk inherent in it.

2. DISCOUNTING   Let $\rho$ denote a rate of time discount that is common to all parties, the incumbent, the entrant, and consumers. Let

$$D(t, \rho) = \int_0^t e^{-\rho s} ds \qquad (19)$$

denote the present value, at this discount rate, of a unit stream over the interval $[0, t]$.

If the parties litigate, their payoffs are now

$$\overline{Y}^I(\theta) = p\alpha D(\theta, \rho) + (1-p)\beta D(\theta, \rho) - C_I \quad \text{and}$$
$$\overline{Y}^E(\theta) = (1-p)\beta D(\theta, \rho) - C_E \qquad (20)$$

and consumers' surplus is

$$\overline{V}(\theta) = pD(\theta, \rho)(S - \alpha - \mu) + (1-p)D(\theta, \rho)(S - 2\beta - \delta). \qquad (21)$$

If the firms agree on a negotiated settlement that calls for entry at date $t$ their payoffs are

$$Y^I(t \mid \theta) = \beta D(\theta, p) + (\alpha - \beta)D(t, \rho) \quad \text{and}$$
$$Y^E(t \mid \theta) = \beta[D(\theta, \rho) - D(t, \rho)] \qquad (22)$$

and consumers' surplus is

$$V(t \mid \theta) = D(t, \rho)(S - \alpha - \mu) + [D(\theta, \rho) - D(t, \rho)](S - 2\beta - \delta). \qquad (23)$$

As $t$ varies from 0 to $\theta$ the payoff possibility frontier that is traced out is given by

$$\alpha\beta D(\theta, \rho) = \beta Y^I + (\alpha - \beta)Y^E \mid Y^E \leq \beta D(\theta, \rho). \qquad (24)$$

The Nash bargaining solution, then, is characterized by

$$D(t^*, \rho) = pD(\theta, \rho) + \frac{1}{2}\left(\frac{C_E}{\beta} - \frac{C_I}{\alpha - \beta}\right). \tag{25}$$

By (21) and (23) consumer welfare under the settlement relative to consumer welfare under litigation depends, as it did without discounting, on the sign of

$$\frac{C_E}{\beta} - \frac{C_I}{\alpha - \beta}. \tag{26}$$

## IV. The role of cash transfers in welfare-enhancing settlements

### A. *Asymmetric information about market duration*

Assume that $\theta$, the duration of the market, is a random variable that may take on two possible values $\theta_1$ and $\theta_0$, where $0 < \theta_0 < \theta_1$. Let $\lambda = \text{Prob}(\theta = \theta_1)$, and let $1 - \lambda = \text{Prob}(\theta = \theta_0)$. Assume $0 < \lambda < 1$. We assume that the incumbent observes $\theta$, and that the entrant's information is, at least initially, confined to knowledge of the two possible values, $\theta_0$ and $\theta_1$, and their respective probabilities, $1 - \lambda$ and $\lambda$.

1. EXPECTATIONS AND THE WILLINGNESS TO SETTLE WITHOUT CASH PAYMENTS  An entrant who encounters an incumbent willing to settle for entry at date $t$ must know that

$$(1-p)(\alpha - \beta)t + C_I \geq p(\alpha - \beta)(\theta - t)$$
$$t \geq p\theta - \frac{C_I}{\alpha - \beta}. \tag{27}$$

Condition (27) implies that the incumbent with knowledge of the weak market conditions, $\theta_0$, prefers any settlement to litigation that is preferred to litigation by the incumbent with knowledge of strong market conditions, $\theta_1$, and prefers some settlements to litigation that the incumbent with knowledge of the strong market conditions does not.

Thus, when settlements may not include a cash component, they must be one of two types: those in which incumbents with either state of knowledge about the strength of the market conditions would take

686 : *The antitrust bulletin*

part, and those in which only the incumbents with knowledge that the market conditions are weak would take part. In other words, the type of incumbent with knowledge that the market is weak is an inescapable part of any settlement from which cash payments are excluded.

2. WHEN SETTLEMENTS WITHOUT CASH PAYMENTS ARE IMPOSSIBLE
Suppose

$$C_I > p(\alpha - \beta)\theta_0. \tag{28}$$

Under this condition, the entrant would never agree to a settlement that included only the type of incumbent with knowledge that the market is weak. Such a settlement would lead to entry at time $t > 0$ in the weak-market state, but if the entrant presses litigation in that state, the incumbent defaults and entry takes place right away. The entrant is able to save his litigation costs while entering at the earliest possible time. Thus, in this environment, the only types of settlements to which the entrant would agree are those that satisfy (27) for $\theta = \theta_1$.

If $t \leq \theta$, the entrant's expected payoff from taking part in the settlement is

$$\lambda(\theta_1 - t)\beta + (1 - \lambda)(\theta_0 - t)\beta. \tag{29}$$

The entrant would only agree to take part in the settlement if this payoff were at least as great as

$$\lambda[(1 - p)\beta\theta_1 - C_E] + (1 - \lambda)\beta\theta_0, \tag{30}$$

which is the expected payoff the entrant receives from pursuing litigation that only the type of incumbent with knowledge that the market is strong will fight. For the expression in (29) to be greater than or equal to that in (30), the settlement date must satisfy

$$\lambda p\theta_1 + \lambda \frac{C_E}{\beta} \geq t. \tag{31}$$

By (27) and (31), this type of solution is only possible if

$$\lambda p\theta_1 + \lambda \frac{C_E}{\beta} \geq t \geq p\theta_1 - \frac{C_I}{\alpha - \beta}$$

$$\frac{C_I}{\alpha - \beta} + \lambda \frac{C_E}{\beta} \geq p(1 - \lambda)\theta_1. \tag{32}$$

If $t > \theta_0$ the entrant's expected payoff from taking part in the settlement is

$$\lambda\beta(\theta_1 - t) + (1 - \lambda)(0). \tag{33}$$

This payoff differs from (29) because now if the entrant agrees to the settlement, and the incumbent knows that the state of the market is weak, the market will lose its value before the agreed upon entry date is reached. The would-be entrant will never have the opportunity gainfully to enter, so it earns zero profits. The litigation payoff, however, is unchanged. It is still given by (30). Thus, the entrant is only willing to take part in this type of settlement if

$$p\theta_1 + \frac{C_E}{\beta} - \frac{1 - \lambda}{\lambda}\theta_0 \geq t. \tag{34}$$

Therefore, by (27) and (34), this type of settlement is only possible if

$$\frac{C_E}{\beta} - \frac{C_I}{\alpha - \beta} \geq \frac{1 - \lambda}{\lambda}\theta_0. \tag{35}$$

Consequently, by (28), (32), and (35), no settlement is possible if

$$p(\alpha - \beta)\theta_0 < C_I,$$

$$\frac{C_E}{\beta} - \frac{C_I}{\alpha - \beta} < \frac{1 - \lambda}{\lambda}\theta_0, \text{ and} \tag{36}$$

$$\lambda\frac{C_E}{\beta} + \frac{C_I}{\alpha - \beta} < p(1 - \lambda)\theta_1,$$

are all simultaneously satisfied. Combinations of parameter values that satisfy these conditions are plentiful, and for the entire set of these conditions, unless bargaining is permitted to include a cash component, there will be no settlements of the patent dispute.[5]

---

5   To see that such combinations are plentiful, imagine trying to choose a set of parameters to satisfy (36). First, choose, $\beta > 0$, $\alpha > 2\beta$, $C_I > 0$, $\theta_0 > 0$, and $p$ with $0 < p < 1$ to satisfy the first line of (36). Choose $C_E > 0$ arbitrarily, and then choose $\lambda > 0$ but sufficiently small to satisfy the second line of (36). Since the right hand side of the second line of

688 : *The antitrust bulletin*

3. CASH PAYMENTS ENABLE SETTLEMENTS THAT ARE SOCIALLY SUPERIOR TO LITIGATION. To see how a bargain with a modest cash payment can Pareto improve on what is possible without cash payments, consider examples with these stronger versions of (36):

$$(\alpha - \beta)\theta_0 < C_I,$$

$$\frac{C_E}{\beta} + \frac{C_I}{\alpha - \beta} < \frac{1 - \lambda}{\lambda}\theta_0, \text{ and} \qquad (37)$$

$$\lambda\frac{C_E}{\beta} + \frac{C_I}{\alpha - \beta} < p(1 - \lambda)\theta_1.$$

There are plentiful combinations of parameters satisfying (37).[6] Some of the indifference curves obtained in this case are shown in figure 1.

*Figure 1*
**Dominant Self-Selecting Agreements**



(36) tends toward $\infty$ as $\lambda$ tends towards 0, such a value of $\lambda$ can be chosen. Finally, choose $\theta_1$ large enough to satisfy the third line of (36). As a particular example, let $p=.5$, $\alpha = 3$, $\beta = 1$, $C_E = 0$, $C_I = 1.5$, $\theta_0 = 1$, $\theta_1 = 10$, and $\lambda = .5$.

6    As a particular example, let $p=.5$, $\alpha = 3$, $\beta = 1$, $C_E = 0$, $C_I = 3$, $\theta_0 = 1$, $\theta_1 = 6$, and $\lambda = .33$.

In this case, if settlement bargains are not allowed to include a cash payment, then the parties litigate, the type of incumbent with knowledge that the market is weak defaults, the type of incumbent with knowledge that the market is strong fights and the expected duration of monopoly equilibrium is 0 in the weak-market state and $p\theta_1$ in the strong-market state. Suppose, however, that a settlement that involved cash were offered somewhere on the line segment between "High Litigate" and "Best High Settlement" in figure 1. Only the strong-market type incumbent would accept this settlement. The weak-market type incumbent would continue to prefer to default. The entrant strictly prefers the settlement point "High Litigate" to actual litigation with the strong-market type incumbent because it offers the entrant the same expected entry date, saves the entrant's litigation costs, and the entrant receives a cash payment of $C_I$ from the incumbent. By continuity, the entrant will also prefer at least some of the points on the line segment between "High Litigate" and "Best High Settlement." Since these points are on the indifference curve of the strong-market type incumbent, he is indifferent between them and fighting the litigation. Consumers are made better off by the reduction in the expected duration of monopoly.

## B. *Asymmetric expectations: misplaced optimism*

Assume that $p$, the true probability that the incumbent will prevail in the patent litigation, is known to the incumbent. Assume, however, that the entrant is assumed to be overly optimistic. The entrant assesses the probability of the incumbent prevailing as $q$, where $0 < q < p$. As described above, $C_I$ and $C_E$ denote the incumbent s and entrant s costs of litigation, inclusive of risk premia.

1. LITIGATION    The payoffs to the parties from litigating are

$$\overline{Y}^I = p\alpha\theta + (1-p)\beta\theta - C_I$$

$$\overline{Y}^E = (1-q)\beta\theta - C_E.$$

$$(38)$$

Consumers' surplus from litigation is

690 : *The antitrust bulletin*

$$\overline{V} = p(S - \alpha - \mu)\theta + (1-p)(S - 2\beta - \delta)\theta \tag{39}$$
$$= \theta(S - 2\beta - \delta) - p\theta(\alpha - \mu - 2\beta - \delta).$$

2. SETTLEMENTS WITHOUT PAYMENT OF NET CONSIDERATION    If no payment of net consideration is permitted, then the parties' payoffs from a settlement that allows for entry at date $t$ are given by

$$Y^I(t) = \alpha t + \beta(\theta - t), \quad \text{and}$$
$$Y^E(t) = (\theta - t)\beta. \tag{40}$$

Combining (38) and (38), the incumbent is willing to agree to a settlement only if

$$\alpha t + \beta(\theta - t) \geq p\alpha\theta + (1-p)\beta\theta - C_I$$
$$t \geq p\theta - \frac{C_I}{\alpha - \beta}, \tag{41}$$

and the entrant will be willing to agree to a settlement only if

$$(\theta - t)\beta \geq (1-p)\beta\theta - C_E$$
$$q\theta + \frac{C_E}{\beta} \geq t. \tag{42}$$

Thus no settlement without payment of net consideration is possible if

$$p\theta - \frac{C_I}{\alpha - \beta} > q\theta + \frac{C_E}{\beta}. \tag{43}$$

If the costs of litigation are not too large and if the entrant is sufficiently optimistic, i.e., $q$ is small enough, then this condition would be satisfied.

3. SETTLEMENTS WITH PAYMENT OF NET CONSIDERATION    If a settlement with payment of net consideration is to be viable, it is sufficient that the sum of the parties' payoffs from the settlement exceed the sum of their payoffs from litigation. If that condition is satisfied and if they can use a net payment to redistribute payoffs,

then a settlement to which both parties can agree may be found. The required condition is

$$\alpha t + 2(\theta - t)\beta \geq \alpha p\theta + (2 - p - q)\beta\theta - C_I - C_E$$

$$t \geq p\theta + \frac{\beta\,(p - q)}{\alpha - 2\beta}\,\theta - \frac{C_I + C_E}{\alpha - 2\beta}. \tag{44}$$

From consumers' point of view, with or without the payment of net consideration, a settlement that allows for entry at date $t$ provides consumers' surplus of

$$V(t) = p(S - \alpha - \mu)t + (\theta - t)(S - 2\beta - \delta)$$

$$= \theta(S - 2\beta - \delta) - t(\alpha - \mu - 2\beta - \delta). \tag{45}$$

So the settlement is (weakly) preferred by consumers, $[(45) \geq (39)]$, if and only if $t \leq p\theta$.

Therefore, if a value of $t$ may be found that satisfies

$$p\theta > t > p\theta + \frac{\beta\,(p - q)}{\alpha - 2\beta}\,\theta - \frac{C_I + C_E}{\alpha - 2\beta}, \tag{46}$$

then there are settlements with net payment of consideration that are preferred by consumers to litigation.

4. THE NECESSITY OF NET CONSIDERATION     Combining results, when (43) is satisfied and a value of $t$ may be found satisfying (46), there are no settlements without payment of net consideration, and there exist settlements with payment of net consideration that are preferred to litigation by consumers. Now (43) is satisfied if

$$(p - q)\theta > \frac{C_I}{\alpha - \beta} + \frac{C_E}{\beta}, \tag{47}$$

and there exist values of $t$ satisfying (46) as long as

692 : *The antitrust bulletin*

$$\frac{\beta(p-q)}{\alpha-2\beta}\theta < \frac{C_I + C_E}{\alpha-2\beta}$$

$$(p-q)\theta < \frac{C_I + C_E}{\beta}.$$

(48)

Ranges of values of $p$, $q$, and $\theta$ exist that simultaneously satisfy both (47) and (48) as long as

$$\frac{C_I + C_E}{\beta} > \frac{C_I}{\alpha-\beta} + \frac{C_E}{\beta}$$

$$\frac{C_I}{\beta} > \frac{C_I}{\alpha-\beta}$$

(49)

$$\alpha - 2\beta > 0,$$

which is the original assumption that monopoly is more profitable than duopoly. Therefore, there exist ranges of parameters under which there are no settlements without payment of net consideration, while there do exist settlements with payment of net consideration that are preferred to litigation by consumers.

## C. *Asymmetric expectations: varied assessments of success*

Assume that the true probability that the incumbent will prevail in litigation is $p$, and assume that the incumbent believes it is $q_I$, while the entrant believes it is $q_E$. Assume further that

$$0 < p < 1, \quad 0 < q_I < 1, \quad \text{and} \quad 0 < q_E < 1.$$

(50)

1. SETTLEMENTS    A settlement is described by a pair $(t, B)$ where $t$ is the date at which the settlement agreement allows for entry by the generic/entrant, and $B$ is the net payment of consideration flowing from the incumbent to the entrant. The value to the two parties of a settlement is

$$Y^I(t, B) = \alpha t + \beta(\theta - t) - B = (\alpha - \beta)t - B + \beta\theta$$

$$Y^E(t, B) = \beta(\theta - t) + \beta = t\beta + B + \beta\theta.$$

(51)

2. LITIGATION    If the parties litigate, their expected payoffs are

$$\overline{Y}^I = q_I \alpha \theta + (1 - q_I) \beta \theta = Y^I(q_I \theta, 0)$$

$$\overline{Y}^E = (1 - q_E) \beta \theta \qquad = Y^E(q_E \theta, 0). \tag{52}$$

3. SETTLEMENTS WITHOUT PAYMENT OF NET CONSIDERATION    In order to reach a settlement without payment of net consideration $(t, 0)$, the settlement entry date $t$ must satisfy

$$Y^I(t, 0) \geqq Y^I(q_I \theta, 0) \quad \text{and} \quad Y^E(t, 0) \geqq Y^E(q_E \theta, 0) \tag{53}$$

which reduces to

$$q_I \theta \leqq t \leqq q_E \theta. \tag{54}$$

Thus, a settlement requires $q_I \leqq q_E$. If $q_I > q q_E$, then no settlement without payment of net consideration is possible. Note that the condition under which no settlement is possible can be reinterpreted as

$$q_I + (1 - q_E) > 1. \tag{55}$$

Condition (55) may be interpreted as a case of "collective optimism," since the two terms on the left hand side of (55) are the two firms' assessments of their respective probabilities of winning the litigation, and (55) says that these probabilities sum to more than 100%.

4. SETTLEMENTS WITH PAYMENT OF NET CONSIDERATION    If the parties are permitted to reach a settlement that includes payment of net consideration, then each party must evaluate the tradeoff between entry date, $t$, and the net payment, $B$. The two parties do this differently.

For the incumbent, increasing $t$ and reducing $B$ improves the settlement. The rate at which the incumbent is willing to give up bigger $B$ for increased $t$ is $\alpha - \beta$, the difference between the incumbent's monopoly and duopoly profit. This is illustrated by the line labeled "Incumbent's Litigation Line" in the diagram in figure 2. In that diagram, the entry date $t$ is measured along the horizontal axis and the payment, $B$, is measured along the vertical. Thus each point in the dia-

694  :  *The antitrust bulletin*

gram represents a settlement. The line labeled "Incumbent's Litigation Line" shows all the settlements in the diagram that give the incumbent the same expected payoff as the litigation. The slope of "Incumbent's Litigation Line" is $\alpha - \beta$, reflecting the rate at which the incumbent is willing to exchange increased $B$ for increased $t$. The settlements the incumbent prefers to litigation correspond to all the points below and to the right of the line.

*Figure 2*
Bargaining Over a Settlement With Varying Assessments of Success



For the entrant reducing $t$ and increasing $B$ improves the settlement. The rate at which the entrant is willing to exchange later $t$ for bigger $B$ is $\beta$, the profit the entrant earns under duopoly. This is illustrated by the line labeled "Entrant's Litigation Line" in figure 2. The line shows all the settlements in the diagram that give the entrant the same expected payoff as the litigation. The slope of "Entrant's Litigation Line" is $\beta$.

The settlements the entrant likes better than litigation correspond to all the points above and to the left of "Entrant's Litigation Line."

To be mutually agreeable, a settlement must lie below and to the right of "Incumbent's Litigation Line" and above and to the left of "Entrant's Litigation Line." Because the slope of the "Incumbent's Litigation Line" is $\alpha - \beta$, which is greater than $\beta$, the slope of the "Entrant's Litigation Line," there will necessarily be a region like the shaded region that both parties prefer to litigation.[7] That is, allowing for the possibility of payment of consideration, settlements are possible. The earliest possible entry date in such a settlement is illustrated in figure 2 by

$$t^* = q_I \theta + \frac{\beta\theta\,(q_I - q_E)}{\alpha - 2\beta}. \tag{56}$$

5. THE SOCIAL VALUE OF A SETTLEMENT    All the settlements in the shaded region in figure 2 represent settlements that are preferred to litigation by the incumbent, the entrant, and by consumers. Figure 2 also illustrates a case where no settlement is possible, and therefore litigation is the only alternative when payment of net consideration is not permitted. Thus, in the case illustrated by figure 2, allowing payment of net consideration can be beneficial to all.

This particular example came about because of two conditions. First,

$$q_I > q_E, \tag{57}$$

the collective optimism condition. The second condition is

$$p\theta > t^* = q_I \theta + \frac{\beta\theta\,(q_I - q_E)}{\alpha - 2\beta}$$

$$p > q_I + \frac{\beta\,(q_I - q_E)}{\alpha - 2\beta}. \tag{58}$$

There is a wide range of parameters satisfying (57) and (58). In such circumstances, no settlement is possible without payment of net con-

---

7    Recall that by assumption $\alpha > 2\beta$.

696 : *The antitrust bulletin*

sideration, and with payment of net consideration there are settlements that are preferred to litigation by the incumbent, the entrant, and by consumers.

## D. Predictable entry by a nonlitigant

Assume, again, that litigation is costless, that all parties are risk neutral and that all parties agree that the incumbent's probability of prevailing in patent litigation is $p$, where $0 < p < 1$. Assume that all parties know that at a known date $s$, where $0 < s < \theta$, an additional generic competitor will enter the market with a product that does not infringe on the incumbent's patent.

1. LITIGATION    The incumbent's expected payoff from litigation is

$$\overline{Y}^I = p[\alpha s + \beta(\theta - s)] + (1 - p)\beta s. \tag{59}$$

The litigant-entrant's expected payoff from litigation is

$$\overline{Y}^E = (1 - p)\beta s. \tag{60}$$

Consumers' surplus from litigation is

$$\overline{V} = p[s(S - \alpha - \mu) + (\theta - s)(S - 2\beta - \delta) +$$
$$(1 - p)[s(S - 2\beta - \delta) + (\theta - s)S] \tag{61}$$
$$= \theta S - ps(\alpha + \mu) - [p(\theta - s) + (1 - p)s](2\beta + \delta).$$

2. SETTLEMENTS WITHOUT PAYMENT OF NET CONSIDERATION    The incumbent's expected payoff from a settlement is

$$Y^I(t) = \begin{cases} \alpha t + \beta(s - t) & | \; t \leq s \\ \alpha s + \beta(t - s) & | \; t \geq s \end{cases}. \tag{62}$$

The litigant-entrant's expected payoff is

$$Y^E(t) = \begin{cases} \beta(s - t) & | \; t \leq s \\ 0 & | \; t \geq s \end{cases}. \tag{63}$$

Plainly the litigant-entrant will only consider settlements in which $t \leq s$. Moreover, such a settlement is only worthwhile to the litigant-entrant if

$$\beta(s - t) \geq (1 - p)\beta s$$
$$ps \geq t \tag{64}$$

Such a settlement only appeals to the incumbent if

$$\alpha t + \beta(s - t) \geq p[\alpha s + \beta(\theta - s)] + (1 - p)\beta s$$
$$t \geq p\left[\frac{\alpha - 2\beta}{\alpha - \beta} s + \frac{\beta}{\alpha - \beta} \theta\right] = ps + \frac{p\beta(\theta - s)}{\alpha - \beta}. \tag{65}$$

Therefore, such a settlement is only possible if

$$ps \geq t \geq ps + \frac{p\beta(\theta - s)}{\alpha - \beta}, \tag{66}$$

which is in turn impossible, since by basic assumption $s < \theta$. Therefore, settlements without payment of net consideration are impossible.

3. SETTLEMENT WITH PAYMENT OF NET CONSIDERATION    If the two potential litigants can include payment of net consideration in their settlement agreement, then they can reach an agreement whenever the sum of payoffs available to them, which is

$$Y_I + Y_E = \begin{cases} \alpha t + 2\beta(s - t) & \mid t \leq s \\ \alpha s + \beta(t - s) & \mid t \geq s \end{cases} \tag{67}$$

is greater than the sum of their expected payoffs from litigation, which is

$$\overline{Y}^I + \overline{Y}^E = p(\alpha s + \beta(\theta - s)) + (1 - p)2\beta s. \tag{68}$$

For settlements with $t < s$ this condition reduces to the requirement that

$$t \geq p\frac{s\alpha + \beta\theta - 3\beta s}{\alpha - 2\beta} = ps + p\frac{\beta(\theta - s)}{\alpha - 2\beta}, \tag{69}$$

698 : *The antitrust bulletin*

On the other hand, there are settlements with $t < s$ that improve consumers' surplus relative to litigation if consumers' surplus from the settlement,

$$V(t) = \theta S - s(2\beta + \delta) - t(\alpha - \mu - 2\beta - \delta), \qquad (70)$$

is greater than consumers' surplus from litigation as shown in (61). This condition reduces to

$$ps + p(\theta - s)\frac{2\beta + \delta}{\alpha - \mu - 2\beta - \delta} \geq t. \qquad (71)$$

Combining (69) and (71), a range of values of $t$ exist that satisfy both conditions if

$$ps + p(\theta - s)\frac{2\beta + \delta}{\alpha - \mu - 2\beta - \delta} > t > ps + p\frac{\beta(\theta - s)}{\alpha - 2\beta}, \qquad (72)$$

a condition that is ensured for at least some values of $t$ if

$$\frac{2\beta + \delta}{\alpha - \mu - 2\beta - \delta} > \frac{\beta}{\alpha - 2\beta}. \qquad (73)$$

Now, when $\mu = \delta = 0$ is satisfied, (73) is satisfied. Therefore, by continuity there are values of $\mu$ and $\delta$ satisfying $\mu > \delta > 0$ for which (73) is also satisfied.

# Exhibit 9

No. 05-273

IN THE

## Supreme Court of the United States

---

FEDERAL TRADE COMMISSION,

*Petitioner,*

v.

SCHERING-PLOUGH CORPORATION, *et al.*

---

**On Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Eleventh Circuit**

---

**REPLY BRIEF FOR THE PETITIONER**

---

SUSAN A. CREIGHTON
*Director*
BRADLEY S. ALBERT
ELIZABETH R. HILDER
MICHAEL B. KADES
THOMAS G. KRATTENMAKER
*Attorneys*
BUREAU OF COMPETITION

\* Counsel of Record

WILLIAM BLUMENTHAL
*General Counsel*
JOHN D. GRAUBERT \*
*Principal Deputy General
Counsel*
JOHN F. DALY
*Deputy General Counsel
for Litigation*
IMAD D. ABYAD
*Attorney*
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2375

TABLE OF AUTHORITIES

Cases:                                                              Page

*Andrx Pharms., Inc.* v. *Elan Corp., PLC,*
    421 F.3d 1227 (11th Cir. 2005) . . . . . . . . . . . . . . . 9
*Blonder-Tongue Labs., Inc.* v. *Univ. of*
    *Illinois Found.*, 402 U.S. 313 (1971) . . . . . . . . . . . 4
*In re Cardizem CD Antitrust Litig.*, 332 F.3d
    896 (6th Cir. 2003), *cert. denied sub nom.*
    *Andrx Pharms., Inc.* v. *Kroger Co.,*
    No. 03-779 (Oct. 12, 2004) . . . . . . . . . . . . . . . . . 3
*Consolo* v. *Federal Maritime Comm'n,*
    383 U.S. 607 (1966) . . . . . . . . . . . . . . . . . . . . . . 6
*FTC* v. *Indiana Federation of Dentists,*
    476 U.S. 447 (1986) . . . . . . . . . . . . . . . . . . . . . . 7
*Palmer* v. *BRG of Georgia, Inc.,*
    498 U.S. 46 (1990) (per curiam) . . . . . . . . . . . . . 3
*Precision Instrument Mfg. Co.* v. *Automotive*
    *Maintenance Machinery Co.,*
    324 U.S. 806 (1945) . . . . . . . . . . . . . . . . . . . . . . 4
*United States* v. *Griffith,*
    334 U.S. 100 (1948) . . . . . . . . . . . . . . . . . . . . . . 3
*United States* v. *Singer Mfg. Co.,*
    374 U.S. 174 (1963) . . . . . . . . . . . . . . . . . . . . . . 4
*Universal Camera Corp.* v. *NLRB,*
    340 U.S. 474 (1951) . . . . . . . . . . . . . . . . . . . . 6, 7
*Valley Drug Co.* v. *Geneva Pharms., Inc.,*
    344 F.3d 1294 (11th Cir. 2003), *cert. denied,*
    No. 03-1175 (Oct. 12, 2004) . . . . . . . . . . . . . . 2, 3

(I)

II

Statutes and regulations:                                    Page

   15 U.S.C. 45(c) .............................. 9
   15 U.S.C. 45(m) .............................. 8

Miscellaneous:

   Breyer, Stewart, Sunstein & Spitzer, *Administrative*
      *Law and Regulatory Policy* (4th ed. 1999) ....... 7
   Thomas B. Leary, *Antitrust Issues in the*
      *Settlement of Pharmaceutical Patent*
      *Disputes, Part II* (May 17, 2001), available at:
      http://www.ftc.gov/speeches/leary/
      learypharmaceuticalsettlement.htm ............. 7

IN THE

# Supreme Court of the United States

No. 05-273

FEDERAL TRADE COMMISSION,

*Petitioner,*

v.

SCHERING-PLOUGH CORPORATION, *et al.*

ON PETITION FOR A WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**REPLY BRIEF FOR THE PETITIONER**

The promotion of early market entry by low-cost generic drugs in competition with branded drugs is a national policy of critical importance. Respondents do not deny the major economic implications of delayed generic drug entry, not only to individual consumers but also to the States and other health care payors. Nor do respondents seriously dispute that Congress has repeatedly and expressly sought to promote early challenges to patent claims that stand in the way of such entry. Instead, they attempt to brush off the ruling below as a case-specific implementation of accepted principles, dependent on factual findings. In fact, however, the court of appeals fashioned a rule of law "reflect[ing]" its own notions of "policy," Pet. App. 35a, a rule that ignores basic antitrust principles, actively assails the congressional policies of the Hatch-Wax-

(1)

2

man Act, and provides pharmaceutical companies with a road-map for sharing monopoly profits rather than competing. Given the number of pending patent cases involving generic drug challengers and potential consumer injury in the billions if patent holders can simply pay these challengers to go away, this Court's consideration of these issues is urgently needed.

1. a. This case puts into sharp focus an issue that is fundamental to antitrust doctrine in the Hatch-Waxman context: whether a branded drug seller can buy protection from potential generic competition so long as the competition excluded falls within the nominal scope of a non-sham patent claim. Respondents attempt to slough off the legal significance of the issue by emphasizing the "common ground" on which "*all agree*," Resp. Br. 3, 16, and characterizing the Commission's ruling as a flawed "implementation" of an agreed framework. *Id.* at 19-20. In reality, however, the court of appeals and the Commission have articulated and applied dramatically different rules of law, which have dramatically different consequences for competition and consumers.

As we have explained, Pet. 14-16, the court of appeals' ruling here must be understood in conjunction with its earlier decision in *Valley Drug Co.* v. *Geneva Pharms., Inc.*, 344 F.3d 1294 (11th Cir. 2003), *cert. denied*, No. 03-1175 (Oct. 12, 2004). In *Valley Drug*, the court of appeals ruled (correctly) that the reasonableness of any settlement agreement must be judged "at the time [it is] entered into," and, accordingly, ruled that a subsequent adjudication against the patent claims did not advance the antitrust claim. 344 F.3d at 1306, 1309. Thus, respondents' suggestion that a *post hoc* inquiry into the patent merits would satisfy the court of appeals, Resp. Br. 12, 18-19, is disingenuous, because *Valley Drug* precludes a conclusion of liability on that basis.

The present ruling goes beyond *Valley Drug* and completes the barrier against antitrust liability for patent settlements. *Valley Drug* held that a plaintiff cannot rely on a *post hoc*

3

inquiry into the merits, and the ruling below proceeds on the flatly erroneous premise that there is a presumption of both patent validity *and* infringement. These rulings together effectively immunize all payments to delay generic competition, provided the delay does not extend beyond the nominal scope of an untested patent, unless the patent claim is an obvious "sham," Pet. App. 20a, or the patentee "knew" that its claim was without merit, 344 F.3d at 1309.

b. The Commission, by contrast, recognized that allowing a branded drug company to "buy off" a would-be generic entrant is contrary to both basic antitrust principles and the clear directives of the Hatch-Waxman Act, even if the generic's prospects for successful entry are uncertain.[1] Contrary to the assertions of *amicus* Bayer Corporation, Br. 13-20, the Commission's antitrust analysis took account of the uncertainties inherent in patent litigation, and there was nothing novel about doing so. As the Commission pointed out,

> The uncertainty posed by patent litigation is, of course, only one of many types of uncertainty that affect whether a new product can be successfully introduced into a market. But the existence of such uncertainties cannot justify an agreement whose very purpose is to ensure against an increase in competition * * * .

Pet. App. 84a n.62. This holding derives from basic antitrust principles this Court has repeatedly recognized. See Pet. 15 (citing, *inter alia*, *Palmer* v. *BRG of Georgia, Inc.*, 498 U.S. 46

---

[1]    The legal analysis of the court below is also at odds with that of the Sixth Circuit, in *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003), *cert. denied sub nom. Andrx Pharms., Inc.* v. *Kroger Co.*, No. 03-779 (Oct. 12, 2004). See Pet. 23; States Br. 7 ("The Sixth Circuit and the Eleventh Circuit cannot both be correct"). The extent of the inconsistency between the Sixth and Eleventh Circuits was far less apparent before the ruling in this case, which completed the barrier against antitrust challenges to patent settlements. *Cf.* Resp. Br. 20; Bayer Br. 7-8.

4

(1990) (per curiam), and *United States* v. *Griffith*, 334 U.S. 100 (1948)). The Commission's ruling is not based on some theory of a "consumer property right" in such uncertainties, Bayer Br. 14, but on the common-sense notion that it is unlawful for a competitor to buy off threatened, albeit uncertain, competition.

Respondents and *amicus* are wrong, in any event, to deny the public interest in the judicial resolution of disputed patent claims. In *United States* v. *Singer Mfg. Co.*, 374 U.S. 174 (1963), Justice White explained that a patent interference settlement that was part of the conduct the Court held unlawful harmed the public interest because it prevented the possibility that the patent would be invalidated altogether. *Id.* at 199-200 (White, J., concurring). As he further observed, "[t]he patent laws do not authorize, and the Sherman Act does not permit, such agreements between business rivals to encroach upon the public domain and usurp it to themselves." *Id.* at 200.[2]

The Commission's holding was not only compelled by antitrust principles, but is also essential to fulfill the policies of the Hatch-Waxman Act. As we have explained, that statute was enacted to encourage the early resolution of disputed pharmaceutical patent claims, and Congress amended it in 2003 to provide specifically for antitrust review of settlements like the present one by the Commission and the Department of Justice. See Pet. 20-22; Waxman Br. 2-10. The opinion below is overtly hostile to those statutory goals. The court bemoans the "caustic environment" of patent litigation and finds shocking the prospect that a statutory scheme designed to promote chal-

---

[2]    See also *Blonder-Tongue Labs., Inc.* v. *Univ. of Illinois Found.*, 402 U.S. 313, 343 (1971) ("The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope") (quoting *Precision Instrument Mfg. Co.* v. *Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816 (1945)).

5

lenges to patent claims might actually "cost Schering its patent." Pet. App. 33a, 31a.

c.    Respondents distort the Commission's ruling by contending that it amounts to a "*per se*" rule based on a "theory that payments [by the patentee] render settlements anticompetitive." Resp. Br. 11, 19-20.  In fact, the Commission looked to the existence of these payments not as an evil in itself or as *per se* improper, but as a reflection of the parties' own assessment of their respective prospects in patent litigation.  ESI, for example, was *not* willing to trade off its chance of success in litigation for guaranteed entry in January 2004, but it *was* willing to accept that entry date plus $15 million (including $5 million purportedly for attorneys' fees).  Pet. 7.  As the Commission recognized, the parties are in a better position to understand the strengths and weaknesses of their patent claims, and such actions – if unexplained – provide a far more reliable gauge of the real strength of the patent claims than second-guessing by an antitrust tribunal.[3]  See Pet. App. 80a-87a.  The Commission declined respondents' invitation to adjudicate the patent merits as part of the antitrust analysis, because contemporaneous actions are far more probative than *post hoc* rationalizations.[4]

---

[3]    In any event, respondents are wrong in asserting that their evidence regarding the strength of Schering's patent claim was unrebutted, and that generics "would have been excluded" for the full patent term in the absence of settlement.  Resp. Br. 5.  The issue was contested at trial, and the ALJ determined it was not possible to predict the outcome of the patent litigations reliably. Pet. App. 264a-265a. Moreover, as shown previously, contemporaneous projections by respondents themselves presumed that generic entry would in fact occur well in advance of patent expiration.  Pet. 8 n.4.

[4]    The Commission also pointed out additional reasons why an *ex post* inquiry into the patent merits was neither necessary nor helpful, including the inherent unreliability of such inquiries and the prospect that such inquiries could "ultimately have a chilling effect on the efficient settlement of patent litigation." Pet. App. 81a; see *id.* at 80a-87a.

6

The Commission made clear, however, that its rule of reason analysis would permit a patent holder to justify settlements with payments that would promote efficiencies or other procompetitive effects. Pet. App. 61a-62a, 87a-91a. Respondents made no such showing, *ibid.*, and are understandably silent on this issue in their brief in opposition.

*Amicus* Bayer Corporation attacks the strawman of a "'better settlement' theory," Bayer Br. 9-13, on which the Commission did not rely. While the Commission used a hypothetical cashless settlement as a benchmark for the expected outcome of litigation, Pet. App. 75a-76a (see Pet. 18-19), the ultimate focus of its inquiry was simply whether Schering's payments "resulted in a greater delay than would otherwise have occurred," Pet. App. 75a, whether the "otherwise" was an alternative settlement or the expected value of continued litigation. The failure of the court of appeals to discuss these principles, Bayer Br. 15, simply reflects the court's misunderstanding of the antitrust and patent principles at stake in this case.

2. Respondents attempt to forestall this Court's review of the important substantive issues presented by arguing that the analysis of the Upsher agreement turns on factual issues not worthy of this Court's attention and that the ESI agreement can be dismissed as unimportant. Resp. Br. 1-2, 12-16. Neither assertion bears scrutiny.

a. Respondents ignore the most salient aspect of the standard of review issue posed in Question 2 – *i.e.*, that it is the Commission's findings, not the administrative law judge's, that are to be tested against the record and, if supported by substantial evidence, accorded due deference by the court of appeals. *Consolo* v. *Federal Maritime Comm'n*, 383 U.S. 607, 618-620 (1966) (that substantial evidence may support a conclusion contrary to the commission's is no basis for overturning the latter); *Universal Camera Corp.* v. *NLRB*, 340 U.S. 474, 496 (1951) (the substantial evidence "standard is not modified in any way when the [agency] and its examiner disagree"). The

7

court of appeals' improper reliance on the ALJ's findings is pivotal to its analysis. See Pet. App. 25a-26a.

In an apparent effort to lend more weight to the ALJ's findings and diminish those of the Commission, respondents claim that the factual issue reduces to a simple arithmetic comparison of projected sales and money paid for patent licences. Resp. Br. 6-8. The relevant question, however, which the Commission analyzed in 40 pages of findings, was whether the totality of the evidence indicated that Schering's unconditional, up-front payment *really was* a royalty payment, or was instead in large part a payment for the exclusion of competition. See Pet. App. 92a-141a.[5]   To the extent there was a "credibility" issue here, it was "not solely a function of the witness's demeanor but also of that testimony's inherent plausibility," in light of the context. See Breyer, Stewart, Sunstein & Spitzer, *Administrative Law and Regulatory Policy* (4th ed. 1999), at 222. The Commission had the responsibility and prerogative to make that assessment.

We recognize that the Court is generally reluctant to correct errors in the application of the substantial evidence test, but the error here is so blatant and the consequences so serious that review is warranted. See *Universal Camera,* 340 U.S. at 491 (Court will intervene where court of appeals has "grossly misapplied" test); accord *FTC* v. *Indiana Federation of*

---

[5]   There is, therefore, no inconsistency between the Commission's opinion and the statements elsewhere of its author, Commissioner Thomas B. Leary, regarding the difficulty of evaluating intellectual property. See Resp. Br. 10-11 n.7, 16 n.9. In fact, in both the article and the opinion, Commissioner Leary listed exactly the same factors as relevant when assessing whether a side deal amounts to an exclusion payment, including negotiation history, other offers for the intellectual property at issue or property with similar attributes, evidence based on subsequent events, and the structure of the payment terms. See Pet. App. 93a-139a; Leary, *Antitrust Issues in the Settlement of Pharmaceutical Patent Disputes, Part II* (May 17, 2001), at 6, available at: http://www.ftc.gov/speeches/leary/learypharmaceuticalsettlement.htm.

8

*Dentists*, 476 U.S. 447, 454 (1986). This Court need not canvass the record itself and resolve the ultimate issue whether substantial evidence supported the Commission's findings, but may remand to the court of appeals for review of the factual issues under a proper standard.

b. In any event, no such factual dispute exists with regard to the ESI agreement, which the Commission assessed under the same principles as those it applied to the Upsher agreement. As respondents concede, Schering's $10 million payment that was contingent on FDA approval of ESI's competitive generic product had no purpose other than to induce ESI to enter into the agreement in which its market entry was precluded until 2004. Resp. Br. 6. Even assuming that Schering was responding to the pressures of the magistrate-supervised mediation, that does not change the fact that the settlement was a private agreement, entered into by sophisticated business parties for their mutual and substantial benefit, and was *not* approved by any court.

3. Finally, respondents make no serious effort to dispute the showings of the Commission and several *amici* about the staggering economic importance of the availability of generic drugs. Indeed, they acknowledge that "generic entry will bring lower prices." Resp. Br. 17 n.10; *cf.* Pet. 24-25; States Br. 11-14; AARP Br. 9-14; Waxman Br. 2-3; NACDS Br. 4-6. Respondents' attempts to minimize the impact of the present case, Resp. Br. 20-23, ignore the basic fact that whatever "*in terrorem*" effect on anticompetitive settlements the Commission's enforcement program may have had is vitiated by the ruling below. Respondents suggest enforcement under Section 5(m) of the FTC Act, 15 U.S.C. 45(m), but actions under that provision require an existing final Commission order, such as the one vacated here. Equally quixotic is respondents' supposition that a Commission order against an exclusionary settlement could pass muster in the Eleventh Circuit – to which any pharmaceutical company that does business there could appeal.

9

See 15 U.S.C. 45(c). As explained above, the combined effect of the court of appeals' decisions here and in *Valley Drug* precludes meaningful Commission review of patent settlements. See Pet. 21.[6]

\* \* \* \* \*

For the foregoing reasons and those stated in our petition, the petition for a writ of certiorari should be granted.

Respectfully submitted.

|  |  |
|---|---|
|  | WILLIAM BLUMENTHAL<br>*General Counsel*<br>JOHN D. GRAUBERT *<br>*Principal Deputy General*<br>*Counsel* |
| SUSAN A. CREIGHTON<br>*Director*<br>BRADLEY S. ALBERT<br>ELIZABETH R. HILDER<br>MICHAEL B. KADES<br>THOMAS G. KRATTENMAKER<br>*Attorneys*<br>BUREAU OF COMPETITION | JOHN F. DALY<br>*Deputy General Counsel*<br>*for Litigation*<br>IMAD D. ABYAD<br>*Attorney*<br>FEDERAL TRADE COMMISSION<br>600 Pennsylvania Ave., N.W.<br>Washington, DC 20580 |
| * Counsel of Record | (202) 326-2375 |

OCTOBER 2005

---

[6]   That court's recent ruling in *Andrx Pharms., Inc.* v. *Elan Corp., PLC*, 421 F.3d 1227 (11th Cir. 2005), does nothing to ameliorate the effects of its prior rulings, for it is premised on the acceptance (at the dismissal stage) of allegations that the patentee and generic entrant conspired to use the generic's 180-day exclusivity period to block other competitors "from ever marketing a generic" version of the drug in question. 421 F.3d at 1235.

# Exhibit 10

US00RE37516B1

(19) **United States**

(12) **Reissued Patent**
Grebow et al.

(10) Patent Number: **US RE37,516 E**
(45) Date of Reissued Patent: **Jan. 15, 2002**

(54) **ACETAMIDE DERIVATIVE HAVING DEFINED PARTICLE SIZE**

(75) Inventors: **Peter E. Grebow**, Penllyn, PA (US); **Vincent Corvari**, Nahua, NH (US); **David Stong**, Coatesville, PA (US)

(73) Assignee: **Cephalon, Inc.**, West Chester, PA (US)

(21) Appl. No.: **09/285,166**

(22) Filed: **Apr. 1, 1999**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **5,618,845**
    Issued: **Apr. 8, 1997**
    Appl. No.: **08/319,124**
    Filed: **Oct. 6, 1994**

(51) Int. Cl.[7] .......................... A61K 31/16; A61K 9/14
(52) U.S. Cl. ....................................... 514/618; 424/489
(58) Field of Search .......................... 514/618; 424/489

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,002,718 A | 1/1977 | Gardella et al. | 424/37 |
| 4,122,157 A | 10/1978 | Huber | 424/21 |
| 4,177,290 A | 12/1979 | Lafon | 514/618 |
| 4,196,188 A | 4/1980 | Besins | 424/37 |
| 4,332,721 A | 6/1982 | Bernini | 260/239.57 |
| 4,713,246 A | 12/1987 | Begum et al. | 424/455 |
| 4,880,623 A | 11/1989 | Piergiorgio et al. | 424/465 |
| 4,895,726 A | 1/1990 | Curtet et al. | 424/456 |
| 4,927,855 A | 5/1990 | Lafon | 514/618 |
| 5,021,242 A | 6/1991 | Romer et al. | 424/436 |
| 5,180,745 A | 1/1993 | Lafon | 514/618 |
| 5,202,129 A | 4/1993 | Samejima et al. | 424/489 |
| 5,391,576 A | 2/1995 | Lafon | 514/618 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0233106 | 8/1987 |
| EP | 233106 | 8/1987 |
| EP | 462004 | 12/1991 |
| EP | 547952 | 6/1993 |
| EP | 594507 | 4/1994 |
| WO | WO 94/21371 | 9/1994 |
| WO | 94/23171 | 9/1994 |
| WO | 95/1171 | 1/1995 |
| WO | 95/00132 | 1/1995 |
| WO | 85/12944 | 2/1996 |

OTHER PUBLICATIONS

*Remington's Pharmaceutical Sciences*, 16th Ed. (1980) pp. 1355–1368, 305–306, 1535–1545.

Shepherd, *Othero Sclerosis* 110/Suppl 555–563 (1994) Micronized Lenojitrate.

Kondo, *Biol. Pharm. Bull.* 16(8):746–800 (1993) HO–221–A Micronized Poorly Solable Drug.

Carlson, et al., *Clin. Ther.* 15(5):788–796 (1993) Micronized Glyburide.

Treffel, et al., *Acta Derm. Venerol.* 72(1):65–67 (1992) Micronized 5–Methoxypsoralen.

Hargrove, et al., *AM. J. Abstrt. Gynecol.* 161(4):948–951 (1989) Micronized Progesterone.

Stock, et al., *Bor. J. Dermatol.* 112(4):469–473 (1985) Micronized 5–Methoxypsoralen.

McInnes, et al., *J. Clin. Pharmacol.* 22(8):410–417 Micronized Spironolactone.

Lavharanta, et al., *Arch. Dermatol. Res.* 273(1/2) 111–114 (1982) Micronized 8–Methoxypsoralen.

Bastuji H., et al.; "Successful Treatment of Idiopathic Hypersomnia and Narcolepsy with Modafinil"; *Prog. Neuro–Psychopharmacol. & Biol. Psychiat.* 12:695–700 (1988).

Becue T., et al., "Confirmation of the Structure of By–Products in the Synthesis of Modafinil by Liquid Chromatography–Mass Spectrometry"; *J. Chromatography* 557:489–494 (1991).

Drouin J.E., et al.; "Optimization of the Mobile Phase for the Liquid Chromatographic Separation of Modafinil Optical Isomers on a Chiral–AGP Column"; *J. Chromatography* 605:19–31 (1992).

Duteil J., et al.; "Central alpha 1–Adrenergic Stimulation in Relation to the Behavior Stimulating Effect of Modafinil; Studies with Experimental Animals"; *European J. Pharmacol.* 180:49–58 (1990).

Drugs of the Future; "Modafinil"; 15(2):130–132 (1990).

Fuxe K., et al.; "Evidence for a Protective Action of the Vigilance Promoting Drug Modafinil on the MPTP–Induced Degeneration of the Nigrostriatal Dopamine Neurons in . . . "; *Exp. Brain Res.* 88:117–130 (1992).

Lyons T.J., et al.; "Modafinil: The Unique Properties of a New Stimulant"; *Aviation, Space & Environ. Med.* 432–435 (1991).

Milhaud C., et al.; "Effects of Modafinil, An Alpha I Adrenergic Type Psychostimulant on the Sleep of Monkeys"; *Psychopharmacology* 96:Abstract No. 31.05.09 (1988).

Milhaud C.L., et al.; "Presentation of d'un Nouveau Stimulant:Le CRL–40476"; *AGARD Conf. Proc.* 415:5–1–5–7 (1987).

Moachon G., et al.: "Simultaneous Determination of Modafinil and its Acid Metabolite by High–Performance Liquid Chromatography in Human Plasma"; *J. Chromatography* B 654:91–96 (1994).

Roze C., et al.; "Drug CRL 40 028–Induced Inhibition of Pancreatic Secretion in Rats"; *Arch Int. Pharmacodyn* 265:119–127 (1983).

Saletu B., et al.; "Differential Effects of a New Central Adrenergic Agonist–Modafinil–and D–Amphetamine on Sleep and Early Morning Behaviour in Young Health Volunteers"; *Int. J. Clin. Pharm. Res.* IX(3):183–195 (1989).

Primary Examiner—James H. Reamer
(74) Attorney, Agent, or Firm—Robert T. Hrubiec

(57) **ABSTRACT**

Pharmaceutical compositions comprising modafinil in the form of particles of defined size. The particle size of modafinil can have a significant effect on the potency and safety profile of the drug.

**26 Claims, 7 Drawing Sheets**



FIG. 1



*FIG. 2*



*FIG. 3*



*FIG. 4*



*FIG. 5*





FIG. 6



*FIG. 7*



U.S. Patent        Jan. 15, 2002        Sheet 6 of 7        US RE37,516 E



FIG. 8



*FIG. 9*

US RE37,516 E

1

# ACETAMIDE DERIVATIVE HAVING DEFINED PARTICLE SIZE

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

## BACKGROUND OF THE INVENTION

Publications cited in this document are incorporated herein by reference.

This invention relates to the acetamide derivative modafinil. Modafinil ($C_{15}H_{15}NO_2S$), is 2-(benzhydrylsulfinyl) acetamide, and is also known as 2-[(diphenylmethyl) sulfinyl]acetamide.

Modafinil has been described as presenting a "neuropsychopharmacological spectrum characterized by the presence of excitation with hyperactivity and of hypermotility; and by the absence of stereotypy (except in high doses) and of potentialisation of the effects of apomorphine and amphetamine" (U.S. Pat. No. 4,177,290; hereinafter the "'290 patent," which is incorporated herein by reference). A single administration of modafinil results in increased locomotor activity in mice and increased nocturnal activity in monkeys (Duteil et al., Eur. J. Pharmacol. 180:49 (1990)). The neuropsychopharmacological profile of modafinil has been distinguished from that of amphetamines (Saletu et al., Int. J. Clin. Pharm. Res. 9:183 (1989)). Modafinil is thought to modulate the central postsynaptic alpha$_1$-adrenergic receptor, without participation of the dopaminergic system (Duteil et al., supra). Modafinil has been successfully tested in humans for treatment of idiopathic hypersomnia and narcolepsy (Bastuji et al., Prog. Neuro-Psych. Biol. Psych. 12:695 (1988)).

Narcolepsy is a chronic disorder characterized by intermittent sleep attacks, persistent, excessive daytime sleepiness and abnormal rapid eye movement ("REM") sleep manifestations, such as sleep-onset REM periods, cataplexy, sleep paralysis and hypnagogic hallucinations, or both (Assoc. of Sleep Disorders Centers, Sleep 2:1 (1979)). Most patients with narcolepsy also have disrupted nocturnal sleep (Montplaisir, in Guilleminault et al. eds., Narcolepsy, Spectrum Pub., New York, pp. 43–56). Pathological somnolence, whether due to narcolepsy or other causes, is disabling and potentially dangerous. Causes of pathological somnolence, other than narcolepsy, include chronic sleep loss (Carskadon et al., Sleep, 5:S73 (1982); Carskadon et al., Psychophysiology, 18:107 (1981)); sleep apnea (Kryger et al., Principles and Practice of Sleep Medicine, W. B. Saunders Co., Philadelphia, Pa. (1989)); and other sleep disorders (International Classification of Sleep Disorders: Diagnostic and Coding Manual, American Sleep Disorder Association, Rochester, Minn. (1990)). Whether due to narcolepsy or other causes, pathological somnolence produces episodes of unintended sleep, reduced attention, and performance errors. Consequently, it is linked to a variety of transportation and industrial accidents (Mitler et al., Sleep 11:100 (1988)). A therapeutic agent that reduces or eliminates pathological somnolence would have important implications not only for individual patients, but also for public health and safety.

Other uses of modafinil have been presented. U.S. Pat. No. 5,180,745 discloses the use of modafinil for providing a neuroprotective effect in humans, and in particular for the treatment of Parkinson's disease. The levorotatory form of modafinil, i.e., (−)benzhydrylsulfinyl-acetamide, may have potential benefit for treatment of depression, hypersomnia

2

and Alzheimer's disease (U.S. Pat. No. 4,927,855). European Published Application 547952 (published Jun. 23, 1993) discloses the use of modafinil as an anti-ischemic agent. European Published Application 594507 (published Apr. 27, 1994) discloses the use of modafinil to treat urinary incontinence.

## SUMMARY OF THE INVENTION

Our invention discloses a pharmaceutical composition comprising modafinil in the form of particles of a defined size, and the use of such composition. We have discovered that the size of modafinil particles is important to the potency and safety profile of the drug.

"Particle," as used herein, refers to an aggregated physical unit of the acetamide compound, i.e., a piece or a grain of acetamide. For example, FIGS. 2–5 provide photographic representations of various modafinil particles from Lots E-D and L-1.

As used herein, the term "mean," when used in reference to the size of modafinil particles, refers to the sum of the size measurements of all measurable particles measured divided by the total number of particles measured. For example, for five measurable particles which could be measured, and were determined to have diameters of 20 microns, 23 microns, 20 microns, 35 microns and 20 microns, the mean diameter would be 23.6 microns. As used herein, the term "diameter" is a volumetric measurement based on the presumed spherical shape of modafinil particles.

As used herein, the term "median," when used in reference to the size of modafinil particles, indicates that about 50% of all measurable particles measured have a particle size less than the defined median particle size value, and that about 50% of all measurable particles measured have a particle size greater than the defined median particle size value. For example, for the five particle values listed above, the median diameter would be 20 microns.

As used herein, the term "mode," when used in reference to the size of modafinil particles, indicates the most frequently-occurring particle size value. For example, for the five particle values listed above, the mode diameter would be 20 microns.

As used herein, the term "percent cumulative," when used in reference to the size of modafinil particles, refers to an aggregate of the individual percent values for all measurable particles measured at specified diameters.

As used herein, "about" means plus or minus approximately ten percent of the indicated value, such that "about 20 microns" indicates approximately 18 to 22 microns. The size of the particle can be determined, e.g., by the methods provided below, and by conventional methods known to those of skill in the art.

In accordance with the invention disclosed herein, the mean particle size for a modafinil particle preferably ranges from about 2 microns to about 19 microns, more preferably from about 5 microns to about 18 microns, and most preferably from about 10 microns to about 17 microns.

In accordance with the invention disclosed herein, the median particle size for modafinil preferably ranges from about 2 microns to about 60 microns, more preferably from about 10 microns to about 50 microns, and most preferably from about 20 microns to about 40 microns.

In accordance with the invention disclosed herein, the mode particle size for modafinil preferably ranges from about 2 microns to about 60 microns, more preferably from about 10 microns to about 50 microns, and most preferably from about 20 microns to about 40 microns.

US RE37,516 E

3

We view the median measurement as having greater importance compared to the mode or mean values in that the median value provides an indication of the distribution of the particles measured in a given population. While not necessarily a limitation but rather an indicator of the consistency of the population measured, the ratio of median: mean: mode would ideally be 1:1:1; however, a ratio of median to mean of 1:2.50 to 1:0.50 is acceptable, and a ratio of median to mode of 1:2.50 to 1:0.50 is acceptable. Ideally, the standard deviation between the mean, median and mode measurements of a modafinil population would approach zero, indicating that every particle in the population measured was substantially identical or met the criteria for an ideal, normalized distribution. A standard deviation of less than about 25 between the mean, median and mode measurements is acceptable as an indication of the consistency of the population of the particles measured.

In accordance with the invention disclosed herein, it is preferable that not more than about 5% of the cumulative total (percent cumulative) of modafinil particles in any one dose provided to a mammal have particle sizes greater than about 200 microns; it is more preferable that not more than about 5% of the cumulative total (percent cumulative) of modafinil particles in any one dose provided to a mammal have particle sizes greater than about 190 microns; it is most preferable that not more than about 5% of the cumulative total (percent cumulative) of modafinil particles in any one dose provided to a mammal have particle sizes greater than about 180 microns. Thus, a "substantially homogeneous mixture" of modafinil particles, as utilized herein, refers to a mixture of modafinil particles in which at least about 95% of the particles in that mixture are less than a defined size.

The value ranges defined above are based upon measurements made utilizing technology and instruments developed by the Hiac/Royko Division of Pacific Scientific (11801 Tech Road, Silver Spring, Md. 20904, United States of America). As those in the art may appreciate, different instruments manufactured by different companies may provide different measurements for the same particles. For example, in a characteristic modafinil lot (Lot L-2), the mean, median, and mode particle measurements obtained using a Coulter Counter TA II sizing counter were 43, 31, and 29 microns, respectively. Using a Hiac/Royko Model 9064 sizing counter, the mean, median and mode particle measurements obtained for Lot L-2 were 18.75, 31.41 and 25.31 microns, respectively. These differences are presumably predicated upon the different approaches used in measuring particles of such diminutive sizes. Thus, the value ranges provided above are relative and are most preferably to be considered in view of utilization of instruments and operating systems manufactured by Hiac/Royko, for example, and preferably, the Hiac/Royko Model 9064 system sizing counter.

Modafinil particles of the invention can be in the form of a pharmacologically acceptable salt, e.g., an acidic or basic addition salt.

In another aspect, the invention features a method of altering a somnolent state, e.g., narcolepsy, idiopathic hypersomnia and related sleep disorders, using modafinil particles of a defined size. The method involves administering to a mammal a pharmaceutical composition comprising an effective amount of modafinil in the form of particles of a defined size.

"An effective amount", as used herein, is an amount of the pharmaceutical composition that is effective for treating a somnolent or somnolescent state, i.e., an amount of modafinil of a defined particle size that is able to reduce or eliminate the symptoms of a somnolescent state. An effective amount of a pharmaceutical composition of the invention is useful for enhancing alertness, or increasing regularity of sleep rhythms.

A "pharmaceutical composition", as used herein, means a medicament for use in treating a mammal that comprises modafinil of a defined particle size prepared in a manner that is appropriate for administration to a mammal. A pharmaceutical composition according to the invention may also, but does not of necessity, include a non-toxic pharmaceutically acceptable carrier.

The pharmaceutical composition of the invention can contain at least about 50 mg, preferably at least about 100 mg, or more preferably at least about 200 mg of modafinil having a particle size as defined above. The pharmaceutical composition preferably contains no more than about 700 mg; more preferably, no more than about 600 mg; and most preferably, no more than about 400 mg, of modafinil having a particle size as defined above.

Other features and advantages of the invention will be apparent from the following detailed description and from the claims.

DETAILED DESCRIPTION

We first briefly describe the drawings.

I. Drawings

FIG. 1 is a graph depicting particle size distributions for six lots of modafinil: Lots L-1, L-2, E-A, E-B, E-C and E-D.

FIG. 2 is a scanning electron micrograph of a sample of modafinil Lot E-D at 50× magnification.

FIG. 3 is a scanning electron micrograph of a sample of modafinil Lot E-D at 100× magnification.

FIG. 4 is a scanning electron micrograph of a sample of modafinil Lot L-1 at 50× magnification.

FIG. 5 is a scanning electron micrograph of a sample of modafinil Lot L-1 at 100× magnification.

FIG. 6 is a graph depicting the dissolution rate of modafinil particles from Lot E-D (median particle size 94.05 $\mu$m) and Lot L-1 (median particle size 50.18 $\mu$m).

FIG. 7 is a graph depicting the dissolution rate of modafinil particles from Lot E-B (median particle size 89.10 $\mu$m), Lot E-D (median particle size 94.05 $\mu$m) and Lot L-1 (median particle size 50.18 $\mu$m).

FIG. 8 is a graph depicting mean plasma concentration of modafinil in dogs following single oral doses of modafinil from lots with different particle sizes.

FIG. 9 is a graph depicting mean plasma concentration of modafinil equivalents, i.e., modafinil and modafinil acid metabolite, in dogs, following single oral doses of modafinil from lots with different particle sizes.

II. The Invention

The invention results from our discovery that the particle size, and the consistency of the particle size, of modafinil can have a significant effect on its potency and safety profile.

The first human trials for the use of modafinil to treat narcolepsy took place outside of the United States of America. The modafinil used in the initial studies was prepared in non-commercial scale lots (referred to herein as "early" or "E" lots). Pursuant to our discovery of the present invention, it was observed that the early lots had a median particle size of between 80 microns ("$\mu$m") and 150 $\mu$m. In the initial safety studies conducted outside of the United States, early lot modafinil was administered to humans without reports of clinically significant adverse events in acute administration.

US RE37,516 E

5

Separate safety and efficacy studies of modafinil were subsequently conducted in the United States under the direction of Cephalon, Inc. using modafinil lots prepared by a method scaled up for commercial production (referred to herein as "late" or "L" lots). When the late lots of modafinil were administered to humans in the United States, the initial clinical trial revealed the occurrence of unanticipated adverse events at a dose level (800 mg/day) previously determined to be acceptable during studies conducted outside of the United States. We discovered that the late lots had a median particle size of between 30 and 50 $\mu$m. Thus, the initial human trials conducted in the United States were performed with modafinil having a significantly smaller particle size.

As was subsequently discovered, lots comprising a smaller particle size resulted in an increase in the potency of modafinil, leading us to conclude that the drug can be more readily absorbed when compared to modafinil derived from lots comprising a larger particle size. Therefore, modafinil particles of a defined size provide at least two significant and unexpected advantages. First, potency is increased. A smaller average particle size allows achievement of a given modafinil plasma concentration at a lower oral dose. Second, with the knowledge of the importance of particle size on potency, the safety profile of the drug can be more accurately controlled because dosing with consistent and defined particle sizes allows for greater reliability in the dosing of the drug necessary to achieve a desired result.

III. Human Clinical Safety Studies—Foreign

The safety and pharmacodynamics of modafinil were initially characterized in several studies conducted outside the United States using modafinil obtained from the early lots. During these studies, modafinil in amounts of up to 4,500 mg have been ingested without the occurrence of significant clinical side effects (see, for example, Bastuji, supra; see also Lyons, T. J. and French, J. Aviation, Space and Environmental Medicine May, 1991, 432). No statistically or clinically significant hemodynamic changes in heart rate or blood pressure in patients or in healthy volunteers using modafinil doses tested in the foreign studies have been reported.

IV. Human Clinical Safety Studies—United States

While significant testing of modafinil had already been conducted outside the United States, new drug candidates, such as modafinil, typically undergo clinical research in the United States in order to corroborate the information obtained in foreign studies. The first United States clinical evaluation of modafinil was a double-blind, ascending dose study involving oral administration of modafinil to healthy males (i.e., physically and mentally healthy male subjects 18 to 50 years of age; average body weight of −10% to +15% of normal weight for age, height, frame and sex; 2101).

The planned doses for the first United States clinical trial were 200, 400, 600, 800, 1000, 1200 and 1400 mg/day of modafinil or placebo. These dose levels were based upon the safety profile observed during the foreign clinical testing of modafinil. Subsequent doses were given only when it was determined that the previously administered dose was safe and well tolerated. For example, the safety data for the 200

6

mg study dose was reviewed and assessed before other volunteers received the 400 mg dose.

In this first United States Phase I clinical study, modafinil from Lot L-1 was utilized. Complete data were obtained for three of the seven modafinil dose levels intended for testing, i.e., 200, 400, and 600 mg/day. However, elevations in heart rate and blood pressure were noted in two of the volunteers at the 800 mg dose level. These symptoms resolved without treatment or sequelae following drug discontinuation. This was surprising and completely unexpected, given the escalation of modafinil dosing observed in the foreign studies. Because these results were unexpected and because they occurred in healthy volunteers, these adverse events led to discontinuation of dosage progression at the 1000, 1200 and 1400 mg/day levels until the cause of such results was determined.

V. Discrepancy Between the Foreign and United States Results

In searching for the cause of the discrepancy, we compared plasma levels of modafinil measured in the first United States study and the preceding foreign studies. We found that at a given oral dose, when compared to subjects in the foreign studies, subjects in the United States study had higher peak modafinil plasma levels.

The modafinil tablets used in the foreign studies were based upon early lots of modafinil, while the modafinil tablets used in the United States study were based upon late lots of modafinil. We theorized that a difference in bioavailability of the different lots of modafinil was responsible for the differences in maximum tolerable dose observed in the foreign and United States clinical studies. Although not obvious or readily apparent, one of several possible explanations which we posited was a possible difference in the modafinil particle size used in the foreign and the United States studies.

VI. Particle Size Analysis

Following this assumption, we compared various parameters from lots of the bulk drug; such comparisons had not been conducted previously, given the assumption that the modafinil being tested in the United States was the "same" as that investigated outside of the United States. Particle size distribution of the bulk drug was among the parameters examined. We have performed modafinil particle size analyses with a Hiac/Royko Model 9064 sizing counter, a Coulter Counter sizing counter, by optical microscopy and by scanning electron microscopy.

Our particle size measurements were obtained using a Hiac/Royco Model 9064 sizing counter following manufacturer instructions (400 $\mu$m aperture; saturated water with modafinil solution; PDAS program). A summary of the results of these measurements is presented in Table 1, which includes the mean, median and mode particle sizes for six representative lots of modafinil. For comparative purposes, the standard deviation values derived from the mean, median and mode measurements are provided, as are the ratio values of median:mean:mode. Lots E-A, E-B, E-C and E-D were among the so-called early lots, and Lots L-1 and L-2 were among the so-called late lots.

US RE37,516 E

7          8

TABLE 1

| | | | | STD DEVIATION | |
| LOT | MEAN* ($\mu$m) | MEDIAN* ($\mu$m) | MODE* ($\mu$m) | BETWEEN MEAN, MEDIAN, MODE | MEDIAN:MEAN:MODE |
| --- | --- | --- | --- | --- | --- |
| E-A | 34.60 +/– 5.21 | 143.65 +/– 3.26 | 176.48 +/– 5.32 | 74.27 | 1:4.15:.81 |
| E-B | 29.99 +/– 1.09 | 89.10 +/– 4.28 | 78.59 +/– 2.60 | 31.53 | 1:2.97:1.13 |
| E-C | 28.27 +/– 4.10 | 79.00 +/– 3.78 | 101.00 +/– 40.92 | 37.30 | 1:2.79:.78 |
| E-D | 22.14 +/– 0.76 | 94.05 +/– 13.75 | 158.63 +/– 63.81 | 68.28 | 1:4.25:.59 |
| L-1 | 21.40 +/– 2.52 | 50.18 +/– 12.57 | 56.56 +/– 22.39 | 18.73 | 1:2.34:.89 |
| L-2 | 18.75 +/– 1.89 | 31.41 +/– 3.57 | 25.31 +/– 1.34 | 6.36 | 1:1.68:1.24 |

*n = 4; +/– values are standard deviations

FIG. 1 is a graph of particle diameter versus percent cumulative particles for late Lots L-1, L-2, and for the early Lots E-A, E-B, E-C, and E-D. The 50 percent cumulative particle size for Lots L-1 and L-2 was between approximately 30 $\mu$m and approximately 50 $\mu$m, while the 50 percent cumulative particle size for Lots E-A, E-B, E-C, and E-D was between approximately 80 $\mu$m and approximately 140 $\mu$m.

In addition to the Hiac/Royko data, electron microscopy and optical microscopy were used to verify modafinil particle size and morphology. Representative scanning electron micrographs of early Lot E-D are shown in FIG. 2 (50× magnification) and in FIG. 3 (100× magnification). Representative scanning electron micrographs of late Lot L-1 are shown in FIG. 4 (50× magnification) and FIG. 5 (100× magnification).

It is noted that the size of modafinil particles may be determined by any of several conventional methods. Methods useful for analyzing particle size within the range of 100 Angstroms to 100 $\mu$m, include, but are not limited to: laser diffraction particle size analysis, mechanical sieving, optical microscopy, ultracentrifugation, sedimentation, air permeability, electron microscopy, scanning electron microscopy and Coulter Counter techniques. For a general review of methods for determining particle size, see Martin et al., Physical Pharmacy, 3rd Ed., Lea & Febiger, Philadelphia (1983). See also O'Conner in Remington's, infra., Section IX.

Optical microscopy is useful for particle size measurement in the range of 0.2 $\mu$m to 100 $\mu$m. For optical microscopy, an emulsion or suspension, diluted or undiluted, is mounted on a slide or ruled cell. The microscope eyepiece is fitted with a micrometer by which the size of the particles may be estimated.

Mechanical sieving uses a series of standard sieves calibrated by the National Bureau of Standards. Mechanical sieves may be used for screening material as fine as 44 $\mu$m (No. 325 sieve). Sieves manufactured by photo-etching and electroforming are available with apertures from 90 $\mu$m to 5 $\mu$m.

Measurements obtained using instruments and techniques developed by Hiac/Royko are preferred. A Hiac/Royco sizing counter utilizes the principle of light-extinction (obscuration) for particle size detection. The principle involved is that when a particle suspended in a liquid passes through a sensor microcell where a laser beam is directed through a window at the cell, the particles in the fluid block the laser beam from a light-extinction photodiode (photodetector) resulting in a loss of light intensity. This loss of light intensity detected by the photodetector produces an electrical pulse for each particle. These pulses are proportional in amplitude to the light intensity (light extinction) which is a measure of particle size.

VII. Effect of Modafinil Particle Size on Rate of Modafinil Dissolution

We investigated the effect of modafinil particle size on the rate of dissolution. The results of those experiments are summarized in FIG. 6 and FIG. 7.

In the first experiment, 500 ml of deionized water was put in a 1-liter beaker and 50 mg of E-D or L-1 was added. The suspension was stirred constantly with a 5 cm Teflon-coated magnetic stir bar and a magnetic stir plate (Thermolyne model #546725). Samples of 1 ml each were taken at times 0, 1, 5, 10, 15, 20, 25, 30, 40, 50, and 60 minutes, with each sample being replaced with 1 ml of deionized water. The stir plate speed setting was "2" for the first 20 minutes, and "7" from 20 to 60 minutes Each sample was immediately filtered through a 0.45 $\mu$m filter, to remove undissolved particles. The filtered samples were assayed for modafinil, by high performance liquid chromatography, based upon the method of Moachon et al. (J. Chromatag. B 654:91 (1994)). Modafinil Lot L-1 (median: 50.18 $\mu$m) had a faster dissolution rate than did modafinil Lot E-D (mean: 94.05 $\mu$m). The results of the first experiment are summarized in FIG. 6.

A second dissolution rate experiment was conducted to determine relative dissolution rates of modafinil from the capsules used in the dog study (described below) of plasma modafinil levels following oral administration of modafinil from Lots E-B, E-D and L-1. In the second dissolution rate experiment, the solvent was 900 ml of 0.01N HCl, maintained at 37° C. Each sample placed into the solvent consisted of 200 mg of modafinil packed in a gelatin capsule. Stainless steel coils were attached to the capsules to prevent them from floating. A stirring paddle was used at 100 rpm. Solution samples were taken at 0, 5, 10, 15, 20, 25, 30, 40 and 60 minutes The results of the modafinil capsule dissolution experiment are summarized in FIG. 7.

VIII. Effect of Modafinil Particle Size on Modafinil Plasma Concentration

Given the disparity in results between the foreign and United States studies using what was presumed to be "identical" modafinil, additional non-human analyses were necessary prior to continuation of human clinical trials. Accordingly, animal studies in dogs were carried out to determine the in vivo pharmacokinetics of modafinil with different average particle size diameters, roughly designated as having "small" (Lot L-1) and "large" (Lots E-B and E-D) median particle sizes. Nine male dogs were randomly assigned, according to body weight to three dose groups. Each group was given a single oral dose of 200 mg of modafinil weekly for three weeks in a randomized, crossover design, as described in Table 2.

US RE37,516 E

**9**

TABLE 2

| GROUP | NUMBER OF DOGS | WEEK | BULK DRUG LOT AND MEDIAN PARTICLE SIZE |
|---|---|---|---|
| 1 | 3 | 1 | E-D (94.05 μm) |
|  |  | 2 | L-1 (50.18 μm) |
|  |  | 3 | E-B (89.10 μm) |
| 2 | 3 | 1 | L-1 (50.18 μm) |
|  |  | 2 | E-B (89.10 μm) |
|  |  | 3 | E-D (94.05 μm) |
| 3 | 3 | 1 | E-B (89.10 μm) |
|  |  | 2 | E-D (94.05 μm) |
|  |  | 3 | L-1 (50.18 μm) |

After each weekly dose, blood samples (2 ml) were drawn from all animals by venepuncture predose (within one hour of dosing), and at 0.5, 1, 2, 3, 4, 6, 8, 10, 12, 18, 24, and 36 hours post-dose. Blood samples were collected in heparinized (lithium heparin) test tubes and centrifuged at 2,500 to 3,000 rpm. The plasma was drawn off with a glass pipette, and stored frozen (−20° C.) until analyzed. The plasma concentration of modafinil, and its acid and sulfone metabolites were simultaneously determined by high-pressure liquid chromatography, according to the method of Moachon et al. (J. Chromatag. B 654:91 (1994).

Mean plasma modafinil levels in the nine dogs, at 0 to 36 hours after modafinil administration, are depicted in FIG. 8. With "small" particles (Lot L-1), the plasma modafinil concentration peaked at 10 μg/ml. In contrast, with "larger" particles (Lots E-D or E-B), the plasma modafinil concentration peaked at 8 μg/ml. Thus, the modafinil having a median particle size of 50.18 μm resulted in a higher peak plasma concentration than that obtained with the same dose of modafinil administered in the form of larger particles. Similar results were observed regarding the acid metabolite of modafinil, 2-benzhydrylsulfinylacetic acid as depicted in FIG. 9.

These results implicated the consequences of different particle sizes and the importance of controlling modafinil particle size. By controlling the particle size, safety concerns can be addressed. For example, a non-homogenous mixture of modafinil particle sizes may not provide consistent potency nor avoid undesired fluctuations in plasma modafinil concentrations; such fluctuations can lead to undesired and unexpected events. Moreover, the use of modafinil particles having a defined size is more efficient because a given plasma modafinil concentration can be achieved at a lower oral dose.

After the discrepancy between the foreign and first United States studies was resolved and determined to be related to the differences in particle sizes, a second Phase I study was conducted in the United States, to further determine the clinical safety, tolerance and pharmacokinetic properties of modafinil having a particle size as defined. The second study involved normal young males and an experimental design similar to the first United States study (described above). In the second study, all subjects began at 200 mg/day, using modafinil from Lots L-1 or L-2. Dosage was then titrated, in 200 mg/day increments, up to the target dose. The results of this study suggested that 600 mg/day was the maximum tolerable dose ("MTD") of modafinil, with 800 mg/day being the minimum intolerable dose.

IX. Methods of Preparing Modafinil Having Defined Size

Modafinil and modafinil-related compounds can be prepared by conventional methods. Methods for preparing modafinil and modafinil-related compounds appears in the '290 patent. Modafinil of the particle size defined herein

**10**

may be obtained by a variety of approaches utilizing conventional methods, e.g., the methods disclosed in the '290 patent, and then subjecting the modafinil of undefined particle size to conventional methods of milling and sieving. Methods for comminution (i.e., the mechanical process of reducing the size of particles or aggregates) are known to those in the art. Examples are provided in O'Conner et al. Chpt. 88, Remington's Pharmaceutical Sciences, 18th Edition, Mack Publishing Co., Easton, Pa. (1990). Following comminution, the particles can be separated into a series of sieve cuts by passing the particles downward through an agitated vertical stack of sieves of decreasing mesh sizes and collecting the particles retained on each sieve or in the bottom pan. Particles which fall outside of a desired range can again be subjected to milling and sieving.

X. Formulation and Administration

An appropriate dosage for modafinil having a defined particle size is between about 50 mg and about 700 mg of modafinil.

The pharmaceutical composition described herein is most preferably administered orally in the form of a vehicle such as a tablet, capsule, powder, pill, liquid/suspension or emulsion. The administration vehicle may comprise a pharmaceutically-acceptable carrier. The carrier may comprise agents that aid solubility, absorption, flavor, color or texture of the vehicle or its contents. Topical administration via an epidermal patch or the like, or administration via direct injection of the drug, is also acceptable.

A vehicle of the invention can include ±10–15% of the modafinil particle, due to factors such as vehicle manufacturing tolerances and expected shelf life of the modafinil. For example, a vehicle labeled as containing 50 mg can be initially prepared with, e.g., 55 or 58 mg of modafinil, with the expectation that after one month to two years of storage, the active amount of modafinil therein has decreased. Vehicles prepared with such adjustments in order to compensate for the expected degradation of the drug fall within the scope of the invention.

While the invention has been described in considerable detail, the invention disclosed herein is not to be limited to the actual description, but is to be afforded the full scope of the appended claims and all equivalents thereto. Although the specific examples presented herein are directed to the use of modafinil of a defined particle size in the mediation of narcolepsy, other uses of modafinil (e.g., for treatment of Parkinson's disease, urinary incontinence, Alzheimer's disorder, etc.) have been presented in the art, and those utilities are appropriate in conjunction with the invention as disclosed herein.

What is claimed is:

1. A pharmaceutical composition comprising a substantially homogeneous mixture of modafinil particles, wherein at least about 95% of the cumulative total of modafinil particles in said composition have a diameter of less than about 200 microns (μm).

2. The composition of claim 1 wherein said particles have a median diameter range of between about 2μm and about 60 μm.

3. The composition of claim 1, wherein said composition comprises between about 50 milligrams and about 700 milligrams of said modafinil.

4. A method of altering the somnolent state of a mammal, said method comprising administering an effective amount of the composition of claim 1 to said mammal.

5. The method of claim 4, wherein said somnolent state is narcolepsy.

6. The method of claim 4, wherein said effective amount comprises between about 50 milligrams/day and about 700 milligrams/day of said composition.

US RE37,516 E

11

7. A pharmaceutical composition in an oral unit dose form comprising:

an amount of modafinil effective to alter a somnolent state of a mammal upon oral administration,

said amount of modafinil being in the form of solid modafinil particles,

said particles having a size distribution wherein at least about 95% of the cumulative total of said particles have a diameter of less than about 200 microns (μm).

8. The composition in unit dose form of claim 7 wherein said effective amount comprises particles have a medium diameter range of between about 2 μm and about 60 μm.

9. The composition in unit dose form of claim 7, wherein said effective amount comprises between about 100 milligrams and about 200 milligrams of said modafinil.

10. A method of altering the somnolent state of a mammal, said method comprising administering one or more unit doses of the composition of claim 7 to said mammal.

11. The method of claim 10, wherein said somnolent state is narcolepsy.

12. The method of claim 10, wherein between about 100 milligrams/day and about 200 milligrams/day of modafinil are administered to said mammal.

13. A pharmaceutical composition according to claim 7, further comprising additional modafinil particles in excess of said effective amount.

14. A pharmaceutical composition according to claim 13 wherein said additional modafinil particles represent about 10–15% of said effective amount of modafinil.

15. A method for enhancing alertness or increasing regularity of sleep rhythms in a mammal

said method comprising administering an amount of modafinil, as one or more oral unit doses, to said mammal,

said oral unit doses comprising:

an amount of modafinil effective to treat said modafinil-response disease or condition of said mammal upon oral administration,

said amount of modafinil being in the form of solid modafinil particles,

said particles having a size distribution wherein at least about 95% of the cumulative total of said particles have a diameter of less than about 200 microns (μm).

16. A method of treating a mammal diagnosed with a modafinil-responsive disease or condition selected from the group consisting of narcolepsy, Parkinson's disease, urinary incontinence, or Alzheimer's disorder;

said method comprising administering an amount of modafinil, as one or more oral unit doses, to said mammal,

said oral unit doses comprising:

an amount of modafinil effective to treat said modafinil-response disease or condition of said mammal upon oral administration,

said amount of modafinil being in the form of solid modafinil particles,

said particles having a size distribution wherein at least about 95% of the cumulative total of said particles have a diameter of less than about 200 microns (μm).

12

17. A method or composition according to one of claims 7–16 wherein said modafinil particles are in the form of a modafinil salt.

18. A pharmaceutical composition comprising modafinil in unit dose form, wherein:

a) said modafinil is present in an amount effective to alter the somnolent state of a mammal upon oral administration;

b) said modafinil is in the form of solid particles, or is converted to solid particles after oral administration; and

c) said modafinil has a size distribution such that at least about 95% of the cumulative total of said particles have a diameter of less than about 200 microns (μm).

19. The composition in unit dose form of claim 18, wherein said particles in paragraph c) have a median diameter range of between about 2 μm and 60 μm.

20. The composition in unit dose form of claim 18 wherein said effective amount comprises between about 100 milligrams and about 200 milligrams of said modafinil.

21. A method of altering the somnolent state of a mammal, said method comprising administering one or more unit doses of the composition of claim 18 to said mammal.

22. The method of claim 21, wherein said somnolent sate is narcolepsy.

23. The method of claim 21, wherein between about 100 milligrams/day and about 200 milligrams/day of said modafinil are administered to said mammal.

24. A method for enhancing alertness or increasing regularity of sleep rhythms in a mammal comprising orally administering modafinil to said mammal, wherein:

a) said modafinil is present in an amount effective to treat said modafinil-response disease or condition;

b) said modafinil is in the form of said solid particles, or is converted to solid particles after oral administration; and

c) said modafinil has a size distribution such that at least about 95% of the cumulative total of said particles have a diameter of less than about 200 microns (μm).

25. A method of treating a mammal diagnosed with a modafinil-responsive disease or condition selected from the group consisting of: narcolepsy; Parkinson's disease; urinary incontinence; and Alzheimer's disorder; comprising orally administering modafinil to said mammal, wherein:

a) said modafinil is present in an amount effective to treat said modafinil-responsive disease or condition;

b) said modafinil is in the form of solid particles, or is converted to solid particles after oral administration; and

c) said modafinil has a size distribution such that at least about 95% of the cumulative total of said particles have a diameter of less than about 200 microns (μm).

26. A method or composition according to any one of claims 18–25, wherein said modafinil particles are in the form of a modafinil salt.

* * * * *

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
FEDERAL TRADE COMMISSION,                 )
                                          )
                    Plaintiff,            )
          v.                              )    **Civil Case No. 08-cv-00244 (JDB)**
                                          )
CEPHALON, INC.,                           )
                                          )
                    Defendant.            )
_____)

**[PROPOSED] ORDER**

Having considered Defendant's Motion to Dismiss and Memorandum of Points and

Authorities in Support thereof, as well any Opposition thereto, the Court hereby ORDERS that :

Defendants' Motion to Dismiss is GRANTED; and it is

FURTHER ORDERED that Plaintiff's Complaint be DISMISSED WITH PREJUDICE

in its entirety.  This is a final appealable Order.

SO ORDERED this _____ day of _____, 2008.

                                        _____
                                        John D. Bates
                                        United States District Judge

Copies to:

Attorneys for Defendant                      Attorneys for Plaintiff      ___

Eric Mahr (DC Bar # 459350)                Markus H. Meier (DC Bar # 459715)
Daniel J. Matheson (DC Bar # 502490)       Bradley S. Albert
WILMER CUTLER PICKERING                    Philip M. Eisenstat
  HALE AND DORR LLP                        Saralisa C. Brau
1875 Pennsylvania Avenue, NW               Mark J. Woodward (DC Bar # 479537)
Washington, DC 20006                       Jeffrey C. Bank
(202) 663-6000                             600 Pennsylvania Avenue, NW
(202) 663-6363 fax                         Washington, DC 20580
                                           Telephone:  (202) 326-3759
Of Counsel:                                Facsimile:  (202) 326-3384

James C. Burling
Peter A. Spaeth (DC Bar # 392239)
Mark A. Ford
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
(617) 526-5000 fax

David J. Creagan
Michael N. Onufrak
David E. Edwards
WHITE AND WILLIAMS LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
(215) 864-7000
(215) 864-7123 fax

WILMERHALE

Eric J. Mahr

1 202 663 6446 (t)
+1 202 663 6363 (f)
eric.mahr@wilmerhale.com

May 2, 2008

Nancy Mayer-Whittington
Clerk of the Court
United States District Court
for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:     *Federal Trade Commission v. Cephalon, Inc.*, Civil Action No. 08-0244 (JDB)

Dear Ms. Mayer-Whittington:

With this letter please find: (i) Defendant Cephalon, Inc.'s Motion to Dismiss and Memorandum and Points and Authorities in Support of Its Motion to Dismiss; (ii) Declaration of Eric Mahr in Support of Cephalon, Inc.'s Memorandum and Points and Authorities in Support of Its Motion to Dismiss; and (iii) a Proposed Order.

On April 28, 2008, Judge Bates, to whom this matter was assigned, granted Cephalon's motion to transfer this case to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a). However, by Judge Bates' Order of February 20, 2008, Cephalon is required to answer or otherwise respond to the Complaint no later than May 2, 2008. After speaking with your office, we learned that the transfer to the Eastern District of Pennsylvania will not be affected until after May 2, 2008. Accordingly, Cephalon is filing its Motion to Dismiss and accompanying materials today in this Court, with the expectation that they will be forwarded to the Eastern District of Pennsylvania with the rest of the case record when the transfer is affected.

Please contact me if you have any questions.

Kind regards,

Eric Mahr

Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006

Beijing    Berlin    Boston    Brussels    London    Los Angeles    New York    Oxford    Palo Alto    Waltham    Washington